Case 1:01-cv-00197   Document 1   Filed in TXSD on 11/28/2001   Page 1 of 169

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 2 8 2001

Michael N. Milby
Clerk of Court

FREDDY RAY JOHNSON,          )        Hon.
DAVID RAMOS,                 )
                             )        Case No.:
        Plaintiffs           )
                             )        C A B - 01 - 197
V.                           )        State Court Case No. 2000114816-G
                             )
ACandS, INC.                 )
ALLIED SIGNAL AQUA-CHEM, INC. )       Jury
ARMSTRONG WORLD INDUSTRIES, I )
ARVIN INDUSTRIES, INC.       )
ASTEN, INC.                  )
BORG-WARNER CORPORATION      )
C.E. THURSTON & SONS, INC.   )        **JOINT NOTICE OF REMOVAL**
CROWN CORK & SEAL CO., INC.  )
DAIMLER CHRYSLER CORPORATION )
DAIMLER CHRYSLER MOTORS CORP. )
DANA CORPORATION             )
DRESSER INDUSTRIES, INC.     )
FEDERAL MOGUL CORPORATION    )
FLINTKOTE COMPANY (THE)      )
FORD MOTOR COMPANY           )
FOSTER WHEELER ENERGY CORP.  )
GAF CORP.                    )
GARLOCK                      )
GASKET HOLDINGS, INC.        )
GENERAL ELECTRIC CO.         )
GENERAL MOTORS CORP.         )
GENERAL REFRACTORIES COMPA   )
GEORGIA-PACIFIC CORPORATION  )
INGERSOLL-RAND COMPANY       )
J.T. THORPE COMPANY          )
KAISER ALUMINUM & CHEMICAL   )
KELLOG, BROWN & ROOT, INC.   )
KELLY-MOORE                  )
MAREMONT CORPORATION (THE)   )
METROPOLITAN LIFE INSURANCE CO. )
MID-VALLEY, INC.             )

DAL:413727.1
37354.1

MOOG AUTOMOTIVE, INC.                          )
NATIONAL SERVICES INDUSTRIES, I                )
NORTH AMERICAN REFRACTORIES                    )
OWENS-ILLINOIS, INC.                           )
PFIZER, INC.                                   )
PLIBRICO COMPANY                               )
PNEUMO ABEX CORPORATION                        )
PROKO INDUSTRIES, INC.                         )
QUIGLEY COMPANY, INC.                          )
RAPID-AMERICAN CORPORATION                     )
RILEY STOKER CORP.                             )
SHOOK & FLETCHER INSULATION                    )
SYNKOLOID, A DIVISION OF MURA                  )
T & N, plc                                     )
TRIPLEX, INC.                                  )
U.S. GYPSUM COMAPNY                            )
U.S. MINERAL PRODUCTS COMP                     )
UNION CARBIDE CORP.                            )
UNIROYAL HOLDING, INC.                         )
W.R. GRACE & CO-CONN                           )
                                               )
         Defendants.                           )

United States District Court
Southern District of Texas
FILED

NOV 2 8 2001

Michael N. Milby
Clerk of Court

B-01-197

## JOINT NOTICE OF REMOVAL

      DaimlerChrysler Corporation, Ford Motor Company and General Motors Corporation (collectively the "Removing Defendants") file this Joint Notice of Removal pursuant to 28 U.S.C. § 1452(a), and Rule 9027 of the Federal Rules of Bankruptcy Procedure, and in support thereof, state as follows:

      1.  Plaintiff has commenced a civil action (the "Action") against the Removing Defendants and certain other Defendants (collectively the "Other Defendants") in the 404th District Court of Cameron County, State of Texas Case No. A000494-C. Plaintiff asserts various personal injury claims against the Removing Defendants based on injuries allegedly caused by or arising out of

exposure to friction products manufactured and/or sold by Federal Mogul ("friction products"). Plaintiff seeks recovery from the Removing Defendants.

2. On October 1, 2001, Federal Mogul filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware, thereby commencing case no. 01-10578 (the "Bankruptcy").

3. Pursuant to this Joint Notice of Removal, the Removing Defendants remove that portion of the Action that asserts claims and causes of action from exposure to friction products asserted therein, including, but not limited to, all friction products claims asserted against the Removing Defendants (collectively the "Removed Claims").

4. The Removed Claims may be removed to this Court pursuant to 28 U.S.C. § 1452(a) by reason of the following facts: (a) the Removed Claims are asserted in a civil action not exempt from removal; and (b) the Court has jurisdiction of the Removed Claims under 28 U.S.C. § 1334. All friction products claims asserted are related to the Bankruptcy case, and the continued prosecution, outcome at trial, or other resolution of the friction products claims, will have an effect on the administration of the Bankruptcy case.

5. The Action is pending within the district and division of this Court.

6. This Joint Notice of Removal is timely filed under Rule 9027 of the Federal Rules of Bankruptcy.

7. Upon removal of this action, the proceedings with respect thereto are non-core. The Removing Defendants do not consent to entry of a final order or judgment by the bankruptcy judge (to the extent that the bankruptcy court is authorized to hear or determine such claims consistent with 28 U.S.C. § 157(b)(5)).

8. The Removing Defendants removed the Action in order to facilitate transfer of the Action to the United States District Court for the District of Delaware (the District Court presiding over the Bankruptcy case) to resolve on a consolidated basis the common threshold scientific issues concerning whether brakes and other automotive parts cause disease. *See, e.g., In re Dow Corning Corp.*, 1995 WL 495978, at *2 (Bankr. E.D. Mich. Aug. 9, 1995) (personal injury tort claims transferred to bankruptcy court pursuant to 28 U.S.C. § 157(b)(5) to resolve threshold scientific issues concerning whether silicone breast implants cause disease after removal to federal court pursuant to 28 U.S.C. § 1452(a)).

9. On November 20, 2001, the Removing Defendants filed a motion in the Bankruptcy case pursuant to 28 U.S.C. § 157(b)(5) to transfer the Action and all other claims related to friction products for consolidated resolution of the threshold scientific issues concerning whether brakes and other automotive parts cause disease. Attached to this Notice are copies of (1) the motion to transfer, which is currently pending before the United States District Court for the District of Delaware, and (2) the accompanying memorandum in support.

10. Along with this Notice of Removal, the Removing Defendants are filing copies of the docket sheet, pleadings and all orders entered by the court. Because Removing Defendants are not removing all claims and causes of action, they are also filing, along with this Notice of Removal, a motion to limit the documents filed with the Notice of Removal.

WHEREFORE, the Removing Defendants give notice that the action pending in the 404th District Court of Cameron County, State of Texas is removed to this Court.

Respectfully submitted,

By: _John Henderson_ (signature)
John R. Henderson
State Bar No. 09424200
Federal I.D. No. 9857
Brown McCarroll, L.L.P.
2001 Ross Avenue, Suite 2000
Dallas, Texas 75201
(214) 999-6100

**ATTORNEYS FOR DEFENDANT
FORD MOTOR COMPANY**

By: _Robert Thackston_ (signature) by permission JRH
Robert Thackston
State Bar No.00785487
Federal I.D. No. 17568
Joseph Blizzard
State Bar No. 00789156
Federal I.D. No.17736
Jenkens & Gilchrist
1445 Ross Avenue, Suite 3200
Dallas, Texas 75202
(214) 855-4500

**ATTORNEYS FOR DEFENDANT
DAIMLERCHRYSLER**

By: _____
Dawn Wright
State Bar No. 12742030
Federal I.D. No. 11545
Thompson & Knight
1700 Pacific Avenue
Suite 3300
Dallas, TX 75201
214/969-1700
214/969-1751 FAX

**ATTORNEYS FOR DEFENDANT
GENERAL MOTORS CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Joint Notice of Removal was served on ___NOV 29___, 2001 by U.S. Mail, first-class, postage prepaid upon all known counsel of record.

_____
John R. Henderson

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERAL-MOGUL GLOBAL INC., | ) | Case No. 01-10578 (SLR) |
| T&N LIMITED, et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## MOTION TO TRANSFER
## RELATED CLAIMS AND CAUSES OF ACTION

DaimlerChrysler Corporation, Ford Motor Company, and General Motors

Corporation (the "Automobile Manufacturers") in support of this Motion to Transfer

Related Claims and Causes of Action, as defined below, state as follows:

### Procedural Background and Scope of Transfer

1.      On October 1, 2001, Federal-Mogul Global Inc. ("Federal-Mogul" or the

"Debtor") filed a voluntary petition for protection under Chapter 11 of the United States

Bankruptcy Code, commencing bankruptcy case number 01-10578 (the "Federal-Mogul

Bankruptcy Case") currently pending in the United States Bankruptcy Court for the

District of Delaware.

2.      Tens of thousands of personal injury claimants have filed lawsuits against

the Automobile Manufacturers in courts across the country alleging injuries due to

friction products, including brakes and other automotive parts, manufactured by Federal-

Mogul or companies that it purchased, including Abex Corporation and Wagner Electric

Corporation.  The Automobile Manufacturers are in the process of removing claims and

causes of action involving such products that are pending in state courts pursuant to 28

U.S.C. § 1452(a) and Rule 9027(a) of the Federal Rules of Bankruptcy Procedure.

3.     This transfer motion encompasses all claims and causes of action against

the Automobile Manufacturers in state or federal court alleging injuries due to friction

products, including brakes and other automotive parts (the "Friction Product Claims").

### Jurisdiction

4.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§

1334(b) and 157(b)(5).  Section 1334(b) of title 28 sets forth Congress's broad

jurisdictional grant to the district courts for bankruptcy cases and related proceedings –

including the claims and causes of action that are the subject of this transfer motion:

> Notwithstanding any Act of Congress that confers
> exclusive jurisdiction on a court or courts other than the
> district courts, the district courts shall have original but not
> exclusive jurisdiction of all civil proceedings arising under
> title 11, or arising in or *related to a case under title 11*.

28 U.S.C. § 1334(b) (emphasis added).

5.     In *Celotex Corp. v. Edwards*, the Supreme Court adopted the expansive

definition of "related to" jurisdiction first enunciated by the Third Circuit in *Pacor* and

uniformly embraced by the circuit courts in numerous prior decisions:

> The usual articulation for determining whether a civil
> proceeding is related to bankruptcy is whether the *outcome
> of that proceeding could conceivably have any effect on
> the estate being administered in bankruptcy* . . . . Thus,
> the proceeding need not necessarily be against the debtor or
> against the debtor's property.  An action is related to
> bankruptcy if the outcome could alter the debtor's rights,
> liabilities, options, or freedom of action (either positively or

> negatively) and which in any way impacts upon the
> handling and administration of the bankrupt estate.

514 U.S. 300, 306, 308 n.6 (1995) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d

Cir. 1984)) (emphasis in original). Under this test, the Court has "related to" jurisdiction

over the Friction Product Claims against the Automobile Manufacturers. Indeed, the

Supreme Court expressly recognized that "related to" jurisdiction includes "suits between

third parties which have an effect on the bankruptcy estate." *Id.* at 308 n.5 (citing 1

Collier on Bankruptcy ¶ 3.01[1][c][iv], at 3-28 (15th ed. 1994)).

6. The Friction Product Claims have a substantial effect on the Debtor's

estate. Their disposition will directly affect the Debtor's rights, property and liabilities.

For example, as a result of such claims, the Automobile Manufacturers will have

thousands of claims for indemnification and contribution against the Debtor, which will

significantly impact the bankruptcy estate. Accordingly, this Court should exercise the

power conferred upon it by Congress to transfer the Friction Product Claims to this Court.

7. Section 157(b)(5) expressly authorizes the transfer of such claims:

> The district court shall order that personal injury tort and
> wrongful death claims shall be tried in the district court in
> which the bankruptcy case is pending or in the district court
> in the district in which the claim arose, as determined by
> the district court in which the bankruptcy case is pending.

28 U.S.C. § 157(b)(5). As shown in the accompanying Memorandum in Support, this

Court has the authority to determine whether to transfer the Friction Product Claims.

This Court should exercise such authority for the benefit of all parties involved in the

litigation related to such products. Among other reasons, such transfer will permit the

3

eventual consolidation of such claims for purposes of a threshold common issues trial devoted to the core issue of whether brakes and other automotive parts cause the diseases claimed. That issue is at the heart of each and every one of the Friction Product Claims, and it is a central issue to be addressed in the reorganization proceeding.

## Factual Background

8.     The factual background to this transfer motion is set forth fully in the accompanying Memorandum in Support.

## Relief Requested

9.     To centralize the resolution of claims relating to brakes and other automotive parts and to facilitate the efficient administration of the Federal-Mogul Bankruptcy Case, the Automobile Manufacturers request that this Court exercise its authority under 28 U.S.C. § 157(b)(5) and transfer all of the Friction Product Claims to the United States District Court for the District of Delaware.

10.     To efficiently and fully effect such relief, the Automobile Manufacturers request that this Court immediately issue a provisional order transferring the Friction Product Claims to this Court (the "Provisional Transfer Order"). After further notice and opportunity for hearing for the affected parties, the Provisional Transfer Order can be made final.

11.     The immediate entry of the Provisional Transfer Order is necessary to prevent an untenable free-for-all, where plaintiffs will request numerous district courts around the country to remand the removed actions to state courts under 28 U.S.C. § 1452(b), abstain from considering the removed actions under 28 U.S.C. § 1334(c)(1), or

transfer the venue of such action to federal courts other than this Court. In the absence of the immediate entry of the Provisional Transfer Order, such requests would severely compromise the centralization of the Friction Product Claims. Any such requests would be at odds with the clear purpose of 28 U.S.C. § 157(b)(5) to permit this Court to determine whether to transfer the Friction Product Claims to this Court. Such a situation would also require the Automobile Manufacturers to expend tremendous resources in addressing such requests all over the country.

12.  The Automobile Manufacturers request that the Provisional Transfer Order require that the Automobile Manufacturers immediately serve all interested parties with a copy of the Provisional Transfer Order, this transfer motion and the accompanying Memorandum in Support. The Automobile Manufacturers request that the Provisional Transfer Order also provide that parties may file objections to this transfer motion by a date certain and set a hearing date to resolve any objections.

13.  The procedure the Automobile Manufacturers are requesting this Court to employ in immediately entering the Provisional Transfer Order, to be made final upon notice and opportunity for a hearing for all affected parties, is exactly the procedure followed in prior mass-tort bankruptcies such as *Dow Corning* and *A.H. Robins*. In *A.H. Robins v. Piccinin*, 788 F.2d 994, 1015 (4th Cir. 1986), the Fourth Circuit required the same procedure, stating that the immediate transfer:

> . . . is . . . conditional, dependent finally and ultimately on a ruling to be made only after notice to all claimants advising them of their right to enter any objections they may have to such a tentative ruling and to submit a motion for abstention in their particular case. The notice to be given all claimants could be in the form of a letter to both the claimant and to his or

her attorney stating the conditional ruling made subject to a final hearing, to become final only after reasonable opportunity given all claimants to object and/or to seek abstention. We would think the notice should fix a time limit for the filing of objections by claimants and should fix a date for hearing on the objections. The tentative order might be made final as to any claimant who failed to enter an objection within the prescribed time. . . . Such a [procedure] . . . , it would seem, should satisfy the requirements of due process and of the Bankruptcy Rules in the unusual circumstances of this case.

*Id.* Similarly, in *Dow Corning,* the court entered a provisional order pursuant to 28

U.S.C. § 157(b)(5), transferring all related breast implant claims pending against

nondebtor breast implant manufacturers. *See In re Dow Corning Corp.*, 1995 WL

495978, at *2 (Bankr. E.D. Mich. Aug. 9, 1995) (observing that court had entered an

order provisionally transferring claims brought against the "implant co-defendants"). The

Automobile Manufacturers ask that identical procedures be employed in this case.

**WHEREFORE,** the Automobile Manufacturers respectfully request that this

Court immediately issue an order (i) provisionally transferring the Friction Product

Claims to this Court pursuant to 28 U.S.C. § 157(b)(5), (ii) providing that such order

shall become final after notice to, and an opportunity for hearing for, the affected parties,

and (iii) granting the Automobile Manufacturers such other relief as is just.

6

Dated: November 20, 2001                    Respectfully submitted,


_____
KLETT, ROONEY, LIEBER &
SCHORLING
Teresa K.D. Currier (Del. Id. No. 3080)
Daniel Rath (Del. Id. No. 3022)
1000 West Street
Suite 1410
P.O. Box 1397
Wilmington, Delaware
(302) 552-4220
(302) 552-4295 (fax)

- and -

KIRKLAND & ELLIS
David M. Bernick
John Donley
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

Attorneys for DaimlerChrysler Corp., Ford
Motor Company, and General Motors Corp.

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    )    Chapter 11
                                          )
FEDERAL-MOGUL GLOBAL INC.,                )    Case No. 01-10578 (SLR)
T&N LIMITED, et al.,                      )    (Jointly Administered)
                                          )
                    Debtors.              )

## ORDER PROVISIONALLY TRANSFERRING
## RELATED CLAIMS AND CAUSES OF ACTION

On this day, the Court considered the Motion to Transfer Related Claims and

Causes of Action (the "Transfer Motion"), which was filed by DaimlerChrysler Corporation,

Ford Motor Company, and General Motors Corporation (the "Automobile Manufacturers") on

November 13, 2001. At this time, the Court finds and concludes that the Automobile

Manufacturers' request in the Transfer Motion for a provisional order immediately transferring

the Friction Product Claims (as defined in the Transfer Motion) to the United States District

Court for the District of Delaware, should be granted. Accordingly, it is

**ORDERED** that all of the Friction Product Claims shall be, and hereby are, immediately

transferred on a provisional basis from the courts in which they are pending to the United States

District Court for the District of Delaware, subject to a hearing as set forth below; and it is

further

**ORDERED** that no later than four (4) business days following the entry of this Order, the

Automobile Manufacturers shall serve upon all counsel for the persons asserting the Friction

Product Claims a copy of the Transfer Motion, the memorandum filed concurrently with the

Transfer Motion, and this Order; and it is further

**ORDERED** that on _____, 2001, at _____, this Court shall

hold a hearing on the Transfer Motion to determine whether the relief requested in the Transfer

Motion should be made final; and it is further

**ORDERED** that any person who objects to the Transfer Motion shall file a written

objection thereto and serve a copy of such objection upon counsel for the Automobile

Manufacturers, and any such objection shall be filed with the clerk of this Court and actually

received by counsel for the Automobile Manufacturers no later than 4:00 p.m.


Dated: _____


_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERAL-MOGUL GLOBAL INC., | ) | Case No. 01-10578 (SLR) |
| T&N LIMITED, ET AL. | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## MEMORANDUM OF DAIMLERCHRYSLER CORPORATION, FORD MOTOR COMPANY, AND GENERAL MOTORS CORPORATION IN SUPPORT OF THEIR MOTION TO TRANSFER RELATED CLAIMS

KIRKLAND & ELLIS
David M. Bernick
John Donley
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

KLETT, ROONEY, LIEBER &
SCHORLING
Teresa K.D. Currier
(Del. Id. No. 3080)
Daniel Rath (Del. Id. No. 3022)
1000 West Street
Suite 1410
P.O. Box 1397
Wilmington, Delaware
(302) 552-4200
(302) 552-4295 (fax)

Attorneys for DaimlerChrysler Corp.,
Ford Motor Company, and General
Motors Corp.

Dated: November 20, 2001

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . ix

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    RECENTLY, THE PROBLEMS PLAGUING ASBESTOS LITIGATION HAVE
      BEEN BROUGHT TO MAINSTREET AMERICAN INDUSTRIES – INCLUDING
      THE AUTOMOTIVE INDUSTRY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    Far from declining, claims have sky-rocketed in the last two years  . . . . . 5

      B.    These trends have no relationship to any medical or scientific process. . . 8

      C.    The recent rash of new bankruptcies has shifted claims to new industries. 9

      D.    Claims against the automotive industry have grown suddenly, based upon
            exposure to brake dust.  Both brake suppliers (such as the Debtor) and the
            auto companies are named.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.   THE GROWING LITIGATION AGAINST THE AUTOMOTIVE INDUSTRY
      EXISTS ONLY BECAUSE THE DISTINCT BODY OF SCIENCE RELATING TO
      BRAKES HAS NOT BEEN GIVEN PROPER FORCE . . . . . . . . . . . . . . . . . . . 19

      A.    Science shows that brake workers are not exposed to significant quantities of
            asbestos  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            1.    Brake dust contains only trace amounts of asbestos  . . . . . . . . . . 20

            2.    Likewise, brake mechanic exposure studies show that brake workers
                  have been exposed to only minute levels of
                  asbestos  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

i

B.    The established epidemiology has shown no causal relationship between exposure to brake dust and disease ............................ 24

III.   THE PROCEDURAL TOOLS EXIST FOR ADJUDICATING THE CORE SCIENTIFIC ISSUE OF GENERAL CAUSATION ..................... 26

A.    *Daubert* mandates scrutiny of scientific evidence for its reliability .... 27

B.    In the context of toxic torts, quantification of exposure and risk are essential: Epidemiology is used to find whether there is excess risk associated with exposure ................................................... 29

C.    The established science demonstrating the absence of any increased risk presents a clear case for dismissal under *Daubert* .................. 36

IV.   THIS COURT SHOULD EXERCISE ITS POWER TO RESOLVE THE *DAUBERT* ISSUE, WHICH IS CENTRAL TO THESE CHAPTER 11 PROCEEDINGS. . 38

A.    The proposed *Daubert* proceeding promises the resolution of a complex and substantial liability problem that would otherwise consume a significant part of this case and may persist even after confirmation. ................ 38

B.    Under 28 U.S.C. § 1334(b), this Court has "broad jurisdiction" over such litigation whose outcome will have an effect on the bankruptcy estate. . 40

C.    This Court has broad authority under 28 U.S.C. § 157(b)(5) to centralize the adjudication of such claims within a single forum to ensure "prompt, fair and complete resolution of all claims 'related to'" these proceedings ...... 43

D.    That broad authority has been exercised effectively in mass tort bankruptcies such as this to centralize adjudication of related tort claims. .......... 44

1.    The need for centralized resolution of common, threshold issues concerning the validity of asserted claims warrants exercise of this Court's jurisdiction. ................................... 45

2.    Exercise of this Court's jurisdiction is necessary to preclude collateral litigation of liability that is "directly attributable to the Debtor." 47

3.    The very scope of the existing litigation – and the resulting prospect of numerous and significant claims for contribution and indemnification – threatens the successful reorganization of the Debtor and warrants exercise of this Court's jurisdiction. ....... 49

V.    THIS COURT IS UNIQUELY SITUATED TO RESOLVE THIS CENTRAL ISSUE
      PROMPTLY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

      A.    Threshold issues relating to the validity of asserted claims may be resolved
            through summary judgment proceedings. . . . . . . . . . . . . . . . . . . . . . . 50

      B.    Any remaining issues relating to the validity of asserted claims may be
            resolved through Rule 42 common issue trials. . . . . . . . . . . . . . . . . . . 52

      C.    These procedures can be implemented promptly once the Court has asserted
            jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

# TABLE OF CITATIONS

**CASES**

*A.H. Robins v. Piccinin*, 788 F.2d 994 (4th Cir.),

    *cert. denied*, 479 U.S. 876 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194 (5th Cir. 1996) . . . . . . . . . . . . . . 29, 30

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 53

*Barrett v. Atlantic Richfield Co.*, 95 F.3d 375 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . 38

*Barto Tech. Servs., Inc.*, 181 B.R. 255 (Bankr. W.D. Pa. 1995) . . . . . . . . . . . . . . . . . . 53

*Belcufine v. Aloe*, 112 F.3d 633 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

*Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307 (5th Cir. 1989) . . . . . . . . . . . . . . . . 30

*Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . 38

*Calumet Nat'l Bank v. Levine*, 179 B.R. 117 (N.D. Ind. 1995 . . . . . . . . . . . . . . . . . . . . 44

*Castano v. American Tobacco Co.*, 84 F.3d 734, n.24 (5th Cir. 1996) . . . . . . . . . . . . . . 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Dartez v. Fibreboard Corp.*, 765 F.2d 456 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . 35, 36

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,509 U.S. 579, 589 (1993) . . . . . . . *passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc*, 43 F.3d 1311 (9th Cir. 1995) . . . . . *passim*

*DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941 (3d Cir. 1990) . . . . . . . . . . . 32, 37

*Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . 53

*Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673 (3d Cir. 1964) . 54

iv

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 53

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . 4

*Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129 (5th Cir. 1985) . . . . . . . . . . 35, 36

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. 1996) . . . . . . . . . . . . 32, 33

*In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*,

    549 F.2d 1006 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*In re Allegheny Health Education & Research Foundation*,

233 B.R. 671 (Bankr. W.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*In re American Hardwoods, Inc.*, 885 F.2d 621 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . 42

*In re Asbestos*, 726 So.2d 926 (La. App. Ct. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Barto Tech. Servs., Inc.*, 181 B.R. 255 (Bankr. W.D. Pa. 1995) . . . . . . . . . . . . . . 53

*In re Bendectin Litig.*, 857 F.2d 290 (6th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*In re Beverly Hills Supper Club Fire Litig.*, 695 F.2d 207 (6th Cir.) . . . . . . . . . . . . . . . 55

*In re Breast Implant Litig.*, 11 F. Supp.2d 1217 (D. Colo. 1998) . . . . . . . . . . . . . . . . . 31

*In re Canvas Specialty, Inc.*, 261 B.R. 12 (Bankr. C.D. Cal. 2001) . . . . . . . . . . . . . . . 52

*In re Celotex Corp.*, 124 F.3d 619 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 41-43

*In re Dow Corning Corp.*, 86 F.3d 482 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Eagle-Picher Indus., Inc.*, 963 F.2d 855 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 49

*In re Johns-Manville Corp.*, 26 B.R. 420 (Bankr. S.D.N.Y. 1983) . . . . . . . . . . . . . . . . 49

*In re Marcus Hook Develop. Park, Inc.* 943 F.2d 261 (3d Cir. 1991) . . . . . . . . . . . 41, 43

*In re New York Int'l Hostel, Inc.*, 157 B.R. 748 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . 43

*In re Pacor, Inc.*, 743 F.2d 984 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Pan Am Corp.*, 16 F.3d 513 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . 55

*In re Paoli R.R. Yard PCB Litig.*, 2000 WL 274262 (E.D. Pa. Mar. 7, 2000) . . . . . . 31, 38

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) . . . . . . . . . . . . . 29, 31, 37

*In re Salem Mortgage Corp.*, 783 F.2d 626, (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 42

*In re The Babcock & Wilcox Co.*, No. Civ. A 00-0558,

 2000 WL 422372, at *4 (E.D. La. Apr. 17, 2000) . . . . . . . . . . . . . . . . . . . . . . . . 52

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999)
 cert. denied, 520 U.S. 1225 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 37

*In re Wolverine Radio Co.*, 930 F.2d 1132 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . 42, 43

*In re Wood*, 825 F.2d 90 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Jenkins v. Raymark Indus.*, 782 F.2d 468 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 28, 52

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . 53

*McCartney v. Integra Nat'l Bank North*, 106 F.3d 506 (3d Cir. 1997) . . . . . . . . . . 49, 50

*Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997) . . . . . . . . . . . . . . 33

*Mitchell v. Gencorp.*, 165 F.3d 778 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Quick v. Murphy Oil Co.*, 643 So.2d 1291 (La. App. Ct. 1994) . . . . . . . . . . . . . . . . . . 35

*Renaud v. Martin Marietta Corp.*, 972 F.2d 304 (10th Cir. 1992) . . . . . . . . . . . . . . . . . 30

*Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579 (6th Cir. 1990) . . . . . . . . . . . . . 41

*Sutera v. Perrier Group of America, Inc.*, 986 F. Supp. 655 (D. Mass. 1997) . . . . . 31, 34

*Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

vi

*Wright v. Willamette Indus., Inc.*, 91 F.3d 1105 (8th Cir. 1996)  . . . . . . . . . . . . . . . . . . 30

## STATUTES

28 U.S.C. § 1334  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 157(b)(5)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34, 38

## RULES AND REGULATIONS

Fed. R. Civ. P. Rule 56(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Federal Rule of Evidence 706  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

## OTHER AUTHORITIES

Aaron Blair et al., Mortality Patterns of U.S. Veterans by Occupation,
74 J. NCI  1039 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Alison D. McDonald & J. Corbett McDonald, Malignant Mesothelioma in North America,
46 CANCER 1650, 1655 (1980)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B. Jarvholm & J. Brisman, Asbestos Associated Tumors in Car Mechanics,
45 BR. J. INDUS. MED. 645, 646 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

D. Roberts & R. Zumwalde, Industrial Hygiene Summary Report of Asbestos Exposure
  Assessment for Brake Mechanics, Rept. #32.14 (NIOSH 1982) . . . . . . . . . . . . 27

D. Roberts, Industrial Hygiene Report: Asbestos at Reading Brake and Alignment Service,
Ohio, Rept. # 00106004 (NIOSH 1980)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Eva S. Hansen, Mortality of Auto Mechanics: A Ten-Year Follow-Up,
15 SCAND. J. WORK ENVIRON. HEALTH 43, 44-45 (1989) . . . . . . . . . . . . . . . . . . 41

H.J. Woitowitz & K. Rodelsperger, Mesothelioma Among Car Mechanics?,
38 ANN. OCCUP. HYG. 635, 637 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

J. Dement, <u>Cincinnati Municipal Garage: Automobile Braking Service Operation,</u>
Rept. #32.11, at 1-2 (USPHS 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

K. Teschke et. al., <u>Mesothelioma Surveillance to Locate Sources of Exposure to Asbestos,</u>
  88 CANADIAN J. PUB. HEALTH 163, 166 (1997) . . . . . . . . . . . . . . . . . . . 28, 29, 31, 36-38

L. Moore, <u>Asbestos Exposure Associated with Automotive Brake Repair in Pennsylvania,</u>
49 AM. IND. HYG. ASSOC. J. A12 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 37, 53

L. Rushton et al., <u>Epidemiological Survey of Maintenance Workers in London Transport</u>
<u>Executive Bus Garages and Chiswick Works,</u> 40 BR. J. INDUS. MED. 340, 340-41 (1983)37

Mary J. Teta et al., <u>Mesothelioma in Connecticut,</u> <i>1955-1977,</i> 25 J.
OCCUP. MED. 749, 752-53 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-46, 48, 51, 52, 55

Per Gustavsson et al., <u>Lung Cancer and Exposure to Diesel Exhaust Among Bus Garage</u>
      <u>Workers,</u> 16 SCAND. J. WORK ENVIRON. HEALTH 352 (1990) . . . . . . . . . . . . . . . 53

Sheehy et al., <u>Control of Asbestos Exposure During Brake Drum Service,</u>
4 APPLIED IND. HYG. 313 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Spirtas et. al., <u>Proceedings for the Society for Epidemiological Research, National Health</u>
<u>and Welfare Canada,</u> AM. J. EPIDEM. PROCEEDINGS 518 (1985) . . . . . . . . . . . . . . . . . . . 29

Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: <u>Bankrupt and</u>
<u>Backlogged–A Proposal for the Use of Federal Common Law in Mass Tort Class Actions,</u> 58
BROOK. L. REV. 553, 554 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 53

T. Kaupinnen & K. Korhonen, <u>Exposure to Asbestos During Brake Maintenance of</u>
      <u>Automotive Vehicles by Different Methods,</u> 48 AM. IND. HYG. ASSOC. J. 499 (1987)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Yeung et al., <u>An Australian Study to Evaluate Worker Exposure to Chrysotile in the</u>
      <u>Automotive Industry,</u> 14 APPLIED OCC. & ENV. HYG. 448, 450 (1999) . . . . 35, 36

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On October 1, 2001, Federal-Mogul Global Inc. ("Federal-Mogul" or the "Debtor") filed a voluntary petition for protection under Chapter 11 of the United States Bankruptcy Code, commencing bankruptcy case number 01-10578 (the "Federal-Mogul Bankruptcy Case") currently pending in the United States Bankruptcy Court for the District of Delaware.

To obtain a consolidated adjudication regarding the viability of asbestos claims relating to automotive friction products and, thereby, to facilitate the administration of the Federal-Mogul bankruptcy case, on November 20, 2001, the automobile manufacturers filed a motion to transfer claims relating to brakes and other automotive parts to this Court pursuant to 28 U.S.C. § 157(b)(5). The automobile manufacturers have asked the Court to enter an order provisionally transferring these claims. After further notice and opportunity for hearing for the affected parties, the automobile manufacturers ask that the provisional transfer order be made final.

## SUMMARY OF ARGUMENT

1.      The automobile manufacturers ask the Court to transfer pursuant to 28 U.S.C. § 157(b)(5) claims relating to brakes and other automotive parts for consolidated resolution within these proceedings.  Early, centralized resolution of a threshold scientific issue – whether brake dust causes disease – is essential to the successful reorganization of the Debtor.

2.      Recently, the problems plaguing asbestos litigation have been brought to mainstreet American industries – including the automotive industry.  Both brake suppliers (such as the Debtor) and the auto companies are named.

3.      The growing litigation against the automotive industry exists only because the distinct body of science relating to brakes has not been given proper force.  Science shows that brake workers are not exposed to significant quantities of asbestos.  Further, the established epidemiology has shown no causal relationship between exposure to brake dust and disease.

4.      The procedural tools exist for adjudicating the core scientific issue of general causation.  The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) mandates scrutiny of scientific evidence for its reliability.  The established science demonstrating the absence of any increased risk associated with brakes and other automotive products presents a clear case for dismissal under *Daubert*.

5.      The automobile manufacturers ask the Court to exercise its power to resolve the *Daubert* issue, which is central to these Chapter 11 proceedings.  The proposed *Daubert* proceeding promises the resolution of a complex and substantial liability problem that would

otherwise consume a significant part of this case and may persist even after confirmation. Under 28 U.S.C. § 1334(b), this Court has "broad jurisdiction" over such litigation whose outcome will affect the bankruptcy estate. The Court has broad authority under 28 U.S.C. § 157(b)(5) to centralize the adjudication of such claims within a single forum to ensure "prompt, fair and complete resolution of all claims 'related to'" the bankruptcy proceedings.

6.     That broad authority has been exercised effectively in mass tort bankruptcies such as this to centralize adjudication of related tort claims. The need for centralized resolution of common, threshold issues concerning the validity of asserted claims, preclusion of collateral litigation of liability that is "directly attributable" to the Debtor, and the prospect of numerous and significant claims for contribution and indemnification that threaten the successful reorganization of the Debtor warrant transfer of all related claims for consolidated resolution within the Federal-Mogul bankruptcy proceedings.

7.     This Court is uniquely situated to resolve the central *Daubert* issue promptly. Threshold issues relating to the validity of asserted claims may be resolved through summary judgment proceedings. Any remaining issues relating to the validity of asserted claims may be resolved through Rule 42 common issue trials. These procedures can be implemented promptly once the Court has assumed jurisdiction.

# **STATEMENT OF FACTS**

The facts underlying the pending motion are set forth in Parts I and II of the Argument below.

# ARGUMENT

DaimlerChrysler Corporation, Ford Motor Company and General Motors Corporation file this motion in order to resolve an issue that is central to asbestos liabilities which forced the filing of this Chapter 11 case. The issue is whether there is any reliable science supporting the prosecution of asbestos claims predicated upon exposure to brake dust. This issue is at the heart of tens of thousands of claims now pending against the Debtor (and against the movants here). Those claims can and should be subject to a consolidated determination of compliance with *Daubert* (now incorporated into Rule 702 of the Federal Rules). That determination will be decisively controlled by epidemiology. Not only is there substantial epidemiology for the exposure at issue, but the science consistently demonstrates no increased risk of disease. This Court is fully empowered to address and resolve this important *Daubert* issue, and traditional litigation procedures under the Federal Rules are available in this Chapter 11 case to decide the matter promptly and with little burden to the parties and the Court.

This brief is organized as follows:

**The recent expansion of the asbestos litigation and its impact on the automobile industry:** Part I takes one step further the Supreme Court's observation (recited by Federal-Mogul in its Informational Brief) that the tort system is besieged by an "elephantine mass of asbestos cases" that "defies customary judicial administration." Part I traces the recent expansion of that litigation during the past two years, how that surge has forced a new group of major companies into chapter 11, and the contemporaneous filing of a wave of claims against the automotive industry. The later claims have been pursued both against companies that have supplied asbestos-containing brake components and against the

auto companies which have purchased and installed them. Two of the suppliers – Wagner and Abex – are now part of the Debtor. The Debtor's most recent 10-Q reflects that 70,000 "mainly friction products" claims involving Abex and Wagner were pending against it as of June 30, 2001, and that the Debtor's estimated liability for such claims was approximately $236 million.

**The mature science concerning brake dust:** The litigation against the automotive industry has grown without regard to established science. Part II recites the results of more than 30 years of scientific research into the composition and health consequences of brake dust. No longer an area for speculation based upon generalities relating to asbestos, the issue of whether exposure to brake dust during brake maintenance causes illness now has been answered – repeatedly and in the negative – through numerous epidemiological studies.

***Daubert's* mandate:** As demonstrated in Part III, the law today does not tolerate the prosecution of litigation that is not firmly grounded in reliable scientific evidence. Toxic tort claims must pass muster under the *Daubert* requirements incorporated into Rule 702 of the Federal Rules of Evidence. Given the results of the epidemiological studies, claims based upon exposure to brake dust cannot meet those requirements and should be dismissed. This is a classic case for summary disposition under *Daubert.*

**This Court's power to grant relief:** Part IV turns to the role that this Court can and (we submit) should play in bringing science to bear upon the brake-related litigation pending against Federal-Mogul and the movants here. The idea of using a consolidated bankruptcy proceeding to address a central issue in mass tort litigation is not novel. The

Court has clear "related to" jurisdiction under 28 U.S.C. § 1334 and the power under 28 U.S.C. § 157(b)(5) to transfer all related claims to this Court. And the factors present here make the case for exercising that power compelling: (1) the existence of a single issue, amenable to dispositive resolution, affecting a significant area of the Debtor's liability; (2) the fact that the movants' liability for claims of exposure to Wagner and Abex product is derivative of the Debtor's liability (because the source of that liability is product supplied by companies purchased by Federal-Mogul) and the continuation of litigation against the automobile manufacturers therefore will only create additional liability for the Debtor through contribution and indemnification claims; and (3) as already recognized by courts dealing with prior mass tort cases, the sheer volume and dispersion of non-Chapter 11 litigation relating to the same issues presented in the Chapter 11 case inevitably will add to both the scope and uncertainty of the Debtor's own liability, and the only sensible course for defining that liability is a consolidated proceeding.

**Procedures available to address the science efficiently**: Finally, Part V lays out the traditional litigation procedures that can be used to litigate the *Daubert* issue promptly and with minimal burden. The beginning is Rule 42, which allows consolidation of all pending cases for purposes of resolving a common issue. Once consolidated, the well-used path of *Daubert* proceedings, followed with motions for summary judgment, can be completed in a matter of months. While the movants believe that the issue can be resolved through summary judgment, Rule 42 also has been used to conduct trials of common issues in the event a trial is necessary.

3

I.   **RECENTLY, THE PROBLEMS PLAGUING ASBESTOS LITIGATION
     HAVE BEEN BROUGHT TO MAINSTREET AMERICAN INDUSTRIES –
     INCLUDING THE AUTOMOTIVE INDUSTRY.**

As Federal-Mogul described in its Informational Brief, it is beyond debate that

the tort system has failed to resolve effectively and fairly the morass of litigation spawned

by asbestos. Put bluntly, the system has long been in a state of "crisis."[1] The "avalanche of

litigation"[2] has been characterized again and again as a "serious problem,"[3] a "dilemma,"[4]

and a "disaster."[5] Indeed, "[n]o mass tort litigation . . . has received more intense criticism

than the litigation concerning exposure to asbestos."[6]

---

[1] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997) (observing that there is "an asbestos-litigation crisis"); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618 (3d Cir. 1996) ("This case arises against the background of an asbestos litigation crisis."), *aff'd*, 521 U.S. 591 (1997); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged–A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 554 (1992) ("It has become increasingly apparent in the last few years that the asbestos crisis facing the judicial system in the United States has reached epidemic proportions.").

NOTE: BECAUSE THEY ARE VOLUMINOUS, SOURCES IDENTIFIED IN FOOTNOTES ARE NOT FILED HEREWITH, BUT ARE AVAILABLE AT KIRKLAND & ELLIS, AND ANY CITES REQUESTED, WILL BE SUPPLIED IMMEDIATELY TO THE COURT.

[2] *Jenkins v. Raymark Indus.*, 782 F.2d 468, 470 (5th Cir. 1986).

[3] *In re Asbestos Litig.*, 829 F.2d 1233, 1235 (3d Cir. 1987), *cert. denied*, 485 U.S. 1029 (1988).

[4] *Jenkins*, 782 F.2d at 470.

[5] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 89 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School).

[6] Howard M. Erichson, *Mass Tort Litigation and Inquisitorial Justice*, 87 GEO. L. J. 1983, 2017 (1999). *See also* Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 541 (1992) ("Most commentators agree that tort litigation today is a highly unsatisfactory system for resolving claims arising out of workers' exposure to asbestos."); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged – A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 590 (1992) ("The traditional tort system, in connection with asbestos
(continued...)

As the major asbestos manufacturers have sought refuge under Chapter 11, the problem has grown worse, with claims increasingly being brought against mainstreet American corporations. Companies that never manufactured asbestos, but only used asbestos-containing materials in their operations, are being subjected to a huge influx of claims. The ever-expanding litigation is rapidly affecting every company that ever made or used any product that contained asbestos, regardless of the magnitude of any consequent exposure.

**A.      Far from declining, claims have sky-rocketed in the last two years.**

The scope of the problems now plaguing the asbestos claims process is illustrated by the recent experience of asbestos trusts earlier established to pay out claims brought against major asbestos producers. Claim filings against these trusts nearly doubled in 2000 as compared to 1999. So far in 2001, claims are streaming in at more than double the 2000 rate. The flow of asbestos filings has thus essentially quadrupled in the last two years. This, despite recent predictions that the number of asserted claims should be declining.

For example, claims filed against the Manville Trust increased steeply beginning in early 2000 (*see* chart below).[7] The Manville Trust received 55,077 new claims

---

[6] (...continued)
litigation, has been marked by high transaction costs, excessive delays in providing compensation to injured plaintiffs, unequal recoveries among identically injured victims, litigious parties and a judicial system clogged by an avalanche of cases."); *In re Asbestos Litig.*, 829 F.2d at 1235 ("Asbestos litigation poses a serious problem for American tort law, . . . with its inefficiencies, high costs, and inconsistent judgments . . . .").

[7] Chart, "Total POC Filings by Month April 1998-May 2001," *in* D. Austern Mealey's Presentation (July 2, 2001).

in 2000, a 94 percent increase over the 28,416 claims received in 1999.[8] This was "the greatest number of claims the Trust has received in one year with the sole exception of 1989, the first full year of Trust operations."[9]



The problem is so severe that Judge Weinstein (who conducted earlier proceedings involving the Manville Trust) and Judge Lifland (who presided over the Manville bankruptcy) just days ago asked whether the claim resolution process must be revisited in order to cope with the problem:

> The courts have received and reviewed the Financial Statements and Report of the Manville Personal Injury Settlement Trust for the period ending

---

[8] Table, "Number of Claims by Year Received and Industry," *in* D. Austern Mealey's Presentation (July 2, 2001).

[9] D. Austern, Manville Trust Memorandum (Mar. 26, 2001).

6

September 30, 2001. The courts note that there is a continuing rise in the number of claims and that the amount payed pro rata on claims has been reduced from 10 percent to 5 percent of the original value. The courts take judicial notice of the continuing media and other campaigns encouraging a flood of new claims.

This combination of events, together with the increasing number of bankruptcy filings by asbestos related entities, suggests that there may be a misallocation of available funds, inequitably favoring those who are less needy over those with more pressing asbestos related injuries.

Interested attorneys, parties, and others shall appear in Courtroom 10 of the Brooklyn courthouse of the Eastern District of New York on December 13, 2001, at 10:00 A.M. to consider whether the equities involved and changed circumstances warrant or permit modifications of any relevant prior judgments.[10]

Other asbestos trusts also have been inundated. In October 2000, the Eagle-Picher Trust had to reduce its payout from 31.9 percent to 25.7 percent. The reduction took place "largely because of a significant increase in claim filings over and above what . . . expert consultants had predicted two years ago. The consultants now project an additional 100,000 future claims over the life of the Trust as compared to the projections two years ago."[11] Similarly, by the Fall of 2000, claims against the UNR Trust had jumped so quickly that it was forced to lower its payout from 12.9 percent to 7.8 percent. The UNR Trust cited a 33 percent rise in asbestos claims from the previous year and noted that the forecast of new claims after the year 2000 had nearly doubled from 1998 projections.[12]

**B.      These trends have no relationship to any medical or scientific process.**

---

[10] Order, *In re Johns-Manville Corp.*, Nos. 82 B 11656 (BRL) to 82 B 11676 (BRL) (Nov. 7, 2001).

[11] Nurre letter (Oct. 9, 2000).

[12] *See* UNR Asbestos Trust Letter, MEALEY'S LITIG. REP. 21, at D-1 (Dec. 1, 2000).

These increases are not attributable to disease or exposure trends.  Rather, "companies that have had involvement with asbestos-containing products have seen the number of claims made each year escalate far beyond what one might . . . expect based upon medical and scientific data."[13]  As knowledgeable commentators have observed, "[i]n recent years, caseloads have burgeoned – not because of an increase in the numbers of the seriously ill – but rather because of the enormous incentives for plaintiffs to enter the lottery and the far more enormous incentives for plaintiffs' lawyers to obtain ever increasing numbers of claimants."[14]

Indeed, while the number of claims filed against asbestos defendants has experienced a dramatic upward spike, the incidence of actual malignant disease is *decreasing* as more time passes since the enactment in 1971 of strict government regulations concerning asbestos exposure.  For example, National Cancer Institute data show that the number of annual mesothelioma deaths declined in the 1990s (*see* chart below).[15]

---

[13]  Affidavit of William C. Rodraun in Support of First-Day Motions and Applications, *In re Armstrong World Indus.*, No. 00-4471, at 10 (Bankr. D. Del. Dec. 5, 2000). *See also id.* at 11-12 ("As other defendants that [have] historically . . . 'dropped out' of the tort system by commencing Chapter 11 cases, plaintiffs' lawyers have focused more of their efforts on the [remaining] companies . . . . AWI has experienced an escalation in both the number of cases being filed against AWI, as well as the cost of settling claims.").

[14]  Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13 CARDOZO L. REV. 1819, 1834 (1992).

[15]  SEER data from the National Cancer Institute available at www.seer.ims.nci.nih.gov.



**National Mesothelioma Death Rate**

Nonetheless, the number of claims filed continues to increase – in striking contrast to underlying trends in disease – with recent analyses demonstrating that the increase has been driven not by science, but by the mass filing of claims of dubious merit.[16]

**C.    The recent rash of new bankruptcies has shifted claims to new industries.**

The impact of the claims surge has been devastating.  In the last two years, at least ten asbestos defendants have been forced to seek protection under Chapter 11.  Many

---

[16] As shown by a recent Rand Institute report, non-malignant claims have shot steeply upward since the start of 1999 as compared to malignant claims – for no apparent reason.  RAND INSTITUTE, ASBESTOS LITIGATION IN THE U.S.: A NEW LOOK AT AN OLD ISSUE 6-7 (Aug. 2001) ("[I]n the early 1990s, the number of mesothelioma claims, which most view as the most serious asbestos injury claims, drifted downward.  During that period, non-malignant claims continued to rise.").  Similarly, a recent actuarial study graphically shows the wide variability among states in the mix of malignant versus nonmalignant claims, which is not driven by disease, but rather by the ability of plaintiffs' lawyers to bring unimpaired claims in pro-plaintiff jurisdictions.  Tillinghast - Towers Perrin Presentation, *Asbestos Claims: Is this the Beginning or the End?* 10 (May 30, 2001).

of the companies recently entering the bankruptcy system have cited dramatic increases or

"spikes"[17] in the claims filed against them and in settlement demands as the primary factors

driving their Chapter 11 filings:

- *Babcock & Wilcox*: Faced with hundreds of thousands of asbestos claims and increasing settlement demands, Babcock & Wilcox, a company that designed large commercial boiler systems, was compelled to seek refuge under Chapter 11 in February 2000.[18]

- *Pittsburgh Corning*: In connection with its April 2000 filing, Pittsburgh Corning stated that "[h]igh defense costs and administrative costs, coupled with sharply increasing demands, combined to threaten PCC's long-term financial health and left it with no alternative means for resolving the [asbestos] claims brought against it."[19]

- *Owens Corning*: This major asbestos producer sought Chapter 11 protection in October 2000 after a national settlement program it pursued in 1999 failed because "[p]laintiffs attorneys who didn't enter into the national settlement

---

[17] *See, e.g., Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability,* PR NEWSWIRE (Oct. 5, 2000) ("[T]he cost of resolving current and future claims, together with a flurry of recent new filings from plaintiff lawyers not participating in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary."); *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief,* ENG. NEWS-RECORD 22 (Dec. 18, 2000) (noting that "'the number of cases brought against the company increased markedly'"); Queena Sook Kim, *G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases,* WALL ST. J., Jan. 8, 2001, at B12 ("G-I's chief executive officer and general counsel, Richard A. Weinberg, said there was a 'dramatic increase in the number of claims.'"); *G-I Holdings Implements Strategy to Seek Bankruptcy Protection,* ASBESTOS & LEAD ABATEMENT REP. (Feb. 1, 2001) (citing "nearly double the number [of claims] filed in 1996" as reason for bankruptcy); A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 3 (May 7, 2001) ("A common element in all of these bankruptcy filings has been management's assertion that rapidly escalating asbestos claims have necessitated protection under Chapter 11.").

[18] *See Babcock & Wilcox Cite Asbestos Settlements in Filing for Bankruptcy,* MEALEY'S LITIG. REP.: ASBESTOS 18 (Mar. 3, 2000); Melanie Trottman, *Babcock Files for Protection of Chapter 11,* WALL ST. J., Feb. 23, 2000, at A10; Alan Sayre, *Babcock & Wilcox Seeks Bankruptcy,* AP ONLINE (Feb. 22, 2000).

[19] *Pittsburgh Corning Files for Bankruptcy Protection,* MEALEY'S LITIG. REP.: ASBESTOS 6 (Apr. 21, 2000).

continued to bring suits and demand larger payments."[20]

- **Burns & Roe**: This engineering firm filed in December 2000 because "[o]ver the past 12 months, demands from plaintiffs' lawyers spiked to levels dramatically above the historic pattern."[21]

- **Armstrong**: Armstrong World Industries filed in December 2000, stating that "companies that have had involvement with asbestos-containing products have seen the number of claims made each year escalate far beyond what one might expect based upon medical and scientific data" and that, as other defendants have "'dropped out' of the tort system by filing Chapter 11, plaintiffs' lawyers "have focused more of their efforts on the [remaining] companies."[22]

- **G-I Holdings**: Having already paid $1.5 billion to settle more than 500,000 asbestos claims, G-I Holdings (formerly GAF) filed for Chapter 11 in January 2001 due to a "dramatic increase in the number of claims," which the tort system was "not equipped to handle . . . efficiently and fairly."[23]

- **W.R. Grace**: In its April 2001 filing, Grace stated that "the state court system for dealing with asbestos claims is broken, and that Grace cannot effectively defend itself against unmeritorious claims."[24]

- **USG**: In June 2001, USG sought Chapter 11 protection, pointing to the recent wave of asbestos bankruptcies, which caused asbestos costs to "dramatically increase to the point of being 'completely out of proportion' to

---

[20] Queena Sook Kim, *Firms Hit By Asbestos Litigation Take Bankruptcy Route*, WALL ST. J., Dec. 21, 2000, at B4. *See also Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability*, PR NEWSWIRE (Oct. 5, 2000) (citing "a flurry of recent new filings from plaintiff lawyers not participating in the NSP").

[21] *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief*, ENG. NEWS-REC. 22 (Dec. 18, 2000).

[22] Affidavit of W. Rodraun ¶¶ 26, 33, *In re Armstrong World Indus.*, No. 00-4471 (D. Del. Dec. 5, 2000).

[23] Queena Sook Kim, *G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases*, WALL ST. J., Jan. 8, 2001, at B12 ("there was no ebb in the tide of personal-injury claims"; indeed "there was a 'dramatic increase in the number of claims.'"); *see also G-I Holdings Implements Strategy to Seek Bankruptcy Protection*, 14 ASBESTOS & LEAD ABATEMENT REP. (Feb. 1, 2001) (almost 70,000 claims filed against G-I in 2000, nearly double the number filed in 1996).

[24] Paul Owens, *W.R. Grace Files Chapter 11*, AP ONLINE (Apr. 2, 2001); *see also W.R. Grace Files for Bankruptcy, Citing Asbestos Claims*, 23(7) ANDREWS ASBESTOS LITIG. REP. (Apr. 12, 2001).

the company's 'legitimate liability.'"[25]

- **U.S. Mineral:** In July 2001, U.S. Mineral filed for Chapter 11 protection due to an "overwhelming number" of asbestos claims.[26]

- **Federal-Mogul:** On October 1, 2001, Federal-Mogul filed for Chapter 11 protection after being "overwhelmed by asbestos litigation," including thousands of claims based on alleged exposure to asbestos from industrial gaskets that contained only "a small amount of asbestos bound in a latex material and surrounded by steel."[27]

Inevitably, these recent bankruptcy filings have accelerated claim filings and demands against non-bankrupt defendants.[28] Loss of cash flow has spawned a search for new defendants "as plaintiff's attorneys seek to recoup settlements 'lost' to producers now in

---

[25] While USG at one point had been named in only about 50 percent of claims asserted against the Center for Claims Resolution, more recently it was named more than 90 percent of the time. *See* USG Informational Brief 10-11 (June 27, 2001).

[26] *U.S. Mineral Products Co. Becomes Latest Asbestos Co. to File for Bankruptcy*, MEALEY'S LITIG. REP.: ASBESTOS 12-13 (Aug. 3, 2001).

[27] Asbestos Primer, www.federal-mogul.com/reorganization. *See also* Mitchell Pacelle, *Federal-Mogul Plans to Seek Chapter 11 Protection*, WALL ST. J., Oct. 1, 2001, at A3 ("One reason the company's asbestos exposure proved difficult to curtail, company advisers say, is because so many other asbestos defendants had sought protection from claimants in bankruptcy court, where asbestos claims and all other litigation proceedings are stayed. The pool of defendants like Federal-Mogul available to share in settlements was growing smaller.").

[28] As an official of insurance rating service A.M. Best recently stated: "When a bankruptcy occurs, plaintiffs are more likely to come forward quickly, because they worry there may not be money left to cover later claims." Christopher Oster, *Some Insurers Face Shortfall in Reserves for Costly Claims Related to Asbestos*, WALL ST. J., May 7, 2001, at A4. *See also Court, Congress, Leave Asbestos-Taint Companies to Vultures*, DAILY BANKR. REV. 4, 11-12 (June 6, 2001) ("due to the declining number of solvent asbestos-tainted companies that lawsuits can target, attorneys are 'rushing to get claims in, because as more companies file for bankruptcy protection, the fewer there are to sue'" (quoting Omar Jama, Associate Director of Fitch bond rating agency)); A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 3 (May 7, 2001) ("A key driver of th[e] explosion [in new asbestos claims] is the acceleration of bankruptcy filings by major asbestos producers seeking relief from rapidly escalating asbestos claims. As increasing numbers of producers opt for federal bankruptcy protection, remaining defendants are targeted to shoulder larger shares of asbestos costs.").

bankruptcy."[29] The bankruptcies filed in 2000 alone represented "40-75 percent of [the] money plaintiffs have traditionally gotten from asbestos companies."[30] "[A]s one defendant has followed another into chapter 11, plaintiff attorneys have turned to other defendants to substitute for those in bankruptcy (against whom litigation is stayed) and have increased their financial demands on these defendants."[31]

Not only have demands increased, but the number of defendants targeted has also grown "exponentially larger," with approximately 2,000 companies now facing asbestos suits.[32] As a result of this dramatic expansion of the litigation, "[n]ontraditional defendants

---

[29] A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 4 (May 7, 2001) ("Anecdotal evidence suggests that peripheral defendants (those that either produced or used asbestos in small quantities within their products) are being sued for increasing sums as the resources available from the large, more traditional defendants become exhausted.").

[30] Merrill Lynch, *Asbestos Panel Presentation* 1, 20 (Dec. 18, 2000) (observing that "about 40 percent-50 percent of the money going to plaintiffs in [asbestos] cases, went into bankruptcy" when Owens Corning, Babcock & Wilcox, and Pittsburgh Corning filed).

[31] RAND INSTITUTE, ASBESTOS LITIGATION IN THE U.S.: A NEW LOOK AT AN OLD ISSUE 25 (Aug. 2001). *See also id.* at 33 ("plaintiff attorneys told us that they are asking non-bankrupt defendants to pay more money on claims filed against them than previously negotiated").

[32] Douglas McLeod, *Asbestos Continues to Bite Industry*, BUS. INS. 1 (Jan. 8, 2001) (observing that the number of claims is "exponentially larger" than a decade ago and that, "[t]o the extent that many defendants are in bankruptcy or post-bankruptcy . . . (claimants) will now seek recoveries from a broader base."). *See also* EQUITAS ANNUAL REPORT 23 (Aug. 2001) ("nearly 2,000 U.S. companies have reportedly received asbestos claims"); Robin Jones, *Searching for Solutions to the Problems Caused by the "Elephantine Mass" of Asbestos Litigation*, 14 TULANE ENVTL. L.J. 549, 566 n.59 (2001) ("Over 2000 companies, including IBM and Ford, face some type of asbestos lawsuit"); Richard Schmitt, *Burning Issue: How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial*, WALL ST. J., Mar. 5, 2001, at A1 ("The Internet has been a further engine for growth. . . . Several lawyers use the Web to refer big asbestos-injury cases to other lawyers, earning what are, in essence, brokerage fees."); Susan Warren, *Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps*, WALL ST. J., Apr. 12, 2000, at B1 ("You have to look under every stone. . . . The deeper you dig into the industry, the more you find.") (quoting plaintiff attorney James Early).

now account for over 60% of asbestos expenditures."[33]

**D.    Claims against the automotive industry have grown suddenly, based upon exposure to brake dust.  Both brake suppliers (such as the Debtor) and the auto companies are named.**

The expansion of the asbestos litigation has been accompanied by an expansion of the range of products that are the focus of the most recent waves of claims.  As "[p]laintiffs' attorneys have become more aggressive, targeting companies with even passing links to asbestos,"[34] the litigation has expanded to all products associated with asbestos, whether or not they even contained significant amounts of asbestos or were associated with significant levels of exposure.  For example, the following products have all been the subject of asbestos claims:

- Yarn, thread, felt, rope packing, and flame resistant cloth;

- Plain and corrugated paper;

- Industrial gaskets;

- Flooring materials;

- Insulated electrical wire and cable;

- Corrugated roofing, roof sheathing and roofing cement;

---

[33] RAND INSTITUTE, ASBESTOS LITIGATION IN THE U.S.: A NEW LOOK AT AN OLD ISSUE 10 (Aug. 2001).

[34] Paul M. Sherer, *New Credit Aids Federal-Mogul in Asbestos Battle*, WALL ST. J., Jan. 4, 2001, at A10.  *See also* Gregory Zuckerman, *Specter of Costly Asbestos Litigation Haunts Companies*, WALL ST. J., Dec. 27, 2000, at C1 ("Plaintiffs' attorneys have become more aggressive, by targeting all kinds of companies with a passing link to asbestos."); Merrill Lynch, *Asbestos Panel Presentation* 25 (Dec. 18, 2000) ("What they [plaintiffs' lawyers] are looking for now I suppose are real minor players who manufacture products or who provided products that have minimal amounts of asbestos in it, basically to find out if they had insurance for it, to get at the insurance company amounts.  Things such as wire and cable, electrical wire and cable had minimal trace amounts of asbestos in it, there are welding rods that have it in there.") (remarks by plaintiffs' attorney Joseph Cox).

- Wooden doors allegedly containing "asbestos in a mineral core"; and

- Grinding wheels.[35]

Litigation involving such products has been initiated and vigorously pursued, despite the fact that the potential for exposure to asbestos is often extremely low, or even nonexistent.

The automotive industry in particular has been singled out as part of a broad initiative against manufacturers of friction products. Data from the Manville Trust reflect the spike in claims. From 1999 to 2000, claims against friction defendants increased by a staggering 631.9%.[36] This was the largest one-year increase for any of the recorded industries, and claims continued to increase during the first half of 2001.

This surge in claims was a significant predicate for these Chapter 11 proceedings.[37] As Federal-Mogul discussed in its Informational Brief, the company has been

---

[35] Tillinghast - Towers Perrin presentation, *Asbestos Claims: Is this the Beginning or the End?* 17 (May 30, 2001) (listing products); *Two Asbestos Defendants Hit With $35 Million Verdict*, 23 ANDREWS ASB. LITIG. REP. 1 (Mar. 1, 2001) (describing case involving gasket containing small amounts of asbestos encapsulated in metal); Merrill Lynch, *Asbestos Panel Presentation* 1 (Dec. 18, 2000) (newly targeted defendants include "companies who made products with only trace amounts of asbestos, such as electrical wire and cable and welding rods"); USG Informational Brief 1 (June 27, 2001) ("[USG's] involvement in asbestos personal injury litigation relates primarily to a single building product, joint compound, which contained 5% or less asbestos and was used in such a way that exposures were minimal."); Susan Warren, *Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps*, WALL ST. J., Apr. 12, 2000, at B1 (discussing litigation against wooden door company); Victor E. Schwartz & Leah Lorber, *A Letter to the Nation's Trial Judges: How the Focus on Efficiency is Hurting You and Innocent Victims in Asbestos Liability Cases*, 24 AM. J. TRIAL ADVOC. 247, 264 (2000) ("The Carborundum Corporation, which manufactures grinding wheels, found itself hit with a $115 million verdict in one case. . . . Prior to this case, no grinding wheel manufacturer had been held liable for an asbestos-related injury.").

[36] Table, "Number of Claims by Year Received and Industry," *in* D. Austern Mealey's Presentation (July 2, 2001) (reporting 631.9% increase from 1999 to 2000 for "auto maintenance" claims); *see also id.* Graph, "Manville Filings by Selected Industry" (depicting spike in claims for "automobile/mechanical friction" industry).

[37] *See* Asbestos Primer, at **www.federal-mogul.com** (discussing claims arising from products
(continued...)

targeted by claims relating to automotive friction products manufactured by several companies it acquired, including Abex, Wagner and Ferodo.[38]

These companies are longstanding suppliers of brakes and other automotive products to the automobile manufacturers for use both in original equipment manufacturing and as replacement parts.[39] Dating back at least to the 1960s, the auto companies have purchased brake assemblies and components – including components that contained asbestos – from Abex and from Wagner. The supply relationship has included purchase agreements that indemnified the automobile manufacturer. A standard Chrysler purchase agreement stated that the supplier would "defend, indemnify and protect Purchaser against all claims, liabilities, losses and damages due to injury to or death of any person and damage to or loss of any property arising out of . . . allegedly defective material or workmanship in the goods

---

[37] (...continued)
manufactured by Federal-Mogul subsidiaries such as Moog Automotive, Abex and Fel-Pro); Jef Feeley, *Federal-Mogul Files for Protection: Cites Asbestos Lawsuits*, NATIONAL POST, Oct. 2, 2001, at FP11 (observing that "Federal-Mogul Corp., the largest maker of automotive engine bearings and seals, yesterday filed for bankruptcy protection to cope with 'financially crippling' asbestos lawsuits . . . ."); Mitchell Pacelle, *Federal-Mogul Plans to Seek Chapter 11 Protection*, WALL ST. J., Oct. 1, 2001, at A3 (observing that Federal-Mogul "supplies U.S. auto makers with pistons, gaskets, bearings and other parts").

[38] Debtor's Informational Brief 5-6 (Oct. 1, 2001) (D.I. 2).

[39] *Id.* ("The asbestos personal injury claims against Ferodo America, Inc. ('Ferodo') concern asbestos-containing disc pads, clutch facings, heavy duty brake linings, and drum brake linings. . . . Most Ferodo cases involve former brake mechanics who claim to have contracted asbestos-related diseases from exposure to Ferodo products during the installation and replacement of asbestos-containing brake systems. . . . . Most of the asbestos personal injury claims against Abex concern asbestos-containing friction products, such as brake linings and clutch facings. . . . As with Ferodo and Abex, the asbestos personal injury claims against Wagner arise from various asbestos-containing friction products.").

16

or services provided."[40]

Both Abex and Wagner are now part of the Debtor. Through earlier transactions, both became part of the automotive division of Cooper Industries, Inc. (Moog Automotive), which in turn, was purchased by the Debtor in 1998.[41]

This history has resulted in the filing of tens of thousands of claims against Federal-Mogul (individually and/or as successor-in-interest) and the companies it acquired. A typical complaint names a broad range of companies that are part of Federal-Mogul and contains a recitation along the following lines:

> COMES NOW, Plaintiff, Lois Salter, Individually, as Wrongful Death Beneficiary, and as Personal Representative of the Estate of James Salter, Deceased, hereinafter referred to as Plaintiff, complaining of the various Defendants listed below . . . :
> * * *
> Defendant, FEDERAL MOGUL CORPORATION (a Michigan corporation), individually and as successor-in-interest to MOOG AUTOMOTIVE CORPORATION, WORLD BESTOS CORPORATION, WAGNER ELECTRIC CORPORATION, and ABEX FRICTION PRODUCTS, and as successor-in interest to T&N plc, Turner & Newell PLQ and FEDERAL

---

[40] *See* Chrysler Corporation, Purchase Order Terms and Conditions ¶ 14 (Jan. 1971), *attached to* Declaration of William D. Redford, DaimlerChrysler Corporation (Nov. 16, 2001) (attached as Exhibit 1) (discussing issuance of such purchase orders for brakes and other automotive parts to companies such as Abex and Wagner). Separate submissions are attached for Ford Motor Company (attached as Exhibit 2) and General Motors Corporation (attached as Exhibit 3).

[41] *See* Federal-Mogul Asbestos Primer, at **www.federal-mogul.com** ("Federal-Mogul has been defending thousands of claims brought by persons who claim exposure to Wagner asbestos-containing friction products. . . . Federal-Mogul [also] acquired certain friction manufacturing assets of a company known as Abex, and assumed the obligation to defend and indemnify certain asbestos claims against Abex."); *Asbestos Companies Report Annual Numbers of Pending Claims, New Filings in 2000*, 16 MEALEY'S LITIG. REP.: ASBESTOS 19 (May 18, 2001) ("In 1998, Federal Mogul acquired Cooper Automotive Co. and, in doing so, assumed all asbestos-related liability of Cooper and Cooper's two former businesses, Abex and Wagner."); *Asbestos Companies Report Annual Numbers of Pending Claims, New Filings in 1999*, 15 MEALEY'S LITIG. REP.: ASBESTOS 14 (May 5, 2000).

MOGUL PRODUCTS INC.[42]

These suits involve broad and often vague allegations that the plaintiff "was exposed to asbestos-containing products in his occupations" and that, as a result, the plaintiff has suffered from asbestos-related diseases.[43]

As Federal-Mogul indicated in its most recent 10-Q, as of June 30, 2001, there were approximately 70,000 such claims pending involving Abex and Wagner ("mainly involving friction products"), with over 59,000 new claims flowing in during the first six months of 2001 alone.[44] Just prior to its Chapter 11 filing, Federal-Mogul estimated its liability for claims against Abex and Wagner at $236 million, a significant portion of its total liability for asbestos-related claims.[45]

This same history has resulted in litigation against the automobile

---

[42] Plaintiff's First Amended Petition, *Salter v. Armstrong World Indus.*, No. 00-09213, at 8 (Tex. Dist. Ct., Dallas Cty. Aug. 2, 2001). *See also* Plaintiffs' Original Asbestos Petition, *Lucero v. Crown Cork & Seal Co.*, No. 2001-2577, at 11 (Tex. Dist. Ct. El Paso Cty. July 10, 2001) (naming Federal-Mogul individually and as successor-in-interest to Cooper Automotive, Wagner and Abex).

[43] Plaintiff's First Amended Petition, *Salter v. Armstrong World Indus.*, No. 00-09213, at 19 (Tex. Dist. Ct., Dallas Cty. Aug. 2, 2001).

[44] Federal-Mogul Form 10-Q, at 10 (Aug. 1, 2001) ("Former businesses of Cooper Automotive, primarily Abex and Wagner, are involved as defendants in numerous court actions in the United States alleging personal injury from exposure to asbestos or asbestos-containing products, mainly involving friction products. Abex is a defendant in approximately 41,000 pending claims as of June 30, 2001. During the first six months of 2001, approximately 33,000 new claims naming this defendant were received. Wagner is a defendant in approximately 29,000 claims as of June 30, 2001. During the first six months of 2001, approximately 26,000 new claims naming this defendant were received."). A separate asbestos liability relates to claims brought against Federal-Mogul's subsidiary, Turner & Newall, a major asbestos producer. *Id.* at 7-10.

[45] *Id.* at 11 (observing that an "econometric firm" had conducted a study that resulted in an estimate of liability of claims involving Abex and Wagner of "approximately $236 million as of June 30, 2001").

manufacturers in a multiplicity of forums, alleging exposure to asbestos from brake products.[46] Over 20,000 claims have been filed against the automobile manufacturers across the United States. Often these complaints allege that "all Defendants acted in concert" to cause the plaintiff's alleged injuries.[47] Thus, the automobile manufacturers' asserted liability is alleged to be intertwined with that of the Debtor.

## II.　THE GROWING LITIGATION AGAINST THE AUTOMOTIVE INDUSTRY EXISTS ONLY BECAUSE THE DISTINCT BODY OF SCIENCE RELATING TO BRAKES HAS NOT BEEN GIVEN PROPER FORCE.

In stark and irreconcilable contrast to the expanding litigation against the automotive industry, a well-defined body of epidemiological studies has demonstrated repeatedly that brakes and related automotive products are not associated with asbestos-related disease. These results are not surprising, given that exposure studies have shown that brakes emit only trace amounts of asbestos.

### A.　Science shows that brake workers are not exposed to significant quantities of asbestos.

Even the potential for exposure to asbestos from brakes is extremely limited because the asbestos in brakes is thermally transformed during the braking process. As a

---

[46] *See, e.g.,* Plaintiff's First Amended Petition, *Salter v. Armstrong World Indus.*, No. 00-09213, at 8, 16-17 (Tex. Dist. Ct., Dallas Cty. Aug. 2, 2001) (naming Ford, Daimler Chrysler, General Motors, and Federal-Mogul individually and as successor-in-interest to Moog Automotive, Wagner, and Abex); Plaintiffs' Original Asbestos Petition, *Lucero v. Crown Cork & Seal Co.*, No. 2001-2577, at 11 (Tex. Dist. Ct. El Paso Cty. July 10, 2001) (naming Ford, General Motors, Federal-Mogul individually and as successor-in-interest to Cooper Automotive, Wagner and Abex).

[47] *See, e.g.,* Plaintiff's First Amended Petition, *Salter v. Armstrong World Indus.*, No. 00-09213, at 8, 27 (Tex. Dist. Ct., Dallas Cty. Aug. 2, 2001).

19

result, only trace amounts of asbestos are emitted.[48]

### 1.   Brake dust contains only trace amounts of asbestos.

Scientists began looking at the potential asbestos exposure levels of brake workers decades ago in the late 1960s. In 1968, a seminal study by Lynch showed that, although there was approximately 50% asbestos in a given brake lining, less than 1% of the brake dust to which workers might be exposed was asbestos. The remainder had "transformed into some other, nonfibrous material" as a result of the intense heat generated during braking.[49]

Myriad additional studies over the years have followed up on Lynch's findings. Indeed, the later studies have demonstrated more specifically that the actual amount of asbestos in brake debris is *far* less than 1%, with most researchers – including those conducting studies sponsored by the EPA – reporting results ranging from .018% to .23% asbestos in the brake debris.[50] These and other researchers agreed (and continue to

---

[48] Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence*, 34 REG. TOXIC. & PHARM. 170, 174 (2001) ("Fiber measurement studies have indicated that garage mechanics are exposed to extremely low levels of asbestos as a result of the thermal transformation of asbestos fibers during the braking process."). Note: Professor Wong has been an expert witness on behalf of defendants in prior friction products litigation.

[49] Jeremiah Lynch, *Brake Lining Decomposition Products*, 18 J. AIR POLLUTION CONTROL ASSOC. 824, 824, 826 (1968).

[50] *See, e.g.*, M. Jacko & R. DuCharme, *Brake Emissions: Emissions Measurements From Brake and Clutch Linings from Selected Mobil Sources*, Rept. APTD-1557, at 9-24 (EPA 1973) (on average only 0.23% of brake emissions was asbestos); R. Williams & J. Muhlbaier, *Asbestos Brake Emissions*, 29 ENV. RES. 70, 80 (1982) (finding that brake debris contains only 0.03-0.04% asbestos); P. Cha & P. Carter, *Simulation of Automobile Brake Wear Dynamics and Estimation of Emissions*, SAE Technical Paper #831036, at 19 (1983) (finding 0.018% asbestos in brake emissions); D. Hatch, *Possible Alternatives to Asbestos as a Friction Material*, 13 ANN. OCCUP. HYG. 25, 27 (1970) ("very little asbestos survives in the wear products after brakes or clutches have been used under normal operating (continued...)

agree) that the braking process creates temperatures sufficiently high to transform nearly all of the chrysotile asbestos originally present in brakes into forsterite (an anhydrous magnesium silicate) or other non-fibrous, non-asbestos materials.[51]

Moreover, of the small amounts of asbestos found in brake dust, approximately 80-90% of those fibers are below or far below five microns in length.[52] Fibers of that length are not associated with disease. Indeed, OSHA does not even regulate fiber emissions where the fibers are below five microns because researchers agree that such small fibers are of "very low fibrogenic and carcinogenic potential."[53]

---

[50] (...continued)
conditions.").

[51] See, e.g., D. Rowson, The Chrysotile Content of the Wear Debris of Brake Linings, 47 WEAR 315, 315 (1978) ("No evidence of the chrysotile structure was found by either X-ray diffraction or thermal analysis and it is suggested that the structure has been reduced to an amorphous state or to forsterite."); W. PARKES, OCCUPATIONAL LUNG DISORDERS 235 (2d ed. 1982) ("Chrysotile breaks down into forsterite . . . and silicon dioxide between 800 and 850 degrees Celsius . . . Forsterite is not known to have any harmful effects.").

[52] See, e.g., D. Roberts & R. Zumwalde, Industrial Hygiene Summary Report of Asbestos Exposure Assessment for Brake Mechanics, Rept. #32.4, at 17 (NIOSH 1982) ("the greatest proportion of fibers observed was shorter than 5 microns in length (80 to 90%)"); Sheehy et al., Control of Asbestos Exposure During Brake Drum Service, 4 APPLIED IND. HYG. 313, 317 (1989) (less than 1% of brake dust is asbestos, and less than 3% of that asbestos is greater than 5 microns in length for most vehicles); D. Hatch, Possible Alternatives to Asbestos as a Friction Material, 13 ANN. OCCUP. HYG. 25, 28 (1970) (observing that "of the approximately 1 per cent of asbestos remaining in wear products, a large proportion is ground down during the wear process to much less than the 5 micron length at which particles are judged to be fibers"); Johnson et al., Industrial Hygiene Assessment of Seven Brake Servicing Facilities 10 (NIOSH 1979) (82% of the fibers in brake dust were smaller than 5 microns); D. Rowson, The Chrysotile Content of the Wear Debris of Brake Linings, 47 WEAR 315, 317 (1978) (finding no fibers over 5 microns in length).

[53] See, e.g., Victor Roggli et al., Analysis of Tissue Mineral Fiber Content, in PATHOLOGY OF ASBESTOS-ASSOCIATED DISEASES 299, 333 (1992) (The "low risk of asbestos-related diseases among brake repair workers . . . [is] apparently related to the nature of brake dust . . . Experimental animal studies have confirmed the very low fibrogenic and carcinogenic potential of short asbestos fibers."); P. GROSS & D. BRAUN, TOXIC AND BIOMEDICAL EFFECTS OF FIBERS: ASBESTOS, TALC, INORGANIC FIBERS, MAN-MADE VITREOUS FIBERS, AND ORGANIC FIBERS 44 (1984) ("[T]here is both (continued...)

2.      **Likewise, brake mechanic exposure studies show that brake workers have been exposed to only minute levels of asbestos.**

Further studies have taken the next step and measured the levels of asbestos *exposure* associated with automobile brake repair.  This research consistently has found that emissions have been well below the relevant historical time-weighted average threshold levels set by OSHA, even though OSHA requirements have become more and more stringent.  Studies include the following:

- J. Dement, *Cincinnati Municipal Garage: Automobile Braking Service Operation*, Rept. #32.11, at 1-2 (USPHS 1972) ("[V]ery little asbestos dust was found in the samples. . . . None of [the] samples exceeded the average or peak standards.");

- D. Roberts, *Industrial Hygiene Report: Asbestos at Reading Brake and Alignment Service, Ohio*, Rept. # 00106004 (NIOSH 1980) (measuring average fiber concentrations for brake mechanics of .04 f/ml and concluding: "no asbestos hazard exists at this company");

- D. Roberts & R. Zumwalde, *Industrial Hygiene Summary Report of Asbestos Exposure Assessment for Brake Mechanics*, Rept. #32.14 (NIOSH 1982) ("Regardless of the cleaning method utilized, TWA exposures for mechanics at all facilities were consistently less than 0.1 fibers/cc.");

- 51 Fed. Reg. 22612, 22665, at Table 22 (1984) (OSHA regulations reporting that occupational asbestos exposure for automotive repair workers was 0.06 f/ml);

- T. Kaupinnen & K. Korhonen, *Exposure to Asbestos During Brake*

---

[53] (...continued)
experimental and epidemiologic evidence as well as the evidence provided by autopsy findings that short asbestos fibers are not pathogenic."); P. Gross, *Is Short-Fibered Asbestos Dust a Biological Hazard?*, 29 ARCH. ENVIRON. HEALTH 115, 116 (1974) ("[R]eports from different laboratories are unanimous in finding asbestos that has an average length < 5 microns is devoid of pathogenic potential.  This included not only the fibrogenic potential but also the cancerogenic potential."); W. PARKES, OCCUPATIONAL LUNG DISORDERS 72-74 (2d ed. 1982) ("[S]hort fibres (less than about 10 microns) . . . have little or no fibrogenic or oncogenic potential."); *see also* 48 Fed. Reg. 51086, 51111 (1983) ("Evidence for risk from fibers less than 5 micrometers in length is inconclusive.").

*Maintenance of Automotive Vehicles by Different Methods*, 48 AM. IND. HYG. ASSOC. J. 499 (1987) (reporting TWA less than .05 f/ml);

- L. Moore, *Asbestos Exposure Associated with Automotive Brake Repair in Pennsylvania*, 49 AM. IND. HYG. ASSOC. J. A12 (1988) (estimated average exposure during brake work was less than 0.03 f/ml and TWA exposure for a day of work was less than 0.002 f/ml);

- Sheehy et al., *Control of Asbestos Exposure During Brake Drum Service*, 4 APPLIED IND. HYG. 313 (1989) (exposure during brake cleaning was at or below 0.05 f/ml);

- Yeung et al., *An Australian Study to Evaluate Worker Exposure to Chrysotile in the Automotive Industry*, 14 APPLIED OCC. & ENV. HYG. 448, 450 (1999) (reporting levels below .05 f/ml).

As a recent review of these studies concluded, the exposures among auto mechanics doing brake repair work are "negligible" and fall within applicable "safety standards" set by government regulators:

> Industrial hygiene studies have demonstrated that the typical 8-h time-weighted-average (TWA) exposures among auto mechanics at garages range from less than 0.002 to 0.05 fiber/cc. Thus, the 8-h TWA exposure to auto mechanics is well below the safety standards mandated in most countries (for example, 0.1 fiber/cc in the United States), which should provide adequate protection to auto mechanics. In fact, according to the Committee on Hygienic Standards of the British Occupational Hygiene Society (BOHS), such fiber concentrations would have been categorized as "negligible."[54]

Thus, the potential for exposure to asbestos associated with brakes and other automotive products is "extremely low."[55]

**B.      The established epidemiology has shown no causal relationship between exposure to brake dust and disease.**

---

[54] Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence*, 34 REG. TOXIC. & PHARM. 170, 175 (2001).

[55] *Id.* at 175.

23

The key issue thus arises: do these minimal exposures cause disease? Not one but many epidemiological studies speak to this issue. Those studies uniformly have concluded that auto mechanics are not at an increased risk for asbestos-related diseases.

More specifically, epidemiologic investigations have found that mechanics exposed to brake lining dust are not at any increased risk for pleural or pulmonary abnormalities.[56] As one study addressing the issue concluded: "[I]t can be assumed that certain fields of work are or were exposed to such a small extent or not at all that a risk of asbestosis which is relevant in terms of occupational medicine is no longer to be assumed or was not to be assumed. This applies above all to certain work in the frictional coating (brake lining) and asbestos paper industry."[57]

Critically, well-controlled epidemiologic studies have further shown that brake repair work is not associated with malignant disease. These studies include the following:

---

[56] *See, e.g.,* William J. Nicholson et al., *Investigation of Health Hazards in Brake Lining Repair and Maintenance Workers Occupationally Exposed to Asbestos* 25, table 12 (NIOSH 1983) (garage mechanics who did brake repairs at no greater risk for x-ray abnormalities than garage mechanics who did not repair brakes); K. Marcus et al., *Asbestos-Associated Lung Effects in Car Mechanics*, 13 HEALTH 252, 253 (1987) (in study of 925 car mechanics, no respiratory impairment or asbestosis found); H. Raithel et al., *Health Hazards from Fine Asbestos Dust*, 61 OCCUP. ENVIRON. HEALTH 527 (1989); *see also* L. Rushton et al., *Epidemiological Survey of Maintenance Workers in London Transport Executive Bus Garages and Chiswick Works*, 40 BR. J. INDUS. MED. 340, 342 (1983) (in large epidemiologic study of 8,490 bus garage workers, no increased mortality from non-malignant pulmonary diseases detected for mechanics); A. McDonald et al., *Dust Exposure and Mortality in an American Chrysotile Asbestos Friction Products Plant*, 41 BR. J. INDUS. MED. 151, 154 (1984) (not a single case of asbestosis found in large epidemiologic study of 3,641 men employed at a friction products plant, where exposure to asbestos from brake lining dust is much higher than the exposure experienced by brake workers).

[57] H. Raithel et al., *Health Hazards from Fine Asbestos Dust*, 61 OCCUP. ENVIRON. HEALTH 527, 527, 533 (1989) (in study including 2,644 brake workers, percent of brake workers found to have abnormal x-ray findings was lower than expected percent of abnormalities in entire population of workers in the study).

- Alison D. McDonald & J. Corbett McDonald, *Malignant Mesothelioma in North America*, 46 CANCER 1650, 1655 (1980) (no increased risk of mesothelioma for garage mechanics);

- Mary J. Teta et al., *Mesothelioma in Connecticut, 1959-1977*, 25 J. OCCUP. MED. 749, 752-53 (1983) (no increased risk of mesothelioma for garage mechanics);

- L. Rushton et al., *Epidemiological Survey of Maintenance Workers in London Transport Executive Bus Garages and Chiswick Works*, 40 BR. J. INDUS. MED. 340, 340-41 (1983) (observed deaths of bus mechanics from all neoplasms and cancer of the lung were the same or lower than deaths expected in the general population);

- Aaron Blair et al., *Mortality Patterns of U.S. Veterans by Occupation*, 74 J. NCI 1039 (1985) (in study of close to 300,000 veterans, no evidence of an association between auto repair or mechanic work and increased lung cancer risk);

- Spirtas et. al., *Proceedings for the Society for Epidemiological Research Abstracts, National Health and Welfare Canada*, AM. J. EPIDEM. PROCEEDINGS 518 (1985); Spirtas et. al., *Malignant Mesothelioma: Attributable Risk of Asbestos Exposure*, 51 OCC. & ENVIRON. MED. 804 (1994) (no increased risk of mesothelioma for brake workers);

- B. Jarvholm & J. Brisman, *Asbestos Associated Tumors in Car Mechanics*, 45 BR. J. INDUS. MED. 645, 646 (1988) (no increased risk of mesothelioma in car mechanics);

- Eva S. Hansen, *Mortality of Auto Mechanics: A Ten-Year Follow-Up*, 15 SCAND. J. WORK ENVIRON. HEALTH 43, 44-45 (1989) (no elevated risk for lung cancer in mechanics, no statistically significant increased mesothelioma risk);

- Per Gustavsson et al., *Lung Cancer and Exposure to Diesel Exhaust Among Bus Garage Workers*, 16 SCAND. J. WORK ENVIRON. HEALTH 352 (1990) (asbestos exposure of garage mechanics "did not seem to influence the lung cancer risk");

- H.J. Woitowitz & K. Rodelsperger, *Mesothelioma Among Car Mechanics?*, 38 ANN. OCCUP. HYG. 635, 637 (1994) (no evidence that car mechanics are exposed to an increased risk of mesothelioma even if they perform brake repair);

- K. Teschke et. al., *Mesothelioma Surveillance to Locate Sources of Exposure to Asbestos,* 88 CANADIAN J. PUB. HEALTH 163, 166 (1997) ("As with vehicle mechanics in the occupational analysis, a history of brake lining installation or repair had a risk estimate below 1.0").

The studies confirm that there is no increased risk of mesothelioma among auto mechanics as a result of exposure to brakes and other automotive parts:

> A review of the literature indicates that there are six epidemiologic studies providing relevant information on malignant mesothelioma among auto mechanics. . . . The results of the six studies reported no increased risk of malignant mesothelioma among auto mechanics. . . . An application of Hill's causation criteria to epidemiologic data of malignant mesothelioma among auto mechanics clearly demonstrates that auto mechanics do not have an increased risk of malignant mesothelioma as a result of exposure to asbestos fibers from brake linings and clutch facings.[58]

Further, "the results of the individual studies are remarkably consistent in that none of the studies shows an increased risk" of disease.  Rather, there is "strong evidence that garage mechanics' mesothelioma risk is similar to that in the general population."  Indeed, the studies show that teachers, librarians, and secretaries are all at a greater risk of contracting malignant mesothelioma than are auto mechanics.[59]  Similarly, "epidemiologic studies indicate that auto mechanics are not at an increased risk of lung cancer as a result of working with brakes and clutches."[60]

## III.   THE PROCEDURAL TOOLS EXIST FOR ADJUDICATING THE CORE SCIENTIFIC ISSUE OF GENERAL CAUSATION.

---

[58] Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence,* 34 REG. TOXIC. & PHARM. 170, 173-74 (2001).

[59] *Id.* at 173 & table 2; *see also* K. Teschke et. al., *Mesothelioma Surveillance to Locate Sources of Exposure to Asbestos,* 88 CANADIAN J. PUB. HEALTH 163 (1997).

[60] Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence,* 34 REG. TOXIC. & PHARM. 170, 177 (2001).

The rules for litigating claims that turn on science no longer tolerate a "disconnect" between the prosecution of such claims and accepted scientific methodology. As the courts were overwhelmed by rapidly growing toxic tort litigation, a number of commentators and courts observed that rational determinations of liability were often lacking in the tort system, where courts failed to engage in stringent judicial "gate keeping" in order to weed out "weak and frivolous claims." *Castano v. American Tobacco Co.*, 84 F.3d 734, 747 n.24 (5th Cir. 1996) (observing that, if such scrutiny were applied, "even a mass tort like asbestos could be managed . . . in a way that avoids judicial meltdown").

Today, both the Supreme Court and the Federal Rules of Evidence have made clear that such judicial "gatekeeping" is not only desirable – it is required. Courts must stringently scrutinize proffered scientific evidence in order to determine whether, at bottom, it is sufficiently reliable to support a claim.[61]

Given the epidemiology showing no excess risk of disease from exposures to brakes, claims based on such exposure fall squarely within the purview of the Supreme Court's holding in *Daubert* and, lacking admissible evidence of causation, should be summarily dismissed.

A.    ***Daubert*** **mandates scrutiny of scientific evidence for its reliability.**

---

[61]    The Advisory Committee Notes accompanying Rule 702 explain that the rule was amended in 2000 in response to *Daubert* and *Kumho Tire*: "The amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony. Consistently with *Kumho*, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful. Consequently, the admissibility of all expert testimony is governed by principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."

In a landmark decision, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* directed the lower federal courts to act as "gatekeepers" to ensure that proffered scientific evidence is not only relevant, but also reliable. *See* 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138, 147 (1999) ("gatekeeping" requirement "applies to all expert testimony"). The assessment of whether proffered expert testimony is admissible under Federal Rules of Evidence 702 and 703 is a preliminary question for the court. *See* FED R. EVID. 104(a); *Daubert*, 509 U.S. at 592-93. In making that preliminary assessment, the court must scrutinize whether plaintiffs' evidence survives the *Daubert* screen – that is, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Under *Daubert*, causation evidence must be based upon reliable scientific data and methods, and the conclusions must flow logically from those facts and methods. *See id.* at 589-90; Fed. R. Evid. 702; *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *Daubert* provided a non-exclusive list of guidelines to assist trial courts in undertaking their obligation to prevent "subjective belief" and "unsupported speculation" from entering the courtroom under the guise of expert testimony. 509 U.S. at 598-600. The specific factors enumerated by the Supreme Court were: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence

28

and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Id.* at 593-94. *See also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 n.7 (3d Cir. 1994) (listing additional factors such as the qualifications of the expert witness and the non-judicial uses to which the method has been put).

Expert opinion evidence must be rejected where "there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co.*, 522 U.S. at 146. *See also In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999), *cert. denied*, 520 U.S. 1225 (2000); *In re Paoli R.R. Yard*, 35 F.3d at 743; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) ("[T]he district court did not abuse its discretion in finding that the 'analytical gap' between [the expert's] causation opinion and the scientific knowledge and available data advanced to support that opinion was too wide."), *cert. denied*, 526 U.S. 1064 (1999).

**B.      In the context of toxic torts, quantification of exposure and risk are essential: Epidemiology is used to find whether there is excess risk associated with exposure.**

In order to survive judicial scrutiny under *Daubert* in the context of toxic torts, claimants must provide reliable scientific evidence demonstrating that exposure to a toxin is linked to disease. Evidence linking a specific chemical or toxin to disease is inadmissible unless there is "an established scientific connection between exposure and illness," including "information on the level of exposure necessary for a person to sustain . . . injuries." *Moore*, 151 F.3d at 278. *See also Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996) ("[A] plaintiff in a toxic tort case must prove the levels of

29

exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover."); *Mitchell v. Gencorp.*, 165 F.3d 778, 781 (10th Cir. 1999) (same). Indeed, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).[62]

Thus, quantification of exposure and risk are essential, and epidemiological evidence is required to demonstrate general causation in a reliable way. *See, e.g., Renaud v. Martin Marietta Corp.*, 972 F.2d 304, 307 (10th Cir. 1992) (plaintiffs' causation evidence "was not sufficiently reliable, being drawn from tests on non-human subjects without confirmatory epidemiological data"); *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 315 (5th Cir. 1989) (theories of toxic causation "unconfirmed by epidemiologic proof cannot form the basis for causation in a court of law"); *In re Breast Implant Litig.*, 11 F. Supp.2d 1217, 1224 (D. Colo. 1998) ("[E]pidemiologic studies are necessary to determine the cause and effect between breast implants and allegedly associated disease."); *Sutera v. Perrier Group of America, Inc.*, 986 F. Supp. 655, 663 (D. Mass. 1997) (rejecting expert's testimony under *Daubert* that low levels of benzene caused disease where there was a "dearth of any

---

[62] *See also In re TMI Litig. Consol. Proceedings*, 927 F. Supp. 834, 869 (M.D. Pa. 1996) (excluding cancer study where record did not "support the fundamental assumption . . . that doses were significantly higher than originally estimated"), *aff'd in part, rev'd in part*, 193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000), *cert. denied*, 520 U.S. 1225 (2000); *In re TMI Litig. Cases Consol. II*, 910 F. Supp. 200, 203 (M.D. Pa. 1996) (excluding expert testimony where expert's study, "standing alone, cannot speak to the issue of whether the observed tree damage resulted form radiation exposure" and thus, could not assist the jury in "determining whether or not persons (and trees) in the TMI area at the time of the accident were exposed to radiation").

epidemiological evidence supporting a causal relation between exposures to benzene at low levels and [disease]").[63]

And any demonstrated risk must be sufficient in magnitude to have caused the disease in a particular case. As the Third Circuit has stated:

> Testimony that [a toxin] increased the risk that plaintiffs would contract the injuries that they contracted does not show that [the toxin was] a substantial factor in those injuries. . . . *Even under the substantial factor test, plaintiffs must prove that defendants' actions were a cause of plaintiffs' injuries* before the burden switches to defendant to show that the injuries would have occurred even absent any action by the defendant.

*In re Paoli R.R. Yard*, 35 F.3d at 761 n.31 (emphasis supplied). *See also In re Paoli R.R. Yard PCB Litig.*, 2000 WL 274262, at *2 (E.D. Pa. Mar. 7, 2000) (same); *cf. Sutera*, 986 F. Supp. at 667 (rejecting expert testimony under *Daubert* where there was no reliable evidence demonstrating "low dose of benzene in [defendant's product] was a substantial factor in causing [plaintiff's] illness"); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1403 (D. Or. 1996) ("[A] plaintiff seeking to prove causation must 'introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result.' This burden requires plaintiffs to demonstrate that exposure to breast implants more than doubled the risk of their alleged injuries.").

---

[63]   *See also Conde v. Velsicol Chem Corp.*, 804 F. Supp. 972, 1025-26 (S.D. Ohio 1992) ("Epidemiologic studies are the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease."), *aff'd*, 24 F.3d 809 (6th Cir. 1994); *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1554 (D. Colo. 1990) (plaintiffs "required to submit epidemiological evidence in support of their causation contentions"), *aff'd*, 972 F.2d 304 (10th Cir. 1992); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1231 (E.D.N.Y. 1985) ("A number of sound epidemiological studies have been conducted on the health effects of exposure to Agent Orange. These are the only useful studies having any bearing on causation."), *aff'd*, 818 F.2d 187 (2d Cir. 1987), *cert. denied*, 487 U.S. 1234 (1988).

Under Rule 702, this means that a plaintiff must show that the defendant's product was more likely than not, a cause of disease. *See, e.g., Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1322 (9th Cir. 1995) (observing that testimony of plaintiff's experts was inadmissible where "the strongest inference to be drawn for plaintiffs based on the epidemiological evidence is that Bendectin could *possibly* have caused plaintiffs' injuries"); *Hall*, 947 F. Supp. at 1397 (plaintiff must introduce evidence showing that defendant's conduct was "more likely than not" a cause of disease: "A mere possibility of such causation is not enough").

Accordingly, in determining whether proffered scientific evidence of causation is sufficiently reliable, courts have required that epidemiological studies show a doubling of the risk of disease, i.e., a relative risk of 2.0 at a 95% confidence level, from the agent being studied versus the background risk of disease among people without the exposure at issue (whose risk is set at 1.0). *See, e.g., DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958 (3d Cir. 1990) (noting that "in order to avoid summary judgment, the relative risk of limb reduction defects arising from the epidemiological data . . . will, at a minimum, have to exceed '2'"); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n.16 (11th Cir. 1999) ("The threshold for concluding that an agent more likely than not caused a disease is 2.0. A relative risk of 1.0 means that the agent has no causative effect on incidence. A relative risk of 2.0 thus implies a 50% likelihood that the agent caused the disease. Risks greater than 2.0 permit an inference that the plaintiff's disease was more likely than not caused by the agent" (citing *Federal Judicial Center, Reference Manual on Scientific Evidence* 168-69 (1994)); *Daubert*, 43 F.3d at 1321 ("For an epidemiological study

to show causation under a preponderance standard, 'the relative risk of [the disease] arising from the epidemiological data . . . will at a minimum have to exceed '2.'"); *Hall*, 947 F. Supp. at 1403 (more likely than not "standard of proof means that plaintiffs must be able to show a relative risk of greater than 2.0"); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 715 (Tex. 1997) (collecting cases).

The rationale behind this rule is simple. In computing relative risks, epidemiologists determine the ratio of disease in exposed populations to disease in individuals who are not exposed to an alleged toxin. The resulting figure may fall within three distinct categories for purposes of determining whether an exposure is associated with disease. If the relative risk (or ratio) is less than 1.0, then "the risk in exposed individuals is less than the risk in unexposed individuals," and therefore there is "a negative association, which could reflect a protective or curative effect of the agent on the risk of disease." If the relative risk is equal to or brackets 1.0, then "the risk in exposed individuals is the same as the risk in unexposed individuals" and there is "no association" between exposure and disease.[64] It is only where the relative risk is greater than 2.0, meaning that there is a greater than 50% chance that the exposure is associated with an individual's disease, that the evidence is sufficient to meet the preponderance of the evidence standard.[65]

Similarly, courts have invalidated claims of causation at the outset where

---

[64] *See generally* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 349, 384 (2d ed. 2000).

[65] *See id.* at 384 (observing that "[a] substantial number of courts in a variety of toxic substances cases have accepted this reasoning"). A relative risk greater than 2.0, however, merely indicates a statistical association and therefore necessary, but not sufficient, to establish causation: "Once an association has been found between exposure to an agent and development of a disease, researchers consider whether the association reflects a true cause-effect relationship." *Id.* at 374.

exposures fall within applicable regulatory exposure guidelines, which are prophylactic in nature and therefore are set much lower than the tort-law threshold of causation.[66] When issuing health and safety regulations, an agency's purpose is to "suggest or make prophylactic rules governing human exposure . . . in order to reduce public exposure to harmful substances." *Allen*, 102 F.3d at 198. As a result, government "agencies' threshold of proof is reasonably lower than that in tort law, which 'traditionally make[s] more particularized inquiries into cause and effect' and requires a plaintiff to prove that it is more likely than not that another individual has caused him or her harm.'" *Id.* (quoting *Wright*, 91 F.3d at 1107). *See also Sutera*, 986 F. Supp. at 664-65 (same).

Consequently, a number of courts have concluded that asbestos exposures that fall within applicable regulatory guidelines cannot meet the tort-law threshold of causation.[67] *See, e.g., Dartez v. Fibreboard Corp.*, 765 F.2d 456, 470-71 (5th Cir. 1985) (studies showed

---

[66] However, as the court in *Allen* observed, the converse is not true. The fact that an exposure exceeds applicable regulatory guidelines is not sufficient to demonstrate causation because, in order to protect the public, these guidelines are set well below the levels necessary to cause disease. 102 F.3d at 198. Rather, a plaintiff must present reliable epidemiologic proof that an alleged exposure is capable of causing disease (*see* references cited above).

[67] A number of courts have observed that it is axiomatic that "different manufacturers' asbestos products differ in degrees of harmfulness." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 379-80 (3d Cir. 1990). *See also Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir. 1985) ("[A]ll asbestos-containing products cannot be lumped together in determining their dangerousness."); *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1483 (11th Cir. 1985) (observing that "different manufacturers' asbestos products differ in degrees of harmfulness"); *Celotex Corp. v. Copeland*, 471 So.2d 533, 538 (Fla. 1985) ("Asbestos products . . . have widely divergent toxicities, with some asbestos products presenting a much greater risk of harm than others."); *Goldman v. Johns-Manville Sales Corp.*, 514 N.E.2d 691, 697 (Ohio 1987) ("Asbestos-containing products do not create similar risks of harm because there are several varieties of asbestos fibers, and they are used in various quantities even in the same class of product."); *Becker v. Baron Brothers*, 649 A.2d 613, 620 (N.J. 1994) ("[C]ourts have acknowledged that asbestos-containing products are not uniformly dangerous and thus that courts should not treat them all alike.").

that the fiber count for the defendant's product was below the "threshold limit defined by OSHA," and accordingly, the record did "not contain sufficient evidence" that the plaintiff's "limited exposure . . . to the relatively small number of fibers emitted by this cloth under the most unfavorable conditions could be a producing cause of his injuries."); *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir. 1985) (citing OSHA standards and concluding that defendant's asbestos gaskets, textile products and packing materials were not a substantial factor in causing disease: "there was no evidence that the inhalation of the relatively small amounts of asbestos fibers possibly released during the handling of Raymark products was a substantial factor in causing [the plaintiff's] present condition"); *Quick v. Murphy Oil Co.*, 643 So.2d 1291, 1296-97 (La. Ct. App. 1994) (defendant's asbestos-containing products were not "a substantial cause" of plaintiff's disease where "asbestos emissions were below the threshold values established by OSHA").

For the same reason, courts have concluded that products whose asbestos emissions fall within such regulatory guidelines are not defective. *See, e.g., Dartez*, 765 F.2d at 470 ("Compliance with . . . government safety standards constitutes strong and substantial evidence that a product is not defective."); *Gideon*, 761 F.2d at 1144 (same); *see also In re Asbestos*, 726 So.2d 926, 945 (La. Ct. App. 1998) (gaskets containing asbestos "covered in a grease-like substance that prevented large emissions of asbestos fibers" were "considered non-hazardous by OSHA" and therefore could not cause disease).

These standards provide a well-established framework for assessing scientific evidence in toxic tort cases such as this. Both the Supreme Court and now the Federal Rules mandate stringent review of proffered scientific evidence of causation – dictating scrutiny

35

that often was lacking in the infancy of the asbestos litigation.

C.     **The established science demonstrating the absence of any increased risk presents a clear case for dismissal under *Daubert*.**

Under the foregoing standards, the consistent body of epidemiology requires dismissal of any claim based on exposure to brakes or other automotive parts. Here, there is no scientific demonstration of *any* increased risk of disease, to say nothing of a risk in excess of 2.0. The studies report relative risks ranging from .7 to 1.2 for lung cancer and .62 to 1.00 for mesothelioma[68] – figures that are far below the required 2.0 level that is the "threshold" for concluding that an exposure is more likely than not a cause of disease.[69]

As a result, there is no reliable scientific evidence to support any claim based on exposure to such products. *See, e.g., DeLuca*, 911 F.2d at 959 n.23 ("'In no case . . . can evidence suffice to establish a causal link if it does not include at least reasonable estimates of exposure levels and durations, and data that reasonably indicate a relative risk greater than 2.'" (quoting Black & Lilienfeld, *Epidemiological Proof in Toxic Tort Litigation*, 52 FORDHAM L. REV. 732, 769 (1984))); *Allison*, 184 F.3d at 1315 (only "[r]isks greater than 2.0 permit an inference that the plaintiff's disease was more likely than not caused by the agent" (citing *Federal Judicial Center, Reference Manual on Scientific Evidence* 168-69 (1994)); *Daubert*, 43 F.3d at 1321 ("'the relative risk of [the disease] arising from the epidemiological data . . . will at a minimum have to exceed '2.'" to prove causation).

---

[68]  *See, e.g.,* Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence*, 34 REG. TOXIC. & PHARM. 170, 173-74 (2001) (collecting studies).

[69]  *See* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 384 (2d ed. 2000).

Because Federal Rule of Civil Procedure 56(a) requires the party opposing summary judgment to come forward with admissible evidence demonstrating a genuine issue of fact for trial, where causation evidence has been excluded under *Daubert*, summary judgment in favor of the toxic tort defendant must follow. *See, e.g., In re TMI Litig.*, 193 F.3d at 623 (observing that district court granted summary judgment "as a result of its rulings under *Daubert*"); *In re Paoli*, 35 F.3d at 767-70 (affirming in part, reversing in part grant of summary judgment); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1304 (11th Cir. 1999) (upholding grant of summary judgment in breast implant case given "inability to establish liability without the experts" after testimony excluded under *Daubert*); *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1419 (9th Cir.1998) (upholding grant of summary judgment after expert testimony that brain shunt manufactured by defendant was defective and that silicone components in the shunt made plaintiff ill); *Allen*, 102 F.3d at 195-96 (trial court properly excluded scientifically invalid expert testimony asserting that exposure to ethylene oxide caused cancer); *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 382 (5th Cir. 1996) (plaintiff expert's "proposed testimony concerning cotton rat study does not satisfy Rule 702's 'standard of evidentiary reliability,' as interpreted by *Daubert*, because [expert's] testimony would consist of 'unsupported speculation'"); *In re Paoli R.R. Yard PCB Litig.*, 2000 WL 1279922, at *6 (E.D. Pa. 2000) (granting summary judgment motion after applying *Daubert*).[70]

---

[70] Bankruptcy courts have likewise excluded expert testimony under *Daubert* before ruling on the merits of the parties' claims and defenses. *See, e.g., In re Canvas Specialty, Inc.*, No. LA 00-33180, 2001 WL 336463, at *3-*4 (Bankr. C.D. Cal. Mar. 28, 2001); *In re Husting Land & Dev., Inc.*, 255 B.R. 772, 780-81 (Bankr. D. Utah 2000); *In re Dow Corning Corp.*, 237 B.R. 364 (Bankr. E.D. Mich. (continued...)

## IV.   THIS COURT SHOULD EXERCISE ITS POWER TO RESOLVE THE *DAUBERT* ISSUE, WHICH IS CENTRAL TO THESE CHAPTER 11 PROCEEDINGS.

This Court has the power to provide a complete and centralized resolution of the threshold scientific issue affecting brake claims. Resolving that issue will be a substantial step in moving this case forward. Failure to address the issue on a consolidated basis here (rather than in piecemeal litigation throughout the court system) will increase an already substantial liability problem and create further uncertainty about whether and how the Debtor can resolve that problem.

In the mass-tort context, the goal must be to obtain "a single, uniform, fair and efficient resolution of all claims growing out of a set of [related] events."[71] To achieve this end, the Court may centralize the litigation of the threshold scientific issue described above by exercising jurisdiction over all claims that are "related to" these proceedings. *See* 28 U.S.C. §§ 157(b), 1334(b). This mechanism has been used effectively in prior mass tort bankruptcies such as *Dow Corning* and *A.H. Robins* to centralize adjudication of related claims within a single forum.

### A.   The proposed *Daubert* proceeding promises the resolution of a complex and substantial liability problem that would otherwise consume a significant part of this case and may persist even after confirmation.

---

[70] (...continued)

1999). As a bankruptcy court recently explained in excluding one party's expert and granting summary judgment for the other party, "when dealing with expert testimony in a summary judgment motion (as well as at trial), the trial court does have the ability – indeed, the duty – to determine if expert testimony should be admitted in the first instance." *In re Bonham*, 251 B.R. 113, 133 (Bankr. D. Alaska 2000) (emphasis omitted).

[71] Edward H. Cooper, *The (Cloudy) Future of Class Actions*, 40 ARIZ. L. REV. 923, 947 (1998).

Federal-Mogul faces a substantial and poorly-defined liability problem that, if not addressed, will inevitably create a substantial and complex obstacle to resolution of this case.

As described above, the source of the claims at issue is simple – the use of brakes manufactured by businesses purchased by the Debtor.  That fact gives rise both to the claims against Federal-Mogul (because it acquired those businesses) and also to the claims against the automobile manufacturers (because they used such products).  The claims are against different parties, but originate from the same source.

Because Federal-Mogul's businesses made those products, it faces thousands of claims, but because the automobile manufacturers used those same products, Federal-Mogul faces the prospect of additional liability from contribution and indemnification claims.  As is typical in mass-tort cases, thousands upon thousands of claims are involved.  The scope of both the direct claims (against the Debtor) and the indirect claims (for contribution and indemnification) is not only substantial, it is also uncertain.  Uncertainty arises from limitations on what is known about both the facts underlying those claims and the volume of claims that may be asserted in the future.  Further uncertainty will arise in the event litigation against the automobile manufacturers is allowed to continue piecemeal throughout the country.  Disputes about the obligations between the companies will give rise to uncertainty, as will any conflicting decisions concerning the merit of the underlying claims.  The only thing that is certain is that continued litigation will increase the Debtor's exposure to both direct liability (the growth of litigation outside the bankruptcy clearly will translate into more personal injury claims against the Debtor) and indirect liability (as the

scope of indemnity and contribution claims grows).

These substantial, changing and uncertain liabilities will impede the progress of this case. Absent definition of those liabilities, a plan that appropriately addresses them will be difficult to formulate and confirm.

The straightforward concept that drives the pending motion is to address the one issue on which all the asserted liabilities turn – that is, the scientific issue described above. If that issue is resolved, the entire problem may disappear.

**B.      Under 28 U.S.C. § 1334(b), this Court has "broad jurisdiction" over such litigation whose outcome will have an effect on the bankruptcy estate.**

Under 28 U.S.C. § 1334(b), this Court is authorized to exercise jurisdiction over any related litigation whose "outcome . . . could *conceivably* have any effect on the estate being administered in the bankruptcy." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (citing *In re Pacor, Inc.*, 743 F.2d 984, 994 (3d Cir. 1984)). *See also A.H. Robins v. Piccinin*, 788 F.2d 994, 1002 n.11 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986) (same); *In re Dow Corning Corp.*, 86 F.3d 482, 489-90 (6th Cir. 1996) (same).

As the Third Circuit has recognized, "[a] key word in this test is *conceivable*. Certainty, or even likelihood, is not a requirement. Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on the debtor's rights, liabilities, options, or freedom of action or the handling and administration of the bankrupt estate." *In re Marcus Hook Develop. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991) (emphasis in original).

Numerous courts have recognized that under this test, "the reach of 'related to' jurisdiction is very broad." *Belcufine v. Aloe*, 112 F.3d 633, 636 (3d Cir. 1997). *See also*

*Dow Corning*, 86 F.3d at 489, 495, 497 (Section 1334(b) affords federal courts "broad jurisdiction in bankruptcy cases" and noting the "expansive definition" of "related claims" first established by the Third Circuit in *Pacor* and later cited "with approval" by the Supreme Court in *Celotex*); *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 583 (6th Cir. 1990) (observing that federal courts "have uniformly adopted an expansive definition of a related proceeding under section 1334(b)"); *In re Celotex Corp.*, 124 F.3d 619, 626 (4th Cir. 1997) (same).

As the Supreme Court observed in *Celotex*, the congressional intent behind Section 1334 was "to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." 514 U.S. at 308. Indeed, "[t]he emphatic terms in which the jurisdictional grant is described in the legislative history, and the extraordinarily broad wording of the grant itself, leave . . . no doubt that Congress intended to grant to the district courts broad jurisdiction in bankruptcy cases." *In re Salem Mortgage Corp.*, 783 F.2d 626, 633-34 (6th Cir. 1986).

In applying this broad grant of authority, numerous courts have exercised jurisdiction over litigation against non-debtors where, as here, they have claims for contribution and indemnification against the debtor. *See, e.g., Dow Corning*, 86 F.3d at 494 (jurisdiction exists given potential contribution and indemnification claims); *Robins*, 788 F.2d at 1011 (jurisdiction exists given potential indemnity); *In re Wood*, 825 F.2d 90, 94 (5th Cir. 1987) (finding "related to" jurisdiction over suit against non-debtor where the debtor "may bear" all, part, or none of the judgment); *In re Celotex Corp.*, 124 F.3d at 626 (noting that contribution action "could conceivably have an effect on the Celotex bankruptcy case");

41

*In re Wolverine Radio Co.*, 930 F.2d 1132, 1143 (6th Cir. 1991) (holding that "related to" jurisdiction exists over indemnification claim), *cert. dismissed*, 503 U.S. 978 (1992); *In re American Hardwoods, Inc.*, 885 F.2d 621, 624 (9th Cir. 1989) ("related to" jurisdiction existed where debtor's guarantor "would likely" make claim against debtor's officers' stock, which "'could conceivably' affect the administration of [the debtor's] plan"); *In re Salem Mortgage Co.*, 783 F.2d 626, 734 (6th Cir. 1986) ("related to" jurisdiction established where non-debtors "may have an action against the debtors such as breach of the assignment agreement"); *In re New York Int'l Hostel, Inc.*, 157 B.R. 748, 751 (S.D.N.Y. 1993) (where resolution of claims against non-debtor "might" result in non-debtor having claims against debtor, claims against non-debtor were "related to" bankruptcy proceedings).

These courts have concluded that "[t]he potential for [the debtor's] being held liable to the nondebtors in claims for contribution and indemnification, or vice versa, suffices to establish a conceivable impact on the estate in bankruptcy," warranting exercise of the court's jurisdiction. *Dow Corning*, 86 F.3d at 494. Indeed, jurisdiction exists even where such a claim "may ultimately have no effect on the debtor." *In re Wolverine Radio Co.*, 930 F.2d at 1143. *See also In re Celotex Corp.*, 124 F.3d at 626 (observing that test "does not require certain or likely alteration of the debtor's rights, liabilities, options or freedom of action," but rather "[t]he possibility of such alteration or impact is sufficient to confer jurisdiction"); *In re Marcus Hook*, 943 F.2d at 264 (following *Wolverine*).

Similarly, courts have ruled that jurisdiction is bolstered where, as here, non-debtors have contractual indemnity claims against the debtor. The Third Circuit, for example, has stated flatly that such "contractual indemnity claims can have an effect on a

42

bankruptcy estate and thus provide a basis for the exercise of 'related to' jurisdiction."

*Belcufine*, 112 F.3d at 636 (citing *Pacor*, 743 F.2d at 995). *See also In re Allegheny Health Education & Research Foundation*, 233 B.R. 671, 679 (Bankr. W.D. Pa. 1999) (exercising "related to" jurisdiction over claims where there was a "contingent indemnification obligation").

Given this precedent, this Court's jurisdiction under 28 U.S.C. § 1334 is clear. The thousands of claims for indemnification and contribution against the Debtor more than meet the minimal requirement of having a "conceivable" effect on the bankruptcy estate. Indeed, the effect of such claims is significant.

C.     **This Court has broad authority under 28 U.S.C. § 157(b)(5) to centralize the adjudication of such claims within a single forum to ensure "prompt, fair and complete resolution of all claims 'related to'" these proceedings.**

In exercising this broad grant of jurisdictional authority, the district court *where the bankruptcy is pending* may under 28 U.S.C. § 157(b)(5) transfer any related claim or cause of action to be resolved within the bankruptcy proceedings:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

In this manner, the court may exercise jurisdiction over all related claims in order to centralize adjudication in a single forum.

Congress enacted Section 157(b)(5) "to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case." *See, e.g., Dow Corning*, 86 F.3d at 496 (quoting *Robins*, 788 F.2d at 1011). The purpose behind Section 157(b)(5) was to make it

possible for a single forum "to oversee the many claims and proceedings that might arise in or affect" an ongoing reorganization. *Calumet Nat'l Bank v. Levine*, 179 B.R. 117, 121 (N.D. Ind. 1995). *See also In re Pan Am Corp.*, 16 F.3d 513, 516 (2d Cir. 1994) ("Congress enacted section 157(b)(5) to expand the district court's venue-fixing powers with an eye to centralizing the adjudication of a bankruptcy case.").

As Congress recognized in enacting Section 157(b)(5), centralized adjudication allows "'all interests [to] be heard" and "the interests of all claimants [to] be harmonized.'" *Dow Corning*, 96 F.3d at 496-97 (quoting *Robins*, 788 F.2d at 1014). Moreover, "[c]entralization of claims increases the debtor's odds of developing a reasonable plan of reorganization which will 'work a rehabilitation of the debtor and at the same time assure fair and non-preferential resolution of the [asserted] claims.'" *Id.* at 496 (quoting *Robins*, 788 F.2d at 1011).

In this manner, Section 157(b)(5) provides the tools necessary to accomplish a "prompt, fair and complete resolution of all claims 'related to' bankruptcy proceedings." *Id.* at 497 (citing *Robins*, 788 F.2d at 1011).

**D.     That broad authority has been exercised effectively in mass tort bankruptcies such as this to centralize adjudication of related tort claims.**

This broad grant of jurisdictional authority has been used in prior mass tort bankruptcies to centralize adjudication of related tort claims. Mass tort cases present unique problems associated with voluminous dispersed litigation. Such cases involve thousands of claimants bringing cases in multiple state and federal jurisdictions against the debtor and related parties, all of which may impact the bankruptcy estate. In prior mass tort

bankruptcies such as *Dow Corning* and *A.H. Robins*, courts have utilized their broad powers

under 28 U.S.C. § 1334(b) and § 157(b)(5) to resolve the unique problems associated with

mass tort litigation. Similar procedures should be employed here.

> 1. **The need for centralized resolution of common, threshold issues concerning the validity of asserted claims warrants exercise of this Court's jurisdiction.**

The idea of using a consolidated bankruptcy proceeding to address a central

issue in mass tort litigation is not new. Courts in prior mass tort bankruptcies have exercised

jurisdiction under 28 U.S.C. § 1334(b) and § 157(b)(5) to avoid piecemeal adjudication of

central, threshold issues that may seriously impact the bankruptcy estate. *See, e.g., Dow*

*Corning*, 86 F.3d at 489 (breast implant tort claims); *Robins*, 788 F.2d at 1013-14 (Dalkon

Shield IUD tort claims).

In *Dow Corning*, for example, the court transferred thousands of claims

against non-debtor breast implant manufacturers to resolve the threshold scientific issue of

whether silicone breast implants cause disease. The court concluded that it was essential to

Dow Corning's Chapter 11 that related cases against other breast implant manufacturers be

consolidated within the Chapter 11 proceedings to resolve this threshold issue and thereby

"increase[] the debtor's odds of developing a reasonable plan of reorganization" and "'assure

fair and non-preferential resolution of . . . claims.'" *Id.* at 496 (quoting *A.H. Robins*, 788

F.2d at 1011).

Utilizing Section 157(b)(5), the court sought to "establish a mechanism for

resolving the claims at issue in the most fair and equitable manner possible." *Id.* at 487. In

directing that all related claims should be litigated in a single forum, the court took into

consideration "the judicial system's interest in allocating its limited resources effectively and efficiently." *Id. See also Robins*, 788 F.2d at 1013-14 (observing that the "tremendous expense of trying these cases separately" was avoided where "all Dalkon shield claims and suits [were] centralized before a single forum where all interests [could] be harmonized").

Accordingly, the court transferred claims against non-debtor breast implant manufacturers to preside over a "threshold jury trial on the issue of whether silicone gel breast implants cause the diseases claimed." *Dow Corning*, 86 F.3d at 486. Through this mechanism, the court avoided piecemeal litigation in "separate forums nationwide" which could "seriously impact[]" the bankruptcy estate. *Id.* at 490.[72]

The automobile manufacturers request that the same procedures be implemented here. Federal-Mogul's liability for asbestos-related claims is an important part of these Chapter 11 proceedings.[73] Thus, as in *Dow Corning*, exercise of this Court's jurisdiction is necessary to centralize adjudication for a threshold determination concerning whether brakes and other automotive parts cause the diseases claimed.

---

[72] After the Sixth Circuit directed the district court to transfer the pending cases pursuant to Section 157(b)(5), the district court in subsequent proceedings indicated that it would abstain. The non-debtors filed a petition for mandamus, which the Sixth Circuit granted in part and denied in part, indicating that abstention was so "wholly inappropriate" with respect to certain non-debtors that mandamus was warranted. *In re Dow Corning Corp.*, 113 F.3d 565, 570 (6th Cir. 1997).

[73] Federal-Mogul Asbestos Primer, at **www.federal-mogul.com.** *See also* Debtor's Informational Brief 6 (Oct. 1, 2001) (D.I. 2) (observing that asbestos contained in "automotive friction products was resin-bonded and encapsulated chrysotile"); Jamie Butters, *Asbestos Endangers Supplier's Health Lawsuits Could Drive Federal-Mogul to Seek Bankruptcy Protection*, DETROIT FREE PRESS, July 20, 2001, at 1C ("As many as 90 percent of suits are from people with no evidence of asbestos-related illness . . . and if responsible companies are all forced into bankruptcy, they can't pay the rightful claims of those who are sick.") (quoting Federal-Mogul's CEO, Frank Macher).

2.  **Exercise of this Court's jurisdiction is necessary to preclude collateral litigation of liability that is "directly attributable to the Debtor."**

Consolidated proceedings before this Court are particularly critical given the derivative nature of the automobile manufacturers' liability. In prior mass tort bankruptcies, courts have exercised jurisdiction over related tort claims against non-debtors even where the non-debtors were mere co-defendants or joint tortfeasors. For example, in order to resolve the common, threshold scientific issues concerning whether breast implants cause disease, the court in *Dow Corning* transferred claims against non-debtor breast implant manufacturers that were merely co-defendants of the debtor.

Here, however, the relationship between the automobile manufacturers and the Debtor is much closer given that their liability is derivative in nature. The claims against the automobile manufacturers are based in part on the *same products* as claims asserted against the Debtor. Accordingly, the liability of the automobile manufacturers turns on the same threshold question governing the claims against the Debtor – whether the friction products manufactured by the Debtor are capable of causing disease – making the case for centralized adjudication before this Court even more compelling.

Numerous courts have concluded that the exercise of jurisdiction is warranted under such circumstances where the liability of the third party is "directly attributable to the debtor." *Robins*, 788 F.2d at 999, 1004. *See also McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 510 (3d Cir. 1997) (ordering stay whether there was "such identity between the debtor and the third-party defendant" and citing *Robins*); *In re Johns-Manville Corp.*, 26 B.R. 420, 426 (Bankr. S.D.N.Y. 1983) (suits against officers and employees were "in reality

derivative of identical claims brought against Manville"), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 862 (6th Cir. 1992) (enjoining litigation against company officers that was "inextricably intertwined" with claims against the debtor).

For example, in *A.H. Robins*, the district court stayed litigation against certain non-debtors and entered an order transferring Dalkon Shield cases for centralized resolution within the bankruptcy proceedings. In upholding the district court's decision, the Fourth Circuit indicated that an important factor was the "identity between the debtor and the third-party defendant," which existed where the non-debtor's liability was "directly attributable to the debtor." *Robins*, 788 F.2d at 999, 1004.

Similarly, in *McCartney* the Third Circuit following *Robins* applied the automatic stay to actions against a non-debtor codefendant where there was "such identity between the debtor and the third-party defendant . . . that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'" 106 F.3d at 510 (citing *Robins*, 788 F.2d at 999). As the court observed, failing to stay related actions against non-debtor co-defendants where the liability of the non-debtors was derivative of the debtor's liability would "defeat the purpose" of the bankruptcy system to "centralize all prebankruptcy civil claims against a debtor in the bankruptcy court." *Id.* at 511.

Here, as in *Robins* and *McCartney*, the liability of the automobile manufacturers for claims involving brakes and other automobile parts is "directly attributable to the Debtor." *See Robins*, 788 F.2d at 1004. The claims against the automobile manufacturers and thus claims for contribution and indemnification against the Debtor are dependent upon a determination that the products of the Debtor cause disease, making

consolidated adjudication before this Court to resolve this central question even more critical.

> 3.   **The very scope of the existing litigation – and the resulting prospect of numerous and significant claims for contribution and indemnification – threatens the successful reorganization of the Debtor and warrants exercise of this Court's jurisdiction.**

Finally, courts in prior mass tort bankruptcies have concluded that centralization of litigation under 28 U.S.C. § 157(b)(5) is necessary given the thousands of potential claims for contribution and indemnification that threaten the successful reorganization of the debtor. *See, e.g., Dow Corning*, 86 F.3d at 494. *Cf. Celotex*, 504 U.S. at 310 (exercise of jurisdiction warranted where there may be "a direct and substantial adverse effect on [the debtor's] ability to undergo a successful reorganization"); *McCartney*, 106 F.3d at 510 ("Courts have also extended the stay to nondebtor third parties where stay protection is essential to the debtor's efforts of reorganization.").

In *Dow Corning*, for example, the court concluded that, given the sheer magnitude and dispersed nature of the claims involved, transfer of related claims to the bankruptcy court under Section 157(b)(5) was essential. As the court observed, "[a] single possible claim for indemnification or contribution does not represent the same kind of threat to a debtor's reorganization plan as that posed by the thousands of potential indemnification claims at issue here." 86 F.3d at 494. In ruling that the related claims should be transferred, the court reasoned that the thousands of "[c]laims for indemnification and contribution, whether asserted against or by Dow Corning, obviously would affect the size of the estate and the length of time the bankruptcy proceedings will be pending, as well as Dow Corning's

ability to resolve its liabilities and proceed with reorganization." *Id.*

The situation is no different here. Federal-Mogul faces an ever-expanding exposure to claims for contribution and indemnification stemming from thousands of claims involving its products. As in *Dow Corning*, this liability threatens the Debtor's successful reorganization, and therefore should be addressed within these Chapter 11 proceedings.

## V.    THIS COURT IS UNIQUELY SITUATED TO RESOLVE THIS CENTRAL ISSUE PROMPTLY.

Not only is this the only forum in which a complete and centralized resolution of the threshold scientific issue concerning liability for brakes and other automotive parts can occur, the Federal Rules provide a framework for accomplishing this task promptly.

### A.    Threshold issues relating to the validity of asserted claims may be resolved through summary judgment proceedings.

At the outset of these proceedings, the Court may employ summary judgment proceedings to resolve threshold scientific issues concerning the validity of the asserted claims. *See, e.g., In re The Babcock & Wilcox Co.*, No. Civ. A 00-0558, 2000 WL 422372, at *4 (E.D. La. Apr. 17, 2000) (withdrawing the reference to determine validity of asserted asbestos claims); *In re A.H. Robins Co.*, 59 B.R. 99, 102 (Bankr. E.D. Va. 1986); *In re Dow Corning Corp.*, 215 B.R. 346, 360 (Bankr. E.D. Mich. 1997) ("Summary judgment will serve to weed out those claims which do not present a genuine issue of material fact, and for which the debtor is entitled to judgment as a matter of law.").

As part of the summary judgment proceedings, the Court may reject claims based on unreliable scientific evidence of disease and/or causation. *See Daubert*, 509 U.S. at 592-93; *Kumho Tire*, 526 U.S. at 147 ("gatekeeping" requirement applies "to all expert

50

testimony"); *In re Babcock & Wilcox*, 2000 WL 422372, at \*4 (withdrawing the reference to determine "the validity of claims based on unreliable scientific evidence of disease and/or causation"); *In re Dow Corning Corp.*, 211 B.R. 545, 590 (Bankr. E.D. Mich. 1997) (application of *Daubert* in complex personal injury bankruptcy case).

The admissibility of such evidence is governed by applicable federal law. *See, e.g.*, Bankruptcy Rule 9017 (Federal Rules of Evidence (which have been amended to conform with *Daubert*) apply *in toto* to bankruptcy proceedings); *In re Canvas Specialty, Inc.*, 261 B.R. 12, 16 (Bankr. C.D. Cal. 2001) ("This new language [of Federal Rule of Evidence 702, amended December 1, 2000] governs the admissibility of the evidence here at issue.").

Plaintiffs must first come forward and demonstrate to the Court that their evidence is admissible given the stringent gatekeeping requirements outlined by the Supreme Court in *Daubert*. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1071 (6th Cir. 1993) (affirming grant of summary judgment on *Daubert* grounds), *cert. denied*, 510 U.S. 1193 (1994); *Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999) (The "proponent of the expert testimony" must "prove by a preponderance of the evidence that the testimony is reliable.").

If the plaintiffs cannot meet their burden, or if the *Daubert*-tested evidence they produce is otherwise insufficient to allow a reasonable jury to find in their favor, the summary judgment motion must be granted, and the plaintiffs' disease claims must be disallowed as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986) (standard under Rule 56); *see also In re Barto Tech. Servs., Inc.*, 181 B.R. 255, 256 (Bankr. W.D. Pa. 1995) ("The summary judgment standard of Fed. R. Civ. P. Rule 56(c) applies in bankruptcy cases.").

Where, as here, the *Daubert* inquiry involves complicated scientific issues, courts can appoint scientific experts pursuant to Federal Rule of Evidence 706, if necessary, to aid the court in its "gatekeeping" role and ensure that only reliable evidence is admitted. Indeed, the Supreme Court has encouraged the use of scientific experts in complex cases. In *General Electric*, for example, the Court upheld the trial court's grant of summary judgment based in part on the failure of plaintiffs' experts to provide sufficient evidence of disease causation. In a concurring opinion, Justice Breyer recognized the difficulties that complex cases impose on judges, and cited with favor the *New England Journal of Medicine's* proposal for experts to assist courts in the gatekeeping process: "'a judge could better fill this gatekeeper function if he or she had help from scientists. Judges should be strongly be encouraged to make greater use of their inherent authority . . . to appoint experts.'" 522 U.S. at 149-50. Such independent experts can – by virtue of their scientific knowledge – play a critical role in advising the court and informing the decision-making process.[74]

**B.      Any remaining issues relating to the validity of asserted claims may be resolved through Rule 42 common issue trials.**

Should the Court deny any of the motions for summary judgment, the

---

[74] A panel of medical and scientific experts has been proposed in other Chapter 11 proceedings, including the *Babcock & Wilcox* and *W.R. Grace* bankruptcies, which involve thousands of claims for asbestos-related diseases.

remaining issues may be adjudicated using Rule 42 common issue trials. Through Bankruptcy Rule 7042, Federal Rule of Civil Procedure 42 specifically applies in adversary proceedings under Chapter 11. Rule 42(a) "confers upon a district court broad power, whether at the request of a party or upon its own initiative, to consolidate cases for trial as may facilitate the administration of justice." *Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir. 1964).

The "broad grant of authority" found in Rule 42 "has been applied liberally" to avoid unnecessary costs or delay by resolving common issues in unified proceedings. *See* Fed. R. Civ. P. 42(a); *In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1013 (5th Cir. 1977).

Thus, courts in a variety of circumstances have consolidated claims under Rule 42 to resolve common, threshold issues such as those at issue here. *See, e.g., In re Dow Corning*, 211 B.R. 545, 583 (Bankr. E.D. Mich. 1997) (consolidation of breast implant tort claims for generic causation trial appropriate to resolve "a threshold issue which, depending on its resolution, could obviate the need for further proceedings"); *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 & n.5 (3d Cir. 1997) (observing that "exercising its discretion under Federal Rule of Civil Procedure 42(b)," district court ordered consolidated trial on "issues of exposure, causation, medical monitoring, and property damages" which served "the interests of judicial economy"); *In re Bendectin Litig.*, 857 F.2d 290, 317 (6th Cir.1988) (affirming consolidated trial on causation and observing: "Many courts have ... permitted separate issue trials when the issue first tried would be dispositive of the litigation. . . . [A]ll claims depended upon the answer to a single question: Does Bendectin, taken in therapeutic

53

doses cause birth defects?"), *cert. denied*, 488 U.S. 1006 (1989); *In re Beverly Hills Supper Club Fire Litig.*, 695 F.2d 207, 217 (6th Cir.) (affirming consolidation under Rule 42 for trial on causation), *cert. denied*, 461 U.S. 929 (1982).

**C.     These procedures can be implemented promptly once the Court has asserted jurisdiction.**

In order to avoid unnecessary delay and burden, after transferring the related claims the Court may immediately implement these procedures to resolve the threshold scientific issue that is central to these proceedings. Should the Court deem it necessary, it may provide for a brief period of discovery, followed by summary judgment proceedings in which the automobile manufacturers will ask the Court to apply the established law to test the scientific evidence concerning brake exposure claims. In order to aid it in resolving the scientific issue at the heart of this case, the Court may appoint a panel of experts pursuant to Fed. R. Evid. 706. The Court may then conduct hearings and related *Daubert* proceedings before ruling on the automobile manufacturers' summary judgment motions. If necessary, any remaining claims may be consolidated for trial after summary judgment proceedings are completed.

## CONCLUSION

As the foregoing overview has shown, centralized resolution of the threshold scientific issue concerning claims related to brakes and other automotive parts at the outset of these Chapter 11 proceedings is essential to the successful reorganization of the Debtor. Only by applying the established science to the claims brought against the Debtor along with related claims against the automobile manufacturers, can a prompt, fair and complete

54

resolution of all claims related to these proceedings be ensured. The automobile manufacturers respectfully request that the Court initiate such procedures by exercising jurisdiction under 28 U.S.C. § 1334(b) and permitting transfer of claims related to these proceedings pursuant to 28 U.S.C. § 157(b) for the purpose of adjudicating the threshold scientific issue concerning the validity of claims relating to brakes and other automotive parts in a single forum.

Dated: November 20, 2001                    Respectfully submitted,

 

_____

KLETT, ROONEY, LIEBER & SCHORLING
Teresa K.D. Currier (Del. Id. No. 3080)
Daniel Rath (Del. Id. No. 3022)
1000 West Street
Suite 1410
P.O. Box 1397
Wilmington, Delaware
(302) 552-4200
(302) 552-4295 (fax)

- and -

KIRKLAND & ELLIS
David M. Bernick
John Donley
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

Attorneys for DaimlerChrysler Corp., Ford
Motor Company, and General Motors Corp.

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| FREDDY RAY JOHNSON, | ) | Hon. |
| DAVID RAMOS | ) | |
| | ) | Case No.: |
| Plaintiffs | ) | |
| | ) | |
| V. | ) | State Court Case No. 2000114816-G |
| | ) | |
| ACandS, INC. | ) | |
| ALLIED SIGNAL AQUA-CHEM, INC. | ) | Jury |
| ARMSTRONG WORLD INDUSTRIES, I | ) | |
| ARVIN INDUSTRIES, INC. | ) | |
| ASTEN, INC. | ) | |
| BORG-WARNER CORPORATION | ) | |
| C.E. THURSTON & SONS, INC. | ) | **INDEX OF MATTERS FILED** |
| CROWN CORK & SEAL CO., INC. | ) | |
| DAIMLER CHRYSLER CORPORATION | ) | |
| DAIMLER CHRYSLER MOTORS CORP. | ) | |
| DANA CORPORATION | ) | |
| DRESSER INDUSTRIES, INC. | ) | |
| FEDERAL MOGUL CORPORATION | ) | |
| FLINTKOTE COMPANY (THE) | ) | |
| FORD MOTOR COMPANY | ) | |
| FOSTER WHEELER ENERGY CORP. | ) | |
| GAF CORP. | ) | |
| GARLOCK | ) | |
| GASKET HOLDINGS, INC. | ) | |
| GENERAL ELECTRIC CO. | ) | |
| GENERAL MOTORS CORP. | ) | |
| GENERAL REFRACTORIES COMPA | ) | |
| GEORGIA-PACIFIC CORPORATION | ) | |
| INGERSOLL-RAND COMPANY | ) | |
| J.T. THORPE COMPANY | ) | |
| KAISER ALUMINUM & CHEMICAL | ) | |
| KELLOG, BROWN & ROOT, INC. | ) | |
| KELLY-MOORE | ) | |
| MAREMONT CORPORATION (THE) | ) | |
| METROPOLITAN LIFE INSURANCE CO. | ) | |
| MID-VALLEY, INC. | ) | |
| MOOG AUTOMOTIVE, INC. | ) | |
| NATIONAL SERVICES INDUSTRIES, I | ) | |

DAL:413756.1
37354.1

NORTH AMERICAN REFRACTORIES )
OWENS-ILLINOIS, INC. )
PFIZER, INC. )
PLIBRICO COMPANY )
PNEUMO ABEX CORPORATION )
PROKO INDUSTRIES, INC. )
QUIGLEY COMPANY, INC. )
RAPID-AMERICAN CORPORATION )
RILEY STOKER CORP. )
SHOOK & FLETCHER INSULATION )
SYNKOLOID, A DIVISION OF MURA )
T & N, plc )
TRIPLEX, INC. )
U.S. GYPSUM COMAPNY )
U.S. MINERAL PRODUCTS COMP )
UNION CARBIDE CORP. )
UNIROYAL HOLDING, INC. )
W.R. GRACE & CO-CONN )
)
      Defendants. )

## INDEX OF MATTERS FILED

1.     Docket Sheet

2.     State Court Pleadings

3.     State Court Process

4.     State Court Orders

5.     List of Counsel and Parties

Case 1:01-cv-00197   Document 1   Filed in TXSD on 11/28/2001   Page 86 of 169

RUN DATE 11/27/01
RUN TIME 2:57 PM

* * * * C L E R K ' S   E N T R I E S * * * *

00464905
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS        76006 0000

(10)
DAMAGES

DAVID RAMOS, ET AL

VS

ARMSTRONG WORLD INDUSTRIES, INC.

02877701
PETER A MOIR
800 TRAMMELL CROW CENTER
DALLAS TEXAS        75201 0000

| Date | Entry | Date | Entry |
|------|-------|------|-------|
| 01/19/01 | ORDER NOTICE OF NONSUIT/NO ORDER    ALIMAS/IG | 11/28/00 | ORIGINAL |
| 01/19/01 | (AS TO GAF CORP) IG | 11/28/00 | JURY FEE: |
| 06/12/01 | ORDER DISMISSAL    AC LIMAS/IG | 11/28/00 | CITATION: INC. |
| 06/12/01 | (BANKRUPT DEFENDANTS, ARMSTRONG WORLD INDUSTRIES, INC. AND | 11/28/00 | CITATION: INC. |
| 06/12/01 | W. R. GRACE, ONLY) | 11/28/00 | SERVED |
| 10/30/01 | MTN FOR TRIAL SETTING SET FOR 11/14/01 @ 9:30 A.M.,AS PER ORDER | 11/28/00 | CITATION ILLINOIS, |
| 10/30/01 | AC LIMAS/IG | 11/28/00 | SERVED |
| 11/14/01 | HEARING ON MTN FOR TRL SETTING RESET TO 11/28/01. ACLIMAS/MG | 11/28/00 | CITATION: INC. |
| | | 11/28/00 | CITATION: INC. |
| | | 11/29/00 | SERVED |
| | | 11/29/00 | CITATION: COMPANY |
| | | 11/29/00 | SERVED |
| | | 11/29/00 | CITATION: COPORATIC |
| | | 11/29/00 | SERVED |
| | | 11/29/00 | CITATION: SERVED |
| | | 11/29/00 | CITATION: COMPANY |
| | | 11/29/00 | SERVED |
| | | 11/29/00 | CITATION: COMPANY |
| | | 11/29/00 | CITATION: SERVED |
| | | 11/29/00 | CITATION: COMPANY |
| | | 11/29/00 | SERVED |
| | | 11/29/00 | CITATION: SERVED |

PAGE: 01

2000-11-004816-G

11   28   00

30.00

FOSTER &
SEAR, L.L.P.

PETITION FILED
Pd. by SCOTT WERT
ARMSTRONG WORLD INDUSTRIES,

): 01/25/01     FILED: 05/07/01
SEC. OF STATE: OWEN'S
INC.

): 01/19/01     FILED: 02/06/01
CROWN CORK AND SEAL COMPANY,

): 01/25/01     FILED: 05/07/01
METROPOLITAN LIFE INSURANCE

): 01/25/01     FILED: 04/27/01
"FOSTER WHEELER ENERGY

): 01/19/01     FILED: 02/06/01
W.R. GRACE & CO-CONN
:

NORTH AMERICAN REFRACTORIES
:

): 01/25/01     FILED: 05/07/01
PROKO INDUSTRIES INC.

): 02/05/01     FILED: 05/30/01
SEC. OF STATE: THE SYNKLOID

): 01/19/01     FILED: 02/06/01
GEORGIA- PACIFIC CORPORATION

): 01/25/01     FILED: 05/07/01

Case 1:01-cv-00197   Document 1   Filed in TXSD on 11/28/2001   Page 88 of 169

RUN DATE 11/27/01
RUN TIME 2:57 PM

* * * * C L E R K ' S   E N T R I E S * * * *

                                                                    (10)

                                                                    DAMAGES

ARMSTRONG WORLD INDUSTRIES, INC.

VS

DAVID RAMOS, ET AL

00464905
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS        76006 0000

00287701
PETER A MOIR
800 TRAMMELL CROW CENTER
DALLAS TEXAS          75201 0000

11/29/00  CITATION
          PRODUCTS
11/29/00  SERVEI
11/29/00  CITATION
          COMPANY
11/29/00  SERVEI
11/29/00  CITATION
          HOLDING I
11/29/00  SERVEI
11/29/00  CITATION:
          INC.
11/29/00  SERVEI
11/29/00  CITATION
11/29/00  SERVEI
11/29/00  CITATION
          CORPORATI
11/29/00  SERVEI
11/29/00  CITATION:
          CORPORATI
11/29/00  SERVEI
11/29/00  CITATION:
11/29/00  SERVEI
11/29/00  CITATION:
11/29/00  SERVEI
11/29/00  CITATION:
11/30/00  SERVEI
11/30/00  CITATION
11/30/00  SERVEI
11/30/00  CITATION:
11/30/00  SERVEI
11/30/00  CITATION:

PAGE: 02

2000-11-004816-G

11   28   00

30.00

FOSTER & SEAR, L.L.P.

SEC. OF STATE: U.S. MINERAL COMPANY
D: 01/19/01    FILED: 02/06/01

SEC. OF STATE: THE FLINKTONE
D: 01/19/01    FILED: 02/06/01

SEC. OF STATE: UNIROYAL INC.
D: 01/19/01    FILED: 02/06/01

KELLY-MORRE PAINT COMPANY, INC.
D: 01/19/01    FILED: 02/06/01

SEC. OF STATE: RAPID AMERICAN
D: 01/19/01    FILED: 02/06/01

SEC. OF STATE: AQUA-CHEM, INC.
D: 03/02/01    FILED: 03/19/01

KAISER ALUMINUM & CHEMICAL ON
D: 02/19/01    FILED: 02/06/01

RILEY STOKER CORPORATION
D: 01/25/01    FILED: 05/07/01

GENERAL ELECTRIC COMPANY
D: 03/02/01    FILED: 03/26/01

SEC. OF STATE: GAF CORPORATION
D: 01/25/01    FILED: 05/07/01

U.S. GYPSUM COMPANY
D: 01/19/01    FILED: 02/06/01

QUIGLEY COMPANY, INC.
D: 01/25/01    FILED: 05/07/01

RUN DATE 11/27/01
RUN TIME 2:57 PM

* * * *   C L E R K ' S   E N T R I E S   * * * *

DAVID RAMOS, ET AL

VS

ARMSTRONG WORLD INDUSTRIES, INC.

00464905
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS        76006 0000

(10)

DAMAGES

00287701
PETER A MOIR
800 TRAMMELL CROW CENTER
DALLAS TEXAS        75201 0000

| | |
|---|---|
| 11/30/00 | SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION REFRACTOR |
| 11/30/00 | CITATION SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION CORPORATI |
| 11/30/00 | CITATION SERVED |
| 11/30/00 | CITATION SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |
| 11/30/00 | CITATION: SERVED |

PAGE: 03

2000-11-004816-G

11    28    00

30.00

FOSTER &
SEAR, L.L.P.

D: 01/25/01    FILED: 05/07/04
GASKET HOLDINGS INC.

D: 01/25/01    FILED: 05/07/01
J.T. THORPE COMPANY

D: 03/06/01    FILED: 05/30/01
DANA CORPORATION

D: 01/25/01    FILED: 05/07/01
SEC. OF STATE: GENERAL
LIES COMPANY

D: 01/19/01    FILED: 02/06/01
KELLOGG-BROWN & ROOT INC.

D: 01/25/01    FILED: 05/07/01
A C AND S INC.

D: 01/25/01    FILED: 05/07/01
SEC. OF STATE: FEDERAL MOGUL

C: OF STATE: FEDERAL MOGUL

(3.

SEC. OF STATE: T&N PLC.

D: 01/19/01    FILED: 02/06/01
INGERSOLL-RAND COMPANY

D: 01/25/01    FILED: 05/07/01
MID-VALLEY, INC.

D: 02/20/01    FILED: 03/26/01
PLIBRICO COMPANY

D: 01/19/01    FILED: 02/06/01
UNION CARBIDE CORPORATION

D: 01/25/01    FILED: 05/07/01
DRESSER INDUSTRIES, INC.

D: 02/20/01    FILED: 03/26/01

Case 1:01-cv-00197   Document 1   Filed in TXSD on 11/28/2001   Page 92 of 169

P.
RUN DATE 11/27/01
RUN TIME 2:57 PM

DAVID RAMOS, ET AL

VS

ARMSTRONG WORLD INDUSTRIES, INC.

\* \* \* \* C L E R K ' S   E N T R I E S \* \* \* \*

(10)
DAMAGES

00464905
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS      76006 0000

00287701
PETER A MOIR
800 TRAMMELL CROW CENTER
DALLAS TEXAS      75201 0000

11/30/00 CITATION:
         INC.
11/30/00   SERVED
11/30/00 CITATION:
11/30/00   SERVED
11/30/00 CITATION
11/30/00   SERVED
11/30/00 CITATION
         FLETCHER
11/30/00   SERVED
11/30/00 CITATION
         & SONS, 1
11/30/00   SERVED
11/30/00 CITATION:
11/30/00   SERVED
11/30/00 CITATION
         CORPORATI
11/30/00 CITATION
         CORPORATI
11/30/00   SERVED
11/30/00 CITATION:
11/30/00   SERVED
11/30/00 CITATION:
11/30/00   SERVED
11/30/00 CITATION:
         CORPORATI
11/30/00 CITATION
11/30/00   SERVED
11/30/00 CITATION
         INDUSTRII
11/30/00   SERVEI
11/30/00 CITATION:
11/30/00   SERVEI
11/30/00 CITATION

Case 1:01-cv-00197   Document 1   Filed in TXSD on 11/28/2001   Page 93 of 169

PAGE: 04

2000-11-004816-G

11      28      00

30.00

NATIONAL SERVICE INDUSTRIES,

FOSTER &
SEAR, L.L.P.

l: 01/19/01   PFIZER, INC.   FILED: 02/06/01

p: 01/25/01   SEC. OF STATE: SHOCK &
INSULATION CO.   FILED: 05/07/01

p: 01/19/01   SEC. OF STATE: C.E. THURSTON
INC.   FILED: 02/06/01

b: 01/19/01   GUARD-LINE INC.   FILED: 02/06/01

b: 03/06/01   SEC. OF STATE: BORG-WAGNER   FILED: 04/03/01
[ ALLIED SIGNAL

]: J1/19/01   FORD MOTOR COMPANY   FILED: 02/06/01

]: 01/25/01   DAIMLERCHRYSLER CORPORATION   FILED: 05/07/01

p: 01/25/01   DAIMLERCHRYSLER MOTORS   FILED: 05/07/01
[ON

>: 01/25/01   SEC. OF STATE: ARVIN   FILED: 05/04/01
BS, INC.

b: 01/19/01   PNUEMO ABEX CORPORATION   FILED: 02/06/01

b: 01/19/01   SEC. OF STATE: MAREMONT   FILED: 02/06/01

RUN DATE 11/27/01
RUN TIME 2:57 PM

\* \* \* C L E R K ' S   E N T R I E S \* \* \* \*

ARMSTRONG WORLD INDUSTRIES, INC.

VS

DAVID RAMOS, ET AL

00464905
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS      76006 0000

(10)
DAMAGES

00287701
PETER A MOIR
800 TRAMMELL CROW CENTER
DALLAS TEXAS      75201 0000

| Date | Entry |
|---|---|
| 11/30/00 | CORPORATI |
| 11/30/00 | SERVED |
| 11/30/00 | CITATION: |
| 11/30/00 | SERVED |
| 12/01/00 | CITATION: |
| 12/01/00 | SERVED |
| 12/01/00 | CITATION: |
| 12/01/00 | SERVED |
| 12/01/00 | CITATION: |
| 12/01/00 | SERVED |
| 12/01/00 | CITATION: |
| 12/01/00 | SERVED |
| 12/01/00 | CITATION: |
| 12/01/00 | SERVED |
| 12/01/00 | CITATION: |
| 12/01/00 | SERVED |
| 01/01/01 | TRANSFERR |
| 01/01/01 | PLTFS' NO |
| 01/19/01 | GAF CORP) |
| 01/19/01 | RUBER |
| 02/15/01 | OWENS-ILI |
| 02/15/01 | VENUE; AN |
| 02/15/01 | WITHO |
| 02/15/01 | ORIGINAL |
| 02/15/01 | ORIGI |
| 02/16/01 | ORIGINAL |
| 02/16/01 | ORIGINAL |
| 02/16/01 | INSURANCE |
| 02/16/01 | CROSS AC |
| 02/20/01 | INSURANCE |
| 02/20/01 | ORIGINAL |
| 02/20/01 | ORIGINAL |
| 02/20/01 | ORIGINAL |

PAGE: 05

2000-11-004816-G

11   28   00

30.00

FOSTER & SEAR, L.L.P.

ON

N: 01/19/01    FILED: 02/06/01
GARLOCK, INC.

P: TRIPLEX, INC.
D: 03/02/01    FILED: 03/19/01
ALLIED SIGNAL, INC.
D: 01/25/01    FILED: 05/04/01
GENERAL MOTORS
D: 01/25/01    FILED: 05/07/01
MOOG AUTOMOTIVE, INC.
D: 03/02/01    FILED: 03/26/01
RED FROM THE 357TH COURT
TICE OF NONSUIT AGAINST DEFT
CCESSOR TO
_D CORP) (IGARCIA)
LINOIS INC'S MTN TO TRANSFER
D, SUBJECT TO AND
UT WAIVING THE FOREGOING, ITS
ANSWER TO PLTFS
NAL PETITION (IGARCIA)
ANSWER: OWEN'S ILLINOIS, INC.
ANSWER: METROPOLITAN LIFE
E COMPANY
ION: METROPOLITAN LIFE
E COMPANY
ANSWER: A C AND S INC.
ANSWER: FORD MOTOR COMPANY
ANSWER: GENERAL REFRACTORIES

RUN DATE 11/27/01
RUN TIME 2:57 PM

*   *   *   *   C L E R K ' S   E N T R I E S   *   *   *   *

PAGE: 06

2000-11-004816-G

DAVID RAMOS, ET AL

VS

ARMSTRONG WORLD INDUSTRIES, INC.

00464905                                                        (10)              11      28      00
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS        76006 0000

                                                               DAMAGES                            30.00

00287701                                                                          FOSTER &
PETER A MOIR                                                                       SEAR, L.L.P.
800 TRAMMELL CROW CENTER
DALLAS TEXAS           75201 0000

02/20/01   CROSS ACTION: GENERAL REFRACTORIES
           COMPANY
02/20/01   CROSS ACTION: GENERAL REFRACTORIES
           COMPANY (GRC)
02/20/01   ORIGINAL ANSWER: GENERAL ELECTRIC
           COMPANY
02/20/01   ORIGINAL ANSWER: HONEYWELL
           INTERNATIONAL, INC.
02/20/01   CROSS ACTION: HONEYWELL INTERNATIONAL,
           INC.
02/20/01   CROSS ACTION: GENERAL MOTORS
02/20/01   DEFT ACANDS INC'S ORIGINAL ANSWER AND
           DEFT'S ANSWER TO ANY AND
02/20/01   ALL CROSS-ACTIONS(IGARCIA)
02/20/01   DEMAND FOR JURY TRIAL (IGARCIA)
02/20/01   DEFT HONEYWELL INTERNATIONAL INC'S MTN
           TO TRANSFER VENUE,
02/20/01   ORIGINAL ANSWER, CROSS-ACTION, AND
           ANSWER TO ALL CROSS-
02/20/01   ACTIONS(IGARCIA)
02/20/01   DEFT GENERAL MOTORS CORP'S MTN TO
           TRANSFER VENUE, ORIGINAL
02/20/01   ANSWER, CROSS-ACTION, AND ANSWER
           TO ALL CROSS-ACTIONS(IRENE
02/20/01   DEFT GENERAL REF. CO'S SPECIAL
           APPEARANCE TO PRESENT MOTION
02/20/01   TO THE JURISDICTION AND SUBJECT
           THERETO ITS MTN TO TRANSFER
02/20/01   VENUE, AND SUBJECT THERETO, ITS
           ORIGINAL ANSWER TO PLTFS'

Case 1:01-cv-00197   Document 1   Filed in TXSD on 11/28/2001   Page 97 of 169

RUN DATE 11/27/01
RUN TIME 2:57 PM

*   *   *   C L E R K ' S   E N T R I E S   *   *   *

(10)
DAMAGES

ARMSTRONG WORLD INDUSTRIES, INC.

VS

DAVID RAMOS, ET AL

00464905
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS          76006 0000

00287701
PETER A MOIR
800 TRAMMELL CROW CENTER
DALLAS TEXAS          75201 0000

| | |
|---|---|
| 02/20/01 | ORIGI |
| 02/20/01 | AND ANSWE |
| 02/20/01 | DEFT GENE |
| 02/20/01 | TO JOINDE |
| 02/20/01 | ANSWE |
| 02/20/01 | ACTIONS(I |
| 02/20/01 | DEFT FORI |
| 02/20/01 | VENUE ANI |
| 02/20/01 | TO PI |
| 02/20/01 | ASBESTOS |
| 02/20/01 | ITS MIN |
| 02/20/01 | DEFT FORI |
| 02/21/01 | DEMAND(IC |
| 02/21/01 | ORIGINAL |
| 02/21/01 | ORIGINAL |
| 02/21/01 | CHEMICAL |
| 02/21/01 | KAISER AI |
| 02/21/01 | TO TRANSI |
| 02/21/01 | KAISER AI |
| 02/21/01 | ORIGINAL |
| 02/21/01 | ITS N |
| 02/21/01 | VENUE/CR( |
| 02/21/01 | CROS: |
| 02/21/01 | KAISER AI |
| 02/22/01 | CERT. OF |
| 02/22/01 | ORIGINAL |
| 02/22/01 | ORIGINAL |
| | MOTORS C( |

PAGE: 07

2000-11-004816-G

11  28  00

30.00

FOSTER & SEAR, L.L.P.

...NAL PETITION, CROSS-ACTION
..R TO ALL CROSS-
.N (IGARCIA)
..RAL ELECTRIC CO'S OBJECTION
.R, ORIGINAL
.R, AND ANSWER TO ALL CROSS
.[GARCIA)
.) MOTOR CO'S MTN TO TRANSFER
.) ORIGINAL ANSWER
.LTF DAVID RAMOS' ORIGINAL
.[ PETITION SUBJECT TO
.: TO TRANSFER VENUE (IGARCIA)
.) MOTOR CO'S JURY
.GARCIA)
.'SWER: INGERSOLL-RAND COMPANY
.NSWER: KAISER ALUMINUM &
.CORPORATION
.JMINUM & CHEMICAL CORP'S MTN
.FER VENUE(IGARCIA
.JMINUM & CHEMICAL CORP'S
.JMINUM & CHEMICAL CORP'S
.ANSWER SUBJECT TO
.MTN TO TRANSFER
.>SS-CLAIMS AND ANSWER TO ALL
.5-CLAIMS (IGARCIA)
.JMINUM & CHEMICAL CORP'S
.DISCOVERY (IGARCIA)
.ANSWER: UNIROYAL HOLDING INC.
.ANSWER: DAIMLERCHRYSLER
.ORPORATION

Case 1:01-cv-00197   Document 1   Filed in TXSD on 11/28/2001   Page 99 of 169

RUN DATE 11/27/01                                                                    PAGE: 08
RUN TIME 2:57 PM

ARMSTRONG WORLD INDUSTRIES, INC.                                          2000-11-004816-G

VS

DAVID RAMOS, ET AL

* * * * C L E R K ' S  E N T R I E S * * * *

00464905                                          (10)                      11    28    00
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS        76006 0000

00287701                                          DAMAGES                         FOSTER &
PETER A MOIR                                                              SEAR, L.L.P.
800 TRAMMELL CROW CENTER
DALLAS TEXAS            75201 0000                                               30.00

02/22/01  DAIMLERCHRYSLER CORP'S &
          DAIMLERCHRYSLER MOTORS CORP'S MOTION
          TO TRANSFER VENUE AND, SUBJECT
02/22/01  THERETO, MTN TO DISMISS FOR
          FORUM NON CONVENIENS, AND ORIGINAL
02/22/01  ANSWER TO PLTS'
          ORIGINAL ASBESTOS PETITION, TEXAS
02/22/01  EXPOSURE AND/OR RESIDENT
          (IGARCIA)
02/26/01  ORIGINAL ANSWER: PROKO INDUSTRIES INC.
02/26/01  ORIGINAL ANSWER: THE SYNKLOID COMPANY
02/26/01  CROSS ACTION: THE SYNKLOID COMPANY
02/26/01  ORIGINAL ANSWER: GEORGIA- PACIFIC
          CORPORATION
02/26/01  DEFT'S JURY DEMAND (IGARCIA)
02/27/01  ORIGINAL ANSWER: BORG-WAGNER
          CORPORATION ALLIED SIGNAL
02/27/01  EXHIBIT "A" TO DEFT FORD MOTOR CO'S
          MTN TO TRANSFER VENUE
02/27/01  DEFT BORGO-WARNER CORP'S MTN TO
          TRANSFER VENUE AND SUBJECT
02/27/01  PREVIOUSLY HEREIN(IGARCIA)
          THERETO ORIGINAL ANSWER TO PLTF
02/27/01  DAVID RAMOS (IGARCIA)
03/01/01  ORIGINAL ANSWER: THE FLINKTONE COMPANY
03/01/01  SPECIAL APPEARANCE OF THE FLINTKOTE CO
          AND MTN TO TRANSFER AND
03/01/01  ORIGINAL ANSWER SUBJECT
          THERETO (IGARCIA)

RUN DATE 11/27/01
RUN TIME 2:57 PM

ARMSTRONG WORLD INDUSTRIES, INC.

DAVID RAMOS, ET AL

VS

* * * CLERK'S ENTRIES * * * *

(10)
DAMAGES

00464905
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS    76006 0000

00287701
PETER A. MOIR
800 TRAMMELL CROW CENTER
DALLAS TEXAS    75201 0000

03/05/01 ORIGINAL INC.
03/05/01 ORIGINAL
03/05/01 NOTICE OF COUNSEL(I
03/05/01 THE FIBR
03/13/01 ORIGINAL
03/16/01 ORIGINAL INDUSTRIE
03/16/01 GASKET HC SUCCESSOR
03/16/01 FEXIT TO PLTFS'
03/16/01 ASBEST
03/19/01 ORIGINAL
03/19/01 ORIGINAL
03/19/01 ORIGINAL
03/19/01 DEFT'S (F
03/19/01 AND CO IN AND I
03/20/01 FOR DISCI
03/20/01 ORIGINAL
03/20/01 ORIGINAL
03/20/01 CORPORATI
03/22/01 ORIGINAL COMPANY,
03/22/01 DEFT KELI TRANSFER
03/22/01 SUBJE

FOSTER &
SEAR, L.L.P.

ANSWER: KELLOGG-BROWN & ROOT

ANSWER: PLIBRICO COMPANY
DESIGNATION OF LEAD TRIAL
(GARCIA)
ICO CO'S EXHIBIT LIST(IGARCIA)
ANSWER: NATIONAL SERVICE
IS, INC.
LDING, INC'S IND. AND AS
IN INTEREST TO
ALLIC, INC. ORIGINAL ANSWER
ORIGINAL
OS PETITION (IGARCIA)
ANSWER: PFIZER, INC.
'SWER: QUIGLEY COMPANY, INC.
SWER: DANA CORPORATION
FIZER INC FKA CHAS. PFIZER
INC FKA CHAS. PFIZER
(C., QUIGLEY CO
ANA CORP) RULE 194 REQUEST
OSURE TO PLTFS(IG)
ANSWER: GUARD-LINE INC.
ANSWER: AQUA-CHEM, INC.
ANSWER: RAPID AMERICAN
ION
ANSWER: KELLY-MORRE PAINT
INC.
Y-MOORE PAINT CO INC'S MTN TO
VENUE AND
CT THERETO ORIGINAL ANSWER

RUN DATE 11/27/01
RUN TIME  2:57 PM

*   *   *   *   C L E R K ' S   E N T R I E S   *   *   *   *

DAVID RAMOS, ET AL

VS

ARMSTRONG WORLD INDUSTRIES, INC.

(10)   DAMAGES

00464905
SCOTT WERT
1201 N. WATSON ROAD, SUITE 145
ARLINGTON, TEXAS    76006 0000

00287701
PETER A MOIR
800 TRAMMELL CROW CENTER
DALLAS TEXAS    75201 0000

| 03/22/01 | ORIGINAL ANS! |
| 03/27/01 | ORIGINAL ANS! |
|          | AND SPECIAL l |
| 04/02/01 | ORIGINAL ANS! CORPORATION INC. |
| 04/02/01 | ORIGINAL ANS! CORPORATION |
| 04/03/01 | NOTICE OF IN. WRITTEN QUES! |
| 04/06/01 | ORIGINAL ANS! CORPORATION |
| 04/06/01 | ORIGINAL ANS! COMPANY |
| 04/10/01 | ORIGINAL ANS! |
| 04/10/01 | ORIGINAL ANS! CORPORATION |
| 04/12/01 | DEFT'S (T & ] TURNER & NEW. |
| 04/12/01 | REQUEST . |
| 04/12/01 | PLTF(S) (IGAR. |
| 04/12/01 | NOTICE OF IN WRITTEN QUES! |
| 04/12/01 | ORIGINAL ANS! |
| 04/17/01 | ORIGINAL ANS! |
| 04/17/01 | ORIGINAL ANS! CROSS-ACTION |
| 04/17/01 | OF DEFT ' |
| 04/20/01 | ORIGINAL ANS! REFRACTORIES |

CAUSE NO. 2000-11-4816-E

FILED 10 ᵒᵒ O'CLOCK A M
AURORA DE LA GARZA DIST. CLERK

NOV 28 2000

DISTRICT COURT OF CAMERON COUNTY TEXAS
_____ M. ___ DEPUTY

| | |
|---|---|
| DAVID RAMOS AND EMMA RAMOS; FREDDY RAY JOHNSON AND LORETTA JOYCE JOHNSON; <br><br> Plaintiffs, <br><br> VS. <br><br> ~~[struck through]~~ COMPANY); OWENS-ILLINOIS, INC.; GARLOCK INC; CROWN CORK AND SEAL COMPANY, INC. (successor to MUNDET CORK COMPANY); METROPOLITAN LIFE INSURANCE COMPANY; FOSTER WHEELER ENERGY CORPORATION; W. R. GRACE & CO.-CONN. (successor to W. R. GRACE & COMPANY); NORTH AMERICAN REFRACTORIES COMPANY; PROKO INDUSTRIES, INC.; THE SYNKOLOID COMPANY; GEORGIA-PACIFIC CORPORATION (individually and as successor to BESTWALL GYPSUM COMPANY); U.S. MINERAL PRODUCTS COMPANY; THE FLINTKOTE COMPANY; UNIROYAL HOLDING, INC. (successor to U. S. RUBBER COMPANY); KELLY-MOORE PAINT COMPANY, INC.; AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION); RAPID-AMERICAN CORPORATION (as successor-by-merger to GLEN ALDEN CORPORATION, BRIGGS MANUFACTURING CO., PHILIP CAREY CORPORATION AND PHILIP CAREY MANUFACTURING COMPANY); KAISER ALUMINUM & CHEMICAL CORPORATION; RILEY STOKER CORPORATION; GENERAL ELECTRIC COMPANY; GAF CORPORATION (successor to RUBEROID CORPORATION); U.S. GYPSUM COMPANY; QUIGLEY COMPANY, INC.; GASKET HOLDINGS, INC., (successor to FLEXITALLIC GASKET | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § IN THE ~~DISTRICT COURT~~ <br><br> CAMERON COUNTY, TEXAS <br><br> 357th JUDICIAL DISTRICT |

COMPANY); DANA CORPORATION; §
GENERAL REFRACTORIES COMPANY; J.T. §
THORPE COMPANY; KELLOGG-BROWN & §
ROOT, INC. (f/k/a BROWN & ROOT, INC., §
which was f/k/a BROWN & ROOT USA, INC., §
BROWN & ROOT USA DELAWARE INC. §
which is the successor-in-interest to BROWN & §
ROOT USA INC.);  ACandS, INC.;  FEDERAL- §
MOGUL CORPORATION  (as  Successor-in- §
Interest to T & N PLC, f/k/a TURNER & §
NEWELL PLC) ; T&N plc (f/k/a TURNER & §
NEWELL PLC); INGERSOLL-RAND §
COMPANY; MID-VALLEY, INC.; TRIPLEX, §
INC.; PLIBRICO COMPANY; UNION §
CARBIDE CORPORATION (Individually and §
f/k/a UNION CARBIDE CHEMICALS AND §
PLASTIC COMPANY, INC.); DRESSER §
INDUSTRIES, INC.; NATIONAL SERVICE §
INDUSTRIES, INC.; PFIZER, INC.; SHOOK & §
FLETCHER INSULATION CO.; C. E. §
THURSTON & SONS, INC.; GUARD-LINE, §
INC.; BORG-WARNER CORPORATION; §
ALLIED SIGNAL (Individually and as §
Successor-in-Interest to THE BENDIX §
CORPORATION; FORD MOTOR COMPANY; §
DAIMLERCHRYSLER CORPORATION(f/k/a §
and as Successor-in-Interest to CHRYSLER §
CORPORATION); DAIMLERCHRYSLER §
MOTORS CORPORATION (f/k/a and as §
Successor-in-Interest to CHRYSLER §
CORPORATION); GENERAL MOTORS; §
MOOG AUTOMOTIVE, INC. (Individually and §
as Successor-in-Interest to WAGNER §
ELECTRIC CORPORATION); PNEUMO §
ABEX CORPORATION (Individually and as §
Successor-in-Interest to ABEX CORPORATION §
and AMERICAN BRAKE SHOE COMPANY); §
ARVIN INDUSTRIES, INC.; THE §
MAREMONT CORPORATION (a subsidiary of §
ARVIN INDUSTRIES, INC.); §
§
       Defendants. §

---

## PLAINTIFFS' ORIGINAL ASBESTOS PETITION, TEXAS EXPOSURE AND/OR TEXAS RESIDENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Plaintiffs, (the name and residence of each Plaintiff is shown on the attached Exhibit "A" and incorporated herein for all purposes) complaining of the various Defendants listed below and for cause of action would show the Court and Jury as follows:

1.      Plaintiffs reside in the State of Texas, resided in the State of Texas at the time of their exposure to asbestos fibers in Defendants' products, and/or sustained substantial exposure to asbestos fibers in Defendants products while in the State of Texas.  Discovery shall be conducted under Level 2 of Rule 190 of Texas Rules of Civil Procedure.

2.      All or a substantial part of Plaintiffs' asbestos-related injuries from Defendants' products occurred in this County. All or a substantial part of Plaintiffs' causes of action arose in this County.  Certain Defendants named herein reside in this County and maintain a principal office in this County.  Therefore, venue properly lies in this County.

3.      The damages sought by Plaintiffs, exclusive of interests and costs, exceed the minimum jurisdictional limits of the Court.

4.      Defendant ARMSTRONG WORLD INDUSTRIES, INC. may be served with citation in this action by service of citation upon its registered agent C.T. Corporation Systems, 350 N. St. Paul Street, Suite 2900, Dallas, Texas, 75201. Said corporation is being sued individually and as successor-in-interest to ARMSTRONG CORK COMPANY.

5.      Although Defendant, OWENS-ILLINOIS, INC., an Ohio corporation, has at all times relevant to this litigation conducted business in this state and is required to maintain a registered agent for service of process in this state, it has not designated such an agent.  Therefore, said

PLAINTIFFS' ORIGINAL ASBESTOS PETITION/TEXAS EXPOSURE AND/OR TEXAS RESIDENT  Page 3
T:\LITIGATION\Cameron\Ramos\Pleadings\OriginalPetition.wpd\klf

corporation may be served with citation in this action by service of citation upon its corporate headquarters, One Seagate, Toledo, Ohio 43666. Pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045, Defendant, OWENS-ILLINOIS, INC., may be served with process through the Secretary of State for the State of Texas.

6.     Defendant GARLOCK, INC. may be served with citation in this action by service of citation upon its registered agent, C. T. Corporation Systems, 350 N. St. Paul, Suite 2900, Dallas, Texas 75201.

7.     Defendant CROWN CORK AND SEAL COMPANY, INC. may be served with citation in this action by service of citation upon its registered agent, C. T. Corporation Systems, 350 N. St. Paul, Suite 2900, Dallas, Texas 75201. Said corporation is being sued individually and as successor-in-interest to MUNDET CORK COMPANY.

8.     Defendant METROPOLITAN LIFE INSURANCE COMPANY may be served with citation in this action by service of citation upon its registered agent, Robert E. Wolin, Wolin, Ridley & Miller, 1717 Main Street, 3100 Bank One Center, Dallas, Texas 75201.

9.     Defendant FOSTER WHEELER ENERGY CORPORATION may be served with citation in this action by service of citation upon its registered agent, U. S. Corporation, 800 Brazos, Austin, Texas 78701.

10.     Defendant W. R. GRACE & CO.-CONN. may be served with citation in this action by service of citation upon its registered agent, The Prentice-Hall Corporation System, Inc., 800 Brazos, Austin, Texas 78701. Said corporation is being sued individually and as successor-in-interest to W. R. GRACE & COMPANY.

11.     Defendant NORTH AMERICAN REFRACTORIES COMPANY may be served with citation in this action by service of citation upon its registered agent, C. T. Corporation Systems, 350 N. St. Paul, Suite 2900, Dallas, Texas 75201.

12.     Defendant PROKO INDUSTRIES, INC. may be served with citation in this action by service of citation upon its registered agent, Bowers, Orr & Dougall, P.O. Box 25389, Columbia South Carolina 29224.

13.     Defendant THE SYNKOLOID COMPANY has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process in this state, it has not designated such an agent.  Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters, 148 E. 5th Street, Bayonne, New Jersey 07002, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. Defendant SYNKOLOID may be served with process through the Secretary of State for the State of Texas.

14.     Defendant GEORGIA-PACIFIC CORPORATION may be served with citation in this action by service of citation upon its registered agent, C. T. Corporation Systems, 350 N. St. Paul, Suite 2900, Dallas, Texas 75201.  Said corporation is being sued individually and as successor-in-interest to BESTWALL GYPSUM COMPANY.

15.     Although Defendant U. S. MINERAL PRODUCTS COMPANY has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process, it has not designated such an agent.  Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters, Furnace Street, Stanhope, New Jersey 07874, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. &

Case 1:01-cv-00197   Document 1   Filed in TXSD on 11/28/2001   Page 108 of 169

```
*********************
***   RX REPORT   ***
*********************
```

RECEPTION OK

| | |
|---|---|
| TX/RX NO | 6373 |
| CONNECTION TEL | 210 668 7328 |
| CONNECTION ID | |
| ST. TIME | 11/27 17:29 |
| USAGE T | 09'34 |
| PGS. | 15 |
| RESULT | OK |

Rem. Code §§ 17.041-.045. Defendant U.S. MINERAL PRODUCTS COMPANY may be served with process through the Secretary of State for the State of Texas.

16.     Although Defendant THE FLINTKOTE COMPANY has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process in this State, it has not designated such an agent.  Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters, Two Embarcadero Center, Suite 1600, San Francisco, California 94111, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. Defendant, THE FLINTKOTE COMPANY, may be served with process through the Secretary of State for the State of Texas.

17.     Although Defendant UNIROYAL HOLDING, INC. has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process, it has not designated such an agent.  Said corporation is being sued individually and as successor-in-interest to U. S. RUBBER COMPANY.  Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters, 70 Great Hill Road, Naugatuck, Connecticut 06770, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045.  Defendant UNIROYAL HOLDING, INC. may be served with process through the Secretary of State for the State of Texas.

18.     Defendant KELLY-MOORE PAINT COMPANY, INC. may be served with citation in this action by service of citation upon its registered agent,  Kenneth Wall, 2727 Allen Parkway, Suite 1300, Houston, Texas 77019.

19.     Although Defendant AQUA-CHEM, INC. (d/b/a CLEAVER-BROOKS DIVISION) has at all times relevant to this litigation conducted business in this State and is required to maintain

a registered agent for service of process, it has not designated such an agent. Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters 7800 N. 113th Street, Milwaukee, Wisconsin 53224-3136, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. Defendant AQUA-CHEM, INC. may be served with process through the Secretary of State for the State of Texas.

20.     Defendant RAPID-AMERICAN CORPORATION (f/k/a GLEN ALDEN CORPORATION) is a corporation with its principal place of business in a state other than Texas. This corporation is being sued individually and as successor-by-merger to GLEN ALDEN CORPORATION, BRIGGS MANUFACTURING CO., PHILIP CAREY CORPORATION and PHILIP CAREY MANUFACTURING COMPANY. Through its actions in asbestos litigation in New York, RAPID AMERICAN CORPORATION has submitted to the jurisdiction of this court. Therefore, said corporation may be served with citation in this action by service of citation upon its registered agent, The Prentice-Hall Corporation System, Inc., 1013 Centre Road, Wilmington, Delaware 19805.

21.     Defendant KAISER ALUMINUM & CHEMICAL CORPORATION may be served with citation in this action by service of citation upon its registered agent, C. T. Corporation Systems, 350 N. St. Paul, Suite 2900, Dallas, Texas 75201.

22.     Defendant RILEY STOKER CORPORATION may be served with citation in this action by service of citation upon its registered agent, C. T. Corporation Systems, 1021 Main St., Houston, Texas 77002.

NOV-27-01 TUE 6:03 PM   ADM. RCRIS          FAX NO. 210 698 7328                    P. 2

23.     Defendant, GENERAL ELECTRIC, may be served with citation in this action by service of citation upon its registered agent, C. T. Corporation Systems, 350 N. St. Paul, Suite 2900, Dallas, Texas 75201.

24.     Defendant, GAF CORPORATION, has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process, it has not designated such an agent.   Said corporation is being sued individually and as successor-in-interest to RUBEROID CORPORATION.  Therefore, said corporation may be served with citation in this action by service of citation upon its General Counsel, 1361 Alps Rd., Wayne, New Jersey 07470, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code section 17.041-.045. Defendant GAF CORPORATION may be served with process through the Secretary of State for the State of Texas.

25.     Defendant U.S. GYPSUM COMPANY may be served with citation in this action by service of citation upon its registered agent C.T. Corporation Systems, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

26.     Defendant QUIGLEY COMPANY, INC. may be served with citation in this action by service of citation upon its registered agent, C.T. Corporation Systems, 350 N. St. Paul Street, Suite 2900, Dallas, Texas, 75201.

27.     Defendant GASKET HOLDINGS, INC. may be served with citation in this action by service of citation upon its registered agent, C.T. Corporation Systems, 350 N. St. Paul Street, Suite 2900, Dallas, Texas, 75201.  Said corporation is being sued individually and as successor-in-interest to FLEXITALLIC, INC.

28.     Defendant J.T. THORPE COMPANY is a Texas corporation and may be served with citation in this action by service of citation upon its registered agent, W. Miller Thomas, 413 Shelbyville Street, Center, Texas 75935-1719.  Said corporation is being sued individually and as successor-in-interest to THORPE INSULATION COMPANY.  Hereinafter, the terms "Defendant" or "Defendants" shall apply to Defendant J.T. THORPE COMPANY in the claims brought by Plaintiffs.

29.     Defendant DANA CORPORATION may be served with citation in this action by service of citation upon its registered agent, C.T. Corporation Systems, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201.

30.     Although Defendant GENERAL REFRACTORIES COMPANY has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process in this state, it has not designated such an agent.  Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters, 225 City Avenue, Suite 114, Bala Cynwyd, Pennsylvania 19004, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code Sections 17. 041-.045.  Defendant GENERAL REFRACTORIES COMPANY may be served with process through the Secretary of State for the State of Texas.

31.     Defendant KELLOGG-BROWN & ROOT, INC. (f/k/a BROWN & ROOT, INC. which was f/k/a BROWN & ROOT USA INC., BROWN & ROOT USA DELAWARE INC which is the successor-in-interest to BROWN & ROOT USA INC.) is a corporation organized and existing under and by virtue of the laws of the State of Delaware and may be served with process by serving

its agent for service in the State of Texas, to wit; C.T. Corporation System, 1021 Main St., Houston, Texas 77002.

32.     Defendant ACandS, INC. may be served with citation in this action by service of citation upon its registered agent, C.T. Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

33.     Defendant, FEDERAL-MOGUL CORPORATION (as Successor-in-Interest to T & N PLC, f/k/a TURNER & NEWELL PLC), is a corporation organized and existing under and by virtue of the laws of the State of Michigan.  Said corporation may be served with citation in this action by service of citation upon its corporate headquarters Bowden House, Ashburton Road West, Trafford Park, Manchester M17 1RA England, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code section 17.041-.045.  Defendant FEDERAL-MOGUL CORPORATION may be served with process through the Secretary of State of Texas.

34.     Although Defendant T&N plc (f/k/a TURNER & NEWELL PLC) has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process in this state, it has not designated such an agent.  Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters Bowden House, Ashburton Road West, Trafford Park, Manchester M17 1RA England, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code section 17.041-.045. Defendant T&N plc may be served with process through the Secretary of State of Texas.

35.     Defendant, INGERSOLL-RAND COMPANY, is a corporation organized and existing under and by virtue of the laws of the State of New Jersey with an agent for service in the State of Texas, to-wit: C.T. Corporation Systems, 350 N. St. Paul Street, Dallas, Texas 75201.

Therefore, Defendant, INGERSOLL-RAND COMPANY, may be served with citation in this action by service upon its registered agent.

36.     Defendant, MID-VALLEY, INC., is a Delaware corporation doing business in the State of Texas and may be served with citation by serving its registered agent , to-wit: C.T. Corporation Systems,1021 Main St., Houston, Texas 77002.

37.     Defendant, TRIPLEX, INC., may be served with citation by serving its registered agent for service of process, to-wit: Toni Treka, 1122 Kress, Houston, Texas 77020.

38.     Defendant, PLIBRICO COMPANY, is a corporation organized and existing under and by virtue of the laws of the State of Illinois, with an agent for service in the State of Texas, to wit: Corporation Service Company, 800 Brazos, Austin, Texas  78701. They may be served with citation at this address.

39.     Defendant, UNION CARBIDE CORPORATION (Individually and f/k/a UNION CARBIDE CHEMICALS AND PLASTIC COMPANY, INC.), may be served with citation in this action by service of citation upon its registered agent,  C.T. Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

40.     Defendant, DRESSER INDUSTRIES, INC., is a corporation organized and existing under and by virtue of the laws of the State of Delaware with an agent of service in the State of Texas, to wit: C.T. Corporation Systems, 1021 Main St., Suite 1150, Houston, Texas 77002.

41.     Defendant, NATIONAL SERVICE INDUSTRIES, INC., is a corporation organized and existing under and by virtue of the laws of the State of Georgia with an agent of service in the State of Texas, to wit: Corporation Service Company (CSC), 800 Brazos, Austin, Texas 78701.

42.     Defendant, PFIZER, INC., is a corporation organized and existing under and by virtue of the laws of the State of Delaware with an agent of service in the State of Texas, to wit: C.T. Corporation Systems, 350 N. St. Paul, Dallas, Texas 75201.

43.     Although Defendant SHOOK & FLETCHER INSULATION CO. has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process in this state, it has not designated such an agent. Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters: P.O. Box 380501, Birmingham, Alabama 35238, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code section 17.041-.045. Defendant SHOOK & FLETCHER INSULATION CO. may be served with process through the Secretary of State of Texas.

44.     Although Defendant C. E. THURSTON & SONS, INC. has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process in this state, it has not designated such an agent. Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters: 4850 Brookside Court, Norfolk, Virginia 23502-2052, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code section 17.041-.045. Defendant C. E. THURSTON & SONS, INC. may be served with process through the Secretary of State of Texas.

45.     Defendant, GUARD-LINE, INC. may be served with citation in this action by service of citation upon its registered agent, H. Lee Stanley, 215 South Louise, Atlanta, Texas 75551. Only Plaintiff, DAVID RAMOS, is bringing a claim against GUARD-LINE, INC.

46.     Although, Defendant, BORG-WARNER CORPORATION, has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for

service of process in this State, it has not designated such an agent. Therefore, said corporation may be served with process through its corporate headquarters, Legal Department, Attention: Lorene Horiszny, 200 S. Michigan Avenue, Chicago, Illinois 60604, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code section 17.041-.045, Defendant BORG-WARNER CORPORATION may be served with process through the Secretary of State of Texas. Only Plaintiff, DAVID RAMOS, is bringing a claim against BORG-WARNER CORPORATION.

47.     Defendant, ALLIED SIGNAL, INC. (Individually and as Successor-in-Interest to THE BENDIX CORPORATION), may be served with citation by service of citation upon its registered agent, C.T. Corporation Systems, 350 North St. Paul Street, Suite 2900, Dallas, Texas 75201. Said corporation is being sued individually and as successor-in-interest to THE BENDIX CORPORATION. Only Plaintiff, DAVID RAMOS, is bringing a claim against ALLIED SIGNAL.

48.     Defendant, FORD MOTOR COMPANY, may be served with citation by service of citation upon its registered agent, C.T. Corporation Systems, 350 North St. Paul Street, Suite 2900, Dallas, Texas 75201. Only Plaintiff, DAVID RAMOS, is bringing a claim against FORD MOTOR COMPANY.

49.     Defendant, DAIMLERCHRYSLER CORPORATION (f/k/a and as Successor-in-Interest to CHRYSLER CORPORATION), may be served with citation by service of citation upon its registered agent, C.T. Corporation Systems, 350 North St. Paul Street, Suite 2900, Dallas, Texas 75201. Only Plaintiff, DAVID RAMOS, is bringing a claim against DAIMLERCHRYSLER CORPORATION.

50.     Defendant, DAIMLER CHRYSLER MOTORS CORPORATION (f/k/a and as

Successor-in-Interest to CHRYSLER CORPORATION), may be served with citation by service of citation upon its registered agent, C.T. Corporation Systems, 350 North St. Paul Street, Suite 2900, Dallas, Texas 75201. Only Plaintiff, DAVID RAMOS, is bringing a claim against DAIMLERCHRYSLER MOTORS CORPORATION.

51. Defendant, GENERAL MOTORS, may be served with citation by service of citation upon its registered agent, C.T. Corporation Systems, 350 North St. Paul Street, Suite 2900, Dallas, Texas 75201. Only Plaintiff, DAVID RAMOS, is bringing a claim against GENERAL MOTORS.

52. Defendant, MOOG AUTOMOTIVE, INC. (Individually and as Successor-in-Interest to WAGNER ELECTRIC CORPORATION) is a corporation organized and existing under and by virtue of the laws of the State of Delaware with an agent for service in the State of Texas, to wit: C.T. Corporation Systems, 811 Dallas Avenue, Houston, Texas 77002. Said corporation is being sued individually and as successor-in-interest to WAGNER ELECTRIC CORPORATION. Only Plaintiff, DAVID RAMOS, is bringing a claim against MOOG AUTOMOTIVE, INC.

53. Defendant, PNEUMO ABEX CORPORATION, (Individually and as Successor-in-Interest to ABEX CORPORATION and AMERICAN BRAKE SHOE COMPANY) is a corporation organized and existing under and by virtue of the laws of the State of Delaware with an agent for service in the State of Texas, to wit: Prentice-Hall Corporation, 800 Brazos, Austin, Texas 78701. Said corporation is being sued individually and as successor-in-interest to ABEX CORPORATION and AMERICAN BRAKE SHOE COMPANY. Only Plaintiff, DAVID RAMOS, is bringing a claim against PNEUMO ABEX CORPORATION.

54. Although Defendant, ARVIN INDUSTRIES, INC., has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service

of process in this state, it has not designated such an agent. Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters 1531 East 13th Street, Columbus, Indiana 47201. Pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code section 17.041-.045. Defendant ARVIN INDUSTRIES, INC. may be served with process through the Secretary of State of Texas. Only Plaintiff, DAVID RAMOS, is bringing a claim against ARVIN INDUSTRIES, INC.

55.     Although Defendant THE MAREMONT CORPORATION (a subsidiary of ARVIN INDUSTRIES, INC.) has at all times relevant to this litigation conducted business in this State and is required to maintain a registered agent for service of process in this state, it has not designated such an agent. Therefore, said corporation may be served with citation in this action by service of citation upon its corporate headquarters The Maremont Corporation, 2400 Maremont Parkway, Loudon, Tennessee 37774. Pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code section 17.041-.045. Defendant THE MAREMONT CORPORATION may be served with process through the Secretary of State of Texas. Only Plaintiff, DAVID RAMOS, is bringing a claim against THE MAREMONT CORPORATION.

56.     Each Defendant corporation or its predecessor-in-interest, with the exception of the Metropolitan Life Insurance Company, is, or at times material hereto, has been engaged in the mining, processing and/or manufacturing, sale and distribution of asbestos and asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

57.     Plaintiffs would show that for many years, Plaintiffs worked with and/or were exposed to asbestos-containing products and/or machinery requiring or calling for the use of asbestos

and/or asbestos-containing products while working in various shipyards, steel mills, refineries, paper mills, chemical plants and/or other facilities in the United States. Plaintiffs would show that Plaintiffs have been exposed, on numerous occasions, to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products produced, installed, and/or sold by Defendants and, in so doing, had inhaled great quantities of asbestos fibers. Further, Plaintiffs allege, as more specifically set out below, the Plaintiffs suffered injuries proximately caused by their exposure to asbestos-containing products designed, manufactured, installed, and sold by Defendants.

58.    Plaintiffs allege that Plaintiffs were exposed to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products in his occupation. In that each exposure to such products caused or contributed to Plaintiffs' injuries, Plaintiffs say that the doctrine of joint and several liability should be extended to apply to each Defendant herein.

59.    In the event that Plaintiffs are unable to identify each injurious exposure to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products, Plaintiffs would show the Court that the Defendants named herein represent and/or represented a substantial share of the relevant market of asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products at all times material to the cause of action. Consequently, each Defendant should be held jointly and severally liable under the doctrines of enterprise liability, market-share liability, concert of action and alternative liability, among others.

## COUNT ONE

60.     All of the allegations contained in the previous paragraphs are re-alleged herein.

61.     The illnesses and disabilities of Plaintiffs were a direct and proximate result of the negligence of each Defendant and/or its predecessor-in-interest in that said entities produced, sold, installed, and/or otherwise put into the stream of commerce, asbestos, asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products, which the Defendants knew, or in the exercise of ordinary care, should have known were deleterious and highly harmful to Plaintiffs' health and well-being. The Defendants were negligent in one, some and/or all of the following respects, among others, same being the proximate cause of Plaintiffs' illnesses and disabilities:

(a)     in failing to timely and adequately warn Plaintiffs of the dangerous characteristics and serious health hazards associated with exposure to asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(b)     in failing to provide Plaintiffs with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect Plaintiffs from being harmed and disabled by exposure to asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(c)     in failing to place timely and adequate warnings on the containers of said asbestos, or asbestos-containing products, or on the asbestos-containing products themselves, and/or machinery requiring or calling for the use of asbestos and/or asbestos-

**********************
***   RX REPORT   ***
**********************

RECEPTION OK

| | |
|---|---|
| TX/RX NO | 6374 |
| CONNECTION TEL | 210 668 7328 |
| CONNECTION ID | |
| ST. TIME | 11/27 17:40 |
| USAGE T | 08'07 |
| PGS. | 12 |
| RESULT | OK |

containing products to warn of the dangers to health of coming into contact with said

asbestos-containing products and/or machinery;

(d)    in failing to take reasonable precautions or exercise reasonable care to publish, adopt

and enforce a safety plan and/or safe method of handling and installing asbestos

and/or asbestos-containing products, or utilizing the machinery requiring or calling

for the use of asbestos and/or asbestos-containing products in a safe manner;

(e)    in failing to develop and utilize a substitute material to eliminate asbestos fibers in

the asbestos-containing products, and/or the machinery requiring or calling for the

use of asbestos and/or asbestos-containing products;

(f)    in failing to properly design and manufacture asbestos, asbestos-containing products,

and/or machinery requiring or calling for the use of asbestos and/or asbestos-

containing products for safe use under conditions of use that were reasonably

anticipated;

(g)    in failing to properly test said asbestos-containing products or machinery before they

were released for consumer use; and

(h)    in failing to recall and/or remove from the stream of commerce said asbestos-

containing products or machinery or machinery requiring or calling for the use of

asbestos and/or asbestos-containing products despite knowledge of the unsafe and

dangerous nature of such products or machinery.

## COUNT TWO

62.    All of the allegations contained in the previous paragraphs are realleged herein.

63.     Plaintiffs were exposed to asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products that were manufactured and distributed by the Defendants and/or their predecessors-in-interest for use as construction materials and/or machinery in industrial operations.  Plaintiffs would show that the defective condition of the products rendered such products unreasonably dangerous, and that the asbestos-containing products and/or machinery were in this defective condition at the time they left the hands of Defendants.

64.     The Defendants are engaged in the business of selling asbestos-containing products and/or machinery requiring or calling for asbestos or asbestos-containing products, and these asbestos-containing products and/or machinery, without substantial change in the condition in which they were sold, were a proximate cause of the injuries of the Plaintiffs.

65.     Defendants knew that these asbestos-containing products and/or machinery would be used without inspection for defects and, by placing them on the market, represented that they would safely do the job for which they were intended, which must necessarily include safe manipulation and/or installation of the asbestos-containing products and/or operation, maintenance and/or repair of the machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

66.     Plaintiffs were unaware of the hazards and defects in the asbestos-containing products of the Defendants which made them unsafe for purposes of manipulation and/or installation.  Similarly, Plaintiffs were unaware of the hazards and defects in the machinery requiring or calling for the use of asbestos and/or asbestos-containing materials.

67.     During the periods that Plaintiffs were exposed to the asbestos-containing products and/or machinery of the Defendants, these asbestos-containing products and/or machinery were being utilized in a manner which was intended by Defendants.

## COUNT THREE

68.     All of the allegations contained in the previous paragraphs are re-alleged herein.

69.     Plaintiffs further allege that Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated and conspired among themselves to cause Plaintiffs' injuries, diseases and illnesses exposing Plaintiffs to harmful and dangerous asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products. Defendants further knowingly agreed, contrived, combined, confederated and conspired to deprive Plaintiffs of the opportunity of informed free choice as to whether to use said asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products or to expose themselves to said dangers. In this connection, Plaintiffs have sued the Metropolitan Life Insurance Company in its capacity as a conspirator. Defendants committed the above described wrongs by willfully misrepresenting and suppressing the truth as to the risks and dangers associated with the use of and exposure to Defendants' asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

70.     In furtherance of said conspiracies, Defendants performed the following overt acts:

(a)     for many decades, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which clearly indicated that the inhalation of asbestos dust and fibers

resulting from the ordinary and foreseeable use of said asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products were unreasonably dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly;

(b)  despite the medical and scientific data, literature and test reports possessed by and available to Defendants, Defendants individually, jointly, and in conspiracy with each other, fraudulently, willfully, and maliciously:

(1)  withheld, concealed and suppressed said medical and scientific data, literature and test reports regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases from Plaintiffs who were using and being exposed to Defendants' asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(2)  caused to be released, published and disseminated medical and scientific data, literature and test reports containing information and statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses and diseases, which Defendants knew were incorrect, incomplete, outdated and misleading; and

(3)  distorted the results of medical examinations conducted upon Plaintiffs and workers such as Plaintiffs who were using asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products and being exposed to the inhalation of asbestos dust and

fibers by falsely stating and/or concealing the nature and extent of the harm to which Plaintiffs and workers such as Plaintiffs have suffered.

(c)     in addition, Defendants have and continue to engage in a pattern of fraudulent conduct against asbestos Plaintiffs, including these Plaintiffs, as well as various courts and juries.  Specifically, Defendants have deliberately and continuously misrepresented the status of their knowledge regarding the dangerous propensities of asbestos generally, and each of their own asbestos products.  In prior litigation regarding the same subject matter, Defendants have made statements under oath they knew were patently false and specifically involved denial that use of their individual products containing asbestos fibers could cause asbestosis.  Moreover, Defendants have deliberately filed false statements in various courts and have specifically perpetrated a fraud against courts in the state of Texas concerning the issue of knowledge about the dangers of asbestos from their products at various times.  As such, Defendants have generally been involved in a deceptive pattern and practice directed against asbestos Plaintiffs, including these Plaintiffs, in an effort to mislead various courts and juries; and

(d)     by the false and fraudulent representations, omissions and concealments set forth above, Defendants, individually, jointly, and in conspiracy with each other, intended to induce the Plaintiffs to rely upon said false and fraudulent representations, omissions and concealments, to continue to expose themselves to the dangers inherent in the use of and exposure to Defendants' asbestos-containing products,

and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

71. Plaintiffs reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by the Defendants regarding the nature of their asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

72. As a direct and proximate result of Plaintiffs' reliance on Defendants' false and fraudulent representations, omissions and concealments, Plaintiffs sustained damages including injuries, illnesses, disabilities and/or death, and has been deprived of the opportunity of informed free choice in connection with the use of and exposure to Defendants' asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products.

73. Moreover, Defendants continue to contrive, combine, confederate and conspire among themselves to injure Plaintiffs and to deprive Plaintiffs of their rightful recoveries by joining together and forming an entity known as the "Asbestos Claims Facility" and/or "Center for Claims Resolution" and by proposing and entering into an agreement known as the "Wellington Agreement." As a direct and proximate result of Defendants' ongoing actions, Plaintiffs continue to sustain damages.

## COUNT FOUR

74. All of the allegations contained in the previous paragraphs are re-alleged herein.

75. The actions and inactions of Defendants and their predecessors-in-interest, as specifically alleged herein above, whether taken separately or together, were of such a character as to constitute a pattern or practice of intentional wrongful conduct and/or malice resulting in damages

and injuries to the Plaintiffs. More specifically, Defendants and their predecessors-in-interest, consciously and/or deliberately engaged in oppression, fraud, wilfulness, wantonness and/or malice with regard to the Plaintiffs and should be held liable in punitive and exemplary damages to Plaintiffs.

<div align="center">COUNT FIVE</div>

76.    All of the allegations contained in the previous paragraphs are re-alleged herein.

77.    Defendant Metropolitan Life Insurance Company through its Policyholders Service Bureau undertook duties owed by the asbestos-producing Defendants to the Plaintiffs by the testing of asbestos workers and the conduct of scientific studies. These duties included without limitation, the duties:

(a)    to test fully and adequately for health risks concomitant to the normal and intended use of their products; and

(b)    to instruct fully and adequately in the uses of their products so as to eliminate or reduce the health hazards concomitant with their normal or intended use.

In undertaking these duties, Metropolitan Life knew or should have known that it was providing testing services for the ultimate protection of third persons, including the Plaintiffs.

78.    In both conducting said tests and in publishing their alleged results, Metropolitan Life failed to exercise reasonable care to conduct or publish complete, adequate and accurate tests of the health effects of asbestos. Metropolitan Life also caused to be published intentionally false, misleading, inaccurate and deceptive information about the health effects of asbestos exposure.

79.     The Plaintiffs unwittingly but justifiably relied upon the thoroughness of Metropolitan Life's tests and information dissemination, the results of which Metropolitan Life published in leading medical journals.

80.     As a direct and proximate contributing result of Metropolitan Life's failures to conduct or accurately publish adequate tests or disseminate accurate and truthful information, after undertaking to do so; (i) the risk of harm to the Plaintiffs from asbestos exposure was increased, and (ii) the Plaintiffs suffered the injuries described below.

81.     In failing to test fully and adequately for the adverse health effects from exposure to asbestos; in delaying the publication of such results; and in falsely editing such results as were obtained; in suppressing relevant medical inquiry and knowledge about those hazards to promote the sale and distribution of asbestos as a harmless product; and in collaborating with the asbestos-producing Defendants materially to understate the hazards of asbestos exposure, all for its own profit and gain, Metropolitan Life acted recklessly, wantonly, and in calculated disregard for the welfare of the general public, including the Plaintiffs.

## COUNT SIX

82.     All of the allegations contained in the previous paragraphs are re-alleged herein.

83.     The actions of all Defendants aided, abetted, encouraged, induced or directed the negligent and/or intentional acts of each and every other Defendant.

84.     Each of the Defendants knew or should have known that its individual actions would combine to cause the injuries of the Plaintiffs.

85.     The actions of each of the Defendants is a proximate cause of Plaintiffs' injuries. As a result, all Defendants are jointly liable for the damage caused by their combined actions.

86. The actions of each of the Defendants is a proximate cause of the injuries of the Plaintiffs.

87. Each of the Defendants knew or should have known that its individual actions would combine to cause the injuries of the Plaintiffs.

## DAMAGES

88. As a direct and proximate result of Defendants' tortious conduct as aforesaid, Plaintiffs have developed asbestos-related lung disease and other related physical conditions. Plaintiffs have been damaged in the following particulars:

(a) Plaintiffs suffered great physical pain and mental anguish and will continue to suffer great pain of body and mind throughout their lifetimes;

(b) Plaintiffs incurred hospital and/or medical and/or pharmaceutical and/or other expenses and will continue to incur such expenses in the future due to the progressively disabling character of asbestos-related lung disease from which they now suffer and will continue to suffer in the future;

(c) Plaintiffs suffered a permanent partial disability at this time and will continue to suffer this impairment in the future due to the disabling character of asbestos-related lung disease and other physical conditions;

(d) Plaintiffs suffered a permanent partial disability at this time and will become permanently and totally disabled in the future due to the progressive character of asbestos-related lung disease and other related physical conditions;

(e) Plaintiffs are subject to an extraordinarily increased likelihood of developing (or the progression and/or recurrence of) cancer of the lungs, mesothelioma and other

cancers, all due to said exposure to products and/or machinery manufactured, installed, sold, and/or distributed by the named Defendants;

(f)    Plaintiffs will require medical monitoring throughout their lifetimes to survey the progression of their asbestos-related lung disease and to aid in the early detection and treatment of any or all of the cancers described above and will be required to pay for such medical monitoring;

(g)    Plaintiffs suffered a progressive loss of earning capacity and will continue to suffer a loss of earning capacity and wages throughout their lifetimes;

(h)    Plaintiffs require or will require domestic help and nursing care due to their disabilities and have been or will be required to pay for such domestic help and nursing services;

(i)    Prior to the onset of their symptoms, Plaintiffs were extremely active and participated in numerous hobbies and activities, and as a result of their illnesses, Plaintiffs have been and will be prevented from engaging in some of said activities which were normal to them prior to developing symptoms from asbestos-related lung disease. Plaintiffs have been and will otherwise be prevented from participating in and enjoying the benefits of a full and complete life;

(j)    Plaintiffs' spouses have suffered and will suffer the losses of their spouses' services, consortium, financial support and the care and comfort of their society because of their spouses' injuries and disabilities, and have incurred or will incur expenses in the future for medical and nursing attention rendered to their spouses. Plaintiffs'

spouses have suffered and will continue to suffer mental anguish as a consequence of their spouses' illness and diseases; and

(k)     Plaintiffs seek punitive and exemplary damages.  Specifically, each Plaintiff seeks a maximum recovery of Fifteen (15) Million Dollars in actual damages and a maximum recovery of Fifteen (15) Million Dollars in punitive damages against each Defendant named herein.

89.     Plaintiffs filed suit within two (2) years of the date of discovering Plaintiffs' asbestos-related conditions or the existence of any asbestos-related causes of action.

<div align="center">JURY DEMAND</div>

Plaintiffs demand that all issues of fact in this case be tried to a properly empaneled jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs demand judgment against the Defendants, and each of them, jointly and severally, for general damages, special damages, for punitive and exemplary damages, for their costs expended herein, for prejudgment interest from the date of Plaintiffs' exposure to asbestos-containing insulation products and/or machinery calling for the use of asbestos-containing products, and post judgment interest on the judgment at the rate allowed by law, and for such other and further relief, both at law and in equity, to which Plaintiffs may show themselves justly entitled.

<div align="center">Respectfully submitted,</div>

**FOSTER & SEAR, L.L.P.**
360 Place Office Park
1201 N. Watson, Suite 145
Arlington, Texas 76006
Telephone (817) 633-3355
Facsimile (817) 633-5507


By: _Scott W. Wert/wcm_
    SCOTT W. WERT
    State Bar No. 00794835
    DAMON J. CHARGOIS
    State Bar No. 00790451
    ROBERT M. GREENBERG
    State Bar No. 08389000

ATTORNEYS FOR PLAINTIFFS

# EXHIBIT A

**DAVID RAMOS**          **(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)**
2604 29th Street
Lubbock, TX 79410

**FREDDY RAY JOHNSON**   **(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)**
431 North Crosby
Crosbyton, TX 79322

# FOSTER & SEAR L.L.P.

**ATTORNEYS AT LAW**
**360 PLACE OFFICE PARK**
**1201 N. WATSON ROAD, SUITE 145**
**ARLINGTON, TX 76006**

(817) 633-3355
(800) 631-5908
(817) 633-5507 FACSIMILE

November 27, 2000

Aurora de la Garza
Cameron County District Clerk
974 E. Harrison St.
Brownsville, Tx 78520

Re:     *David Ramos, et al v. Armstrong World Industries, et al.;*
        In the District Court of Cameron County, Texas

Dear Ms. de la Garza:

I have enclosed an original and extra copies of Plaintiffs' Original Asbestos Petition with regard to the above-captioned matter. I have also enclosed a check in the amount of $601.00, which represents the following fees:

1)    $155.00 - filing fee
2)    $296.00 - 37 regular citations
3)    $120.00 - 15 citations through the Secretary of State
4)    $ 30.00 - Jury fee

Please file the original with the Court and return the extra copies and citations in the enclosed self-addressed, stamped envelope.

If you have any further questions or concerns, you may contact me at (800) 631-5908.

Thank you for your time and attention to this matter.

Very truly yours,

Kerri L. Fidler
Legal Assistant

# Jenkens & Gilchrist
### A PROFESSIONAL CORPORATION

**1445 ROSS AVENUE**
**SUITE 3200**
**DALLAS, TEXAS 75202**

(214) 855-4500
TELECOPIER (214) 855-4300

www.jenkens.com

AUSTIN, TEXAS
(512) 499-3800

HOUSTON, TEXAS
(713) 951-3300

LOS ANGELES, CALIFORNIA
(310) 820-8800

SAN ANTONIO, TEXAS
(210) 246-5000

WASHINGTON, D.C.
(202) 326-1500

AFFILIATE OFFICE
CHICAGO, ILLINOIS
(312) 425-3900

R. Robert Garcia
(214) 855-4767
rrgarcia@jenkens.com

February 19, 2001

*Via Certified Mail, RRR # 7000 0520 0024 6420 3391*

Aurora De La Garza
Cameron County Courthouse
974 E. Harrison Street
Brownsville, Texas 78520

Re: *David Ramos and Emma Ramos, et al. v. Armstrong World Industries, Inc.; et al.;* Cause
No. B31233; In the 357th Judicial District Court of Cameron County, Texas

Dear Ms. Garza:

I am enclosing an original and two copies of DaimlerChrysler Corporation's and
DaimlerChrysler Motors Corporation's Motion to Transfer Venue and, Subject Thereto, Motion to
Dismiss for Forum Non Conveniens, and Original Answer to Plaintiffs' Original Asbestos Petition,
Texas Exposure and/or Texas Resident for filing in the above-referenced cause.

By copy of this letter, I am providing copies to Plaintiffs' counsel of same.

Please call me if you have any questions.

Sincerely,

*Robert Garcia /kgh*

R. Robert Garcia

RRG:kgh
Encls.

cc:   All Counsel of Record (Via facsimile w/o encl.)

Scott W. Wert (Via CMRRR # 7000 0520 0024 6420 3407)
Foster & Sear

Dallas3 667959 v 1, 43920.00521

2000-11-4816-G

CAUSE NO. B31233

| | | |
|---|---|---|
| DAVID RAMOS AND EMMA RAMOS; et al. . | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | CAMERON COUNTY, TEXAS |
| | § | |
| ARMSTRONG WORLD INDUSTRIES, INC., et al. | § | |
| | § | |
| Defendants. | § | 357th JUDICIAL DISTRICT |

FILED _____ O'CLOCK ____
AURORA DE LA GARZA DIST. CLERK
FEB 2 2 2001
DISTRICT COURT OF CAMERON COUNTY, TEXAS
_____ DEPUTY

## DAIMLERCHRYSLER CORPORATION'S AND DAIMLERCHRYSLER MOTORS CORPORATION'S MOTION TO TRANSFER VENUE AND, SUBJECT THERETO, MOTION TO DISMISS FOR FORUM NON CONVENIENS, AND ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL ASBESTOS PETITION, TEXAS EXPOSURE AND/OR TEXAS RESIDENT

NOW COMES DaimlerChrysler Corporation and DaimlerChrysler Motors Corporation ("Chrysler"), and files this Motion to Transfer Venue and, Subject Thereto, Motion to Dismiss for Forum Non Conveniens, and Original Answer to Plaintiffs' Original Asbestos Petition, Texas Exposure and/or Texas Resident:

## I.   Motion to Transfer Venue.

Chrysler objects to venue in CameronCounty because it is not a proper county of venue, as no basis exists mandating or permitting venue in it under Chapter Fifteen of the Texas Civil Practice and Remedies Code. Further, Plaintiffs' Petition does not allege sufficient facts to establish proper venue in CameronCounty and Chrysler specifically denies that CameronCounty is a proper county of venue because:

(1)     all or a substantial part of the events or omissions giving rise to the claims did not occur in CameronCounty;

(2)     Cameron County is not the county of Chrysler's principal office in Texas;

(3)     Plaintiffs did not reside in Cameron County at the time of the accrual of the cause of action; and

(4)     Cameron County is not the county of residence of Plaintiffs.

Therefore, pursuant to Section 15.002(b) of the Texas Civil Practice and Remedies Code, in the interest of justice and for the convenience of the parties and witnesses, Chrysler requests that this Court transfer this case to Dallas County, Texas, where one or more defendants to this action have their principal office. Further, this Motion to Transfer Venue has been filed and served timely and concurrently with, or before, the filing of Chrysler's Original Answer, or any other pleading or motion.

WHEREFORE, PREMISES CONSIDERED, Chrysler respectfully prays that this Court grant its Motion to Transfer Venue and transfer this case to Dallas County, Texas, a county of proper venue, and for such other and further relief to which it may show itself justly entitled.

## II.     Motion to Dismiss for Forum Non Conveniens.

Subject to the foregoing Motion to Transfer Venue, Chrysler respectfully prays that this case be dismissed for Forum Non Conveniens, pursuant to Section 71.051 of the Texas Civil Practices and Remedies Code.

## III.     General Denial.

1.     Chrysler denies each material allegation contained in the Petition and demands strict proof thereof by a preponderance of the evidence before this Court and a jury. Moreover, Chrysler is not obligated to answer any allegations relating to any other Defendant and, therefore, denies them.

2.     Chrysler denies that Plaintiffs sustained any injury or illness caused by, produced by, or resulting from contact with any product manufactured, sold, or distributed by Chrysler.

**IV.   Defenses.**

3.     Chrysler would show that claims in the Petition are barred by statutes of limitation under Texas Civil Practices & Remedies Code § 16.001, *et seq.*, and all other applicable statutes of limitations, including those of strict liability, breach of express or implied warranty, and those of appropriate state jurisdictions.

4.     Chrysler would show that the Due Process Clause of the Fourteenth Amendment of the United States Constitution bars jurisdiction to proceed with this cause because the State of Texas lacks sufficient contacts with both the parties and the controversy to render an assertion of fair and reasonable jurisdiction.

5.     Chrysler would show that, alternatively, this Court should decline jurisdiction under the doctrine of forum non conveniens.

6.     Chrysler would show that Plaintiffs are not entitled to recover for any alleged breach of express or implied warranty, as there are neither any express or implied warranties nor any privity of contract between Chrysler and Plaintiffs.

7.     Chrysler would show that Plaintiffs may have assumed the risk of any injuries or damages allegedly incurred as a result of exposure to products manufactured, sold, or distributed by Chrysler because Plaintiffs, or their employers, may have had equal or greater knowledge of the alleged hazards of exposure to asbestos. Additionally, Chrysler would show that Plaintiffs may have used the product without showing proper regard for their own health and safety.

DAIMLERCHRYSLER CORPORATION'S AND DAIMLERCHRYSLER MOTORS CORPORATION'S MOTION TO TRANSFER VENUE AND, SUBJECT THERETO, MOTION TO DISMISS FOR FORUM NON CONVENIENS, AND ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL ASBESTOS PETITION, TEXAS EXPOSURE AND/OR TEXAS RESIDENT– Page 3 of 9
Dallas3 663809 v 1, 43920.00001

8.     Chrysler would show that there could be no strict liability claim for any alleged exposure to toxic materials and substances occurring prior to June 7, 1967, because the Texas Supreme Court did not adopt strict liability under § 402A, Restatement 2d of Torts, until then in *McKisson v. Sales*, 416 S.W.2d 787 (Tex. 1967).

9.     Chrysler would show that Plaintiffs should not recover exemplary damages because such an award, pursuant to either Texas Civil Practices & Remedies Code § 41.001, *et seq.*, or common law, would: (1) violate the Excessive Fines Clause of the Eighth Amendment of the United States Constitution by failing to place a limit on the amount; (2) be void for vagueness and violative of the Equal Protection Clause of the Fifth and Fourteenth Amendments of the United States Constitution; or (3) violate Article 1, §§ 10 and 13 of the Constitution of the State of Texas.

10.     Chrysler would show that an exemplary damages award requires proof by clear and convincing evidence to comport with the Due Process Clause of the Fourteenth Amendment of the United States Constitution, Section 19 of the Constitution of the State of Texas, and the constitution and laws of any other applicable state.

11.     Chrysler would show that any exemplary damages award would be imposed under a standard of conduct formulated years after any of Chrysler's actions and such a retroactive application of this standard would violate due process.

12.     Chrysler would show that Texas Civil Practice & Remedies Code § 41.008 limits exemplary damages to a maximum of four times actual damages, or $200,000.00, whichever is greater.

DAIMLERCHRYSLER CORPORATION'S AND DAIMLERCHRYSLER MOTORS CORPORATION'S MOTION TO TRANSFER VENUE AND, SUBJECT THERETO, MOTION TO DISMISS FOR FORUM NON CONVENIENS, AND ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL ASBESTOS PETITION, TEXAS EXPOSURE AND/OR TEXAS RESIDENT – Page 4 of 9
DaDat3 663809 v 1, 43920.00001

13.     Chrysler would show that, if it manufactured, distributed, or sold any asbestos-containing products, any alleged exposure of Plaintiffs to those products was de minimis and insufficient to establish to a reasonable degree of probability that they caused any alleged injury.

14.     Chrysler would show that there should be no recovery against it because the superseding and intervening negligence of third parties caused Plaintiffs' alleged injuries, and this conduct, either by omission or commission, interrupted the natural and proximate causal relationship between any alleged act or omission of Chrysler and Plaintiffs' alleged resulting injuries and damages.

15.     Chrysler would show that there should be no recovery against it because Plaintiffs failed to mitigate any alleged damages.

16.     Chrysler would show that the Workers' Compensation Act provides, as an exclusive remedy, compensation benefits for the disability of an employee if such disability resulted from an injury, or occupational disease, and was incurred, or sustained, in the course of employment. Moreover, Chrysler would further show that any alleged exposure of Plaintiffs to any Chrysler products occurred during a period when an entity then subscribing to Workers' Compensation insurance employed Plaintiffs. Thus, Chrysler would show that Workers' Compensation, with its attendant benefits, is the exclusive remedy for any alleged injury or occupational disease incurred.

17.     Chrysler would show that, at all relevant times, its products complied with industry, federal, and state standards and regulations governing the manufacturing, sale, packaging, and distribution of such products.

18.     Chrysler would show that any alleged absence of warning did not lead Plaintiffs to rely on the safety of any product at issue.

19.     Chrysler would show that recovery is barred because Plaintiffs' misuse, or improper use, of the products at issue was the sole cause of any alleged resulting injuries or damages or, alternatively, was the proximate or producing cause, or contributed to causing, Plaintiffs' alleged injuries or damages.

20.     Chrysler would show that Plaintiffs' recovery is barred because Plaintiffs' negligent conduct, or fault, was the sole cause of the alleged resulting injuries or damages.

21.     Chrysler would show that Plaintiffs' recovery is barred because the negligent conduct, or fault, of Plaintiffs was a proximate and producing cause of any injuries or damages, and also exceeded any negligence, or other fault, of Chrysler and other Defendants. Alternatively, Chrysler would show that the claims of Plaintiffs are barred to the extent of the Plaintiffs' comparative negligence or fault. Moreover, Chrysler would show that Plaintiffs' negligence, whether it be the sole cause or a contributing cause, is a complete bar to recovery to the extent that any alleged exposure occurred prior to September 30, 1972.

22.     Chrysler would show that other named Defendants caused any alleged injuries or damages sustained by Plaintiffs and Chrysler held no right of control over these Defendants.

23.     Alternatively, Chrysler would show that it breached no duty because Plaintiffs, or their superiors, knew about any alleged risks associated with the products' use.

24.     Alternatively, Chrysler would show that it breached no duty because Plaintiffs' employers or supervisors knew about any alleged dangers of which Plaintiffs now complain.

25.     Chrysler would show that any alleged injuries were either preexisting or not the result of contact with any products manufactured, sold, or distributed by Chrysler.

26.     Chrysler would show there is no product liability claim from any alleged exposure under Texas Civil Practice and Remedies Code § 82.001, *et seq.*

27.     Chrysler would show that there was no concert of action between it and any other named Defendant.

28.     Chrysler would show that pursuant to Chapters 32 and 33 of the Texas Civil Practices & Remedies Code, and without accepting the truth of the pleadings and denying all liability, Chrysler reserves it right, if it is found to have any liability to Plaintiffs, to a set-off, percentage, or pro rata reduction of any such liability, or to a credit for the amount of any settlement paid by each settling Defendant.

29.     Alternatively, in the event it is not otherwise entitled to judgment as a matter of law, Chrysler invokes the apportionment of damages system adopted by the Texas Supreme Court in *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984), and alleges that, if it is found to be liable for any portion of damages to Plaintiffs, it is liable only for the percentage of damages for which it is found comparatively at fault. Moreover, should this case be submitted to the jury, Chrysler alleges that it should be submitted in a manner that secures a determination as to the relative fault of the causation of damages by Plaintiffs and by each of the parties hereto. Any judgment that is to be entered should be so limited.

30.     Chrysler would show that any alleged defects in its products were beyond both the scientific and medical knowledge available at the time of manufacturing. Chrysler would also show that the then existing state-of-the-art prevented Chrysler from knowing of any such alleged defects.

31.     Chrysler alleges that its products were at all times reasonably fit and suitable for the purposes for which they were sold, and denies that such products were in any way defective for such

DAIMLERCHRYSLER CORPORATION'S AND DAIMLERCHRYSLER MOTORS CORPORATION'S MOTION TO TRANSFER VENUE AND, SUBJECT THERETO, MOTION TO DISMISS FOR FORUM NON CONVENIENS, AND ORIGINAL ANSWER TO PLAINTIFFS' ORIGINAL ASBESTOS PETITION, TEXAS EXPOSURE AND/OR TEXAS RESIDENT – Page 7 of 9

Dallas3 665889 v 1. 43920.08001

use. Thus, Plaintiffs' alleged injuries did not result from a defect in any product manufactured, sold, or distributed by Chrysler and, if products were altered after leaving Chrysler's control, such changes were the legal cause of any damages.

32.    Chrysler adopts all affirmative defenses pled by any other Defendant.

33.    Chrysler reserves its right to amend its pleadings upon completion of discovery.

34.    Chrysler reserves its right to amend and adopt all applicable defenses under the laws of any other state once Plaintiffs' worksites involved in this action have been identified.

## V.    Request for Bifurcated Trial.

35.    Chrysler requests that the issues regarding exemplary damages be bifurcated and that a separate trial be had upon said issues.

## VI.    Answer to All Cross-Actions.

36.    In answer to any cross-actions for indemnity or contribution, by any other named Defendants, Chrysler denies that such are entitled to indemnity or contribution.

WHEREFORE, PREMISES CONSIDERED, DaimlerChrysler Corporation and DaimlerChrysler Motors Corporation respectfully pray that Plaintiffs take nothing by reason of said claims, and that it be discharged and recover costs and attorneys' fees expended on its behalf, and for such other and further relief to which it may show itself justly entitled.

Respectfully submitted,

JENKENS & GILCHRIST,
*A Professional Corporation,*

By: _____

ROBERT E. THACKSTON
State Bar No. 00785487
**R. ROBERT GARCIA**  463301
State Bar No. 00796602

1445 Ross Avenue, Suite 3200
Dallas, TX 75202
Telephone:   (214) 855-4500
Telecopy:   (214) 855-4300

**ATTORNEYS FOR DAIMLERCHRYSLER
CORPORATION AND
DAIMLERCHRYSLER MOTORS
CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to counsel for Plaintiffs, Scott W. Wert, Foster & Sear, 1201 N. Watson, Suite 145, Arlington, Texas 76006, via certified mail, return receipt requested, and to all other known counsel of record via facsimile on this 19th day of February, 2001.

_____
R. Robert Garcia

## CAUSE NO. 00-11-004816-E

| | | |
|---|---|---|
| DAVID RAMOS, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | CAMERON COUNTY, TEXAS |
| | § | |
| ARMSTRONG WORLD | § | |
| INDUSTRIES, ET AL | § | 357TH JUDICIAL DISTRICT |

### DEFENDANT FORD MOTOR COMPANY'S MOTION TO TRANSFER VENUE AND ORIGINAL ANSWER TO PLAINTIFF DAVID RAMOS' ORIGINAL ASBESTOS PETITION SUBJECT TO ITS MOTION TO TRANSFER VENUE

FILED 9:00 O'CLOCK
AURORA DE LA GARZA DIST. CLERK

FEB 2 0 2001

DISTRICT COURT OF CAMERON COUNTY, TEX
DEPUT

**TO THE COURT:**

Defendant **FORD MOTOR COMPANY** files this its Motion to Transfer Venue pursuant to Rule 86, Texas Rules of Civil Procedure and, subject to its Motion to Transfer Venue, files this its Original Answer to Plaintiff's Original Asbestos Petition:

## MOTION TO TRANSFER VENUE

### 1.

Defendant objects to venue in Cameron County, Texas, the county in which this action was instituted, because it is not a proper county, and no basis exists mandating or permitting venue in this county. Cameron County, Texas is not a proper venue because the Defendant does not reside nor maintain agents or representatives in Cameron County, Texas. Defendant specifically denies that Plaintiff **DAVID RAMOS** has a cause of action against this Defendant and also specifically denies the venue facts pled in Paragraph 2 of Plaintiffs' Original Asbestos Petition. **FORD MOTOR COMPANY** further specially denies that all claims or actions against all defendants arose out of the same series of transactions or occurrences in Cameron County, Texas, resulting in Plaintiff's injuries.

F:\DATA\DOCS\41-768\ANSMTV

## ORIGINAL ANSWER

**2.**

Plaintiff states no venue facts in his Original Petition which supports venue in Cameron County, Texas. The fact that any defendant may have conducted a substantial amount of business in a particular county does not make venue proper in that county. Further, the fact that a defendant may have a principal place of business in Texas does not make venue proper in Cameron County, Texas, if Cameron County, Texas, is not the county where that principal place of business is situated.

**3.**

Additionally, neither at the time of this occurrence nor at the time that this action was filed did Defendant have agents, representatives or it principal place of business in Cameron County, Texas. Defendant does have a registered agent, representative and its principal place of business in Dallas County, Texas, C.T. Corporation System, and did have a registered agent, representative and its principal place of business in Dallas County, Texas at the time that Plaintiff sued Defendant. *(See the Affidavit of Michael J. Daley attached to this Motion as Exhibit "A".)* Therefore, it is clear that pursuant to §15.002 (a)(3), venue in this case lies in Dallas County, Texas, the county where Defendant has a registered agent, representative, and its principal office.

**4.**

Therefore, not only has **FORD MOTOR COMPANY** established that venue is proper in Dallas County, Texas, **FORD MOTOR COMPANY** has also demonstrated that there is no basis in Plaintiff's Original Petition for venue in Cameron County, Texas. For the reasons stated above, Defendant respectfully requests that this case be transferred to Dallas County, Texas.

2

# ORIGINAL ANSWER

Subject to its Motion to Transfer Venue, Defendant FORD MOTOR COMPANY states as follows:

**1.**

As authorized by Rule 92 of the Texas Rules of Civil Procedure, Defendant FORD MOTOR COMPANY enters a general denial of all matters pled by Plaintiff DAVID RAMOS and requests that the Court require Plaintiff to prove his charges and allegations by a preponderance of the evidence as required by the Constitution and laws of the State of Texas.

**2.**

Discovery may reveal that acts, or omissions to act, by Plaintiff which constituted negligence, may have caused or contributed to the injuries of which Plaintiff complains.

**3.**

Discovery may reveal that acts, or omissions to act, on the part of third parties not under the control of this Defendant, were the sole or a cause of the injuries of which Plaintiff complains.

**4.**

Pleading further and by way of affirmative defense, Defendant FORD MOTOR COMPANY would show that the incident in question and the allegedly resulting injuries and damages were the result of the negligent acts and/or omissions of other Defendants or third parties who are beyond the control of Defendant FORD MOTOR COMPANY, and that the conduct of such Defendants or third parties was the sole or contributing cause of Plaintiff's incident and/or damages and injuries.

Therefore, Defendant **FORD MOTOR COMPANY** invokes the doctrine of comparative causation with regard to these other Defendants and third parties. **TEX. CIV. PRAC. & REM. CODE §33.001,** *et seq.*

## 5.

This Defendant denies that Plaintiff sustained any injuries as a result of contact with or use of any product manufactured or sold by this Defendant.

## 6.

This Defendant asserts that punitive damages are not appropriate in this case under either Texas law or federal common law, which Defendant asserts preempts state law and precludes recovery of punitive damages. Defendant further asserts that permitting recovery of punitive damages in this case would amount to repeated and excessive punitive damage awards for a single course of alleged tortious conduct in violation of the Fifth Amendment double jeopardy clause, that the standard for awarding punitive damages in this and most jurisdictions is so vague as to deny Defendant's right to due process and is a violation of the Fourteenth Amendment and repetitive punitive damages awards for a single course of conduct may amount to an unconstitutionally excessive fine in violation of the Eighth Amendment. In the alternative, the award of punitive damages is barred by federal common law and the Constitution, and an award of punitive damages could be violative of the Eighth and Fourteenth amendment. An award of punitive damages is also barred in this case because the award would be imposed under a standard of conduct newly formulated by the courts and applied retroactively to conduct that occurred years before that standard of conduct was announced. In addition, an award of punitive damages in this case could violate Texas Constitution Article 1, Sections 13, 14 16 and 19.

**7.**

Alternatively, if Defendant is not entitled to judgment as a matter of law, Defendant alleges

that if it is found to be liable for any portion of Plaintiff's damages, then it is liable only for a

percentage of damages the jury finds it to be at fault, and alleges that the case be submitted to the

jury in such a manner as to secure determination as to the relative fault and percent causation of

damages by Plaintiff and by each of the parties hereto whether such parties have settled or not

settled, that any judgment that is entered against Defendant should be so limited to that percentage

which Defendant should be found liable and no other.

**8.**

Defendant **FORD MOTOR COMPANY** would show unto the Court and Jury that the claim for

additional damages and punitive damages sought by Plaintiff are in direct conflict with the

Fourteenth, Eighth, and Ninth Amendments to the United States Constitution for the following

reasons:

    (1)    The claim for additional damages and/or punitive damages constitutes an attempt to take property from this Defendant without due process of law;

    (2)    The claim for additional and/or punitive damages has a chilling effect on the exercise of economic free speech and free commerce by this Defendant;

    (3)    The amount of additional and/or punitive damages sought by the Plaintiff is so far out of line to the amount of actual damages allegedly sustained by the Plaintiff that the amount, in and of itself, constitutes cruel and unusual punishment;

    (4)    The amount of additional and/or punitive damage sought by the Plaintiff is so far out of line to the amount of actual damages allegedly sustained by the Plaintiff that the amount of additional and/or punitive damages, in and of itself, constitutes a denial to this Defendant of due process of law; and

5

(5)   The nature of this suit against this Defendant for additional and/or punitive damages is in the nature of a quasi-criminal complaint, and as such, the cause of action is barred by the Ex Post Facto provisions of the United States Constitution.

Although Defendant **FORD MOTOR COMPANY** denies it is liable for punitive damages, Defendant **FORD MOTOR COMPANY** hereby invokes the applicable provisions of Chapter 41, Texas Civil Practice and Remedies Code, with regard to liability and limitation of damages.

**9.**

Defendant **FORD MOTOR COMPANY** says that it is entitled to an offset or credit for any monies paid to Plaintiff herein by any Co-Defendants or Third Party Tortfeasor, and that it is entitled to submit to the jury at the trial of this cause as to the comparative causation, comparative fault and/or comparative negligence of any other Co-Defendant or Third Party Tortfeasor.

**10.**

Plaintiff's damages, if any, were the result of other conditions, injuries or illnesses that caused or contributed to his damages and alleged injuries.

**11.**

Defendant **FORD MOTOR COMPANY** further pleads Statute of Limitations as an affirmative defense.

**THEREFORE,** Defendant **FORD MOTOR COMPANY** prays that upon final hearing, Plaintiff **DAVID RAMOS** take nothing against said Defendant by reason of this suit; that Defendant receive judgment in its favor; that Defendant recover its costs; and that Defendant have such other and further relief to which it may be justly entitled.

Respectfully submitted,

**CALLIER & GARZA, L.L.P.**

Bernardo S. Garza
State Bar No. 07730400
4900 Woodway, Suite 700
Houston, Texas 77056
Telephone:    (713) 439-0248
Facsimile:    (713) 439-1908

Attorneys for Defendant,
FORD MOTOR COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon all counsel of record by either hand delivery, certified mail, return receipt requested, or facsimile on February 13, 2001.

Bernardo S. Garza

## CAUSE NO. 00-11-004816-E

| | | |
|---|---|---|
| DAVID RAMOS, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | CAMERON COUNTY, TEXAS |
| | § | |
| ARMSTRONG WORLD | § | |
| INDUSTRIES, ET AL | § | 357TH JUDICIAL DISTRICT |

## DEFENDANT FORD MOTOR COMPANY'S
## JURY DEMAND

Defendant FORD MOTOR COMPANY, hereby demands a trial by jury pursuant to Rule 216

of the Texas Rules of Civil Procedure. The jury fee has already been paid.

Respectfully submitted,

CALLIER & GARZA, L.L.P.

FILED ___9.00___ O'CLOCK __a__ M.
AURORA DE LA GARZA DIST. CLERK

FEB 2 0 2001

DISTRICT COURT OF CAMERON COUNTY, TEXAS
_____ DEPUTY

Bernardo S. Garza
State Bar No. 07730400
4900 Woodway, Suite 700
Houston, Texas 77056
Telephone:    (713) 439-0248
Facsimile:    (713) 439-1908

Attorneys for Defendant,
FORD MOTOR COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon
all counsel of record by either hand delivery, certified mail, return receipt requested, or facsimile on
February 13, 2001.

Bernardo S. Garza

F:\DATA\DOCS\41-768\ANSMTV

## CAUSE NO. 00-11-004816-E

| | | |
|---|---|---|
| DAVID RAMOS, ET AL | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | CAMERON COUNTY, TEXAS |
| | § | |
| ARMSTRONG WORLD | § | |
| INDUSTRIES, ET AL | § | 357TH JUDICIAL DISTRICT |

### REQUEST FOR ORAL HEARING

FORD MOTOR COMPANY, Defendant in the above referenced cause, hereby requests an oral hearing on its Motion to Transfer Venue, filed herein.

Respectfully submitted,

CALLIER & GARZA, L.L.P.

Bernardo S. Garza
State Bar No. 07730400
4900 Woodway, Suite 700
Houston, Texas 77056
Telephone:    (713) 439-0248
Facsimile:    (713) 439-1908

Attorneys for Defendant,
FORD MOTOR COMPANY

FILED 9:00 O'CLOCK A M
AURORA DE LA GARZA DIST. CLERK
FEB 2 0 2001
DISTRICT COURT OR CAMERON COUNTY, TEXAS
DEPUTY

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served upon all counsel of record by either hand delivery, certified mail, return receipt requested, or facsimile on February 13, 2001.

Bernardo S. Garza

F:\DATA\DOCS\41-768\ANSMTV

C.T. CORPORATION SYSTEMS
350 N. ST. PAUL STREE
SUITE 2900
DALLAS, TEXAS 75201

he _____ DEFENDANT _____, GREETING:

You are commanded to appear by filing a written answer to the

LAINTIFFS ORIGINAL PETITION

t or before 10:00 o'clock a.m. of the Monday next after the expiration of 20 ays after the date of service of this citation before the Honorable District ourt 357th Judicial District of Cameron County, Texas at the Courthouse of said ounty in Brownsville, Texas.  Said _____ PETITION _____ was filed on OVEMBER 28, 2000 .  A copy of same accompanies this citation.

he file number of said suit being No. 2000-11-004816-E.

ne style of the case is:

DAVID RAMOS, ET AL
VS.
ARMSTRONG WORLD INDUSTRIES, INC.

aid petition was filed in said court by _____ SCOTT WERT
Attorney for _____ PLAINTIFF _____ ), whose address is
201 N. WATSON ROAD, SUITE 145 ARLINGTON, TEXAS   76006

The nature of the demand is fully shown by a true and correct copy of the etition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to equirements of law, and the mandates thereof, and make due return as the law irects.

Issued and given under my hand and seal of said Court at Brownsville, exas, this the 1st day of DECEMBER , A.D. 2000.

AURORA DE LA GARZA _____, DISTRICT CLERK
_____ County, Texas
_____ rrison St.
_____ le, Texas 78521
_____ M. Cornejo _____, Deputy
RICK M. CORNEJO

'itation for Personal Service <u>- NON-RESIDENT NOTICE</u>   Lit. Seq. # <u>5.049.01</u>

No. <u>2000-11-004816-E</u>            **ORIGINAL**

T H E   S T A T E   O F   T E X A S

   NOTICE TO DEFENDANT:  You have been sued.  You may employ an attorney.  If
ou or your attorney do not file a written answer with the clerk who issued this
itation by 10:00 a.m. on the Monday next following the expiration of twenty
ays after you were served this citation and petition, a default judgment may be
aken against you.

Ɔ: <u>GENERAL MOTORS</u>
   <u>SERVING ITS REGISTERED AGENT</u>

## FICERS RETURN OF SERV

**COUNTY: CAMERON**          **CASE # 2000114816H**          **COURT 357**

Clt. Ref.# RAMOS, DAVID   Clt.#   4452

DAVID RAMOS AND EMMA RAMOS; FREDDY RAY JOHNSON AND LORETTA
JOYCE JOHNSON

VS

ARMSTRONG WORLD INDUSTRIES, INC. (SUCCESSOR TO ARMSTRONG CORK
COMPANY) ET AL

The documents came to our hand for service on 12/12/00  Time: 13:31:40

Documents received for service:

**CITATION; PLAINTIFFS' ORIGINAL ASBESTOS PETITION/TEXAS
EXPOSURE AND/OR TEXAS RESIDENTS**

The documents were delivered on **01/25/01  Time: 11:20:00**

Executed at: 350 N. St.Paul St. Ste.2900
             Dallas, TX 75201

```
FILED _____9:00_____ O'CLOCK ___Q__ M
AURORA DE LA GARZA DIST. CLERK
        MAY 0 7 2001
DISTRICT COURT OF CAMERON COUNTY, TEXAS
_____ DEPUTY
```

to the following: **General Motors**
                **By Delivering To C.T. Corporation Systems, Registered Agent**
                **By Delivering To Kasy Mcgee, Designated Agent**

_✓_ PERSONALLY delivering the document to the person above.
___ SUBSTITUTE SERVICE per Order by delivering to _____in person
     who is sixteen (16) years of age or older, at the above listed address which is the
     usual place of abode/business of the above named person.
___ POSTING per Order by securely affixing to the main entry way at the above address.

James Prince

**AFFIDAVIT**

I, am over the age of eighteen, not a party to nor interested in the outcome of the above
suit, I have never been convicted of a felony or misdemeanor involving moral turpitude
in any state of federal jurisdicion and I have studied an am familiar with the Texas RULES
OF CIVIL PROCEDURE, VERNON'S TEXAS CIVIL STATUTES, CIVIL PRATICA AND REMEDIES CODE and all
other applicable rules and statutes relating to service of citation and/or notices.

Service Fee: _18.00_

Witness Fee Tendered: _____

STATE OF TEXAS}

James Prince
Professional Civil Process Austin
P.O. Box 342467
Austin, Texas 78734-0042
(512) 477-3500

**VERIFICATION**

Before me, a notary public, on this day personally appeared the above named authorized
person known to me to be the person whose name is subscribed to the foregoing document
and, being by me first duly sworn declared that the statements therein contained are
true and correct.  Given my hand and seal of office this ___ day of _April_  2001.

PCP Inv.# A01011910

```
DEE ROBERTS
Notary Public, State of Texas
My Commission Expires 09-27-03
```

NOTARY PUBLIC SIGNATURE

C.T. CORPORATION SYSTEMS
350 N. ST. PAUL ST. S    2900
DALLAS, TX 75201

\e         DEFENDANT        , GREETING:

    You are commanded to appear by filing a written answer to the

:AINTIFFS' ORIGINAL PETITION

: or before 10:00 o'clock a.m. of the Monday next after the expiration of 20
\ys after the date of service of this citation before the Honorable District
\urt 357th Judicial District of Cameron County, Texas at the Courthouse of said
\unty in Brownsville, Texas.  Said _____PETITION_____ was filed on
\VEMBER 28, 2000 .  A copy of same accompanies this citation.

\e file number of said suit being No. 2000-11-004816-E.

\e style of the case is:

<div align="center">

DAVID RAMOS, ET AL
VS.
ARMSTRONG WORLD INDUSTRIES, INC.

</div>

\id petition was filed in said court by _____SCOTT WERT_____
\ttorney for _____PLAINTIFF_____), whose address is
\01 N, WATSON ROAD, SUITE 145 ARLINGTON, TEXAS  76006                    .

    The nature of the demand is fully shown by a true and correct copy of the
\tition accompanying this citation and made a part hereof.

    The officer executing this writ shall promptly serve the same according to
\quirements of law, and the mandates thereof, and make due return as the law
\rects.

    Issued and given under my hand and seal of said Court at Brownsville,
\xas, this the 30th day of NOVEMBER , A.D. 2000.

AURORA DE LA GARZA____, DISTRICT CLERK
Cameron County, Texas
974 E. Harrison St.
Brownsville, Texas 78521
M. Cornejo
_____, Deputy
RICK M. CORNEJO

tation for Personal Service - <u>NON-RESIDENT NOTICE</u>      Lit. Seq. # <u>5.048.01</u>

No. <u>2000-11-004816-E</u>          **ORIGINAL**

T H E    S T A T E    O F    T E X A S

NOTICE TO DEFENDANT: You have been sued. You may employ an attorney. If
ou or your attorney do not file a written answer with the clerk who issued this
tation by 10:00 a.m. on the Monday next following the expiration of twenty
ays after you were served this citation and petition, a default judgment may be
ken against you.

): <u>DAIMLERCHRYSLER MOTORS CORPORATION</u>
   <u>SERVING ITS REGISTERED AGENT</u>

# C   ..ICERS RETURN OF SERVICE

**COUNTY: CAMERON**         **CASE # 2000114816E**        **COURT 357**
                                                  Clt. Ref.# RAMOS, DAVID   Clt.#   4452

DAVID RAMOS AND EMMA RAMOS;FREDDY RAY JOHNSON AND LORETTA
JOYCE JOHNSON


VS

ARMSTRONG WORLD INDUSTRIES, INC.(SUCCESSOR TO ARMSTRONG CORK
COMPANY)ET AL


The documents came to our hand for service on 12/12/00  Time: 13:31:40

Documents received for service:

**CITATION;PLAINTIFFS' ORIGINAL ASBESTOS PETITION/TEXAS
EXPOSURE AND/OR TEXAS RESIDENTS**

The documents were delivered on 01/25/01  Time: 11:20:00

Executed at: 350 N. St.Paul St. Ste.2900
             Dallas, TX 75201

to the following: **Daimlerchrysler Motors Corporation
                   By Delivering To C.T. Corporation Systems, Registered Agent
                   By Delivering To Kasy Mcgee, Designated Agent**

_____  PERSONALLY delivering the document to the person above.
_____  SUBSTITUTE SERVICE per Order by delivering to _____in person
        who is sixteen (16) years of age or older, at the above listed address which is the
        usual place of abode/business of the above named person.
_____  POSTING per Order by securely affixing to the main entry way at the above address.

                                James Prince

                                **AFFIDAVIT**

I, am over the age of eighteen, not a party to nor interested in the outcome of the above
suit, I have never been convicted of a felony or misdemeanor involving moral turpitude
in any state of federal jurisdicion and I have studied and am familiar with the Texas RULES
OF CIVIL PROCEDURE, VERNON'S TEXAS CIVIL STATUTES, CIVIL PRACTICE AND REMEDIES CODE and all
other applicable rules and statutes relating to service of citation and/or notices.

Service Fee: 18,00                James Prince
                                  Professional Civil Process Austin
Witness Fee Tendered:_____    P.O. Box 342467
                                  Austin, Texas 78734-0042
STATE OF TEXAS}                   (512) 477-3500
                      VERIFICATION

Before me, a notary public, on this day personally appeared the above named authorized
person known to me to be the person whose name is subscribed to the foregoing document
and, being by me first duly sworn declared that the statements therein contained are
true and correct.  Given my hand and seal of office this ___ day of April        2001.

PCP Inv.# A01011904                          NOTARY PUBLIC SIGNATURE

DEE ROBERTS
Notary Public, State of Texas
My Commission Expires 09-27-03

FILED _____ O'CLOCK _____M
AURORA DE LA GARZA DIST. CLERK
MAY 07 2001
DISTRICT COURT OF CAMERON COUNTY, TEXAS
_____ DEPUTY

C.T. CORPORATION SYSTEMS
350 N. ST. PAUL ST. STE 2900
DALLAS, TX 75201

the _____ DEFENDANT _____, GREETING:

You are commanded to appear by filing a written answer to the

PLAINTIFFS' ORIGINAL PETITION

at or before 10:00 o'clock a.m. of the Monday next after the expiration of 20 days after the date of service of this citation before the Honorable District Court 357th Judicial District of Cameron County, Texas at the Courthouse of said county in Brownsville, Texas. Said _____ PETITION _____ was filed on NOVEMBER 28, 2000 . A copy of same accompanies this citation.

The file number of said suit being No. 2000-11-004816-E.

The style of the case is:

DAVID RAMOS, ET AL
VS.
ARMSTRONG WORLD INDUSTRIES, INC.

Said petition was filed in said court by _____ SCOTT WERT
(Attorney for _____ PLAINTIFF _____ ), whose address is
1201 N. WATSON ROAD, SUITE 145 ARLINGTON, TEXAS 76006 .

The nature of the demand is fully shown by a true and correct copy of the Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Brownsville, Texas, this the 30th day of NOVEMBER , A.D. 2000.

AURORA DE LA GARZA , DISTRICT CLERK
Cameron County, Texas
974 E. Harrison St.
Brownsville, Texas 78521

_____ , Deputy
RICK M. CORNEJO

Citation for Personal Service - <u>NON-RESIDENT NOTICE</u>      Lit. Seq. # <u>5.047.01</u>

No. <u>2000-11-004816-E</u>      **ORIGINAL**

T H E   S T A T E   O F   T E X A S

NOTICE TO DEFENDANT: You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

TO: DAIMLERCHRYSLER CORPORATION
     SERVING ITS REGISTERED AGENT

# OFFICERS RETURN OF SERVICE

**COUNTY: CAMERON**          **CASE # 2000114816E**          **COURT 357**

Clt. Ref.# RAMOS, DAVID  Clt.#   4452

DAVID RAMOS AND EMMA RAMOS;FREDDY RAY JOHNSON AND LORETTA
JOYCE JOHNSON

VS

ARMSTRONG WORLD INDUSTRIES, INC.(SUCCESSOR TO ARMSTRONG CORK
COMPANY)ET AL

The documents came to our hand for service on 12/12/00  Time: 13:31:40

Documents received for service:

**CITATION;PLAINTIFFS' ORIGINAL ASBESTOS PETITION/TEXAS
EXPOSURE AND/OR TEXAS RESIDENTS**

```
FILED _____ O'CLOCK ____ M
AURORA DE LA GARZA DIST. CLERK
        MAY 0 7 2001
DISTRICT COURT OF CAMERON COUNTY, TEXAS
                              DEPUTY
```

The documents were delivered on **01/25/01  Time: 11:20:00**

Executed at: 350 N. St.Paul St. Ste.2900
             Dallas, TX 75201

to the following: **Daimlerchrysler Corporation**
                 **By Delivering To C.T. Corporation Systems, Registered Agent**
                 **By Delivering To Kasy Mcgee, Designated Agent**

_____ ✓  PERSONALLY delivering the document to the person above.
_____     SUBSTITUTE SERVICE per Order by delivering to _____in person
          who is sixteen (16) years of age or older, at the above listed address which is the
          usual place of abode/business of the above named person.
_____     POSTING per Order by securely affixing to the main entry way at the above address.

                                James Prince

### AFFIDAVIT

I, am over the age of eighteen, not a party to nor interested in the outcome of the above
suit, I have never been convicted of a felony or misdemeanor involving moral turpitude
in any state of federal jurisdicion and I have studied and am familiar with the Texas RULES
OF CIVIL PROCEDURE, VERNON'S TEXAS CIVIL STATUTES, CIVIL PRATICE AND REMEDIES CODE and all
other applicable rules and statutes relating to service of citation and/or notices.

Service Fee: 18.00

Witness Fee Tendered: _____

STATE OF TEXAS}

James Prince
Professional Civil Process Austin
P.O. Box 342467
Austin, Texas 78734-0042
(512) 477-3500

### VERIFICATION

Before me, a notary public, on this day personally appeared the above named authorized
person known to me to be the person whose name is subscribed to the foregoing document
and, being by me first duly sworn declared that the statements therein contained are
true and correct. Given my hand and seal of office this ____ day of _____ 2001.

PCP Inv.# A01011902

```
DEE ROBERTS
Notary Public, State of Texas
My Commission Expires 09-27-03
```

NOTARY PUBLIC SIGNATURE

C.T. CORPORATION SYSTEM
350 N. ST. PAUL ST. STE. 2900
DALLAS, TX 75201

he _____ DEFENDANT _____ , GREETING:

You are commanded to appear by filing a written answer to the

LAINTIFFS' ORIGINAL PETITION

t or before 10:00 o'clock a.m. of the Monday next after the expiration of 20
ays after the date of service of this citation before the Honorable District
ourt 357th Judicial District of Cameron County, Texas at the Courthouse of said
ounty in Brownsville, Texas.   Said _____ PETITION _____ was filed on
OVEMBER 28, 2000 .  A copy of same accompanies this citation.

he file number of said suit being No. 2000-11-004816-E.

ue style of the case is:

<div align="center">

DAVID RAMOS, ET AL
VS.
ARMSTRONG WORLD INDUSTRIES, INC.

</div>

id petition was filed in said court by _____ SCOTT WERT
ttorney for _____ PLAINTIFF _____ ), whose address is
01 N. WATSON ROAD, SUITE 145 ARLINGTON, TEXAS  76006 .

The nature of the demand is fully shown by a true and correct copy of the
tition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to
quirements of law, and the mandates thereof, and make due return as the law
rects.

Issued and given under my hand and seal of said Court at Brownsville,
as, this the 30th day of NOVEMBER , A.D. 2000.

AURORA DE LA GARZA   , DISTRICT CLERK

Citation for Personal Service - NON-RESIDENT NOTICE     Lit. Seq. # 5.046.01

No. 2000-11-004816-E     ORIGINAL

T H E   S T A T E   O F   T E X A S

NOTICE TO DEFENDANT:  You have been sued.  You may employ an attorney.  If
you or your attorney do not file a written answer with the clerk who issued this
citation by 10:00 a.m. on the Monday next following the expiration of twenty
days after you were served this citation and petition, a default judgment may be
taken against you.

TO: FORD MOTOR COMPANY
    SERVING ITS REGISTERED AGENT

# OFFICERS RETURN OF SERVICE

**COUNTY: CAMERON**   **CASE # 2000114816E**   **COURT 357**

Clt. Ref.# RAMOS, DAVID   Clt.#   4452

DAVID RAMOS AND EMMA RAMOS;FREDDY RAY JOHNSON AND LORETTA
JOYCE JOHNSON


VS


ARMSTRONG WORLD INDUSTRIES, INC.(SUCCESSOR TO ARMSTRONG CORK
COMPANY)ET AL


The documents came to our hand for service on 12/12/00  Time: 13:31:40

Documents received for service:

**CITATION;PLAINTIFFS' ORIGINAL ASBESTOS PETITION/TEXAS
EXPOSURE AND/OR TEXAS RESIDENTS**

The documents were delivered on 01/25/01  Time: 11:20:00

Executed at: 350 N. St.Paul St. Ste.2900
Dallas, TX 75201

to the following: Ford Motor Company
By Delivering To C.T. Corporation Systems, Registered Agent
By Delivering To Kasy Mcgee, Designated Agent

✓ PERSONALLY delivering the document to the person above.
___ SUBSTITUTE SERVICE per Order by delivering to _____in person
who is sixteen (16) years of age or older, at the above listed address which is the
usual place of abode/business of the above named person.
___ POSTING per Order by securely affixing to the main entry way at the above address.

James Prince

**AFFIDAVIT**

I, am over the age of eighteen, not a party to nor interested in the outcome of the above
suit, I have never been convicted of a felony or misdemeanor involving moral turpitude
in any state of federal jurisdicion and I have studied and am familiar with the Texas RULES
OF CIVIL PROCEDURE, VERNON'S TEXAS CIVIL STATUTES, CIVIL PRATICE AND REMEDIES CODE and all
other applicable rules and statutes relating to service of citation and/or notices.

Service Fee: 18.00

Witness Fee Tendered:_____

STATE OF TEXAS}

James Prince
Professional Civil Process Austin
P.O. Box 342467
Austin, Texas 78734-0042
(512) 477-3500

**VERIFICATION**

Before me, a notary public, on this day personally appeared the above named authorized
person known to me to be the person whose name is subscribed to the foregoing document
and, being by me first duly sworn declared that the statements therein contained are
true and correct.  Given my hand and seal of office this ___ day of April , 2001.

PCP Inv.# A01011894

DEE ROBERTS
Notary Public, State of Texas
My Commission Expires 09-27-03

NOTARY PUBLIC SIGNATURE

FILED ___ O'CLOCK ___ M
AURORA DE LA GARZA DIST. CLERK

MAY 07 2001

DISTRICT COURT OF CAMERON COUNTY, TEXAS
                                      DEPUTY

No.  2000-11-4816-G

| RAMOS, ET AL | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| | § | |
| VS. | § | CAMERON COUNTY, TEXAS |
| | § | |
| | § | |
| US GYPSUM, ET AL | § | 404TH JUDICIAL DISTRICT |

## ORDER OF DISMISSAL (SUBJECT TO REINSTATEMENT)

It coming to the attention of this Court that there are certain Defendants herein who have filed petitions under the Bankruptcy Code for protection from creditors.   Pursuant to Section 362 of the Bankruptcy Code and/or federal bankruptcy order, a stay or injunction of the action is in effect as to the following Defendants:

1,   ARMSTRONG WORLD INDUSTRIES, INC. (successor to ARMSTRONG CORK COMPANY)

2,   W. R. GRACE & COMPANY

In an effort to manage the Court's docket more efficiently, the claims against the above Defendants will be dismissed without prejudice subject to being reopened against any such bankrupt Defendant upon motion of either party pursuant to any action taken in the related bankruptcy proceedings. The right to reopen this cause without prejudice to the rights of the parties shall continue until sixty (60) days after the related bankruptcy proceedings are concluded. This Order does not affect any prior Orders in this cause.

SO ORDERED this 12 day of _____, 2001.

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| FREDDY RAY JOHNSON, | ) | Hon. |
| DAVID RAMOS, | ) | |
| | ) | Case No.: |
| Plaintiffs | ) | |
| | ) | |
| V. | ) | State Court Case No. 2000114816-g |
| | ) | |
| ACandS, INC. | ) | |
| ALLIED SIGNAL AQUA-CHEM, INC. | ) | Jury |
| ARMSTRONG WORLD INDUSTRIES, I | ) | |
| ARVIN INDUSTRIES, INC. | ) | |
| ASTEN, INC. | ) | |
| BORG-WARNER CORPORATION | ) | |
| C.E. THURSTON & SONS, INC. | ) | **LIST OF PARTIES AND** |
| CROWN CORK & SEAL CO., INC. | ) | **THEIR COUNSEL** |
| DAIMLER CHRYSLER CORPORATION | ) | **OF RECORD** |
| DAIMLER CHRYSLER MOTORS CORP. | ) | |
| DANA CORPORATION | ) | |
| DRESSER INDUSTRIES, INC. | ) | |
| FEDERAL MOGUL CORPORATION | ) | |
| FLINTKOTE COMPANY (THE) | ) | |
| FORD MOTOR COMPANY | ) | |
| FOSTER WHEELER ENERGY CORP. | ) | |
| GAF CORP. | ) | |
| GARLOCK | ) | |
| GASKET HOLDINGS, INC. | ) | |
| GENERAL ELECTRIC CO. | ) | |
| GENERAL MOTORS CORP. | ) | |
| GENERAL REFRACTORIES COMPA | ) | |
| GEORGIA-PACIFIC CORPORATION | ) | |
| INGERSOLL-RAND COMPANY | ) | |
| J.T. THORPE COMPANY | ) | |
| KAISER ALUMINUM & CHEMICAL | ) | |
| KELLOG, BROWN & ROOT, INC. | ) | |
| KELLY-MOORE | ) | |
| MAREMONT CORPORATION (THE) | ) | |
| METROPOLITAN LIFE INSURANCE CO. | ) | |
| MID-VALLEY, INC. | ) | |

DAL:413753.1
37354.1

MOOG AUTOMOTIVE, INC.                    )
NATIONAL SERVICES INDUSTRIES, I          )
NORTH AMERICAN REFRACTORIES              )
OWENS-ILLINOIS, INC.                     )
PFIZER, INC.                             )
PLIBRICO COMPANY                         )
PNEUMO ABEX CORPORATION                  )
PROKO INDUSTRIES, INC.                   )
QUIGLEY COMPANY, INC.                    )
RAPID-AMERICAN CORPORATION               )
RILEY STOKER CORP.                       )
SHOOK & FLETCHER INSULATION              )
SYNKOLOID, A DIVISION OF MURA            )
T & N, plc                               )
TRIPLEX, INC.                            )
U.S. GYPSUM COMAPNY                      )
U.S. MINERAL PRODUCTS COMP               )
UNION CARBIDE CORP.                      )
UNIROYAL HOLDING, INC.                   )
W.R. GRACE & CO-CONN                     )
                                         )
        Defendants.                      )

## LIST OF PARTIES AND THEIR COUNSEL OF RECORD

1.    **Plaintiffs**:
      FREDDY RAY JOHNSON and DAVID RAMOS
      **Attorney of Record**:
      Foster & Sear, L.L.P., Scott W. Wert, State Bar No. 00794835, 360 Place Office Park, 1201
      N. Watson Road, Suite 145, Arlington, Texas 76006, (817) 633-3355 Telephone, (817) 633-
      5507 Facsimile

2.    **Defendants and Attorneys of Record:**


Removal is pending as to Ford Motor Company, DaimlerChrysler and General Motors Corporation.