United States District Court
Southern District of Texas
FILED

JAN 1 4 2002

Michael N. Milby
Clerk of Court

) 0

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| FREDDY RAY JOHNSON, | ) | Hon. |
| DAVID RAMOS, | ) | |
| | ) | Case No.:  B-01-197 |
| Plaintiffs | ) | |
| | ) | |
| V. | ) | State Court Case No. 2000114816-G |
| | ) | |
| ACandS, INC., et al. | ) | |
| | ) | Jury |
| Defendants. | | |

## MEMORANDUM OF DAIMLERCHRYSLER CORPORATION, FORD MOTOR COMPANY AND GENERAL MOTORS CORPORATION IN RESPONSE TO PLAINTIFFS' MOTION TO REMAND AND ABSTAIN

Defendants DaimlerChrysler Corporation, Ford Motor Company and General Motors Corporation submit the following memorandum in response to Plaintiffs' motion to remand and abstain.

Respectfully submitted,

By: _John R. Henderson_
John R. Henderson
State Bar No. 09424200
Federal I.D. No. 9857
Brown McCarroll, L.L.P.
2001 Ross Avenue, Suite 2000
Dallas, Texas 75201
(214) 999-6100
**ATTORNEYS FOR
DEFENDANT
FORD MOTOR COMPANY**

DAL:421131.1
37354.100969

By: _Robert Thackston_ *by permission ORH*
Robert Thackston
State Bar No. 00785487
Federal I.D. No. Bar No. 17568
Joseph Blizzard
State Bar No. 00789156
Federal I.D. No. 17736
Jenkens & Gilchrist
1445 Ross Avenue, Suite 3200
Dallas, Texas 75202
(214) 855-4500
**ATTORNEYS FOR**
**DEFENDANT**
**DAIMLERCHRYSLER**

By: _Dawn Wright_ *by permission ORH*
Dawn Wright
State Bar No. 12742030
Thompson & Knight, L.L.P.
1700 Pacific Avenue
Suite 3300
Dallas, TX 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
**ATTORNEYS FOR**
**DEFENDANT**
**GENERAL MOTORS**
**CORPORATION**

# MEMORANDUM IN RESPONSE

On December 10, 2001, Judge Alfred M. Wolin of the United States District Court for the District of Delaware issued an order provisionally transferring the removed claims against DaimlerChrysler Corporation, Ford Motor Company and General Motors Corporation (Exhibit A).  As is clear from Judge Wolin's provisional transfer order, the claims asserted against the automobile manufacturers are now before Judge Wolin and are solely under his jurisdiction pursuant to 28 U.S.C. § 157(b)(5).  *See, e.g., Glasstech, Inc. v. AB Kyro OY*, 769 F.2d 1574, 1576 (Fed. Cir. 1985) ("after an order changing venue the jurisdiction of the transferor court ceases; and that thereafter the transferor court can issue no further orders, and any steps taken by it are of no effect"); *In re The Upjohn Company Antibiotic "Cleocin" Products Liability Litigation*, 508 F. Supp. 1020, 1021, 1981 U.S. Dist. LEXIS 12151 (E.D. Mich. 1981) (same); *General Electric Company v. Byrne*, 611 F.2d 670, 673 (7th Cir. 1979) ("the entry of the transfer order deprives the transferor court of jurisdiction until the case is returned to it, so that any action taken by the transferor court after transfer would be ineffective"); *Astarte Shipping v. Allied Steel Export Service*, 767 F.2d 86, 87 (5th Cir. 1985) (after the entry of a transfer order, "the transferor district court is deprived of jurisdiction until the case is returned to it.").[1]

Indeed, since Judge Wolin entered the Provisional Transfer Order, a number of courts have determined that they no longer have jurisdiction to rule upon any pending remand motions:

---

[1] On December 18, 2001, Judge Wolin entered a second Order, which is attached to this Notice, to establish a method by which the interests of all parties may be represented in the adjudication of the Transfer Motion.  The December 18, 2001 Order sets forth a briefing schedule and service requirements for all pleadings. (Exhibit B).

1. Judge Charles R. Breyer ruled that "[a]s the only claims that were removed to this Court have been transferred to the District of Delaware, there are no claims pending in this Court for the Court to remand. Accordingly, plaintiffs' motion to remand is DENIED without prejudice to plaintiffs renewing their motion should the District of Delaware rescind its provisional transfer order and return the friction claims to this Court." A copy of Judge Breyers December 17, 2001 Order is attached as Exhibit C. See Edmiston vs. General Motors Corporation et al., No. C-01-4397 CRB (N.D.Ca. Dec. 17, 2001).

2. The Honorable Donetta W. Ambrose of the Western District of Pennsylvania ordered that "all pending deadlines are stayed pending the outcome of the Motion to Transfer to the United states [sic] District Court for the District of Delaware." Copies of the December 13 and 14, 2001 Orders are attached as Exhibit D.

3. On December 21, 2001, the Honorable Joseph Hood, for the Western District of Kentucky ruled that he no longer had jurisdiction to rule on plaintiffs' motion to remand based upon Judge Wolin's December 10, 2001 Provisional Transfer Order. A copy of the transcript from the December 21, 2001 hearing has been ordered and will be provided upon receipt.

4. The Honorable Claudia Wilken of the Northern District of California denied plaintiffs' motions to remand holding that the friction product claims against General Motors, Ford Motor Company and DaimlerChrysler had been transferred to the District of Delaware and that there were no claims pending in the court to remand. Copies of Judge Wilken's December 20 and 21, 2001 orders are attached as Exhibits E and F.

5. On December 26, 2001, the Honorable Paul R. Matia, for the Northern District of Ohio, issued three separate orders stating that "[the Court] will not rule on the motion to remand or, in the alternative, to abstain because Judge Wolin issued the Provisional Transfer Order while the motion was still pending in this Court. Copies of the December 26, 2001 Orders are attached as Exhibit G.

The motion to transfer that was filed in the United States District Court for the District of

Delaware pursuant to 28 U.S.C. §157, which was the subject of Judge Wolin's December

10, 2001 transfer order, specifically requested the provisional transfer of all the friction

product claims asserted against the three Removing Defendants herein that are pending in

various state and federal courts across the country -- which include the claims removed to

this Court (Exhibit H). The motion to transfer, which is attached to the Removing

Defendants' Joint Notices of Removals, set forth the scope of the transferred claims and

the necessity for issuing the provisional transfer order issued by Judge Wolin, as follows:

"3.        This transfer motion encompasses all claims and causes of action
           against the Automobile Manufacturers in state or federal court
           alleging injuries due to friction products, including brakes and other
           automotive parts (the "Friction Product Claims")." (Exhibit B, p. 2)
                              *   *   *

"9.        To centralize the resolution of claims relating to brakes and other
           automotive parts and to facilitate the efficient administration of the
           Federal-Mogul Bankruptcy Case, the Automobile Manufacturers
           request that this Court exercise its authority under 28 U.S.C.
           §157(b)(5) and transfer all of the Friction Product Claims to the
           United States Court for the District of Delaware.

10.        To efficiently and fully effect such relief, the Automobile
           Manufacturers request that this Court immediately issue a provisional
           order transferring the Friction Product Claims to this Court (the
           'Provisional Transfer Order'). After further notice and opportunity
           for hearing for the affected parties, the Provisional Transfer Order can
           be made final.

11.        The immediate entry of the Provisional Transfer Order is necessary
           to prevent an untenable free-for-all, where plaintiffs will request
           numerous district courts around the country to remand the removed
           actions to state courts under 28 U.S.C. §1452(b), abstain from
           considering the removed actions under 28 U.S.C. §1334(c)(1), or
           transfer the venue of such action to federal courts other than this
           Court. In the absence of the immediate entry of the Provisional
           Transfer Order, such requests would severely compromise the
           centralization of the Friction Product Claims. Any such requests
           would be at odds with the clear purpose of 28 U.S.C. §157(b)(5) to
           permit this Court to determine whether to transfer the Friction
           Product Claims to this Court." (Exhibit B, pp. 3-4)

Judge Wolin's December 10 order granted the Removing Defendants' motion to provisionally transfer all the claims asserted against them that had been removed to the federal courts in the various states throughout the country, including the claims removed to this Court, stating:

> "This matter having been opened upon the motion of General Motors Corporation, Ford Motor Company and DaimlerChrysler Corporation for a motion to transfer (the "Transfer Motion") certain lawsuits against them arising out of so-called "friction products" as to which the movants contend they have a right of indemnification against the debtors in these administratively consolidated Chapter 11 proceedings (the "Friction Product Claims"); and it appearing that movants have removed these cases from the several state courts to the United States District Courts for Districts in which these cases were pending; and the movants having also moved for a provisional order of transfer to preserve the status quo pending a plenary hearing and determination by the Court of the Transfer Motion; and the Court having reviewed the several briefs and letters of counsel in support and in opposition to the provisional transfer motion; and good cause appearing. It is this 10th day of December, 2001 . . . ¶ ORDERED that the application for provisional transfer order is granted and the Friction Product Claims are hereby provisionally transferred to this Court subject to further Order of the Court." (Exhibit A, pp. 1-2)

Section 157(b)(5) gives the exclusive jurisdiction to the "district court in which the bankruptcy case is pending" (in this case Judge Wolin) to transfer claims to that court for resolution as part of the bankruptcy proceedings:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, *as determined by the district court in which the bankruptcy case is pending.*
> 28 U.S.C. § 157(b)(5) (emphasis added).

Section 157(b)(5) has been used effectively in prior mass tort cases to transfer thousands of related tort claims against non-debtors for centralized resolution within ongoing bankruptcy proceedings. *See, e.g., In re Dow Corning Corp.,* 86 F.3d 482 (6th Cir. 1996) (breast implant claims transferred for

resolution within Dow Corning bankruptcy); *A.H. Robins v. Piccinin* 788 F.2d 994 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986) (Dalkon Shield claims transferred for resolution with A.H. Robins bankruptcy); *see also Calumet National Bank v.Levine*, 179 B.R. 117, 120-21 (N.D. Ind. 1995)(motion to transfer pursuant to 28 U.S.C. § 157(b)(5) is properly directed to and decided by the district court in the district where the bankruptcy action is proceeding).

Based on the provisional transfer order issued by Judge Wolin and the authorities above, the removed claims against the Removing Defendants herein have been transferred to the United States District Court for the District of Delaware and, hence, this Court should deny plaintiffs' motion to remand on this ground alone. To the extent that a jurisdictional determination is required before a court may transfer claims under Section 157(b)(5), as Plaintiffs' Motions to Remand and Abstain suggest, that determination has already been made by Judge Wolin. In fact, the motion to transfer and the memorandum in support of the motion to transfer discussed in detail why the removed friction product claims are "related to" the bankruptcy action pending before Judge Wolin and the reasons upon which jurisdiction is proper in the United States District Court for the District of Delaware under 28 USC §1334(b) and §157(b). (Exhibit F) Therefore, because this case is no longer before the Court, the Removing Defendants respectfully request that the Court deny Plaintiffs' motion for remand.

Respectfully submitted,

By: _____

John R. Henderson
State Bar No. 09424200
Federal I.D. No. 9857
Brown McCarroll, L.L.P.
2001 Ross Avenue, Suite 2000
Dallas, Texas 75201
(214) 999-6100
**ATTORNEYS FOR**
**DEFENDANT**
**FORD MOTOR COMPANY**

By: _____

Robert Thackston
State Bar No.0078548
Federal I.D. No. Bar No. 17568
Joseph Blizzard
State Bar No. 00789156
Federal I.D. No.17736
Jenkens & Gilchrist
1445 Ross Avenue, Suite 3200
Dallas, Texas 75202
(214) 855-4500
**ATTORNEYS FOR**
**DEFENDANT**
**DAIMLERCHRYSLER**

DAL:421131.1
37354.100969

By: _____
Dawn Wright
State Bar No.12742030
Thompson & Knight, L.L.P.
1700 Pacific Avenue
Suite 3300
Dallas, TX 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
**ATTORNEYS FOR**
**DEFENDANT**
**GENERAL MOTORS CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing  Memorandum of

DaimlerChrysler Corporation, Ford Motor Company and General Motors Corporation in Response

to Plaintiffs' Motion to Remand and Abstain was served on the ____ day of January 2002 by U.S.

Mail, first-class, postage prepaid upon all known counsel of record.

John R. Henderson

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: FEDERAL-MOGUL  :    Chapter 11
GLOBAL, INC., T&N     :    Case Nos. 01-10578, et al.[1]
LIMITED, et al.,      :
                      :
        Debtors.      :
------------------------- :


### ORDER: (1) PARTIALLY WITHDRAWING THE REFERENCE, and (2) PROVISIONALLY TRANSFERRING CERTAIN FRICTION PRODUCT CLAIMS

This matter having been opened upon the motion of General
Motors Corporation, Ford Motor Company and Daimler Chrysler
Corporation for a motion to transfer (the "Transfer Motion")
certain lawsuits against them arising out of so-called "friction
products" as to which the movants contend they have a right of
indemnification against the debtors in these administratively
consolidated Chapter 11 proceedings (the "Friction Product
Claims"); and it appearing that movants have removed these cases
from the several state courts to the United States District
Courts for the Districts in which these cases were pending; and
the movants having also moved for a provisional order of transfer
to preserve the status quo pending a plenary hearing and
determination by the Court of the Transfer Motion; and the Court
having reviewed the several briefs and letters of counsel in
support and in opposition to the provisional transfer motion; and
good cause appearing

[1] See attached list.

It is this 10th day of December, 2001

ORDERED that, pursuant to 28 U.S.C. § 157 and the Order of this Court issued December 10, 2001, the reference of this case to the Bankruptcy Court, Judge Randall K. Newsome presiding, is hereby withdrawn with respect to the Transfer Motion and the provisional transfer motion, and with respect to matters involving subject matter jurisdiction, abstention and remand regarding the Friction Product Claims, and it is further

ORDERED that the application for a provisional transfer Order is granted and the Friction Product Claims are hereby provisionally transferred to this Court subject to further Order of the Court, and it is further

ORDERED that all parties shall refrain from submitting papers in support of or in opposition to the Transfer Motion pending further Order of the Court providing for notice, a briefing schedule and a hearing date for the Transfer Motion.

/s/ _____
ALFRED M. WOLIN, U.S.D.J.

IN RE: FEDERAL-MOGUL GLOBAL, INC.
## Case Numbers

| | | | |
|---|---|---|---|
| 01-10578 | 01-10643 | 01-10700 | 01-10750 |
| 01-10580 | 01-10644 | 01-10701 | 01-10751 |
| 01-10582 | 01-10646 | 01-10702 | 01-10752 |
| 01-10585 | 01-10647 | 01-10703 | 01-10753 |
| 01-10586 | 01-10649 | 01-10704 | 01-10754 |
| 01-10587 | 01-10650 | 01-10705 | 01-10755 |
| 01-10589 | 01-10651 | 01-10706 | 01-10756 |
| 01-10591 | 01-10652 | 01-10707 | 01-10757 |
| 01-10593 | 01-10653 | 01-10708 | 01-10758 |
| 01-10594 | 01-10654 | 01-10710 | 01-10759 |
| 01-10596 | 01-10655 | 01-10711 | 01-10760 |
| 01-10598 | 01-10656 | 01-10712 | 01-10761 |
| 01-10599 | 01-10657 | 01-10713 | 01-10762 |
| 01-10600 | 01-10658 | 01-10714 | 01-10763 |
| 01-10601 | 01-10659 | 01-10715 | 01-10764 |
| 01-10603 | 01-10660 | 01-10716 | 01-10765 |
| 01-10604 | 01-10661 | 01-10717 | 01-10766 |
| 01-10605 | 01-10662 | 01-10718 | 01-10767 |
| 01-10606 | 01-10664 | 01-10719 | 01-10768 |
| 01-10608 | 01-10665 | 01-10721 | 01-10769 |
| 01-10610 | 01-10666 | 01-10722 | 01-10770 |
| 01-10611 | 01-10668 | 01-10723 | 01-10771 |
| 01-10613 | 01-10669 | 01-01724 | 01-10772 |
| 01-10614 | 01-10672 | 01-10726 | 01-10773 |
| 01-10615 | 01-10673 | 01-10727 | 01-10774 |
| 01-10617 | 01-10675 | 01-10728 | |
| 01-10618 | 01-10682 | 01-10729 | |
| 01-10619 | 01-10683 | 01-10730 | |
| 01-10620 | 01-10684 | 01-10731 | |
| 01-10621 | 01-10685 | 01-10732 | |
| 01-10622 | 01-10686 | 01-10733 | |
| 01-10623 | 01-10687 | 01-10734 | |
| 01-10625 | 01-10688 | 01-10736 | |
| 01-10626 | 01-10689 | 01-10737 | |
| 01-10627 | 01-10690 | 01-10739 | |
| 01-10629 | 01-10691 | 01-10741 | |
| 01-10630 | 01-10692 | 01-10742 | |
| 01-10632 | 01-10693 | 01-10743 | |
| 01-10633 | 01-10694 | 01-10744 | |
| 01-10634 | 01-10695 | 01-10745 | |
| 01-10637 | 01-10696 | 01-10746 | |
| 01-10640 | 01-10698 | 01-10749 | |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ARMSTRONG WORLD INDUSTRIES, INC., et al.,<br><br>　　　　Debtors. | :<br>:<br>:<br>: | Chapter 11<br>Case Nos. 00-4471, 00-4469,<br>　　　　00-4470 |
| IN RE: W.R. GRACE & CO., et al.,<br><br>　　　　Debtors. | :<br>:<br>:<br>: | Chapter 11<br>Case Nos. 01-1139 through<br>　　　　0-1200 |
| IN RE: FEDERAL-MOGUL GLOBAL, INC., T&N LIMITED, et al.,<br><br>　　　　Debtors. | :<br>:<br>:<br>:<br>: | Chapter 11<br>Case Nos. 01-10578, et al.[1] |
| IN RE: USG CORPORATION, a Delaware Corporation, et al.,<br><br>　　　　Debtors. | :<br>:<br>:<br>: | Chapter 11<br>Case Nos. 01-2094 through<br>　　　　01-2104 |
| IN RE: OWENS CORNING, et al.,<br><br>　　　　Debtors. | :<br>:<br>:<br>: | Chapter 11<br>Case Nos. 00-3837 through<br>　　　　00-3854 |

**ORDER (1) REFERRING CERTAIN CASES TO THE BANKRUPTCY COURT AND (2) ALLOCATING RESPONSIBILITIES BETWEEN THE DISTRICT COURT AND THE BANKRUPTCY COURT**

The above-captioned Chapter 11 cases having been being transferred to this Court pursuant to the Order of the Honorable Susan L. Robinson, Chief Judge of the United States District Court for the District of Delaware, and this Court having

[1] See attached list.

authority pursuant to 28 U.S.C. § 157(a) to refer these cases to
the United States Bankruptcy Judges of this District; and the
Honorable Randall J. Newsome and the Honorable Judith K.
Fitzgerald, United States Bankruptcy Judges of the Northern
District of California and the Western District of Pennsylvania
respectively, sitting by designation in this District and
possessing special expertise and familiarity with these matters;
and good cause appearing

IT IS THIS   day of December 2001

ORDERED that the following Order applies to the lead cases
identified in the caption of this Order and to all cases filed as
related cases thereto, and it is further

ORDERED that In re W.R. Grace & Co., Bankruptcy No. 01-1139,
is hereby referred to the Honorable Judith K. Fitzgerald is
further

ORDERED that In re Armstrong World Industries, Inc.,
Bankruptcy No. 00-4471, is hereby referred to the Honorable
Randall J. Newsome, and it is further

ORDERED that In re Federal-Mogul Global, Inc., Bankruptcy
No. 01-10578, is hereby referred to the Honorable Randall J.
Newsome, and it is further

ORDERED that In re Owens Corning, Bankruptcy No. 00-3837, is
referred to the Honorable Judith K. Fitzgerald before ...

... reporting ... to ...

ORDERED that In re DSG, Bankruptcy. No. 01-2094, is hereby referred to the Honorable Randall J. Newsome before whom it was previously pending, and it is further

ORDERED that Judges Fitzgerald and Newsome will cooperate between themselves and with this Court in the scheduling of the above-mentioned five cases to facilitate the expeditious administration of the debtors' estates in bankruptcy, and it is further

ORDERED that all persons are on notice that this Court may, sua sponte, upon recommendation received from the Bankruptcy Judges, or upon motion, withdraw the references made by this Order with respect to specific proceedings or issues as may be required by law or as may from time to time be deemed advisable by the Court to facilitate the efficient resolution of the several cases and/or to adjudicate common issues among them and it is further

ORDERED that the withdrawal of the references is specifically contemplated with respect to asbestos-related claims and issues, provided however that the Court's authority to withdraw the references shall not be limited to that issue nor by whether a particular proceeding is considered core for the purposes of the jurisdiction of the Bankruptcy Court under the United States Code, and it is further

ORDERED that all pi          ... ...           ... ...  ...  ...

3

concerning these cases shall be filed with the Clerk of the
Bankruptcy Court for the District of Delaware in accordance with
applicable procedures and Local and Federal Rules of Bankruptcy
Procedure, and it is further

ORDERED that counsel for the debtors shall transmit a copy
of each Omnibus Hearing Agenda Letter to this Court
simultaneously with filing that letter in the Bankruptcy Court,
and debtors' counsel shall immediately contact this chambers by
telephone to arrange the mode of transmittal of the Agenda
Letters, and it is further

ORDERED that at the status conference in these cases
presently scheduled for December 20, 2001, this Court will
solicit views from the parties with respect to which specific
proceedings, and particularly which asbestos-related proceedings,
the references to the Bankruptcy Judges should be withdrawn, and
it is further

ORDERED that, from the date of this Order, the Bankruptcy
Judges will conduct an initial review of all proceedings and
issues presently pending before them in the above-captioned cases
to determine whether, as a matter of statutory jurisdiction or to
facilitate the several cases and/or to adjudicate common issues
among them, the reference should be withdrawn as to any of them,
and it is further

ORDERED that upon completion of their review, the Bankruptcy

4

Judges shall recommend to this Court as to which proceedings or issues the references should be withdrawn, and it is further

ORDERED that this Order shall be without prejudice to the right of any party to move to withdraw a reference with respect to a particular proceeding, and it is further

ORDERED that nothing in this Order shall be construed to require that the Bankruptcy Court render formal findings or recommendations with respect to a withdrawal of the references or a determination of the core/non-core nature of a particular proceeding unless a party in interest files a motion requesting a determination of the core/non-core status of a particular proceeding, and it is further

ORDERED that all proceedings currently pending before the Bankruptcy Judges will continue to be handled by them in accordance with the provisions of 28 U.S.C. § 157 and this Order, subject to further Order of this Court, and it is further

ORDERED that all previous orders in the above captioned cases shall continue in force except as modified or superseded by the terms of this Order.

/s/
_____
Alfred M. Wolin, District Judge
District Court, New Jersey
Sitting by Designation for
Delaware

IN RE: FEDERAL-MOGUL GLOBAL, INC.
Case Numbers

| | | | |
|---|---|---|---|
| 01-10578 | 01-10643 | 01-10700 | 01-10750 |
| 01-10580 | 01-10644 | 01-10701 | 01-10751 |
| 01-10582 | 01-10646 | 01-10702 | 01-10752 |
| 01-10585 | 01-10647 | 01-10703 | 01-10753 |
| 01-10586 | 01-10649 | 01-10704 | 01-10754 |
| 01-10587 | 01-10650 | 01-10705 | 01-10755 |
| 01-10589 | 01-10651 | 01-10706 | 01-10756 |
| 01-10591 | 01-10652 | 01-10707 | 01-10757 |
| 01-10593 | 01-10653 | 01-10708 | 01-10758 |
| 01-10594 | 01-10654 | 01-10710 | 01-10759 |
| 01-10596 | 01-10655 | 01-10711 | 01-10760 |
| 01-10598 | 01-10656 | 01-10712 | 01-10761 |
| 01-10599 | 01-10657 | 01-10713 | 01-10762 |
| 01-10600 | 01-10658 | 01-10714 | 01-10763 |
| 01-10601 | 01-10659 | 01-10715 | 01-10764 |
| 01-10603 | 01-10660 | 01-10716 | 01-10765 |
| 01-10604 | 01-10661 | 01-10717 | 01-10766 |
| 01-10605 | 01-10662 | 01-10718 | 01-10767 |
| 01-10606 | 01-10664 | 01-10719 | 01-10768 |
| 01-10608 | 01-10665 | 01-10721 | 01-10769 |
| 01-10610 | 01-10666 | 01-10722 | 01-10770 |
| 01-10611 | 01-10668 | 01-10723 | 01-10771 |
| 01-10613 | 01-10669 | 01-01724 | 01-10772 |
| 01-10614 | 01-10672 | 01-10726 | 01-10773 |
| 01-10615 | 01-10673 | 01-10727 | 01-10774 |
| 01-10617 | 01-10675 | 01-10728 | |
| 01-10618 | 01-10682 | 01-10729 | |
| 01-10619 | 01-10683 | 01-10730 | |
| 01-10620 | 01-10684 | 01-10731 | |
| 01-10621 | 01-10685 | 01-10732 | |
| 01-10622 | 01-10686 | 01-10733 | |
| 01-10623 | 01-10687 | 01-10734 | |
| 01-10625 | 01-10688 | 01-10736 | |
| 01-10626 | 01-10689 | 01-10737 | |
| 01-10627 | 01-10690 | 01-10739 | |
| 01-10629 | 01-10691 | 01-10741 | |
| 01-10630 | 01-10692 | 01-10742 | |
| 01-10632 | 01-10693 | 01-10743 | |

6

01-10633      01-10694      01-10744
01-10634      01-10695      01-10745
01-10637      01-10696      01-10746
01-10638      01-10697      01-10747
01-10640      01-10698      01-10748
01-10641      01-10699      01-10749

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE: FEDERAL-MOGUL      :   Chapter 11
GLOBAL, INC., T&N         :   Case Nos. 01-10578, et al.[1]
LIMITED, et al.,          :
                          :
          Debtors.        :   **O R D E R**
------------------------------

This matter having been opened upon the motion of General
Motors Corporation, Ford Motor Company and Daimler Chrysler
Corporation (the "Big Three") for a motion to transfer (the
"Transfer Motion") as further set forth in this Court's
Provisional Transfer Order of December 10, 2001; and it appearing
that the number of plaintiffs affected by the Transfer Motion
(the "Transferred Plaintiffs") is too large to permit each of
them to be heard in accordance with the normal motion practice of
this Court; and the Court having conferred with counsel to
determine a method by which the interests of all parties may be
represented in the adjudication of the Transfer Motion and that
all parties may be afforded due process of law; and good cause
appearing

It is on this 18th day of December, 2001

ORDERED that with respect to notice that:

1.  David Bernick, Esq., counsel to the Big Three shall
serve on counsel for all parties affected by the Provisional

--------

[1]See attached list.

Transfer Order and on plaintiffs pro se a copy of this Order, a

form of stipulation of waiver of further service in connection

with the Transfer Motion, directions on how papers filed relevant

to the Transfer Motion may be retrieved from the electronic

filing web site maintained by the Clerk of the Delaware

Bankruptcy Court and a statement that a paper copy of the Big

Three's moving papers is available upon request to Mr. Bernick's

office, and that

2.  Service by Mr. Bernick pursuant to this Order shall be

accomplished as soon as practicable by first class mail, and it

is further

ORDERED that with respect to briefing the Transfer Motion

that:

1.  All responses to the Transfer Motion filed or otherwise

received by the Court to date are deemed withdrawn, and that

2.  The Big Three's motion for leave to file an overlength

brief is granted and the Big Three's papers in support of the

Transfer Motion are hereby accepted as filed, and that

3.  The Transferred Plaintiffs shall be limited to four (4)

briefs of forty (40) pages each, or some lesser number of briefs

which shall total no more than 160 pages in the aggregate, and

that

4.  Counsel for the Transferred Plaintiffs shall confer to

determine a method by which responsibility for preparing their

2

Case 1:01-cv-00197  Document 10  Filed in TXSD on 01/14/2002  Page 23 of 142

briefs shall be allocated, which method shall be as fair as practicable and best calculated to cause each issue of importance to the Transferred Plaintiffs to be presented to the Court while minimizing redundancy, and that

5.  Briefs and other papers on behalf of the Transferred Plaintiffs shall be served and filed with the Court on or before January 2, 2002, and that

6.  The debtor and/or each of the two committees appointed by the United States Trustee in this Chapter 11 proceeding may serve and file papers, including briefs not to exceed forty pages, in support or opposition to the Transfer Motion on or before January 16, 2002, and that

7.  The Big Three may serve and file reply papers, including a brief not to exceed twenty (20) pages on or before January 22, 2002, and it is further

ORDERED that each of the Transferred Plaintiffs shall be deemed to oppose the Transfer Motion and to adopt the positions taken in the briefs submitted on behalf of the Transferred Plaintiffs unless they notify Mr. Bernick to the contrary on or before January 16, 2002, and it is further

ORDERED that the Clerks of the several United States District Courts from which matters were transferred pursuant to the Provisional Transfer Order of December 10, 2001, shall retain physical possession of their files of each transferred matter

3

Case 1:01-cv-00197   Document 10   Filed in TXSD on 01/14/2002   Page 24 of 142

pending a final determination of the Transfer Motion and further

Order of this Court.

/S/ ALFRED M. WOLIN

_____

ALFRED M. WOLIN, U.S.D.J.

# IN RE: FEDERAL-MOGUL GLOBAL, INC.
## Case Numbers

| | | | |
|---|---|---|---|
| 01-10578 | 01-10643 | 01-10700 | 01-10750 |
| 01-10580 | 01-10644 | 01-10701 | 01-10751 |
| 01-10582 | 01-10646 | 01-10702 | 01-10752 |
| 01-10585 | 01-10647 | 01-10703 | 01-10753 |
| 01-10586 | 01-10649 | 01-10704 | 01-10754 |
| 01-10587 | 01-10650 | 01-10705 | 01-10755 |
| 01-10589 | 01-10651 | 01-10706 | 01-10756 |
| 01-10591 | 01-10652 | 01-10707 | 01-10757 |
| 01-10593 | 01-10653 | 01-10708 | 01-10758 |
| 01-10594 | 01-10654 | 01-10710 | 01-10759 |
| 01-10596 | 01-10655 | 01-10711 | 01-10760 |
| 01-10598 | 01-10656 | 01-10712 | 01-10761 |
| 01-10599 | 01-10657 | 01-10713 | 01-10762 |
| 01-10600 | 01-10658 | 01-10714 | 01-10763 |
| 01-10601 | 01-10659 | 01-10715 | 01-10764 |
| 01-10603 | 01-10660 | 01-10716 | 01-10765 |
| 01-10604 | 01-10661 | 01-10717 | 01-10766 |
| 01-10605 | 01-10662 | 01-10718 | 01-10767 |
| 01-10606 | 01-10664 | 01-10719 | 01-10768 |
| 01-10608 | 01-10665 | 01-10721 | 01-10769 |
| 01-10610 | 01-10666 | 01-10722 | 01-10770 |
| 01-10611 | 01-10668 | 01-10723 | 01-10771 |
| 01-10613 | 01-10669 | 01-01724 | 01-10772 |
| 01-10614 | 01-10672 | 01-10726 | 01-10773 |
| 01-10615 | 01-10673 | 01-10727 | 01-10774 |
| 01-10617 | 01-10675 | 01-10728 | |
| 01-10618 | 01-10682 | 01-10729 | |
| 01-10619 | 01-10683 | 01-10730 | |
| 01-10620 | 01-10684 | 01-10731 | |
| 01-10621 | 01-10685 | 01-10732 | |
| 01-10622 | 01-10686 | 01-10733 | |
| 01-10623 | 01-10687 | 01-10734 | |
| 01-10625 | 01-10688 | 01-10736 | |
| 01-10626 | 01-10689 | 01-10737 | |
| 01-10627 | 01-10690 | 01-10739 | |
| 01-10629 | 01-10691 | 01-10741 | |
| 01-10630 | 01-10692 | 01-10742 | |
| 01-10632 | 01-10693 | 01-10743 | |
| 01-10633 | 01-10694 | 01-10744 | |
| 01-10634 | 01-10695 | 01-10745 | |
| 01-10637 | 01-10696 | 01-10746 | |
| 01-10638 | 01-10697 | 01-10747 | |
| 01-10640 | 01-10698 | 01-10748 | |
| 01-10641 | 01-10699 | 01-10749 | |

Sent by: CLARK HILL P.L.C. #7          13139658252;          12/27  -  11:17AM; JetFax #71; Page 15/21

DEC-20-01 08:48 FROM:GGCS

ID 2125. 444          PAGE  2/3
NO.454   P.1/2

**United States District Court**
*For the Northern District of California*

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   ALICE EDMISTON and BARRY EDMISTON,        No. C-01-4397  CRB

12            Plaintiffs,                       ORDER RE: MOTION TO REMAND

13        v.

14   GENERAL MOTORS CORPORATION,
     DAIMLER CHRYSLER CORPORATION,
15   FORD MOTOR COMPANY,

16            Defendants.

17

18        Plaintiffs commenced a civil personal injury asbestos lawsuit in San Francisco Superior Court

19   against a long list of defendants, including General Motors Corporation, Daimler Chrysler Corporation,

20   Ford Motor Company, and Federal Mogul Corporation.  Among other things, plaintiffs allege injuries

21   caused by exposure to friction products manufactured and/or sold by Federal Mogul.

22        Federal Mogul filed a voluntary bankruptcy petition for relief under Chapter 11 on October 1,

23   2001.  Defendants General Motors Corporation, Daimler Chrysler Corporation and Ford Motor Company

24   ("the removing defendants") subsequently removed the plaintiffs' claims against them to this Court pursuant

25   to 28 U.S.C. § 1452(a).  Section 1452 provides that "[a] party may remove any claim or cause of action in

26   a civil action . . . to the district court for the district where such civil action is pending, if such district court

27   has jurisdiction

28

DEC 27 2001  1:48 PM FR CLARK HILL        313 965 8252 TO 912149956170        P.04
DEC 25 01 00.10 FROM GCCS
DEC.18.2001 12:18PM                                        NO.459  P.22

2    B.R. 853, 854-55 (Bkrtcy. N.D. Ind. 1991);  S. Elizabeth Gibson, Removal of Claims Related to

3    Bankruptcy Cases: What is a "Claim or Cause of Action?" 34 UCLA L. Rev. 1 (1986).  The removing

4    defendants did not purport to remove, and did not remove, any of the plaintiffs' non-friction claims pending

5    against the non-removing defendants.  They specifically removed only plaintiffs' claims which "assert[]

6    causes of action from exposure to friction products."  Thus, the non-friction claims asserted by plaintiffs

7    against the defendants who did not join in removal were not removed to this Court; they remained and

8    remain in state court.

9            Plaintiffs subsequently moved to remand the friction claims removed to this Court.  Before the

10    Court could decide the motion to remand, however, the United States District Court for the District of

11    Delaware provisionally transferred all friction claims against the removing defendants – including the claims

12    removed to this Court – to the District of Delaware.  See 28 U.S.C. § 157(b)(5); see also In re Dow

13    Corning Corp., 1995 WL 95978 (Bkrtcy. E.D. Mich. Aug. 9, 1995) (discussing provisional transfer

14    pursuant to section 157(b)(5)).  As the only claims that were removed to this Court have been transferred

15    to the District of Delaware, there are no claims pending in this Court for the Court to remand.  Accordingly,

16    plaintiffs' motion to remand is DENIED without prejudice to plaintiffs renewing their motion should the

17    District of Delaware rescind its provisional transfer order and return the friction claims to this Court.

18            **IT IS SO ORDERED.**

19

20    Dated: December 17, 2001

21                                                    _____
                                                      CHARLES R. BREYER
                                                      UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

Sent by: CLARK HILL P.L.C. #7          13130650252;          12/27  · 11:17AM;JetFax #71, Page 16/21
          DEC 17 2001 16:07 FR D   ⌐ C          412 261 7251 TC   .S#35205#13139 P.02/27

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANET DITTMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CA 1-2253 |
| | ) | |
| OLDSMOBILE, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this _13th_ day of _Dec_____, 2001, upon consideration of Notice of Order Provisionally Transferring Friction Product Claims to The United States District Court for the District of Delaware, filed at Document No.3 ;

IT IS HEREBY ORDERED that all pending deadlines are stayed pending the outcome of the Motion to Transfer to the United states District Court for the District of Delaware.

_Donetta F. Ambrose_
Donetta W. Ambrose
United States District Judge

cc:   Edwin Beachler, Esq.
      Eric K. Falk, Esq.

Sent by: CLARK HILL P L.C. #7          12139658252;          12/27 → 11:10AM;JetFax #71; Page 17/21

DEC 17 2001 16:07 FR D    _ C          412 261 7251 TO    5H35205#13139 P.03/07

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN LEE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CA 1-2257 |
| | ) | |
| A-BEST PRODUCTS | ) | |
| COMPANY, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this ___13th___ day of ___dec_____, 2001, upon consideration of Notice of Order Provisionally Transferring Friction Product Claims to The United States District Court for the District of Delaware, filed at Document No.7 ,

IT IS HEREBY ORDERED that all pending deadlines are stayed pending the outcome of the Motion to Transfer to the United states District Court for the District of Delaware.

_Donetta F. Ambrose_

Donetta W. Ambrose
United States District Judge

cc:    Theodore Goldberg, Esq.
       Eric K. Falk, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCES FOLINO, ET AL., | ) | |
| | ) | |
| Plaintiffs. | ) | |
| | ) | |
| vs. | ) | CA 1-2258 |
| | ) | |
| A-BEST PRODUCTS | ) | |
| COMPANY, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

AND NOW, this __13th__ day of __Dec_____, 2001, upon consideration of Notice of Order Provisionally Transferring Friction Product Claims to The United States District Court for the District of Delaware, filed at Document No.7 ,

IT IS HEREBY ORDERED that all pending deadlines are stayed pending the outcome of the Motion to Transfer to the United states District Court for the District of Delaware.

_Donetta W. Ambrose_
Donetta W. Ambrose
United States District Judge

cc:     Theodore Goldberg, Esq.
        Eric K. Falk, Esq.

Sent by: CLARK HILL P.L.C. #7          13139658252;          12/27/·1  11:18AM; JetFax #71; Page 19/21
          DEC 17 2001 16:07 FR D    , C          412 261 7251 TL    :5H35205H13139 F.25/07

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GEORGE RANKIN, ET AL.,                    )
                                          )
          Plaintiffs,                     )
                                          )
vs.                                       )          CA 1-2267
                                          )
A.P. GREEN SERVICES, INC, ET AL.,         )
                                          )
          Defendants.                     )

## ORDER

AND NOW, this __13th__ day of __Dec_____, 2001, upon consideration of Notice of Order Provisionally Transferring Friction Product Claims to The United States District Court for the District of Delaware, filed at Document No.8 ,

IT IS HEREBY ORDERED that all pending deadlines are stayed pending the outcome of the Motion to Transfer to the United states District Court for the District of Delaware.

Donetta W. Ambrose
United States District Judge

cc:    Theodore Goldberg, Esq.
       Eric K. Falk, Esq.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH CARL SMITH,                    )
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )          CA 1-2250
                                      )
A.P. GREEN SERVICES, INC., ET AL.,    )
                                      )
          Defendants.                 )

## ORDER

AND NOW, this _13th_ day of _Dec_____, 2001, upon consideration of Notice of Order Provisionally Transferring Friction Product Claims to The United States District Court for the District of Delaware, filed at Document No. 8 ,

IT IS HEREBY ORDERED that all pending deadlines are stayed pending the outcome of the Motion to Transfer to the United states District Court for the District of Delaware.

_Donetta W. Ambrose_
Donetta W. Ambrose
United States District Judge

cc:   Theodore Goldberg, Esq.
      Eric K. Falk, Esq.

Sent by: CLARK HILL P.L.C. #7          13139658252;          12/27  11:18AM;*JetFax #71*; Page 21/21
        DEC 17 2001 16:28 FR E    C          412 281 7251 TO   5H35205#13139 P.07/27

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HARRY L. MANNY, JR.,                )
                                    )
        Plaintiff,                  )
                                    )
        vs.                         )          CA 1-2246
                                    )
KEENE CORPORATION, ET AL.,          )
                                    )
        Defendants.                 )


## ORDER

AND NOW, this ___14th___ day of ___Dec_____, 2001, upon
consideration of Notice of Order Provisionally Transferring Friction Product Claims to The
United States District Court for the District of Delaware, filed at Document No.4 ,

IT IS HEREBY ORDERED that all pending deadlines are stayed pending the
outcome of the Motion to Transfer to the United states District Court for the District of
Delaware.


_Donetta F. Ambrose_
Donetta W. Ambrose
United States District Judge


cc:    Edwin Beachler, Esq.
       Eric K. Palk, Esq.

E-FILED ORIGINAL

DEC 2 0 2001

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALEXANDER HATTEN,

        Plaintiff,

    v.

GENERAL MOTORS CORPORATION, DAIMLER
CHRYSLER CORPORATION, FORD MOTOR
COMPANY, et al.,

        Defendants.

_____/

No. 01-4375 CW

ORDER DENYING
PLAINTIFF'S
MOTION TO REMAND

Pursuant to 28 U.S.C. § 157(b)(5) and the provisional transfer order entered on December 10, 2001 in In re Federal-Mogul Global Inc., No. 01-10578 et. al., this matter has been transferred to the United States District Court for the District of Delaware. Proceedings in this case are stayed pending further order from that court.

Plaintiff's motion to remand is DENIED without prejudice to refiling in the proper forum.

Dated: DEC 2 0 2001

CLAUDIA WILKEN
United States District Judge

Copies mailed to counsel
as noted on the following page

United States District Court
For the Northern District of California

C-01-4375 CW

Eugene Brown
Filice Brown Eassa & Mcleod
Lake Merritt Plaza
1999 Harrison Street, Eighteenth Floor
Oakland, CA 94612


Jack K. Clapper
Clapper & Patti
Marina Office Plaza
2330 Marinship Way
Suite 140
Sausalito, CA 94965


Philip R. Cosgrove
Grace, Genson, Cosgrove & Schirm
444 South Flower Street
Suite 1100
Los Angeles, CA 90071-2912

JAN 02 2002 10:49 AM FR_C...K HILL          313 965 8252      912149996170      P.23/28
DEC-27-01 15:56 FROM:...                     ID:21   15464                     PAGE  2/4
DEC-20-01 17:52 FROM:GGCE
DEC. 20, 2001  3:07PM                                            NO. 3105   P. 2

1  HARRY F. WARTNICK, State Bar No. 54761
   STEVEN M. HAROWITZ, State Bar No. 71117
2  MARTHA A. H. BERMAN, State Bar No. 122212
   WARTNICK, CHABER, HAROWITZ & TIGERMAN
3  101 California Street, Suite 2200
   San Francisco, California 94111
4  Telephone 415-986-5566

5

6  Attorneys for Plaintiffs

7

8

9

                    UNITED STATES DISTRICT COURT

                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  FREDERICK GRAHAM AND MYRA          No. C01-04572
    GRAHAM,
12                                     [PROPOSED] ORDER RE PLAINTIFFS'
               Plaintiffs,             MOTION TO REMAND
13

14     v.

15  GENERAL MOTORS CORPORATION,
    DAIMLERCHRYSLER CORPORATION,
16  FORD MOTOR COMPANY, et al.,

17            Defendants.

18

19

20      Plaintiffs Fred Graham and Myra Graham commenced a civil personal injury asbestos

21  lawsuit in San Francisco Superior Court against numerous defendants, including General Motors

22  Corporation, DaimlerChrysler Corporation, Ford Motor Company and subsidiaries of Federal

23  Mogul Corporation. Among other things, plaintiffs allege injuries caused by exposure to friction

24  products manufactured and/or sold by Federal Mogul subsidiaries.

25

26

27

28

JAN 02 2002 10:49 AM FR C.  .K HILL          313 965 8252    912149996170      P.24/28
DEC-27-01 13:53 FROM:CCCS
DEC-26-01 17:52 FROM:CCCS
 JEC 21, 2001  3:6:76                                                 NO. 2135   F. 2

1    Federal Mogul filed a voluntary bankruptcy petition for relief under Chapter 11 on

2    October 1, 2001.  Defendants General Motors Corporation, DaimlerChrysler Corporation and

3    Ford Motor Company ("the removing defendants") subsequently removed the plaintiff's claims

4    against them to this Court pursuant to 28 U.S.C. Section 1452(a).  Section 1452 provides that "a

5    party may remove any claim or cause of action in a civil action...to the district court for the

6    district where such civil action is pending, if such district court has jurisdiction of such claim or

7    cause of action under section 1334 of this title."  The plain language of section 1452(a) permits

8    removal of claims and causes of action within a single lawsuit.  See In re Braneman Bros., Inc.,

9    135 B.R. 853, 854-55 (Bkrtcy. N.D. Ind. 1991); S. Elizabeth Gibson, Removal of claims Related

10   to Bankruptcy Cases: What is a "Claim or Cause of Action?" 34 UCLA L. Rev. 1 (1986).  The

11   removing defendants did not purport to remove, and did not remove any claims other than the

12   Friction Product Claims asserted by plaintiff against them.  No other defendants joined the

13   removing defendants.

14

15        Plaintiff subsequently moved to remand the removed claims and causes of action that had

16   been removed to this Court.  Before this Court could decide the motion to remand, however,

17   the United States District Court for the District of Delaware provisionally transferred all Friction

18   Product Claims, which are those claims against the removing defendants.  See 28 U.S.C. Section

19   157(b)(5).  Since those Friction Product Claims against General Motors Corporation, Ford Motor

20   Company and DaimlerChrysler are the only claims that were in front of this Court, and they

21   have been transferred to the District of Delaware, there are no claims pending in this Court for

22   this Court to remand.

23

24

25

26

27

28

PROPOSED ORDER RE MO. TO REMAND
ML CR-CV

1

2    Accordingly, plaintiffs' motion to remand is DENIED without prejudice to plaintiffs

3    renewing their motion should the District of Delaware rescind its provisional transfer order and

4    return the Friction Product Claims against General Motors Corporation, Ford Motor Company

5    and DaimlerChrysler Corporation to this Court.

6        IT IS SO ORDERED.

7

8

9

10   DATED:   DEC 21 2001                    _____
                                             Honorable Claudia Wilken
11                                           JUDGE OF THE DISTRICT COURT

12

13

14   APPROVED AS TO FORM:

15   GRACE, GENSON, COSGOVE & SCHIRM

16
     By _____
17       THOMAS H. HUTCHINSON

18   Attorneys for Defendants

19

20

21

22   WARTNICK, CHABER, HAROWITZ & TIGERMAN

23
     By _____
24       MARTHA A.H. BERMAN

25

26   Attorneys for Plaintiffs

27

28

[PROPOSED] ORDER RE NO. TO REMAND
No. C01-007

C-01-4572 CW

Eugene Brown
Filice Brown Eassa & Mcleod
Lake Merritt Plaza
1999 Harrison Street, Eighteenth Floor
Oakland, CA 94612

Martha Berman
Wartnick Chaber Harowitz smith & Tigerma
101 California Street
Suite 2200
San Francisco, CA 94111

Philip R. Cosgrove
Grace, Genson, Cosgrove & Schirm
444 South Flower Street
Suite 1100
Los Angeles, CA 90071-2912

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


MARY ELLEN YOUNG, etc.            )      JUDGE PAUL R. MATIA
                                  )
          Plaintiff              )      CASE NO. 1:01CV22027
                                  )
     -vs-                         )
                                  )      O R D E R
ARMSTRONG WORLD INDUSTRIES, et al. )
                                  )
          Defendants              )


          Plaintiff's motion to remand or, in the

alternative, to abstain, filed on December 10, 2001, is pending

before the Court.  Plaintiff moves the Court to remand the

above-entitled action to state court because this Court lacks

subject matter jurisdiction.  In the alternative, mandatory or

discretionary abstention should apply.  Plaintiff cites *In re

Asbestos Litigation*, No. 2:01-1055, 2:01-1224, 2:01-1064,

2:01-1074, 2:01-1056, 2:01-1071, 2:01-1085, 2:01-1060, 2:01-1089,

2001 WL 1561793 (S.D.W.Va. Dec. 7, 2001), in support of its

motion.  Plaintiff also asserts that the removal was outside the

30-day time period prescribed by 28 U.S.C. § 1446(b).  Plaintiff

argues that the 90-day time period set forth in Bankruptcy Rule

9027(a) is not controlling.

          On November 27, 2001, Judge Edward R. Becker, Chief

Judge of the United States Court of Appeals for the Third Circuit,

signed an Order Concerning Specific Bankruptcy Cases with Asbestos

Claims.  The Order designates and assigns District Judge Alfred M

Wolin of the United States District Court for the District of New

Jersey to hold court in the District of Delaware to complete

unfinished business in, among other cases, the Chapter 11

bankruptcy case of Federal-Mogul Global, Inc., T&N Limited,

et al., Case Nos. 01-10578, et al.  On November 29, 2001, Judge

Sue L. Robinson, Chief Judge of the United States District Court

for the District of Delaware signed an Order Assigning Asbestos

Cases to Judge Wolin.  A copy of that order can be obtained at the

website of the United States Bankruptcy Court for the District of

Delaware (http://www.deb.uscourts.gov).

On December 10, 2001, Judge Wolin issued an Order

that provisionally transferred certain Friction Product Claims

(including the case at bar) to the United States District Court

for the District of Delaware.

After notice to the parties, plaintiff's motion to

remand or, in the alternative, to abstain came on for hearing

before the Court on December 20, 2001.  After considering the oral

arguments of counsel, this Court determines that it will not rule

on the motion to remand or, in the alternative, to abstain because

Judge Nolin issued the Provisional Transfer Order while the motion
was still pending in this Court.

IT IS SO ORDERED.

s/ PAUL R. MATIA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

### CERTIFICATE OF SERVICE

A copy of the foregoing Order was filed
electronically this 26th day of December, 2001. Parties may
access this filing through the Court's system. A copy of this
Order has been sent by fax this 26th day of December, 2001 to
Mark Wintering, Esq. (216.696.0679), Michael J. Sullivan, Esq.
(313.965.6252), and Matthew C. O'Connell, Esq. (216.687.1841) and
by regular mail this 26th day of December, 2001 to Mark Wintering,
Esq. and Mary Brigid Sweeney, Esq., Robert E. Sweeney Co., L.P.A.,
55 Public Square, Suite 1500, Cleveland, Ohio 44113-1998;
Michael J. Sullivan, Esq., Clark Hill PLC, 500 Woodward Avenue,
Suite 3500, Detroit Michigan 48226-3435; Matthew C. O'Connell,
Esq. and Christina Tuggey Hidek, Esq., Reminger & Reminger Co.,
L.P.A., The 113 St. Clair Building, Cleveland, Ohio 44114;
Ruth Antinone, Esq., Willman & Arnold, 705 McKnight Park Drive,
Pittsburgh, Pennsylvania 15237; Susan S. Box, Esq., Roetzel &

3

Andress, 222 South Main Street, Akron, Ohio 44308; and C. James

Zeszutek, Esq. and Michael R. Bucci, Jr., Esq., Thorp Reed &

Armstrong, One Oxford Centre, 301 Grant Street, 14th Floor,

Pittsburgh, Pennsylvania 15219-1425


                                    s/ PAUL R. MATIA
                                    CHIEF JUDGE
                                    UNITED STATES DISTRICT COURT

Sent by: CLARK HILL P.L.C. #7          13139658252;          12/27·   11:15AM;JetFax #71; Page 6/21

2001-Dec-26  14:47    From-JUDGE PAUL R ...tIA              +2165277119          T-536  P 006/013  f-321

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CAROL M. BAAL, etc. | ) | JUDGE PAUL R. MATIA |
| | ) | |
| Plaintiff | ) | CASE NO. 1:01CV21881 |
| | ) | |
| -vs- | ) | |
| | ) | O R D E R |
| ALLIED SIGNAL, INC., et al. | ) | |
| | ) | |
| Defendants | ) | |

Plaintiff's motion to remand or, in the
alternative, to abstain, filed on December 5, 2001, is pending
before the Court.  Plaintiff moves the Court to remand the
above-entitled action to state court because this Court lacks
subject matter jurisdiction.  In the alternative, mandatory or
discretionary abstention should apply.  Plaintiff cites *In re
Asbestos Litigation*, No. 2:01-1055, 2:01-1224, 2:01-1064,
2:01-1074, 2:01-1058, 2:01-1071, 2:01-1085, 2:01-1060, 2:01-1089,
2001 WL 1561793 (S.D.W.Va. Dec. 7, 2001), in support of its
motion.  Plaintiff also asserts that the removal was outside the
30-day time period prescribed by 28 U.S.C. § 1446(b).  Plaintiff
argues that the 90-day time period set forth in Bankruptcy Rule
9027(a) is not controlling.

On November 27, 2001, Judge Edward R. Becker, Chief
Judge of the United States Court of Appeals for the Third Circuit,
signed an Order Concerning Specific Bankruptcy Cases with Asbestos

Clause   The Order designates and assigns District Judge Alfred M. Wolin of the United States District Court for the District of New Jersey to hold court in the District of Delaware to complete unfinished business in, among other cases, the Chapter 11 bankruptcy case of Federal Mogul Global, Inc., T&N Limited, et al., Case Nos. 01-10578, et al.  On November 29, 2001, Judge Sue L. Robinson, Chief Judge of the United States District Court for the District of Delaware signed an Order Assigning Asbestos Cases to Judge Wolin.   Copies of these orders are published on the website of the United States Bankruptcy Court for the District of Delaware (http://www.deb.uscourts.gov).

On December 10, 2001, Judge Wolin issued an Order that provisionally transferred certain Friction Product Claims (including the case at bar) to the United States District Court for the District of Delaware.

After notice to the parties, plaintiff's motion to remand or, in the alternative, to abstain came on for hearing before the Court on December 20, 2001.  After considering the oral arguments of counsel, this Court determines that it will not rule on the motion to remand or, in the alternative, to abstain because

2

Judge Wolin issued the Provisional Transfer Order while the matter
was still pending in this Court.

    IT IS SO ORDERED.


                              s/ PAUL R. MATIA
                              CHIEF JUDGE
                              UNITED STATES DISTRICT COURT


## CERTIFICATE OF SERVICE

    A copy of the foregoing Order was filed
electronically this 26th day of December, 2001.  Notice of this
filing will be sent to Mary Brigid Sweeney, Esq. and Matthew C.
O'Connell, Esq. by operation of the Court's electronic filing
system.  Parties may access this filing through the Court's
system.  A copy of this Order has also been sent by fax this 26th
day of December, 2001 to Mark Wintering, Esq. (216.696.0679) and
Michael J. Sullivan, Esq. (313.565.8252), and by regular mail this
26th day of December, 2001 to Mark Wintering, Esq. and Mary Brigid
Sweeney, Esq., Robert E. Sweeney Co., L.P.A., 55 Public Square,
Suite 1500, Cleveland, Ohio 44113-1998; Michael J. Sullivan, Esq.,
Clark Hill PLC, 500 Woodward Avenue, Suite 3500, Detroit Michigan
48226-3435; Ruth Antinone, Esq., Willman & Arnold, 705 McKnight
Park Drive, Pittsburgh, Pennsylvania 15237; Bruce P. Mandel, Esq.,
Ulmer & Berne, LLP, 1300 E. 9th Street, Suite 900, Cleveland, Ohio

44111; Susan S. Box, Esq., Roetzel & Andress, 222 South Main Street, Akron, Ohio 44308; C. James Zeszutek, Esq. and Michael R. Bucci, Jr., Esq., Thorp Reed & Armstrong, One Oxford Centre, 301 Grant Street, 14th Floor, Pittsburgh, Pennsylvania 15219-1425, Donald J. Hoffman, Esq., Donald J. Hoffman & Associates, IMA Building, Suite 635, 14701 Detroit Avenue, Lakewood, Ohio 44107; and Carolyn P. Killian, Mgr. Human Resources, Honeywell Friction Materials, 105 Pawtucket Avenue, Rumford, Rhode Island 02916.

s/ PAUL R. MATIA
CHIEF JUDGE
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM R. TAYLOR, et al. | ) | JUDGE PAUL R. MATIA |
| | ) | |
| Plaintiffs | ) | CASE NO. 1:01CV21879 |
| | ) | |
| -vs- | ) | |
| | ) | **O R D E R** |
| ALLIED SIGNAL, INC., et al. | ) | |
| | ) | |
| Defendants | ) | |

      Plaintiffs' motion to remand or, in the
alternative, to abstain, filed on December 5, 2001, is pending
before the Court.  Plaintiffs move the Court to remand the
above-entitled action to state court because this Court lacks
subject matter jurisdiction.  In the alternative, mandatory or
discretionary abstention should apply.  Plaintiffs cite *In re
Asbestos Litigation*, No. 2:01-1055, 2:01-1224, 2:01-1064,
2:01-1074, 2:01-1056, 2:01-1071, 2:01-1085, 2:01-1060, 2:01-1089,
2001 WL 1561793 (S.D.W.Va. Dec. 7, 2001), in support of their
motion.  Plaintiffs also assert that the removal was outside the
30-day time period prescribed by 28 U.S.C. § 1446(b).  Plaintiffs
argue that the 90-day time period set forth in Bankruptcy Rule
9027(a) is not controlling.

      On November 27, 2001, Judge Edward R. Becker, Chief
Judge of the United States Court of Appeals for the Third Circuit,
signed an Order Concerning Specific Bankruptcy Cases with Asbestos

Claims.  The order designates and assigns District Judge Alfred M.
Wolin of the United States District Court for the District of New
Jersey to hold court in the District of Delaware to complete
unfinished business in, among other cases, the Chapter 11
bankruptcy case of Federal-Mogul Global, Inc., T&N Limited,
et al., Case Nos. 01-10578, et al.  On November 29, 2001, Judge
Sue L. Robinson, Chief Judge of the United States District Court
for the District of Delaware signed an Order Assigning Asbestos
Cases to Judge Wolin.  Copies of these orders are published on the
website of the United States Bankruptcy Court for the District of
Delaware (http://www.deb.uscourts.gov).

On December 10, 2001, Judge Wolin issued an Order
that provisionally transferred certain Friction Product Claims
(including the case at bar) to the United States District Court
for the District of Delaware.

After notice to the parties, plaintiffs' motion to
remand or, in the alternative, to abstain came on for hearing
before the Court on December 20, 2001.  After considering the oral
arguments of counsel, this Court determines that it will not rule
on the motion to remand or, in the alternative, to abstain because

Judge Matia issued the Provisional Transfer Order while the motion
was still pending in this Court.

**IT IS SO ORDERED.**

s/ PAUL R. MATIA
**CHIEF JUDGE**
UNITED STATES DISTRICT COURT

CERTIFICATE OF SERVICE

A copy of the foregoing Order was filed
electronically this 26th day of December, 2001. Notice of this
filing will be sent to Matthew C. O'Connell, Esq. by operation of
the Court's electronic filing system. Parties may access this
filing through the Court's system. A copy of this Order has also
been sent by fax this 26th day of December, 2001 to
Mark Wintering, Esq. (216.696.0679) and Michael J. Sullivan, Esq.
(313.965.8252), and by regular mail this 26th day of December,
2001 to Mark Wintering, Esq. and Mary Brigid Sweeney, Esq.,
Robert E. Sweeney Co., L.P.A., 55 Public Square, Suite 1500,
Cleveland, Ohio 44113-1998; Michael J. Sullivan, Esq.,
Clark Hill PLC, 500 Woodward Avenue, Suite 3500, Detroit Michigan
48226-3435; Ruth Antinone, Esq., Willman & Arnold, 705 McKnight
Park Drive, Pittsburgh, Pennsylvania 15237; Susan S. Box, Esq.,
Roetzel & Andress, 222 South Main Street, Akron, Ohio 44308; and

Sent by: CLARK HILL P.L.C. #7          13139658252;          12/27   . 11:15AM; *JetFax* #71; Page 5

2001-Dec-26  14:47     From-JUDGE PAUL A MATIA                    +2165227119            T-505   P 005/013   F-321

Edward P  Popp, Esq., Baker & Hostetler, LLP, 3200 National City
Center, 1900 East 9th Street, Cleveland, Ohio 44114.

                                    s/ PAUL R  MATIA
                                    CHIEF JUDGE
                                    UNITED STATES DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERAL-MOGUL GLOBAL INC., | ) | Case No. 01-10578 (SLR) |
| T&N LIMITED, et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## MOTION TO TRANSFER
## RELATED CLAIMS AND CAUSES OF ACTION

DaimlerChrysler Corporation, Ford Motor Company, and General Motors

Corporation (the "Automobile Manufacturers") in support of this Motion to Transfer

Related Claims and Causes of Action, as defined below, state as follows:

### Procedural Background and Scope of Transfer

1.      On October 1, 2001, Federal-Mogul Global Inc. ("Federal-Mogul" or the

"Debtor") filed a voluntary petition for protection under Chapter 11 of the United States

Bankruptcy Code, commencing bankruptcy case number 01-10578 (the "Federal-Mogul

Bankruptcy Case") currently pending in the United States Bankruptcy Court for the

District of Delaware.

2.      Tens of thousands of personal injury claimants have filed lawsuits against

the Automobile Manufacturers in courts across the country alleging injuries due to

friction products, including brakes and other automotive parts, manufactured by Federal-

Mogul or companies that it purchased, including Abex Corporation and Wagner Electric

Corporation. The Automobile Manufacturers are in the process of removing claims and

causes of action involving such products that are pending in state courts pursuant to 28

U.S.C. § 1452(a) and Rule 9027(a) of the Federal Rules of Bankruptcy Procedure.

3.     This transfer motion encompasses all claims and causes of action against

the Automobile Manufacturers in state or federal court alleging injuries due to friction

products, including brakes and other automotive parts (the "Friction Product Claims").

## Jurisdiction

4.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§

1334(b) and 157(b)(5).  Section 1334(b) of title 28 sets forth Congress's broad

jurisdictional grant to the district courts for bankruptcy cases and related proceedings –

including the claims and causes of action that are the subject of this transfer motion:

> Notwithstanding any Act of Congress that confers
> exclusive jurisdiction on a court or courts other than the
> district courts, the district courts shall have original but not
> exclusive jurisdiction of all civil proceedings arising under
> title 11, or arising in or *related to a case under title 11*.

28 U.S.C. § 1334(b) (emphasis added).

5.     In *Celotex Corp. v. Edwards*, the Supreme Court adopted the expansive

definition of "related to" jurisdiction first enunciated by the Third Circuit in *Pacor* and

uniformly embraced by the circuit courts in numerous prior decisions:

> The usual articulation for determining whether a civil
> proceeding is related to bankruptcy is whether the *outcome
> of that proceeding could conceivably have any effect on
> the estate being administered in bankruptcy* . . . . Thus,
> the proceeding need not necessarily be against the debtor or
> against the debtor's property.  An action is related to
> bankruptcy if the outcome could alter the debtor's rights,
> liabilities, options, or freedom of action (either positively or

2

negatively) and which in any way impacts upon the
handling and administration of the bankrupt estate.

514 U.S. 300, 306, 308 n.6 (1995) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d

Cir. 1984)) (emphasis in original).  Under this test, the Court has "related to" jurisdiction

over the Friction Product Claims against the Automobile Manufacturers.  Indeed, the

Supreme Court expressly recognized that "related to" jurisdiction includes "suits between

third parties which have an effect on the bankruptcy estate." *Id.* at 308 n.5 (citing 1

Collier on Bankruptcy ¶ 3.01[1][c][iv], at 3-28 (15th ed. 1994)).

      6.     The Friction Product Claims have a substantial effect on the Debtor's

estate.  Their disposition will directly affect the Debtor's rights, property and liabilities.

For example, as a result of such claims, the Automobile Manufacturers will have

thousands of claims for indemnification and contribution against the Debtor, which will

significantly impact the bankruptcy estate.  Accordingly, this Court should exercise the

power conferred upon it by Congress to transfer the Friction Product Claims to this Court.

      7.     Section 157(b)(5) expressly authorizes the transfer of such claims:

> The district court shall order that personal injury tort and
> wrongful death claims shall be tried in the district court in
> which the bankruptcy case is pending or in the district court
> in the district in which the claim arose, as determined by
> the district court in which the bankruptcy case is pending.

28 U.S.C. § 157(b)(5).  As shown in the accompanying Memorandum in Support, this

Court has the authority to determine whether to transfer the Friction Product Claims.

This Court should exercise such authority for the benefit of all parties involved in the

litigation related to such products.  Among other reasons, such transfer will permit the

3

eventual consolidation of such claims for purposes of a threshold common issues trial

devoted to the core issue of whether brakes and other automotive parts cause the diseases

claimed. That issue is at the heart of each and every one of the Friction Product Claims,

and it is a central issue to be addressed in the reorganization proceeding.

### Factual Background

8.      The factual background to this transfer motion is set forth fully in the

accompanying Memorandum in Support.

### Relief Requested

9.      To centralize the resolution of claims relating to brakes and other

automotive parts and to facilitate the efficient administration of the Federal-Mogul

Bankruptcy Case, the Automobile Manufacturers request that this Court exercise its

authority under 28 U.S.C. § 157(b)(5) and transfer all of the Friction Product Claims to

the United States District Court for the District of Delaware.

10.      To efficiently and fully effect such relief, the Automobile Manufacturers

request that this Court immediately issue a provisional order transferring the Friction

Product Claims to this Court (the "Provisional Transfer Order"). After further notice and

opportunity for hearing for the affected parties, the Provisional Transfer Order can be

made final.

11.      The immediate entry of the Provisional Transfer Order is necessary to

prevent an untenable free-for-all, where plaintiffs will request numerous district courts

around the country to remand the removed actions to state courts under 28 U.S.C. §

1452(b), abstain from considering the removed actions under 28 U.S.C. § 1334(c)(1), or

4

transfer the venue of such action to federal courts other than this Court.  In the absence of

the immediate entry of the Provisional Transfer Order, such requests would severely

compromise the centralization of the Friction Product Claims.  Any such requests would

be at odds with the clear purpose of 28 U.S.C. § 157(b)(5) to permit this Court to

determine whether to transfer the Friction Product Claims to this Court.  Such a situation

would also require the Automobile Manufacturers to expend tremendous resources in

addressing such requests all over the country.

12.     The Automobile Manufacturers request that the Provisional Transfer Order

require that the Automobile Manufacturers immediately serve all interested parties with a

copy of the Provisional Transfer Order, this transfer motion and the accompanying

Memorandum in Support.  The Automobile Manufacturers request that the Provisional

Transfer Order also provide that parties may file objections to this transfer motion by a

date certain and set a hearing date to resolve any objections.

13.     The procedure the Automobile Manufacturers are requesting this Court to

employ in immediately entering the Provisional Transfer Order, to be made final upon

notice and opportunity for a hearing for all affected parties, is exactly the procedure

followed in prior mass-tort bankruptcies such as *Dow Corning* and *A.H. Robins*.  In *A.H.*

*Robins v. Piccinin*, 788 F.2d 994, 1015 (4th Cir. 1986), the Fourth Circuit required the

same procedure, stating that the immediate transfer:

> . . . is . . . conditional, dependent finally and ultimately on a ruling to be
> made only after notice to all claimants advising them of their right to enter
> any objections they may have to such a tentative ruling and to submit a
> motion for abstention in their particular case.  The notice to be given all
> claimants could be in the form of a letter to both the claimant and to his or

5

> her attorney stating the conditional ruling made subject to a final hearing,
> to become final only after reasonable opportunity given all claimants to
> object and/or to seek abstention. We would think the notice should fix a
> time limit for the filing of objections by claimants and should fix a date for
> hearing on the objections. The tentative order might be made final as to
> any claimant who failed to enter an objection within the prescribed time. . .
> . Such a [procedure] . . . , it would seem, should satisfy the requirements
> of due process and of the Bankruptcy Rules in the unusual circumstances
> of this case.

*Id.* Similarly, in *Dow Corning*, the court entered a provisional order pursuant to 28

U.S.C. § 157(b)(5), transferring all related breast implant claims pending against

nondebtor breast implant manufacturers. *See In re Dow Corning Corp.*, 1995 WL

495978, at *2 (Bankr. E.D. Mich. Aug. 9, 1995) (observing that court had entered an

order provisionally transferring claims brought against the "implant co-defendants"). The

Automobile Manufacturers ask that identical procedures be employed in this case.

**WHEREFORE,** the Automobile Manufacturers respectfully request that this

Court immediately issue an order (i) provisionally transferring the Friction Product

Claims to this Court pursuant to 28 U.S.C. § 157(b)(5), (ii) providing that such order

shall become final after notice to, and an opportunity for hearing for, the affected parties,

and (iii) granting the Automobile Manufacturers such other relief as is just.

6

Dated: November 20, 2001          Respectfully submitted,

_____

KLETT, ROONEY, LIEBER &
SCHORLING
Teresa K.D. Currier (Del. Id. No. 3080)
Daniel Rath (Del. Id. No. 3022)
1000 West Street
Suite 1410
P.O. Box 1397
Wilmington, Delaware
(302) 552-4220
(302) 552-4295 (fax)

- and -

KIRKLAND & ELLIS
David M. Bernick
John Donley
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

Attorneys for DaimlerChrysler Corp., Ford
Motor Company, and General Motors Corp.

7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERAL-MOGUL GLOBAL INC., | ) | Case No. 01-10578 (SLR) |
| T&N LIMITED, et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## ORDER PROVISIONALLY TRANSFERRING
## RELATED CLAIMS AND CAUSES OF ACTION

On this day, the Court considered the Motion to Transfer Related Claims and Causes of Action (the "Transfer Motion"), which was filed by DaimlerChrysler Corporation, Ford Motor Company, and General Motors Corporation (the "Automobile Manufacturers") on November 13, 2001. At this time, the Court finds and concludes that the Automobile Manufacturers' request in the Transfer Motion for a provisional order immediately transferring the Friction Product Claims (as defined in the Transfer Motion) to the United States District Court for the District of Delaware, should be granted. Accordingly, it is

ORDERED that all of the Friction Product Claims shall be, and hereby are, immediately transferred on a provisional basis from the courts in which they are pending to the United States District Court for the District of Delaware, subject to a hearing as set forth below; and it is further

ORDERED that no later than four (4) business days following the entry of this Order, the Automobile Manufacturers shall serve upon all counsel for the persons asserting the Friction Product Claims a copy of the Transfer Motion, the memorandum filed concurrently with the Transfer Motion, and this Order; and it is further

**ORDERED** that on _____, 2001, at _____, this Court shall

hold a hearing on the Transfer Motion to determine whether the relief requested in the Transfer

Motion should be made final; and it is further

**ORDERED** that any person who objects to the Transfer Motion shall file a written

objection thereto and serve a copy of such objection upon counsel for the Automobile

Manufacturers, and any such objection shall be filed with the clerk of this Court and actually

received by counsel for the Automobile Manufacturers no later than 4:00 p.m.

Dated: _____

UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FEDERAL-MOGUL GLOBAL INC., | ) | Case No. 01-10578 (SLR) |
| T&N LIMITED, ET AL. | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

## MEMORANDUM OF DAIMLERCHRYSLER CORPORATION, FORD MOTOR COMPANY, AND GENERAL MOTORS CORPORATION IN SUPPORT OF THEIR MOTION TO TRANSFER RELATED CLAIMS

KIRKLAND & ELLIS
David M. Bernick
John Donley
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

KLETT, ROONEY, LIEBER & SCHORLING
Teresa K.D. Currier
(Del. Id. No. 3080)
Daniel Rath (Del. Id. No. 3022)
1000 West Street
Suite 1410
P.O. Box 1397
Wilmington, Delaware
(302) 552-4200
(302) 552-4295 (fax)

Attorneys for DaimlerChrysler Corp.,
Ford Motor Company, and General
Motors Corp.

Dated: November 20, 2001

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING . . . . . . . . ix

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      RECENTLY, THE PROBLEMS PLAGUING ASBESTOS LITIGATION HAVE
        BEEN BROUGHT TO MAINSTREET AMERICAN INDUSTRIES – INCLUDING
        THE AUTOMOTIVE INDUSTRY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        A.      Far from declining, claims have sky-rocketed in the last two years . . . . . 5

        B.      These trends have no relationship to any medical or scientific process. . . 8

        C.      The recent rash of new bankruptcies has shifted claims to new industries. 9

        D.      Claims against the automotive industry have grown suddenly, based upon
                exposure to brake dust.  Both brake suppliers (such as the Debtor) and the
                auto companies are named. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.     THE GROWING LITIGATION AGAINST THE AUTOMOTIVE INDUSTRY
        EXISTS ONLY BECAUSE THE DISTINCT BODY OF SCIENCE RELATING TO
        BRAKES HAS NOT BEEN GIVEN PROPER FORCE . . . . . . . . . . . . . . . . . . . 19

        A.      Science shows that brake workers are not exposed to significant quantities of
                asbestos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                1.      Brake dust contains only trace amounts of asbestos . . . . . . . . . . 20

                2.      Likewise, brake mechanic exposure studies show that brake workers
                        have been exposed to only minute levels of
                        asbestos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

i

B.    The established epidemiology has shown no causal relationship between exposure to brake dust and disease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.   THE PROCEDURAL TOOLS EXIST FOR ADJUDICATING THE CORE SCIENTIFIC ISSUE OF GENERAL CAUSATION . . . . . . . . . . . . . . . . . . . . . 26

A.    *Daubert* mandates scrutiny of scientific evidence for its reliability . . . . 27

B.    In the context of toxic torts, quantification of exposure and risk are essential: Epidemiology is used to find whether there is excess risk associated with exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C.    The established science demonstrating the absence of any increased risk presents a clear case for dismissal under *Daubert* . . . . . . . . . . . . . . . . . 36

IV.   THIS COURT SHOULD EXERCISE ITS POWER TO RESOLVE THE *DAUBERT* ISSUE, WHICH IS CENTRAL TO THESE CHAPTER 11 PROCEEDINGS. . 38

A.    The proposed *Daubert* proceeding promises the resolution of a complex and substantial liability problem that would otherwise consume a significant part of this case and may persist even after confirmation. . . . . . . . . . . . . . . . 38

B.    Under 28 U.S.C. § 1334(b), this Court has "broad jurisdiction" over such litigation whose outcome will have an effect on the bankruptcy estate. . 40

C.    This Court has broad authority under 28 U.S.C. § 157(b)(5) to centralize the adjudication of such claims within a single forum to ensure "prompt, fair and complete resolution of all claims 'related to'" these proceedings . . . . . . 43

D.    That broad authority has been exercised effectively in mass tort bankruptcies such as this to centralize adjudication of related tort claims. . . . . . . . . . . 44

    1.    The need for centralized resolution of common, threshold issues concerning the validity of asserted claims warrants exercise of this Court's jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    2.    Exercise of this Court's jurisdiction is necessary to preclude collateral litigation of liability that is "directly attributable to the Debtor." 47

    3.    The very scope of the existing litigation – and the resulting prospect of numerous and significant claims for contribution and indemnification – threatens the successful reorganization of the Debtor and warrants exercise of this Court's jurisdiction. . . . . . . 49

V.     THIS COURT IS UNIQUELY SITUATED TO RESOLVE THIS CENTRAL ISSUE PROMPTLY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

     A.    Threshold issues relating to the validity of asserted claims may be resolved through summary judgment proceedings. . . . . . . . . . . . . . . . . . . . . . . . 50

     B.    Any remaining issues relating to the validity of asserted claims may be resolved through Rule 42 common issue trials. . . . . . . . . . . . . . . . . . . . 52

     C.    These procedures can be implemented promptly once the Court has asserted jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## **TABLE OF CITATIONS**

**CASES**

*A.H. Robins v. Piccinin*, 788 F.2d 994 (4ᵗʰ Cir.),

    *cert. denied*, 479 U.S. 876 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194 (5ᵗʰ Cir. 1996) . . . . . . . . . . . . . . 29, 30

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300 (11ᵗʰ Cir. 1999) . . . . . . . . . . . . . . . . . . 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Barrett v. Atlantic Richfield Co.*, 95 F.3d 375 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 38

*Barto Tech. Servs., Inc.*, 181 B.R. 255 (Bankr. W.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . 53

*Belcufine v. Aloe*, 112 F.3d 633 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

*Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307 (5ᵗʰ Cir. 1989) . . . . . . . . . . . . . . . . . 30

*Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9ᵗʰ Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Calumet Nat'l Bank v. Levine*, 179 B.R. 117 (N.D. Ind. 1995 . . . . . . . . . . . . . . . . . . . . 44

*Castano v. American Tobacco Co.*, 84 F.3d 734, n.24 (5ᵗʰ Cir. 1996) . . . . . . . . . . . . . . . 27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Dartez v. Fibreboard Corp.*, 765 F.2d 456 (5ᵗʰ Cir. 1985) . . . . . . . . . . . . . . . . . . . . . 35, 36

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,509 U.S. 579, 589 (1993) . . . . . . . *passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc*, 43 F.3d 1311 (9ᵗʰ Cir. 1995) . . . . . *passim*

*DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941 (3d Cir. 1990) . . . . . . . . . . . . . 32, 37

*Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068 (6ᵗʰ Cir. 1993) . . . . . . . . . . . . . . . . . . . 53

*Ellerman Lines, Ltd. v. Atlantic & Gulf Stevedores, Inc.*, 339 F.2d 673 (3d Cir. 1964) . 54

iv

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 53

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 4

*Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129 (5th Cir. 1985) . . . . . . . . . . . 35, 36

*Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387 (D. Or. 1996) . . . . . . . . . . . . . 32, 33

*In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972,*

     549 F.2d 1006 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*In re Allegheny Health Education & Research Foundation,*

233 B.R. 671 (Bankr. W.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*In re American Hardwoods, Inc.*, 885 F.2d 621 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 42

*In re Asbestos*, 726 So.2d 926 (La. App. Ct. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*In re Barto Tech. Servs., Inc.*, 181 B.R. 255 (Bankr. W.D. Pa. 1995) . . . . . . . . . . . . . . 53

*In re Bendectin Litig.*, 857 F.2d 290 (6th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*In re Beverly Hills Supper Club Fire Litig.*, 695 F.2d 207 (6th Cir.) . . . . . . . . . . . . . . . . 55

*In re Breast Implant Litig.*, 11 F. Supp.2d 1217 (D. Colo. 1998) . . . . . . . . . . . . . . . . . . 31

*In re Canvas Specialty, Inc.*, 261 B.R. 12 (Bankr. C.D. Cal. 2001) . . . . . . . . . . . . . . . . 52

*In re Celotex Corp.*, 124 F.3d 619 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41-43

*In re Dow Corning Corp.*, 86 F.3d 482 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Eagle-Picher Indus., Inc.*, 963 F.2d 855 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 49

*In re Johns-Manville Corp.*, 26 B.R. 420 (Bankr. S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . 49

*In re Marcus Hook Develop. Park, Inc.* 943 F.2d 261 (3d Cir. 1991) . . . . . . . . . . . . 41, 43

*In re New York Int'l Hostel, Inc.*, 157 B.R. 748 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . 43

*In re Pacor, Inc.*, 743 F.2d 984 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Pan Am Corp.*, 16 F.3d 513 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . 55

*In re Paoli R.R. Yard PCB Litig.*, 2000 WL 274262 (E.D. Pa. Mar. 7, 2000) . . . . . . 31, 38

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) . . . . . . . . . . . . . . 29, 31, 37

*In re Salem Mortgage Corp.*, 783 F.2d 626, (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . 42

*In re The Babcock & Wilcox Co.*, No. Civ. A 00-0558,

     2000 WL 422372, at *4 (E.D. La. Apr. 17, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 52

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999)
     cert. denied, 520 U.S. 1225 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 37

*In re Wolverine Radio Co.*, 930 F.2d 1132 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . 42, 43

*In re Wood*, 825 F.2d 90 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Jenkins v. Raymark Indus.*, 782 F.2d 468 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . 28, 52

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . 53

*McCartney v. Integra Nat'l Bank North*, 106 F.3d 506 (3d Cir. 1997) . . . . . . . . . . 49, 50

*Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997) . . . . . . . . . . . . . . . 33

*Mitchell v. Gencorp.*, 165 F.3d 778 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Quick v. Murphy Oil Co.*, 643 So.2d 1291 (La. App. Ct. 1994) . . . . . . . . . . . . . . . . . . . . 35

*Renaud v. Martin Marietta Corp.*, 972 F.2d 304 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . 30

*Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579 (6th Cir. 1990) . . . . . . . . . . . . . . 41

*Sutera v. Perrier Group of America, Inc.*, 986 F. Supp. 655 (D. Mass. 1997) . . . . . 31, 34

*Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Wright v. Willamette Indus., Inc.*, 91 F.3d 1105 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . 30

## STATUTES

28 U.S.C. § 1334 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

28 U.S.C. § 157(b)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34, 38

## RULES AND REGULATIONS

Fed. R. Civ. P. Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Federal Rule of Evidence 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

## OTHER AUTHORITIES

Aaron Blair et al., Mortality Patterns of U.S. Veterans by Occupation,
74 J. NCI 1039 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Alison D. McDonald & J. Corbett McDonald, Malignant Mesothelioma in North America,
46 CANCER 1650, 1655 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B. Jarvholm & J. Brisman, Asbestos Associated Tumors in Car Mechanics,
45 BR. J. INDUS. MED. 645, 646 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

D. Roberts & R. Zumwalde, Industrial Hygiene Summary Report of Asbestos Exposure
     Assessment for Brake Mechanics, Rept. #32.14 (NIOSH 1982) . . . . . . . . . . . . . 27

D. Roberts, Industrial Hygiene Report: Asbestos at Reading Brake and Alignment Service,
Ohio, Rept. # 00106004 (NIOSH 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Eva S. Hansen, Mortality of Auto Mechanics: A Ten-Year Follow-Up,
15 SCAND. J. WORK ENVIRON. HEALTH 43, 44-45 (1989) . . . . . . . . . . . . . . . . . . . . 41

H.J. Woitowitz & K. Rodelsperger, Mesothelioma Among Car Mechanics?,
38 ANN. OCCUP. HYG. 635, 637 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

J. Dement, Cincinnati Municipal Garage: Automobile Braking Service Operation, Rept. #32.11, at 1-2 (USPHS 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

K. Teschke et. al., Mesothelioma Surveillance to Locate Sources of Exposure to Asbestos, 88 CANADIAN J. PUB. HEALTH 163, 166 (1997) . . . . . . . . . . . . . . . . . . . 28, 29, 31, 36-38

L. Moore, Asbestos Exposure Associated with Automotive Brake Repair in Pennsylvania, 49 AM. IND. HYG. ASSOC. J. A12 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 37, 53

L. Rushton et al., Epidemiological Survey of Maintenance Workers in London Transport Executive Bus Garages and Chiswick Works, 40 BR. J. INDUS. MED. 340, 340-41 (1983)37

Mary J. Teta et al., Mesothelioma in Connecticut, 1955-1977, 25 J. OCCUP. MED. 749, 752-53 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44-46, 48, 51, 52, 55

Per Gustavsson et al., Lung Cancer and Exposure to Diesel Exhaust Among Bus Garage Workers, 16 SCAND. J. WORK ENVIRON. HEALTH 352 (1990) . . . . . . . . . . . . . . . 53

Sheehy et al., Control of Asbestos Exposure During Brake Drum Service, 4 APPLIED IND. HYG. 313 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Spirtas et. al., Proceedings for the Society for Epidemiological Research, National Health and Welfare Canada, AM. J. EPIDEM. PROCEEDINGS 518 (1985) . . . . . . . . . . . . . . . . . . . 29

Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: Bankrupt and Backlogged—A Proposal for the Use of Federal Common Law in Mass Tort Class Actions, 58 BROOK. L. REV. 553, 554 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 53

T. Kauppinnen & K. Korhonen, Exposure to Asbestos During Brake Maintenance of Automotive Vehicles by Different Methods, 48 AM. IND. HYG. ASSOC. J. 499 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Yeung et al., An Australian Study to Evaluate Worker Exposure to Chrysotile in the Automotive Industry, 14 APPLIED OCC. & ENV. HYG. 448, 450 (1999) . . . . 35, 36

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On October 1, 2001, Federal-Mogul Global Inc. ("Federal-Mogul" or the "Debtor") filed a voluntary petition for protection under Chapter 11 of the United States Bankruptcy Code, commencing bankruptcy case number 01-10578 (the "Federal-Mogul Bankruptcy Case") currently pending in the United States Bankruptcy Court for the District of Delaware.

To obtain a consolidated adjudication regarding the viability of asbestos claims relating to automotive friction products and, thereby, to facilitate the administration of the Federal-Mogul bankruptcy case, on November 20, 2001, the automobile manufacturers filed a motion to transfer claims relating to brakes and other automotive parts to this Court pursuant to 28 U.S.C. § 157(b)(5). The automobile manufacturers have asked the Court to enter an order provisionally transferring these claims. After further notice and opportunity for hearing for the affected parties, the automobile manufacturers ask that the provisional transfer order be made final.

ix

## SUMMARY OF ARGUMENT

1.      The automobile manufacturers ask the Court to transfer pursuant to 28 U.S.C. § 157(b)(5) claims relating to brakes and other automotive parts for consolidated resolution within these proceedings.  Early, centralized resolution of a threshold scientific issue – whether brake dust causes disease – is essential to the successful reorganization of the Debtor.

2.      Recently, the problems plaguing asbestos litigation have been brought to mainstreet American industries – including the automotive industry.  Both brake suppliers (such as the Debtor) and the auto companies are named.

3.      The growing litigation against the automotive industry exists only because the distinct body of science relating to brakes has not been given proper force.  Science shows that brake workers are not exposed to significant quantities of asbestos.  Further, the established epidemiology has shown no causal relationship between exposure to brake dust and disease.

4.      The procedural tools exist for adjudicating the core scientific issue of general causation.  The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) mandates scrutiny of scientific evidence for its reliability.  The established science demonstrating the absence of any increased risk associated with brakes and other automotive products presents a clear case for dismissal under *Daubert*.

5.      The automobile manufacturers ask the Court to exercise its power to resolve the *Daubert* issue, which is central to these Chapter 11 proceedings.  The proposed *Daubert* proceeding promises the resolution of a complex and substantial liability problem that would

otherwise consume a significant part of this case and may persist even after confirmation. Under 28 U.S.C. § 1334(b), this Court has "broad jurisdiction" over such litigation whose outcome will affect the bankruptcy estate. The Court has broad authority under 28 U.S.C. § 157(b)(5) to centralize the adjudication of such claims within a single forum to ensure "prompt, fair and complete resolution of all claims 'related to'" the bankruptcy proceedings.

6.     . That broad authority has been exercised effectively in mass tort bankruptcies such as this to centralize adjudication of related tort claims. The need for centralized resolution of common, threshold issues concerning the validity of asserted claims, preclusion of collateral litigation of liability that is "directly attributable" to the Debtor, and the prospect of numerous and significant claims for contribution and indemnification that threaten the successful reorganization of the Debtor warrant transfer of all related claims for consolidated resolution within the Federal-Mogul bankruptcy proceedings.

7.     This Court is uniquely situated to resolve the central *Daubert* issue promptly. Threshold issues relating to the validity of asserted claims may be resolved through summary judgment proceedings. Any remaining issues relating to the validity of asserted claims may be resolved through Rule 42 common issue trials. These procedures can be implemented promptly once the Court has assumed jurisdiction.

## **STATEMENT OF FACTS**

The facts underlying the pending motion are set forth in Parts I and II of the Argument below.

xii

## ARGUMENT

DaimlerChrysler Corporation, Ford Motor Company and General Motors Corporation file this motion in order to resolve an issue that is central to asbestos liabilities which forced the filing of this Chapter 11 case. The issue is whether there is any reliable science supporting the prosecution of asbestos claims predicated upon exposure to brake dust. This issue is at the heart of tens of thousands of claims now pending against the Debtor (and against the movants here). Those claims can and should be subject to a consolidated determination of compliance with *Daubert* (now incorporated into Rule 702 of the Federal Rules). That determination will be decisively controlled by epidemiology. Not only is there substantial epidemiology for the exposure at issue, but the science consistently demonstrates no increased risk of disease. This Court is fully empowered to address and resolve this important *Daubert* issue, and traditional litigation procedures under the Federal Rules are available in this Chapter 11 case to decide the matter promptly and with little burden to the parties and the Court.

This brief is organized as follows:

**The recent expansion of the asbestos litigation and its impact on the automobile industry:** Part I takes one step further the Supreme Court's observation (recited by Federal-Mogul in its Informational Brief) that the tort system is besieged by an "elephantine mass of asbestos cases" that "defies customary judicial administration." Part I traces the recent expansion of that litigation during the past two years, how that surge has forced a new group of major companies into chapter 11, and the contemporaneous filing of a wave of claims against the automotive industry. The later claims have been pursued both against companies that have supplied asbestos-containing brake components and against the

auto companies which have purchased and installed them. Two of the suppliers – Wagner and Abex – are now part of the Debtor. The Debtor's most recent 10-Q reflects that 70,000 "mainly friction products" claims involving Abex and Wagner were pending against it as of June 30, 2001, and that the Debtor's estimated liability for such claims was approximately $236 million.

**The mature science concerning brake dust**: The litigation against the automotive industry has grown without regard to established science. Part II recites the results of more than 30 years of scientific research into the composition and health consequences of brake dust. No longer an area for speculation based upon generalities relating to asbestos, the issue of whether exposure to brake dust during brake maintenance causes illness now has been answered – repeatedly and in the negative – through numerous epidemiological studies.

***Daubert's* mandate**: As demonstrated in Part III, the law today does not tolerate the prosecution of litigation that is not firmly grounded in reliable scientific evidence. Toxic tort claims must pass muster under the *Daubert* requirements incorporated into Rule 702 of the Federal Rules of Evidence. Given the results of the epidemiological studies, claims based upon exposure to brake dust cannot meet those requirements and should be dismissed. This is a classic case for summary disposition under *Daubert*.

**This Court's power to grant relief**: Part IV turns to the role that this Court can and (we submit) should play in bringing science to bear upon the brake-related litigation pending against Federal-Mogul and the movants here. The idea of using a consolidated bankruptcy proceeding to address a central issue in mass tort litigation is not novel. The

2

Court has clear "related to" jurisdiction under 28 U.S.C. § 1334 and the power under 28 U.S.C. § 157(b)(5) to transfer all related claims to this Court. And the factors present here make the case for exercising that power compelling: (1) the existence of a single issue, amenable to dispositive resolution, affecting a significant area of the Debtor's liability; (2) the fact that the movants' liability for claims of exposure to Wagner and Abex product is derivative of the Debtor's liability (because the source of that liability is product supplied by companies purchased by Federal-Mogul) and the continuation of litigation against the automobile manufacturers therefore will only create additional liability for the Debtor through contribution and indemnification claims; and (3) as already recognized by courts dealing with prior mass tort cases, the sheer volume and dispersion of non-Chapter 11 litigation relating to the same issues presented in the Chapter 11 case inevitably will add to both the scope and uncertainty of the Debtor's own liability, and the only sensible course for defining that liability is a consolidated proceeding.

**Procedures available to address the science efficiently**: Finally, Part V lays out the traditional litigation procedures that can be used to litigate the *Daubert* issue promptly and with minimal burden. The beginning is Rule 42, which allows consolidation of all pending cases for purposes of resolving a common issue. Once consolidated, the well-used path of *Daubert* proceedings, followed with motions for summary judgment, can be completed in a matter of months. While the movants believe that the issue can be resolved through summary judgment, Rule 42 also has been used to conduct trials of common issues in the event a trial is necessary.

3

## I.   RECENTLY, THE PROBLEMS PLAGUING ASBESTOS LITIGATION HAVE BEEN BROUGHT TO MAINSTREET AMERICAN INDUSTRIES – INCLUDING THE AUTOMOTIVE INDUSTRY.

As Federal-Mogul described in its Informational Brief, it is beyond debate that the tort system has failed to resolve effectively and fairly the morass of litigation spawned by asbestos. Put bluntly, the system has long been in a state of "crisis."[1] The "avalanche of litigation"[2] has been characterized again and again as a "serious problem,"[3] a "dilemma,"[4] and a "disaster."[5] Indeed, "[n]o mass tort litigation . . . has received more intense criticism than the litigation concerning exposure to asbestos."[6]

---

[1] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997) (observing that there is "an asbestos-litigation crisis"); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618 (3d Cir. 1996) ("This case arises against the background of an asbestos litigation crisis."), *aff'd*, 521 U.S. 591 (1997); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged—A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 554 (1992) ("It has become increasingly apparent in the last few years that the asbestos crisis facing the judicial system in the United States has reached epidemic proportions.").

NOTE: BECAUSE THEY ARE VOLUMINOUS, SOURCES IDENTIFIED IN FOOTNOTES ARE NOT FILED HEREWITH, BUT ARE AVAILABLE AT KIRKLAND & ELLIS, AND ANY CITES REQUESTED, WILL BE SUPPLIED IMMEDIATELY TO THE COURT.

[2] *Jenkins v. Raymark Indus.*, 782 F.2d 468, 470 (5th Cir. 1986).

[3] *In re Asbestos Litig.*, 829 F.2d 1233, 1235 (3d Cir. 1987), *cert. denied*, 485 U.S. 1029 (1988).

[4] *Jenkins*, 782 F.2d at 470.

[5] REPORT OF THE JUDICIAL CONFERENCE AD HOC COMMITTEE ON ASBESTOS LITIGATION 2 (Mar. 1991); *The Fairness in Asbestos Compensation Act of 1999: Legislative Hearing on H.R. 1283*, 106th Cong. at 89 (1999) (statement of Professor William N. Eskridge, Jr., Yale Law School).

[6] Howard M. Erichson, *Mass Tort Litigation and Inquisitorial Justice*, 87 GEO. L. J. 1983, 2017 (1999). *See also* Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 HARV. J.L. & PUB. POL'Y 541, 541 (1992) ("Most commentators agree that tort litigation today is a highly unsatisfactory system for resolving claims arising out of workers' exposure to asbestos."); Steven L. Schultz, In re Joint Eastern and Southern District Asbestos Litigation: *Bankrupt and Backlogged – A Proposal for the Use of Federal Common Law in Mass Tort Class Actions*, 58 BROOK. L. REV. 553, 590 (1992) ("The traditional tort system, in connection with asbestos
(continued...)

4

As the major asbestos manufacturers have sought refuge under Chapter 11, the problem has grown worse, with claims increasingly being brought against mainstreet American corporations. Companies that never manufactured asbestos, but only used asbestos-containing materials in their operations, are being subjected to a huge influx of claims. The ever-expanding litigation is rapidly affecting every company that ever made or used any product that contained asbestos, regardless of the magnitude of any consequent exposure.

A.       **Far from declining, claims have sky-rocketed in the last two years.**

The scope of the problems now plaguing the asbestos claims process is illustrated by the recent experience of asbestos trusts earlier established to pay out claims brought against major asbestos producers. Claim filings against these trusts nearly doubled in 2000 as compared to 1999. So far in 2001, claims are streaming in at more than double the 2000 rate. The flow of asbestos filings has thus essentially quadrupled in the last two years. This, despite recent predictions that the number of asserted claims should be declining.

For example, claims filed against the Manville Trust increased steeply beginning in early 2000 (*see* chart below).[7] The Manville Trust received 55,077 new claims

---

[6] (...continued)
litigation, has been marked by high transaction costs, excessive delays in providing compensation to injured plaintiffs, unequal recoveries among identically injured victims, litigious parties and a judicial system clogged by an avalanche of cases."); *In re Asbestos Litig.*, 829 F.2d at 1235 ("Asbestos litigation poses a serious problem for American tort law, . . . with its inefficiencies, high costs, and inconsistent judgments . . . .").

[7] Chart, "Total POC Filings by Month April 1998-May 2001," *in* D. Austern Mealey's Presentation (July 2, 2001).

5

in 2000, a 94 percent increase over the 28,416 claims received in 1999.[8] This was "the greatest number of claims the Trust has received in one year with the sole exception of 1989, the first full year of Trust operations."[9]



The problem is so severe that Judge Weinstein (who conducted earlier proceedings involving the Manville Trust) and Judge Lifland (who presided over the Manville bankruptcy) just days ago asked whether the claim resolution process must be revisited in order to cope with the problem:

> The courts have received and reviewed the Financial Statements and
> Report of the Manville Personal Injury Settlement Trust for the period ending

---

[8] Table, "Number of Claims by Year Received and Industry," *in* D. Austern Mealey's Presentation (July 2, 2001).

[9] D. Austern, Manville Trust Memorandum (Mar. 26, 2001).

6

September 30, 2001. The courts note that there is a continuing rise in the number of claims and that the amount payed pro rata on claims has been reduced from 10 percent to 5 percent of the original value. The courts take judicial notice of the continuing media and other campaigns encouraging a flood of new claims.

This combination of events, together with the increasing number of bankruptcy filings by asbestos related entities, suggests that there may be a misallocation of available funds, inequitably favoring those who are less needy over those with more pressing asbestos related injuries.

Interested attorneys, parties, and others shall appear in Courtroom 10 of the Brooklyn courthouse of the Eastern District of New York on December 13, 2001, at 10:00 A.M. to consider whether the equities involved and changed circumstances warrant or permit modifications of any relevant prior judgments.[10]

Other asbestos trusts also have been inundated. In October 2000, the Eagle-Picher Trust had to reduce its payout from 31.9 percent to 25.7 percent. The reduction took place "largely because of a significant increase in claim filings over and above what . . . expert consultants had predicted two years ago. The consultants now project an additional 100,000 future claims over the life of the Trust as compared to the projections two years ago."[11] Similarly, by the Fall of 2000, claims against the UNR Trust had jumped so quickly that it was forced to lower its payout from 12.9 percent to 7.8 percent. The UNR Trust cited a 33 percent rise in asbestos claims from the previous year and noted that the forecast of new claims after the year 2000 had nearly doubled from 1998 projections.[12]

**B.      These trends have no relationship to any medical or scientific process.**

---

[10] Order, *In re Johns-Manville Corp.*, Nos. 82 B 11656 (BRL) to 82 B 11676 (BRL) (Nov. 7, 2001).

[11] Nurre letter (Oct. 9, 2000).

[12] *See* UNR Asbestos Trust Letter, MEALEY'S LITIG. REP. 21, at D-1 (Dec. 1, 2000).

These increases are not attributable to disease or exposure trends.  Rather, "companies that have had involvement with asbestos-containing products have seen the number of claims made each year escalate far beyond what one might . . . expect based upon medical and scientific data."[13]  As knowledgeable commentators have observed, "[i]n recent years, caseloads have burgeoned – not because of an increase in the numbers of the seriously ill – but rather because of the enormous incentives for plaintiffs to enter the lottery and the far more enormous incentives for plaintiffs' lawyers to obtain ever increasing numbers of claimants."[14]

Indeed, while the number of claims filed against asbestos defendants has experienced a dramatic upward spike, the incidence of actual malignant disease is *decreasing* as more time passes since the enactment in 1971 of strict government regulations concerning asbestos exposure.  For example, National Cancer Institute data show that the number of annual mesothelioma deaths declined in the 1990s (*see* chart below).[15]

---

[13]  Affidavit of William C. Rodraun in Support of First-Day Motions and Applications, *In re Armstrong World Indus.*, No. 00-4471, at 10 (Bankr. D. Del. Dec. 5, 2000).  *See also id.* at 11-12 ("As other defendants that [have] historically . . . 'dropped out' of the tort system by commencing Chapter 11 cases, plaintiffs' lawyers have focused more of their efforts on the [remaining] companies . . . .  AWI has experienced an escalation in both the number of cases being filed against AWI, as well as the cost of settling claims.").

[14]  Lester Brickman, *The Asbestos Litigation Crisis: Is There a Need for an Administrative Alternative?*, 13 CARDOZO L. REV. 1819, 1834 (1992).

[15]  SEER data from the National Cancer Institute available at www-seer.ims.nci.nih.gov.

8

**National Mesothelioma Death Rate**



Nonetheless, the number of claims filed continues to increase – in striking contrast to underlying trends in disease – with recent analyses demonstrating that the increase has been driven not by science, but by the mass filing of claims of dubious merit.[16]

C.   **The recent rash of new bankruptcies has shifted claims to new industries.**

The impact of the claims surge has been devastating. In the last two years, at least ten asbestos defendants have been forced to seek protection under Chapter 11. Many

---

[16] As shown by a recent Rand Institute report, non-malignant claims have shot steeply upward since the start of 1999 as compared to malignant claims – for no apparent reason. RAND INSTITUTE, ASBESTOS LITIGATION IN THE U.S.: A NEW LOOK AT AN OLD ISSUE 6-7 (Aug. 2001) ("[I]n the early 1990s, the number of mesothelioma claims, which most view as the most serious asbestos injury claims, drifted downward. During that period, non-malignant claims continued to rise."). Similarly, a recent actuarial study graphically shows the wide variability among states in the mix of malignant versus nonmalignant claims, which is not driven by disease, but rather by the ability of plaintiffs' lawyers to bring unimpaired claims in pro-plaintiff jurisdictions. Tillinghast - Towers Perrin Presentation, *Asbestos Claims: Is this the Beginning or the End?* 10 (May 30, 2001).

of the companies recently entering the bankruptcy system have cited dramatic increases or "spikes"[17] in the claims filed against them and in settlement demands as the primary factors driving their Chapter 11 filings:

- *Babcock & Wilcox*: Faced with hundreds of thousands of asbestos claims and increasing settlement demands, Babcock & Wilcox, a company that designed large commercial boiler systems, was compelled to seek refuge under Chapter 11 in February 2000.[18]

- *Pittsburgh Corning*: In connection with its April 2000 filing, Pittsburgh Corning stated that "[h]igh defense costs and administrative costs, coupled with sharply increasing demands, combined to threaten PCC's long-term financial health and left it with no alternative means for resolving the [asbestos] claims brought against it."[19]

- *Owens Corning*: This major asbestos producer sought Chapter 11 protection in October 2000 after a national settlement program it pursued in 1999 failed because "[p]laintiffs attorneys who didn't enter into the national settlement

---

[17] *See, e.g., Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability*, PR NEWSWIRE (Oct. 5, 2000) ("[T]he cost of resolving current and future claims, together with a flurry of recent new filings from plaintiff lawyers not participating in the NSP, led us to the conclusion that a Chapter 11 reorganization was prudent and necessary."); *Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief*, ENG. NEWS-RECORD 22 (Dec. 18, 2000) (noting that "'the number of cases brought against the company increased markedly'"); Queena Sook Kim, *G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases*, WALL ST. J., Jan. 8, 2001, at B12 ("G-I's chief executive officer and general counsel, Richard A. Weinberg, said there was a 'dramatic increase in the number of claims.'"); *G-I Holdings Implements Strategy to Seek Bankruptcy Protection*, ASBESTOS & LEAD ABATEMENT REP. (Feb. 1, 2001) (citing "nearly double the number [of claims] filed in 1996" as reason for bankruptcy); A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 3 (May 7, 2001) ("A common element in all of these bankruptcy filings has been management's assertion that rapidly escalating asbestos claims have necessitated protection under Chapter 11.").

[18] *See Babcock & Wilcox Cite Asbestos Settlements in Filing for Bankruptcy*, MEALEY'S LITIG. REP.: ASBESTOS 18 (Mar. 3, 2000); Melanie Trottman, *Babcock Files for Protection of Chapter 11*, WALL ST. J., Feb. 23, 2000, at A10; Alan Sayre, *Babcock & Wilcox Seeks Bankruptcy*, AP ONLINE (Feb. 22, 2000).

[19] *Pittsburgh Corning Files for Bankruptcy Protection*, MEALEY'S LITIG. REP.: ASBESTOS 6 (Apr. 21, 2000).

continued to bring suits and demand larger payments."[20]

- **_Burns & Roe_:** This engineering firm filed in December 2000 because "[o]ver the past 12 months, demands from plaintiffs' lawyers spiked to levels dramatically above the historic pattern."[21]

- **_Armstrong_:** Armstrong World Industries filed in December 2000, stating that "companies that have had involvement with asbestos-containing products have seen the number of claims made each year escalate far beyond what one might expect based upon medical and scientific data" and that, as other defendants have "'dropped out' of the tort system by filing Chapter 11, plaintiffs' lawyers "have focused more of their efforts on the [remaining] companies."[22]

- **_G-I Holdings_:** Having already paid $1.5 billion to settle more than 500,000 asbestos claims, G-I Holdings (formerly GAF) filed for Chapter 11 in January 2001 due to a "dramatic increase in the number of claims," which the tort system was "not equipped to handle . . . efficiently and fairly."[23]

- **_W.R. Grace_:** In its April 2001 filing, Grace stated that "the state court system for dealing with asbestos claims is broken, and that Grace cannot effectively defend itself against unmeritorious claims."[24]

- **_USG_:** In June 2001, USG sought Chapter 11 protection, pointing to the recent wave of asbestos bankruptcies, which caused asbestos costs to "dramatically increase to the point of being 'completely out of proportion' to

---

[20] Queena Sook Kim, _Firms Hit By Asbestos Litigation Take Bankruptcy Route_, WALL ST. J., Dec. 21, 2000, at B4. _See also Owens Corning Files Voluntary Chapter 11 Petition to Resolve Asbestos Liability_, PR NEWSWIRE (Oct. 5, 2000) (citing "a flurry of recent new filings from plaintiff lawyers not participating in the NSP").

[21] _Asbestos Woe Leads Burns & Roe to File for Bankruptcy Relief_, ENG. NEWS-REC. 22 (Dec. 18, 2000).

[22] Affidavit of W. Rodraun ¶¶ 26, 33, _In re Armstrong World Indus._, No. 00-4471 (D. Del. Dec. 5, 2000).

[23] Queena Sook Kim, _G-I Holdings' Bankruptcy Filing Cites Exposure in Asbestos Cases_, WALL ST. J., Jan. 8, 2001, at B12 ("there was no ebb in the tide of personal-injury claims"; indeed "there was a 'dramatic increase in the number of claims.'"); _see also G-I Holdings Implements Strategy to Seek Bankruptcy Protection_, 14 ASBESTOS & LEAD ABATEMENT REP. (Feb. 1, 2001) (almost 70,000 claims filed against G-I in 2000, nearly double the number filed in 1996).

[24] Paul Owens, _W.R. Grace Files Chapter 11_, AP ONLINE (Apr. 2, 2001); _see also W.R. Grace Files for Bankruptcy, Citing Asbestos Claims_, 23(7) ANDREWS ASBESTOS LITIG. REP. (Apr. 12, 2001).

11

the company's 'legitimate liability.'"[25]

- **U.S. Mineral:** In July 2001, U.S. Mineral filed for Chapter 11 protection due to an "overwhelming number" of asbestos claims.[26]

- **Federal-Mogul:** On October 1, 2001, Federal-Mogul filed for Chapter 11 protection after being "overwhelmed by asbestos litigation," including thousands of claims based on alleged exposure to asbestos from industrial gaskets that contained only "a small amount of asbestos bound in a latex material and surrounded by steel."[27]

Inevitably, these recent bankruptcy filings have accelerated claim filings and demands against non-bankrupt defendants.[28] Loss of cash flow has spawned a search for new defendants "as plaintiff's attorneys seek to recoup settlements 'lost' to producers now in

---

[25] While USG at one point had been named in only about 50 percent of claims asserted against the Center for Claims Resolution, more recently it was named more than 90 percent of the time. *See* USG Informational Brief 10-11 (June 27, 2001).

[26] *U.S. Mineral Products Co. Becomes Latest Asbestos Co. to File for Bankruptcy*, MEALEY'S LITIG. REP.: ASBESTOS 12-13 (Aug. 3, 2001).

[27] Asbestos Primer, www.federal-mogul.com/reorganization. *See also* Mitchell Pacelle, *Federal-Mogul Plans to Seek Chapter 11 Protection*, WALL ST. J., Oct. 1, 2001, at A3 ("One reason the company's asbestos exposure proved difficult to curtail, company advisers say, is because so many other asbestos defendants had sought protection from claimants in bankruptcy court, where asbestos claims and all other litigation proceedings are stayed. The pool of defendants like Federal-Mogul available to share in settlements was growing smaller.").

[28] As an official of insurance rating service A.M. Best recently stated: "When a bankruptcy occurs, plaintiffs are more likely to come forward quickly, because they worry there may not be money left to cover later claims." Christopher Oster, *Some Insurers Face Shortfall in Reserves for Costly Claims Related to Asbestos*, WALL ST. J., May 7, 2001, at A4. *See also Court, Congress, Leave Asbestos-Taint Companies to Vultures*, DAILY BANKR. REV. 4, 11-12 (June 6, 2001) ("due to the declining number of solvent asbestos-tainted companies that lawsuits can target, attorneys are 'rushing to get claims in, because as more companies file for bankruptcy protection, the fewer there are to sue'" (quoting Omar Jama, Associate Director of Fitch bond rating agency)); A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 3 (May 7, 2001) ("A key driver of th[e] explosion [in new asbestos claims] is the acceleration of bankruptcy filings by major asbestos producers seeking relief from rapidly escalating asbestos claims. As increasing numbers of producers opt for federal bankruptcy protection, remaining defendants are targeted to shoulder larger shares of asbestos costs.").

bankruptcy."[29]  The bankruptcies filed in 2000 alone represented "40-75 percent of [the] money plaintiffs have traditionally gotten from asbestos companies."[30]  "[A]s one defendant has followed another into chapter 11, plaintiff attorneys have turned to other defendants to substitute for those in bankruptcy (against whom litigation is stayed) and have increased their financial demands on these defendants."[31]

Not only have demands increased, but the number of defendants targeted has also grown "exponentially larger," with approximately 2,000 companies now facing asbestos suits.[32]  As a result of this dramatic expansion of the litigation, "[n]ontraditional defendants

---

[29] A.M. Best, *Asbestos Claims Surge Set to Dampen Earnings for Commercial Insurers* 4 (May 7, 2001) ("Anecdotal evidence suggests that peripheral defendants (those that either produced or used asbestos in small quantities within their products) are being sued for increasing sums as the resources available from the large, more traditional defendants become exhausted.").

[30] Merrill Lynch, *Asbestos Panel Presentation* 1, 20 (Dec. 18, 2000) (observing that "about 40 percent-50 percent of the money going to plaintiffs in [asbestos] cases, went into bankruptcy" when Owens Corning, Babcock & Wilcox, and Pittsburgh Corning filed).

[31] RAND INSTITUTE, ASBESTOS LITIGATION IN THE U.S.: A NEW LOOK AT AN OLD ISSUE 25 (Aug. 2001).  *See also id.* at 33 ("plaintiff attorneys told us that they are asking non-bankrupt defendants to pay more money on claims filed against them than previously negotiated").

[32] Douglas McLeod, *Asbestos Continues to Bite Industry*, BUS. INS. 1 (Jan. 8, 2001) (observing that the number of claims is "exponentially larger" than a decade ago and that, "[t]o the extent that many defendants are in bankruptcy or post-bankruptcy . . . (claimants) will now seek recoveries from a broader base.").  *See also* EQUITAS ANNUAL REPORT 23 (Aug. 2001) ("nearly 2,000 U.S. companies have reportedly received asbestos claims"); Robin Jones, *Searching for Solutions to the Problems Caused by the "Elephantine Mass" of Asbestos Litigation*, 14 TULANE ENVTL. L.J. 549, 566 n.59 (2001) ("Over 2000 companies, including IBM and Ford, face some type of asbestos lawsuit"); Richard Schmitt, *Burning Issue: How Plaintiffs' Lawyers Have Turned Asbestos Into a Court Perennial*, WALL ST. J., Mar. 5, 2001, at A1 ("The Internet has been a further engine for growth. . . . Several lawyers use the Web to refer big asbestos-injury cases to other lawyers, earning what are, in essence, brokerage fees."); Susan Warren, *Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps*, WALL ST. J., Apr. 12, 2000, at B1 ("You have to look under every stone. . . . The deeper you dig into the industry, the more you find.") (quoting plaintiff attorney James Early).

13

now account for over 60% of asbestos expenditures."[33]

**D.    Claims against the automotive industry have grown suddenly, based upon exposure to brake dust.  Both brake suppliers (such as the Debtor) and the auto companies are named.**

The expansion of the asbestos litigation has been accompanied by an expansion of the range of products that are the focus of the most recent waves of claims.  As "[p]laintiffs' attorneys have become more aggressive, targeting companies with even passing links to asbestos,"[34] the litigation has expanded to all products associated with asbestos, whether or not they even contained significant amounts of asbestos or were associated with significant levels of exposure.  For example, the following products have all been the subject of asbestos claims:

- Yarn, thread, felt, rope packing, and flame resistant cloth;

- Plain and corrugated paper;

- Industrial gaskets;

- Flooring materials;

- Insulated electrical wire and cable;

- Corrugated roofing, roof sheathing and roofing cement;

---

[33] RAND INSTITUTE, ASBESTOS LITIGATION IN THE U.S.: A NEW LOOK AT AN OLD ISSUE 10 (Aug. 2001).

[34] Paul M. Sherer, *New Credit Aids Federal-Mogul in Asbestos Battle*, WALL ST. J., Jan. 4, 2001, at A10.  *See also* Gregory Zuckerman, *Specter of Costly Asbestos Litigation Haunts Companies*, WALL ST. J., Dec. 27, 2000, at C1 ("Plaintiffs' attorneys have become more aggressive, by targeting all kinds of companies with a passing link to asbestos."); Merrill Lynch, *Asbestos Panel Presentation* 25 (Dec. 18, 2000) ("What they [plaintiffs' lawyers] are looking for now I suppose are real minor players who manufacture products or who provided products that have minimal amounts of asbestos in it, basically to find out if they had insurance for it, to get at the insurance company amounts. Things such as wire and cable, electrical wire and cable had minimal trace amounts of asbestos in it, there are welding rods that have it in there.") (remarks by plaintiffs' attorney Joseph Cox).

14

- Wooden doors allegedly containing "asbestos in a mineral core"; and

- Grinding wheels.[35]

Litigation involving such products has been initiated and vigorously pursued, despite the fact that the potential for exposure to asbestos is often extremely low, or even nonexistent.

The automotive industry in particular has been singled out as part of a broad initiative against manufacturers of friction products. Data from the Manville Trust reflect the spike in claims. From 1999 to 2000, claims against friction defendants increased by a staggering 631.9%.[36] This was the largest one-year increase for any of the recorded industries, and claims continued to increase during the first half of 2001.

This surge in claims was a significant predicate for these Chapter 11 proceedings.[37] As Federal-Mogul discussed in its Informational Brief, the company has been

---

[35] Tillinghast - Towers Perrin presentation, *Asbestos Claims: Is this the Beginning or the End?* 17 (May 30, 2001) (listing products); *Two Asbestos Defendants Hit With $35 Million Verdict*, 23 ANDREWS ASB. LITIG. REP. 1 (Mar. 1, 2001) (describing case involving gasket containing small amounts of asbestos encapsulated in metal); Merrill Lynch, *Asbestos Panel Presentation* 1 (Dec. 18, 2000) (newly targeted defendants include "companies who made products with only trace amounts of asbestos, such as electrical wire and cable and welding rods"); USG Informational Brief 1 (June 27, 2001) ("[USG's] involvement in asbestos personal injury litigation relates primarily to a single building product, joint compound, which contained 5% or less asbestos and was used in such a way that exposures were minimal."); Susan Warren, *Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps*, WALL ST. J., Apr. 12, 2000, at B1 (discussing litigation against wooden door company); Victor E. Schwartz & Leah Lorber, *A Letter to the Nation's Trial Judges: How the Focus on Efficiency is Hurting You and Innocent Victims in Asbestos Liability Cases*, 24 AM. J. TRIAL ADVOC. 247, 264 (2000) ("The Carborundum Corporation, which manufactures grinding wheels, found itself hit with a $115 million verdict in one case. . . . Prior to this case, no grinding wheel manufacturer had been held liable for an asbestos-related injury.").

[36] Table, "Number of Claims by Year Received and Industry," *in* D. Austern Mealey's Presentation (July 2, 2001) (reporting 631.9% increase from 1999 to 2000 for "auto maintenance" claims); *see also id.* Graph, "Manville Filings by Selected Industry" (depicting spike in claims for "automobile/mechanical friction" industry).

[37] *See* Asbestos Primer, at www.federal-mogul.com (discussing claims arising from products
(continued...)

15

targeted by claims relating to automotive friction products manufactured by several companies it acquired, including Abex, Wagner and Ferodo.[38]

        These companies are longstanding suppliers of brakes and other automotive products to the automobile manufacturers for use both in original equipment manufacturing and as replacement parts.[39]  Dating back at least to the 1960s, the auto companies have purchased brake assemblies and components – including components that contained asbestos – from Abex and from Wagner.  The supply relationship has included purchase agreements that indemnified the automobile manufacturer.  A standard Chrysler purchase agreement stated that the supplier would "defend, indemnify and protect Purchaser against all claims, liabilities, losses and damages due to injury to or death of any person and damage to or loss of any property arising out of . . . allegedly defective material or workmanship in the goods

---

[37] (...continued)
manufactured by Federal-Mogul subsidiaries such as Moog Automotive, Abex and Fel-Pro); Jef Feeley, *Federal-Mogul Files for Protection: Cites Asbestos Lawsuits*, NATIONAL POST, Oct. 2, 2001, at FP11 (observing that "Federal-Mogul Corp., the largest maker of automotive engine bearings and seals, yesterday filed for bankruptcy protection to cope with 'financially crippling' asbestos lawsuits . . . ."); Mitchell Pacelle, *Federal-Mogul Plans to Seek Chapter 11 Protection*, WALL ST. J., Oct. 1, 2001, at A3 (observing that Federal-Mogul "supplies U.S. auto makers with pistons, gaskets, bearings and other parts").

[38] Debtor's Informational Brief 5-6 (Oct. 1, 2001) (D.I. 2).

[39] *Id.* ("The asbestos personal injury claims against Ferodo America, Inc. ('Ferodo') concern asbestos-containing disc pads, clutch facings, heavy duty brake linings, and drum brake linings. . . . Most Ferodo cases involve former brake mechanics who claim to have contracted asbestos-related diseases from exposure to Ferodo products during the installation and replacement of asbestos-containing brake systems. . . . . Most of the asbestos personal injury claims against Abex concern asbestos-containing friction products, such as brake linings and clutch facings. . . . As with Ferodo and Abex, the asbestos personal injury claims against Wagner arise from various asbestos-containing friction products.").

16

or services provided."[40]

Both Abex and Wagner are now part of the Debtor. Through earlier transactions, both became part of the automotive division of Cooper Industries, Inc. (Moog Automotive), which in turn, was purchased by the Debtor in 1998.[41]

This history has resulted in the filing of tens of thousands of claims against Federal-Mogul (individually and/or as successor-in-interest) and the companies it acquired. A typical complaint names a broad range of companies that are part of Federal-Mogul and contains a recitation along the following lines:

> COMES NOW, Plaintiff, Lois Salter, Individually, as Wrongful Death Beneficiary, and as Personal Representative of the Estate of James Salter, Deceased, hereinafter referred to as Plaintiff, complaining of the various Defendants listed below . . . :
>
> \* \* \*
>
> Defendant, FEDERAL MOGUL CORPORATION (a Michigan corporation), individually and as successor-in-interest to MOOG AUTOMOTIVE CORPORATION, WORLD BESTOS CORPORATION, WAGNER ELECTRIC CORPORATION, and ABEX FRICTION PRODUCTS, and as successor-in interest to T&N plc, Turner & Newell PLQ and FEDERAL

---

[40] *See* Chrysler Corporation, Purchase Order Terms and Conditions ¶ 14 (Jan. 1971), *attached to* Declaration of William D. Redford, DaimlerChrysler Corporation (Nov. 16, 2001) (attached as Exhibit 1) (discussing issuance of such purchase orders for brakes and other automotive parts to companies such as Abex and Wagner). Separate submissions are attached for Ford Motor Company (attached as Exhibit 2) and General Motors Corporation (attached as Exhibit 3).

[41] *See* Federal-Mogul Asbestos Primer, at www.federal-mogul.com ("Federal-Mogul has been defending thousands of claims brought by persons who claim exposure to Wagner asbestos-containing friction products. . . . Federal-Mogul [also] acquired certain friction manufacturing assets of a company known as Abex, and assumed the obligation to defend and indemnify certain asbestos claims against Abex."); *Asbestos Companies Report Annual Numbers of Pending Claims, New Filings in 2000,* 16 MEALEY'S LITIG. REP.: ASBESTOS 19 (May 18, 2001) ("In 1998, Federal Mogul acquired Cooper Automotive Co. and, in doing so, assumed all asbestos-related liability of Cooper and Cooper's two former businesses, Abex and Wagner."); *Asbestos Companies Report Annual Numbers of Pending Claims, New Filings in 1999,* 15 MEALEY'S LITIG. REP.: ASBESTOS 14 (May 5, 2000).

## MOGUL PRODUCTS INC.[42]

These suits involve broad and often vague allegations that the plaintiff "was exposed to asbestos-containing products in his occupations" and that, as a result, the plaintiff has suffered from asbestos-related diseases.[43]

  As Federal-Mogul indicated in its most recent 10-Q, as of June 30, 2001, there were approximately 70,000 such claims pending involving Abex and Wagner ("mainly involving friction products"), with over 59,000 new claims flowing in during the first six months of 2001 alone.[44] Just prior to its Chapter 11 filing, Federal-Mogul estimated its liability for claims against Abex and Wagner at $236 million, a significant portion of its total liability for asbestos-related claims.[45]

  This same history has resulted in litigation against the automobile

---

[42] Plaintiff's First Amended Petition, *Salter v. Armstrong World Indus.*, No. 00-09213, at 8 (Tex. Dist. Ct., Dallas Cty. Aug. 2, 2001). *See also* Plaintiffs' Original Asbestos Petition, *Lucero v. Crown Cork & Seal Co.*, No. 2001-2577, at 11 (Tex. Dist. Ct. El Paso Cty. July 10, 2001) (naming Federal-Mogul individually and as successor-in-interest to Cooper Automotive, Wagner and Abex).

[43] Plaintiff's First Amended Petition, *Salter v. Armstrong World Indus.*, No. 00-09213, at 19 (Tex. Dist. Ct., Dallas Cty. Aug. 2, 2001).

[44] Federal-Mogul Form 10-Q, at 10 (Aug. 1, 2001) ("Former businesses of Cooper Automotive, primarily Abex and Wagner, are involved as defendants in numerous court actions in the United States alleging personal injury from exposure to asbestos or asbestos-containing products, mainly involving friction products. Abex is a defendant in approximately 41,000 pending claims as of June 30, 2001. During the first six months of 2001, approximately 33,000 new claims naming this defendant were received. Wagner is a defendant in approximately 29,000 claims as of June 30, 2001. During the first six months of 2001, approximately 26,000 new claims naming this defendant were received."). A separate asbestos liability relates to claims brought against Federal-Mogul's subsidiary, Turner & Newall, a major asbestos producer. *Id.* at 7-10.

[45] *Id.* at 11 (observing that an "econometric firm" had conducted a study that resulted in an estimate of liability of claims involving Abex and Wagner of "approximately $236 million as of June 30, 2001").

manufacturers in a multiplicity of forums, alleging exposure to asbestos from brake products.[46] Over 20,000 claims have been filed against the automobile manufacturers across the United States. Often these complaints allege that "all Defendants acted in concert" to cause the plaintiff's alleged injuries.[47] Thus, the automobile manufacturers' asserted liability is alleged to be intertwined with that of the Debtor.

II.     **THE GROWING LITIGATION AGAINST THE AUTOMOTIVE INDUSTRY EXISTS ONLY BECAUSE THE DISTINCT BODY OF SCIENCE RELATING TO BRAKES HAS NOT BEEN GIVEN PROPER FORCE.**

In stark and irreconcilable contrast to the expanding litigation against the automotive industry, a well-defined body of epidemiological studies has demonstrated repeatedly that brakes and related automotive products are not associated with asbestos-related disease. These results are not surprising, given that exposure studies have shown that brakes emit only trace amounts of asbestos.

A.     **Science shows that brake workers are not exposed to significant quantities of asbestos.**

Even the potential for exposure to asbestos from brakes is extremely limited because the asbestos in brakes is thermally transformed during the braking process. As a

---

[46] *See, e.g.,* Plaintiff's First Amended Petition, *Salter v. Armstrong World Indus.,* No. 00-09213, at 8, 16-17 (Tex. Dist. Ct., Dallas Cty. Aug. 2, 2001) (naming Ford, Daimler Chrysler, General Motors, and Federal-Mogul individually and as successor-in-interest to Moog Automotive, Wagner, and Abex); Plaintiffs' Original Asbestos Petition, *Lucero v. Crown Cork & Seal Co.,* No. 2001-2577, at 11 (Tex. Dist. Ct. El Paso Cty. July 10, 2001) (naming Ford, General Motors, Federal-Mogul individually and as successor-in-interest to Cooper Automotive, Wagner and Abex).

[47] *See, e.g.,* Plaintiff's First Amended Petition, *Salter v. Armstrong World Indus.,* No. 00-09213, at 8, 27 (Tex. Dist. Ct., Dallas Cty. Aug. 2, 2001).

19

result, only trace amounts of asbestos are emitted.[48]

### 1.    Brake dust contains only trace amounts of asbestos.

Scientists began looking at the potential asbestos exposure levels of brake workers decades ago in the late 1960s.   In 1968, a seminal study by Lynch showed that, although there was approximately 50% asbestos in a given brake lining, less than 1% of the brake dust to which workers might be exposed was asbestos.   The remainder had "transformed into some other, nonfibrous material" as a result of the intense heat generated during braking.[49]

Myriad additional studies over the years have followed up on Lynch's findings.   Indeed, the later studies have demonstrated more specifically that the actual amount of asbestos in brake debris is *far* less than 1%, with most researchers – including those conducting studies sponsored by the EPA – reporting results ranging from .018% to .23% asbestos in the brake debris.[50]   These and other researchers agreed (and continue to

---

[48]   Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence*, 34 REG. TOXIC. & PHARM. 170, 174 (2001) ("Fiber measurement studies have indicated that garage mechanics are exposed to extremely low levels of asbestos as a result of the thermal transformation of asbestos fibers during the braking process."). Note: Professor Wong has been an expert witness on behalf of defendants in prior friction products litigation.

[49]   Jeremiah Lynch, *Brake Lining Decomposition Products*, 18 J. AIR POLLUTION CONTROL ASSOC. 824, 824, 826 (1968).

[50]   *See, e.g.*, M. Jacko & R. DuCharme, *Brake Emissions: Emissions Measurements From Brake and Clutch Linings from Selected Mobil Sources*, Rept. APTD-1557, at 9-24 (EPA 1973) (on average only 0.23% of brake emissions was asbestos); R. Williams & J. Muhlbaier, *Asbestos Brake Emissions*, 29 ENV. RES. 70, 80 (1982) (finding that brake debris contains only 0.03-0.04% asbestos); P. Cha & P. Carter, *Simulation of Automobile Brake Wear Dynamics and Estimation of Emissions*, SAE Technical Paper #831036, at 19 (1983) (finding 0.018% asbestos in brake emissions); D. Hatch, *Possible Alternatives to Asbestos as a Friction Material*, 13 ANN. OCCUP. HYG. 25, 27 (1970) ("very little asbestos survives in the wear products after brakes or clutches have been used under normal operating (continued...)

agree) that the braking process creates temperatures sufficiently high to transform nearly all of the chrysotile asbestos originally present in brakes into forsterite (an anhydrous magnesium silicate) or other non-fibrous, non-asbestos materials.[51]

Moreover, of the small amounts of asbestos found in brake dust, approximately 80-90% of those fibers are below or far below five microns in length.[52] Fibers of that length are not associated with disease. Indeed, OSHA does not even regulate fiber emissions where the fibers are below five microns because researchers agree that such small fibers are of "very low fibrogenic and carcinogenic potential."[53]

---

[50] (...continued)
conditions.").

[51] See, e.g., D. Rowson, The Chrysotile Content of the Wear Debris of Brake Linings, 47 WEAR 315, 315 (1978) ("No evidence of the chrysotile structure was found by either X-ray diffraction or thermal analysis and it is suggested that the structure has been reduced to an amorphous state or to forsterite."); W. PARKES, OCCUPATIONAL LUNG DISORDERS 235 (2d ed. 1982) ("Chrysotile breaks down into forsterite . . . and silicon dioxide between 800 and 850 degrees Celsius . . . Forsterite is not known to have any harmful effects.").

[52] See, e.g., D. Roberts & R. Zumwalde, Industrial Hygiene Summary Report of Asbestos Exposure Assessment for Brake Mechanics, Rept. #32.4, at 17 (NIOSH 1982) ("the greatest proportion of fibers observed was shorter than 5 microns in length (80 to 90%)"); Sheehy et al., Control of Asbestos Exposure During Brake Drum Service, 4 APPLIED IND. HYG. 313, 317 (1989) (less than 1% of brake dust is asbestos, and less than 3% of that asbestos is greater than 5 microns in length for most vehicles); D. Hatch, Possible Alternatives to Asbestos as a Friction Material, 13 ANN. OCCUP. HYG. 25, 28 (1970) (observing that "of the approximately 1 per cent of asbestos remaining in wear products, a large proportion is ground down during the wear process to much less than the 5 micron length at which particles are judged to be fibers"); Johnson et al., Industrial Hygiene Assessment of Seven Brake Servicing Facilities 10 (NIOSH 1979) (82% of the fibers in brake dust were smaller than 5 microns); D. Rowson, The Chrysotile Content of the Wear Debris of Brake Linings, 47 WEAR 315, 317 (1978) (finding no fibers over 5 microns in length).

[53] See, e.g., Victor Roggli et al., Analysis of Tissue Mineral Fiber Content, in PATHOLOGY OF ASBESTOS-ASSOCIATED DISEASES 299, 333 (1992) (The "low risk of asbestos-related diseases among brake repair workers . . . [is] apparently related to the nature of brake dust . . . Experimental animal studies have confirmed the very low fibrogenic and carcinogenic potential of short asbestos fibers."); P. GROSS & D. BRAUN, TOXIC AND BIOMEDICAL EFFECTS OF FIBERS: ASBESTOS, TALC, INORGANIC FIBERS, MAN-MADE VITREOUS FIBERS, AND ORGANIC FIBERS 44 (1984) ("[T]here is both (continued...)

2.     **Likewise, brake mechanic exposure studies show that brake workers have been exposed to only minute levels of asbestos.**

Further studies have taken the next step and measured the levels of asbestos *exposure* associated with automobile brake repair. This research consistently has found that emissions have been well below the relevant historical time-weighted average threshold levels set by OSHA, even though OSHA requirements have become more and more stringent. Studies include the following:

- J. Dement, *Cincinnati Municipal Garage: Automobile Braking Service Operation*, Rept. #32.11, at 1-2 (USPHS 1972) ("[V]ery little asbestos dust was found in the samples. . . . None of [the] samples exceeded the average or peak standards.");

- D. Roberts, *Industrial Hygiene Report: Asbestos at Reading Brake and Alignment Service, Ohio*, Rept. # 00106004 (NIOSH 1980) (measuring average fiber concentrations for brake mechanics of .04 f/ml and concluding: "no asbestos hazard exists at this company");

- D. Roberts & R. Zumwalde, *Industrial Hygiene Summary Report of Asbestos Exposure Assessment for Brake Mechanics*, Rept. #32.14 (NIOSH 1982) ("Regardless of the cleaning method utilized, TWA exposures for mechanics at all facilities were consistently less than 0.1 fibers/cc.");

- 51 Fed. Reg. 22612, 22665, at Table 22 (1984) (OSHA regulations reporting that occupational asbestos exposure for automotive repair workers was 0.06 f/ml);

- T. Kaupinnen & K. Korhonen, *Exposure to Asbestos During Brake*

---

[53] (...continued)

experimental and epidemiologic evidence as well as the evidence provided by autopsy findings that short asbestos fibers are not pathogenic."); P. Gross, *Is Short-Fibered Asbestos Dust a Biological Hazard?*, 29 ARCH. ENVIRON. HEALTH 115, 116 (1974) ("[R]eports from different laboratories are unanimous in finding asbestos that has an average length < 5 microns is devoid of pathogenic potential. This included not only the fibrogenic potential but also the cancerogenic potential."); W. PARKES, OCCUPATIONAL LUNG DISORDERS 72-74 (2d ed. 1982) ("[S]hort fibres (less than about 10 microns) . . . have little or no fibrogenic or oncogenic potential."); *see also* 48 Fed. Reg. 51086, 51111 (1983) ("Evidence for risk from fibers less than 5 micrometers in length is inconclusive.").

22

*Maintenance of Automotive Vehicles by Different Methods*, 48 AM. IND. HYG. ASSOC. J. 499 (1987) (reporting TWA less than .05 f/ml);

- L. Moore, *Asbestos Exposure Associated with Automotive Brake Repair in Pennsylvania*, 49 AM. IND. HYG. ASSOC. J. A12 (1988) (estimated average exposure during brake work was less than 0.03 f/ml and TWA exposure for a day of work was less than 0.002 f/ml);

- Sheehy et al., *Control of Asbestos Exposure During Brake Drum Service*, 4 APPLIED IND. HYG. 313 (1989) (exposure during brake cleaning was at or below 0.05 f/ml);

- Yeung et al., *An Australian Study to Evaluate Worker Exposure to Chrysotile in the Automotive Industry*, 14 APPLIED OCC. & ENV. HYG. 448, 450 (1999) (reporting levels below .05 f/ml).

As a recent review of these studies concluded, the exposures among auto mechanics doing brake repair work are "negligible" and fall within applicable "safety standards" set by government regulators:

> Industrial hygiene studies have demonstrated that the typical 8-h time-weighted-average (TWA) exposures among auto mechanics at garages range from less than 0.002 to 0.05 fiber/cc. Thus, the 8-h TWA exposure to auto mechanics is well below the safety standards mandated in most countries (for example, 0.1 fiber/cc in the United States), which should provide adequate protection to auto mechanics. In fact, according to the Committee on Hygienic Standards of the British Occupational Hygiene Society (BOHS), such fiber concentrations would have been categorized as "negligible."[54]

Thus, the potential for exposure to asbestos associated with brakes and other automotive products is "extremely low."[55]

**B.   The established epidemiology has shown no causal relationship between exposure to brake dust and disease.**

---

[54] Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence*, 34 REG. TOXIC. & PHARM. 170, 175 (2001).

[55] *Id.* at 175.

23

The key issue thus arises: do these minimal exposures cause disease? Not one but many epidemiological studies speak to this issue. Those studies uniformly have concluded that auto mechanics are not at an increased risk for asbestos-related diseases.

More specifically, epidemiologic investigations have found that mechanics exposed to brake lining dust are not at any increased risk for pleural or pulmonary abnormalities.[56] As one study addressing the issue concluded: "[I]t can be assumed that certain fields of work are or were exposed to such a small extent or not at all that a risk of asbestosis which is relevant in terms of occupational medicine is no longer to be assumed or was not to be assumed. This applies above all to certain work in the frictional coating (brake lining) and asbestos paper industry."[57]

Critically, well-controlled epidemiologic studies have further shown that brake repair work is not associated with malignant disease. These studies include the following:

---

[56] See, e.g., William J. Nicholson et al., *Investigation of Health Hazards in Brake Lining Repair and Maintenance Workers Occupationally Exposed to Asbestos* 25, table 12 (NIOSH 1983) (garage mechanics who did brake repairs at no greater risk for x-ray abnormalities than garage mechanics who did not repair brakes); K. Marcus et al., *Asbestos-Associated Lung Effects in Car Mechanics*, 13 HEALTH 252, 253 (1987) (in study of 925 car mechanics, no respiratory impairment or asbestosis found); H. Raithel et al., *Health Hazards from Fine Asbestos Dust*, 61 OCCUP. ENVIRON. HEALTH 527 (1989); *see also* L. Rushton et al., *Epidemiological Survey of Maintenance Workers in London Transport Executive Bus Garages and Chiswick Works*, 40 BR. J. INDUS. MED. 340, 342 (1983) (in large epidemiologic study of 8,490 bus garage workers, no increased mortality from non-malignant pulmonary diseases detected for mechanics); A. McDonald et al., *Dust Exposure and Mortality in an American Chrysotile Asbestos Friction Products Plant*, 41 BR. J. INDUS. MED. 151, 154 (1984) (not a single case of asbestosis found in large epidemiologic study of 3,641 men employed at a friction products plant, where exposure to asbestos from brake lining dust is much higher than the exposure experienced by brake workers).

[57] H. Raithel et al., *Health Hazards from Fine Asbestos Dust*, 61 OCCUP. ENVIRON. HEALTH 527, 527, 533 (1989) (in study including 2,644 brake workers, percent of brake workers found to have abnormal x-ray findings was lower than expected percent of abnormalities in entire population of workers in the study).

24

- Alison D. McDonald & J. Corbett McDonald, *Malignant Mesothelioma in North America*, 46 CANCER 1650, 1655 (1980) (no increased risk of mesothelioma for garage mechanics);

- Mary J. Teta et al., *Mesothelioma in Connecticut, 1959-1977*, 25 J. OCCUP. MED. 749, 752-53 (1983) (no increased risk of mesothelioma for garage mechanics);

- L. Rushton et al., *Epidemiological Survey of Maintenance Workers in London Transport Executive Bus Garages and Chiswick Works*, 40 BR. J. INDUS. MED. 340, 340-41 (1983) (observed deaths of bus mechanics from all neoplasms and cancer of the lung were the same or lower than deaths expected in the general population);

- Aaron Blair et al., *Mortality Patterns of U.S. Veterans by Occupation*, 74 J. NCI 1039 (1985) (in study of close to 300,000 veterans, no evidence of an association between auto repair or mechanic work and increased lung cancer risk);

- Spirtas et. al., *Proceedings for the Society for Epidemiological Research Abstracts, National Health and Welfare Canada*, AM. J. EPIDEM. PROCEEDINGS 518 (1985); Spirtas et. al., *Malignant Mesothelioma: Attributable Risk of Asbestos Exposure*, 51 OCC. & ENVIRON. MED. 804 (1994) (no increased risk of mesothelioma for brake workers);

- B. Jarvholm & J. Brisman, *Asbestos Associated Tumors in Car Mechanics*, 45 BR. J. INDUS. MED. 645, 646 (1988) (no increased risk of mesothelioma in car mechanics);

- Eva S. Hansen, *Mortality of Auto Mechanics: A Ten-Year Follow-Up*, 15 SCAND. J. WORK ENVIRON. HEALTH 43, 44-45 (1989) (no elevated risk for lung cancer in mechanics, no statistically significant increased mesothelioma risk);

- Per Gustavsson et al., *Lung Cancer and Exposure to Diesel Exhaust Among Bus Garage Workers*, 16 SCAND. J. WORK ENVIRON. HEALTH 352 (1990) (asbestos exposure of garage mechanics "did not seem to influence the lung cancer risk");

- H.J. Woitowitz & K. Rodelsperger, *Mesothelioma Among Car Mechanics?*, 38 ANN. OCCUP. HYG. 635, 637 (1994) (no evidence that car mechanics are exposed to an increased risk of mesothelioma even if they perform brake repair);

25

- K. Teschke et. al., *Mesothelioma Surveillance to Locate Sources of Exposure to Asbestos,* 88 CANADIAN J. PUB. HEALTH 163, 166 (1997) ("As with vehicle mechanics in the occupational analysis, a history of brake lining installation or repair had a risk estimate below 1.0").

The studies confirm that there is no increased risk of mesothelioma among auto mechanics as a result of exposure to brakes and other automotive parts:

> A review of the literature indicates that there are six epidemiologic studies providing relevant information on malignant mesothelioma among auto mechanics. . . . The results of the six studies reported no increased risk of malignant mesothelioma among auto mechanics. . . . An application of Hill's causation criteria to epidemiologic data of malignant mesothelioma among auto mechanics clearly demonstrates that auto mechanics do not have an increased risk of malignant mesothelioma as a result of exposure to asbestos fibers from brake linings and clutch facings.[58]

Further, "the results of the individual studies are remarkably consistent in that none of the studies shows an increased risk" of disease. Rather, there is "strong evidence that garage mechanics' mesothelioma risk is similar to that in the general population." Indeed, the studies show that teachers, librarians, and secretaries are all at a greater risk of contracting malignant mesothelioma than are auto mechanics.[59] Similarly, "epidemiologic studies indicate that auto mechanics are not at an increased risk of lung cancer as a result of working with brakes and clutches."[60]

## III.   THE PROCEDURAL TOOLS EXIST FOR ADJUDICATING THE CORE SCIENTIFIC ISSUE OF GENERAL CAUSATION.

---

[58] Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence,* 34 REG. TOXIC. & PHARM. 170, 173-74 (2001).

[59] *Id.* at 173 & table 2; *see also* K. Teschke et. al., *Mesothelioma Surveillance to Locate Sources of Exposure to Asbestos,* 88 CANADIAN J. PUB. HEALTH 163 (1997).

[60] Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence,* 34 REG. TOXIC. & PHARM. 170, 177 (2001).

The rules for litigating claims that turn on science no longer tolerate a "disconnect" between the prosecution of such claims and accepted scientific methodology. As the courts were overwhelmed by rapidly growing toxic tort litigation, a number of commentators and courts observed that rational determinations of liability were often lacking in the tort system, where courts failed to engage in stringent judicial "gate keeping" in order to weed out "weak and frivolous claims." *Castano v. American Tobacco Co.*, 84 F.3d 734, 747 n.24 (5th Cir. 1996) (observing that, if such scrutiny were applied, "even a mass tort like asbestos could be managed . . . in a way that avoids judicial meltdown").

Today, both the Supreme Court and the Federal Rules of Evidence have made clear that such judicial "gatekeeping" is not only desirable – it is required. Courts must stringently scrutinize proffered scientific evidence in order to determine whether, at bottom, it is sufficiently reliable to support a claim.[61]

Given the epidemiology showing no excess risk of disease from exposures to brakes, claims based on such exposure fall squarely within the purview of the Supreme Court's holding in *Daubert* and, lacking admissible evidence of causation, should be summarily dismissed.

A.    ***Daubert* mandates scrutiny of scientific evidence for its reliability.**

---

[61]    The Advisory Committee Notes accompanying Rule 702 explain that the rule was amended in 2000 in response to *Daubert* and *Kumho Tire*: "The amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony. Consistently with *Kumho*, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful. Consequently, the admissibility of all expert testimony is governed by principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."

In a landmark decision, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* directed the lower federal courts to act as "gatekeepers" to ensure that proffered scientific evidence is not only relevant, but also reliable. *See* 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138, 147 (1999) ("gatekeeping" requirement "applies to all expert testimony"). The assessment of whether proffered expert testimony is admissible under Federal Rules of Evidence 702 and 703 is a preliminary question for the court. *See* FED R. EVID. 104(a); *Daubert*, 509 U.S. at 592-93. In making that preliminary assessment, the court must scrutinize whether plaintiffs' evidence survives the *Daubert* screen – that is, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

Under *Daubert*, causation evidence must be based upon reliable scientific data and methods, and the conclusions must flow logically from those facts and methods. *See id.* at 589-90; Fed. R. Evid. 702; *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). *Daubert* provided a non-exclusive list of guidelines to assist trial courts in undertaking their obligation to prevent "subjective belief" and "unsupported speculation" from entering the courtroom under the guise of expert testimony. 509 U.S. at 598-600. The specific factors enumerated by the Supreme Court were: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence

28

and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. *Id.* at 593-94. *See also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 n.7 (3d Cir. 1994) (listing additional factors such as the qualifications of the expert witness and the non-judicial uses to which the method has been put).

Expert opinion evidence must be rejected where "there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co.*, 522 U.S. at 146. *See also In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999), *cert. denied*, 520 U.S. 1225 (2000); *In re Paoli R.R. Yard*, 35 F.3d at 743; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) ("[T]he district court did not abuse its discretion in finding that the 'analytical gap' between [the expert's] causation opinion and the scientific knowledge and available data advanced to support that opinion was too wide."), *cert. denied*, 526 U.S. 1064 (1999).

**B.     In the context of toxic torts, quantification of exposure and risk are essential: Epidemiology is used to find whether there is excess risk associated with exposure.**

In order to survive judicial scrutiny under *Daubert* in the context of toxic torts, claimants must provide reliable scientific evidence demonstrating that exposure to a toxin is linked to disease. Evidence linking a specific chemical or toxin to disease is inadmissible unless there is "an established scientific connection between exposure and illness," including "information on the level of exposure necessary for a person to sustain . . . injuries." *Moore*, 151 F.3d at 278. *See also Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996) ("[A] plaintiff in a toxic tort case must prove the levels of

29

exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover."); *Mitchell v. Gencorp.*, 165 F.3d 778, 781 (10th Cir. 1999) (same). Indeed, "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).[62]

Thus, quantification of exposure and risk are essential, and epidemiological evidence is required to demonstrate general causation in a reliable way. *See, e.g., Renaud v. Martin Marietta Corp.*, 972 F.2d 304, 307 (10th Cir. 1992) (plaintiffs' causation evidence "was not sufficiently reliable, being drawn from tests on non-human subjects without confirmatory epidemiological data"); *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 315 (5th Cir. 1989) (theories of toxic causation "unconfirmed by epidemiologic proof cannot form the basis for causation in a court of law"); *In re Breast Implant Litig.*, 11 F. Supp.2d 1217, 1224 (D. Colo. 1998) ("[E]pidemiologic studies are necessary to determine the cause and effect between breast implants and allegedly associated disease."); *Sutera v. Perrier Group of America, Inc.*, 986 F. Supp. 655, 663 (D. Mass. 1997) (rejecting expert's testimony under *Daubert* that low levels of benzene caused disease where there was a "dearth of any

---

[62] *See also In re TMI Litig. Consol. Proceedings*, 927 F. Supp. 834, 869 (M.D. Pa. 1996) (excluding cancer study where record did not "support the fundamental assumption . . . that doses were significantly higher than originally estimated"), *aff'd in part, rev'd in part*, 193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000), *cert. denied*, 520 U.S. 1225 (2000); *In re TMI Litig. Cases Consol. II*, 910 F. Supp. 200, 203 (M.D. Pa. 1996) (excluding expert testimony where expert's study, "standing alone, cannot speak to the issue of whether the observed tree damage resulted form radiation exposure" and thus, could not assist the jury in "determining whether or not persons (and trees) in the TMI area at the time of the accident were exposed to radiation").

epidemiological evidence supporting a causal relation between exposures to benzene at low levels and [disease]").[63]

And any demonstrated risk must be sufficient in magnitude to have caused the disease in a particular case. As the Third Circuit has stated:

> Testimony that [a toxin] increased the risk that plaintiffs would contract the injuries that they contracted does not show that [the toxin was] a substantial factor in those injuries. . . . *Even under the substantial factor test, plaintiffs must prove that defendants' actions were a cause of plaintiffs' injuries* before the burden switches to defendant to show that the injuries would have occurred even absent any action by the defendant.

*In re Paoli R.R. Yard*, 35 F.3d at 761 n.31 (emphasis supplied). *See also In re Paoli R.R. Yard PCB Litig.*, 2000 WL 274262, at *2 (E.D. Pa. Mar. 7, 2000) (same); *cf. Sutera*, 986 F. Supp. at 667 (rejecting expert testimony under *Daubert* where there was no reliable evidence demonstrating "low dose of benzene in [defendant's product] was a substantial factor in causing [plaintiff's] illness"); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1403 (D. Or. 1996) ("[A] plaintiff seeking to prove causation must 'introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in the result.' This burden requires plaintiffs to demonstrate that exposure to breast implants more than doubled the risk of their alleged injuries.").

---

[63]   *See also Conde v. Velsicol Chem Corp.*, 804 F. Supp. 972, 1025-26 (S.D. Ohio 1992) ("Epidemiologic studies are the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease."), *aff'd*, 24 F.3d 809 (6th Cir. 1994); *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1554 (D. Colo. 1990) (plaintiffs "required to submit epidemiological evidence in support of their causation contentions"), *aff'd*, 972 F.2d 304 (10th Cir. 1992); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1231 (E.D.N.Y. 1985) ("A number of sound epidemiological studies have been conducted on the health effects of exposure to Agent Orange. These are the only useful studies having any bearing on causation."), *aff'd*, 818 F.2d 187 (2d Cir. 1987), *cert. denied*, 487 U.S. 1234 (1988).

Under Rule 702, this means that a plaintiff must show that the defendant's product was more likely than not, a cause of disease. *See, e.g., Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1322 (9th Cir. 1995) (observing that testimony of plaintiff's experts was inadmissible where "the strongest inference to be drawn for plaintiffs based on the epidemiological evidence is that Bendectin could *possibly* have caused plaintiffs' injuries"); *Hall*, 947 F. Supp. at 1397 (plaintiff must introduce evidence showing that defendant's conduct was "more likely than not" a cause of disease: "A mere possibility of such causation is not enough").

Accordingly, in determining whether proffered scientific evidence of causation is sufficiently reliable, courts have required that epidemiological studies show a doubling of the risk of disease, i.e., a relative risk of 2.0 at a 95% confidence level, from the agent being studied versus the background risk of disease among people without the exposure at issue (whose risk is set at 1.0). *See, e.g., DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958 (3d Cir. 1990) (noting that "in order to avoid summary judgment, the relative risk of limb reduction defects arising from the epidemiological data . . . will, at a minimum, have to exceed '2'"); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n.16 (11th Cir. 1999) ("The threshold for concluding that an agent more likely than not caused a disease is 2.0. A relative risk of 1.0 means that the agent has no causative effect on incidence. A relative risk of 2.0 thus implies a 50% likelihood that the agent caused the disease. Risks greater than 2.0 permit an inference that the plaintiff's disease was more likely than not caused by the agent" (citing *Federal Judicial Center, Reference Manual on Scientific Evidence* 168-69 (1994)); *Daubert*, 43 F.3d at 1321 ("For an epidemiological study

to show causation under a preponderance standard, 'the relative risk of [the disease] arising from the epidemiological data . . . will at a minimum have to exceed '2.'''); *Hall*, 947 F. Supp. at 1403 (more likely than not "standard of proof means that plaintiffs must be able to show a relative risk of greater than 2.0"); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 715 (Tex. 1997) (collecting cases).

The rationale behind this rule is simple. In computing relative risks, epidemiologists determine the ratio of disease in exposed populations to disease in individuals who are not exposed to an alleged toxin. The resulting figure may fall within three distinct categories for purposes of determining whether an exposure is associated with disease. If the relative risk (or ratio) is less than 1.0, then "the risk in exposed individuals is less than the risk in unexposed individuals," and therefore there is "a negative association, which could reflect a protective or curative effect of the agent on the risk of disease." If the relative risk is equal to or brackets 1.0, then "the risk in exposed individuals is the same as the risk in unexposed individuals" and there is "no association" between exposure and disease.[64] It is only where the relative risk is greater than 2.0, meaning that there is a greater than 50% chance that the exposure is associated with an individual's disease, that the evidence is sufficient to meet the preponderance of the evidence standard.[65]

Similarly, courts have invalidated claims of causation at the outset where

---

[64] *See generally* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 349, 384 (2d ed. 2000).

[65] *See id.* at 384 (observing that "[a] substantial number of courts in a variety of toxic substances cases have accepted this reasoning"). A relative risk greater than 2.0, however, merely indicates a statistical association and therefore necessary, but not sufficient, to establish causation: "Once an association has been found between exposure to an agent and development of a disease, researchers consider whether the association reflects a true cause-effect relationship." *Id.* at 374.

33

exposures fall within applicable regulatory exposure guidelines, which are prophylactic in nature and therefore are set much lower than the tort-law threshold of causation.[66] When issuing health and safety regulations, an agency's purpose is to "suggest or make prophylactic rules governing human exposure . . . in order to reduce public exposure to harmful substances." *Allen*, 102 F.3d at 198. As a result, government "agencies' threshold of proof is reasonably lower than that in tort law, which 'traditionally make[s] more particularized inquiries into cause and effect' and requires a plaintiff to prove that it is more likely than not that another individual has caused him or her harm.'" *Id.* (quoting *Wright*, 91 F.3d at 1107). *See also Sutera*, 986 F. Supp. at 664-65 (same).

Consequently, a number of courts have concluded that asbestos exposures that fall within applicable regulatory guidelines cannot meet the tort-law threshold of causation.[67] *See, e.g., Dartez v. Fibreboard Corp.*, 765 F.2d 456, 470-71 (5th Cir. 1985) (studies showed

---

[66] However, as the court in *Allen* observed, the converse is not true. The fact that an exposure exceeds applicable regulatory guidelines is not sufficient to demonstrate causation because, in order to protect the public, these guidelines are set well below the levels necessary to cause disease. 102 F.3d at 198. Rather, a plaintiff must present reliable epidemiologic proof that an alleged exposure is capable of causing disease (*see* references cited above).

[67] A number of courts have observed that it is axiomatic that "different manufacturers' asbestos products differ in degrees of harmfulness." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 379-80 (3d Cir. 1990). *See also Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir. 1985) ("[A]ll asbestos-containing products cannot be lumped together in determining their dangerousness."); *Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1483 (11th Cir. 1985) (observing that "different manufacturers' asbestos products differ in degrees of harmfulness"); *Celotex Corp. v. Copeland*, 471 So.2d 533, 538 (Fla. 1985) ("Asbestos products . . . have widely divergent toxicities, with some asbestos products presenting a much greater risk of harm than others."); *Goldman v. Johns-Manville Sales Corp.*, 514 N.E.2d 691, 697 (Ohio 1987) ("Asbestos-containing products do not create similar risks of harm because there are several varieties of asbestos fibers, and they are used in various quantities even in the same class of product."); *Becker v. Baron Brothers*, 649 A.2d 613, 620 (N.J. 1994) ("[C]ourts have acknowledged that asbestos-containing products are not uniformly dangerous and thus that courts should not treat them all alike.").

that the fiber count for the defendant's product was below the "threshold limit defined by OSHA," and accordingly, the record did "not contain sufficient evidence" that the plaintiff's "limited exposure . . . to the relatively small number of fibers emitted by this cloth under the most unfavorable conditions could be a producing cause of his injuries."); *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir. 1985) (citing OSHA standards and concluding that defendant's asbestos gaskets, textile products and packing materials were not a substantial factor in causing disease: "there was no evidence that the inhalation of the relatively small amounts of asbestos fibers possibly released during the handling of Raymark products was a substantial factor in causing [the plaintiff's] present condition"); *Quick v. Murphy Oil Co.*, 643 So.2d 1291, 1296-97 (La. Ct. App. 1994) (defendant's asbestos-containing products were not "a substantial cause" of plaintiff's disease where "asbestos emissions were below the threshold values established by OSHA").

For the same reason, courts have concluded that products whose asbestos emissions fall within such regulatory guidelines are not defective. *See, e.g., Dartez*, 765 F.2d at 470 ("Compliance with . . . government safety standards constitutes strong and substantial evidence that a product is not defective."); *Gideon*, 761 F.2d at 1144 (same); *see also In re Asbestos*, 726 So.2d 926, 945 (La. Ct. App. 1998) (gaskets containing asbestos "covered in a grease-like substance that prevented large emissions of asbestos fibers" were "considered non-hazardous by OSHA" and therefore could not cause disease).

These standards provide a well-established framework for assessing scientific evidence in toxic tort cases such as this. Both the Supreme Court and now the Federal Rules mandate stringent review of proffered scientific evidence of causation – dictating scrutiny

35

that often was lacking in the infancy of the asbestos litigation.

C.     **The established science demonstrating the absence of any increased risk presents a clear case for dismissal under *Daubert*.**

Under the foregoing standards, the consistent body of epidemiology requires dismissal of any claim based on exposure to brakes or other automotive parts. Here, there is no scientific demonstration of *any* increased risk of disease, to say nothing of a risk in excess of 2.0. The studies report relative risks ranging from .7 to 1.2 for lung cancer and .62 to 1.00 for mesothelioma[68] – figures that are far below the required 2.0 level that is the "threshold" for concluding that an exposure is more likely than not a cause of disease.[69]

As a result, there is no reliable scientific evidence to support any claim based on exposure to such products. *See, e.g., DeLuca*, 911 F.2d at 959 n.23 ("'In no case . . . can evidence suffice to establish a causal link if it does not include at least reasonable estimates of exposure levels and durations, and data that reasonably indicate a relative risk greater than 2.'" (quoting Black & Lilienfeld, *Epidemiological Proof in Toxic Tort Litigation*, 52 FORDHAM L. REV. 732, 769 (1984))); *Allison*, 184 F.3d at 1315 (only "[r]isks greater than 2.0 permit an inference that the plaintiff's disease was more likely than not caused by the agent" (citing *Federal Judicial Center, Reference Manual on Scientific Evidence* 168-69 (1994)); *Daubert*, 43 F.3d at 1321 ("'the relative risk of [the disease] arising from the epidemiological data . . . will at a minimum have to exceed '2.'" to prove causation).

---

[68] *See, e.g.,* Otto Wong, *Malignant Mesothelioma and Asbestos Exposure Among Auto Mechanics: An Appraisal of Scientific Evidence,* 34 REG. TOXIC. & PHARM. 170, 173-74 (2001) (collecting studies).

[69] *See* FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 384 (2d ed. 2000).

Because Federal Rule of Civil Procedure 56(a) requires the party opposing summary judgment to come forward with admissible evidence demonstrating a genuine issue of fact for trial, where causation evidence has been excluded under *Daubert*, summary judgment in favor of the toxic tort defendant must follow. *See, e.g., In re TMI Litig.*, 193 F.3d at 623 (observing that district court granted summary judgment "as a result of its rulings under *Daubert*"); *In re Paoli*, 35 F.3d at 767-70 (affirming in part, reversing in part grant of summary judgment); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1304 (11th Cir. 1999) (upholding grant of summary judgment in breast implant case given "inability to establish liability without the experts" after testimony excluded under *Daubert*); *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1419 (9th Cir.1998) (upholding grant of summary judgment after expert testimony that brain shunt manufactured by defendant was defective and that silicone components in the shunt made plaintiff ill); *Allen*, 102 F.3d at 195-96 (trial court properly excluded scientifically invalid expert testimony asserting that exposure to ethylene oxide caused cancer); *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 382 (5th Cir. 1996) (plaintiff expert's "proposed testimony concerning cotton rat study does not satisfy Rule 702's 'standard of evidentiary reliability,' as interpreted by *Daubert*, because [expert's] testimony would consist of 'unsupported speculation'"); *In re Paoli R.R. Yard PCB Litig.*, 2000 WL 1279922, at *6 (E.D. Pa. 2000) (granting summary judgment motion after applying *Daubert*).[70]

---

[70] Bankruptcy courts have likewise excluded expert testimony under *Daubert* before ruling on the merits of the parties' claims and defenses. *See, e.g., In re Canvas Specialty, Inc.*, No. LA 00-33180, 2001 WL 336463, at *3-*4 (Bankr. C.D. Cal. Mar. 28, 2001); *In re Husting Land & Dev., Inc.*, 255 B.R. 772, 780-81 (Bankr. D. Utah 2000); *In re Dow Corning Corp.*, 237 B.R. 364 (Bankr. E.D. Mich. (continued...)

## IV. THIS COURT SHOULD EXERCISE ITS POWER TO RESOLVE THE *DAUBERT* ISSUE, WHICH IS CENTRAL TO THESE CHAPTER 11 PROCEEDINGS.

This Court has the power to provide a complete and centralized resolution of the threshold scientific issue affecting brake claims. Resolving that issue will be a substantial step in moving this case forward. Failure to address the issue on a consolidated basis here (rather than in piecemeal litigation throughout the court system) will increase an already substantial liability problem and create further uncertainty about whether and how the Debtor can resolve that problem.

In the mass-tort context, the goal must be to obtain "a single, uniform, fair and efficient resolution of all claims growing out of a set of [related] events."[71] To achieve this end, the Court may centralize the litigation of the threshold scientific issue described above by exercising jurisdiction over all claims that are "related to" these proceedings. *See* 28 U.S.C. §§ 157(b), 1334(b). This mechanism has been used effectively in prior mass tort bankruptcies such as *Dow Corning* and *A.H. Robins* to centralize adjudication of related claims within a single forum.

**A. The proposed *Daubert* proceeding promises the resolution of a complex and substantial liability problem that would otherwise consume a significant part of this case and may persist even after confirmation.**

---

[70] (...continued)
1999). As a bankruptcy court recently explained in excluding one party's expert and granting summary judgment for the other party, "when dealing with expert testimony in a summary judgment motion (as well as at trial), the trial court does have the ability – indeed, the duty – to determine if expert testimony should be admitted in the first instance." *In re Bonham*, 251 B.R. 113, 133 (Bankr. D. Alaska 2000) (emphasis omitted).

[71] Edward H. Cooper, *The (Cloudy) Future of Class Actions*, 40 ARIZ. L. REV. 923, 947 (1998).

Federal-Mogul faces a substantial and poorly-defined liability problem that, if not addressed, will inevitably create a substantial and complex obstacle to resolution of this case.

As described above, the source of the claims at issue is simple – the use of brakes manufactured by businesses purchased by the Debtor. That fact gives rise both to the claims against Federal-Mogul (because it acquired those businesses) and also to the claims against the automobile manufacturers (because they used such products). The claims are against different parties, but originate from the same source.

Because Federal-Mogul's businesses made those products, it faces thousands of claims, but because the automobile manufacturers used those same products, Federal-Mogul faces the prospect of additional liability from contribution and indemnification claims. As is typical in mass-tort cases, thousands upon thousands of claims are involved. The scope of both the direct claims (against the Debtor) and the indirect claims (for contribution and indemnification) is not only substantial, it is also uncertain. Uncertainty arises from limitations on what is known about both the facts underlying those claims and the volume of claims that may be asserted in the future. Further uncertainty will arise in the event litigation against the automobile manufacturers is allowed to continue piecemeal throughout the country. Disputes about the obligations between the companies will give rise to uncertainty, as will any conflicting decisions concerning the merit of the underlying claims. The only thing that is certain is that continued litigation will increase the Debtor's exposure to both direct liability (the growth of litigation outside the bankruptcy clearly will translate into more personal injury claims against the Debtor) and indirect liability (as the

39

scope of indemnity and contribution claims grows).

These substantial, changing and uncertain liabilities will impede the progress of this case. Absent definition of those liabilities, a plan that appropriately addresses them will be difficult to formulate and confirm.

The straightforward concept that drives the pending motion is to address the one issue on which all the asserted liabilities turn – that is, the scientific issue described above. If that issue is resolved, the entire problem may disappear.

**B.      Under 28 U.S.C. § 1334(b), this Court has "broad jurisdiction" over such litigation whose outcome will have an effect on the bankruptcy estate.**

Under 28 U.S.C. § 1334(b), this Court is authorized to exercise jurisdiction over any related litigation whose "outcome . . . could *conceivably* have any effect on the estate being administered in the bankruptcy." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (citing *In re Pacor, Inc.*, 743 F.2d 984, 994 (3d Cir. 1984)). *See also A.H. Robins v. Piccinin*, 788 F.2d 994, 1002 n.11 (4th Cir.), *cert. denied*, 479 U.S. 876 (1986) (same); *In re Dow Corning Corp.*, 86 F.3d 482, 489-90 (6th Cir. 1996) (same).

As the Third Circuit has recognized, "[a] key word in this test is *conceivable*. Certainty, or even likelihood, is not a requirement. Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on the debtor's rights, liabilities, options, or freedom of action or the handling and administration of the bankrupt estate." *In re Marcus Hook Develop. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991) (emphasis in original).

Numerous courts have recognized that under this test, "the reach of 'related to' jurisdiction is very broad." *Belcufine v. Aloe*, 112 F.3d 633, 636 (3d Cir. 1997). *See also*

*Dow Corning*, 86 F.3d at 489, 495, 497 (Section 1334(b) affords federal courts "broad jurisdiction in bankruptcy cases" and noting the "expansive definition" of "related claims" first established by the Third Circuit in *Pacor* and later cited "with approval" by the Supreme Court in *Celotex*); *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 583 (6th Cir. 1990) (observing that federal courts "have uniformly adopted an expansive definition of a related proceeding under section 1334(b)"); *In re Celotex Corp.*, 124 F.3d 619, 626 (4th Cir. 1997) (same).

As the Supreme Court observed in *Celotex*, the congressional intent behind Section 1334 was "to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." 514 U.S. at 308. Indeed, "[t]he emphatic terms in which the jurisdictional grant is described in the legislative history, and the extraordinarily broad wording of the grant itself, leave . . . no doubt that Congress intended to grant to the district courts broad jurisdiction in bankruptcy cases." *In re Salem Mortgage Corp.*, 783 F.2d 626, 633-34 (6th Cir. 1986).

In applying this broad grant of authority, numerous courts have exercised jurisdiction over litigation against non-debtors where, as here, they have claims for contribution and indemnification against the debtor. *See, e.g.*, *Dow Corning*, 86 F.3d at 494 (jurisdiction exists given potential contribution and indemnification claims); *Robins*, 788 F.2d at 1011 (jurisdiction exists given potential indemnity); *In re Wood*, 825 F.2d 90, 94 (5th Cir. 1987) (finding "related to" jurisdiction over suit against non-debtor where the debtor "may bear" all, part, or none of the judgment); *In re Celotex Corp.*, 124 F.3d at 626 (noting that contribution action "could conceivably have an effect on the Celotex bankruptcy case");

41

*In re Wolverine Radio Co.*, 930 F.2d 1132, 1143 (6th Cir. 1991) (holding that "related to" jurisdiction exists over indemnification claim), *cert. dismissed*, 503 U.S. 978 (1992); *In re American Hardwoods, Inc.*, 885 F.2d 621, 624 (9th Cir. 1989) ("related to" jurisdiction existed where debtor's guarantor "would likely" make claim against debtor's officers' stock, which "'could conceivably' affect the administration of [the debtor's] plan"); *In re Salem Mortgage Co.*, 783 F.2d 626, 734 (6th Cir. 1986) ("related to" jurisdiction established where non-debtors "may have an action against the debtors such as breach of the assignment agreement"); *In re New York Int'l Hostel, Inc.*, 157 B.R. 748, 751 (S.D.N.Y. 1993) (where resolution of claims against non-debtor "might" result in non-debtor having claims against debtor, claims against non-debtor were "related to" bankruptcy proceedings).

These courts have concluded that "[t]he potential for [the debtor's] being held liable to the nondebtors in claims for contribution and indemnification, or vice versa, suffices to establish a conceivable impact on the estate in bankruptcy," warranting exercise of the court's jurisdiction. *Dow Corning*, 86 F.3d at 494. Indeed, jurisdiction exists even where such a claim "may ultimately have no effect on the debtor." *In re Wolverine Radio Co.*, 930 F.2d at 1143. *See also In re Celotex Corp.*, 124 F.3d at 626 (observing that test "does not require certain or likely alteration of the debtor's rights, liabilities, options or freedom of action," but rather "[t]he possibility of such alteration or impact is sufficient to confer jurisdiction"); *In re Marcus Hook*, 943 F.2d at 264 (following *Wolverine*).

Similarly, courts have ruled that jurisdiction is bolstered where, as here, non-debtors have contractual indemnity claims against the debtor. The Third Circuit, for example, has stated flatly that such "contractual indemnity claims can have an effect on a

42

bankruptcy estate and thus provide a basis for the exercise of 'related to' jurisdiction." *Belcufine*, 112 F.3d at 636 (citing *Pacor*, 743 F.2d at 995). *See also In re Allegheny Health Education & Research Foundation*, 233 B.R. 671, 679 (Bankr. W.D. Pa. 1999) (exercising "related to" jurisdiction over claims where there was a "contingent indemnification obligation").

Given this precedent, this Court's jurisdiction under 28 U.S.C. § 1334 is clear. The thousands of claims for indemnification and contribution against the Debtor more than meet the minimal requirement of having a "conceivable" effect on the bankruptcy estate. Indeed, the effect of such claims is significant.

C.      **This Court has broad authority under 28 U.S.C. § 157(b)(5) to centralize the adjudication of such claims within a single forum to ensure "prompt, fair and complete resolution of all claims 'related to'" these proceedings.**

In exercising this broad grant of jurisdictional authority, the district court *where the bankruptcy is pending* may under 28 U.S.C. § 157(b)(5) transfer any related claim or cause of action to be resolved within the bankruptcy proceedings:

> The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.

In this manner, the court may exercise jurisdiction over all related claims in order to centralize adjudication in a single forum.

Congress enacted Section 157(b)(5) "to eliminate the multiplicity of forums for the adjudication of parts of a bankruptcy case." *See, e.g., Dow Corning*, 86 F.3d at 496 (quoting *Robins*, 788 F.2d at 1011). The purpose behind Section 157(b)(5) was to make it

43

possible for a single forum "to oversee the many claims and proceedings that might arise in or affect" an ongoing reorganization. *Calumet Nat'l Bank v. Levine*, 179 B.R. 117, 121 (N.D. Ind. 1995). *See also In re Pan Am Corp.*, 16 F.3d 513, 516 (2d Cir. 1994) ("Congress enacted section 157(b)(5) to expand the district court's venue-fixing powers with an eye to centralizing the adjudication of a bankruptcy case.").

As Congress recognized in enacting Section 157(b)(5), centralized adjudication allows "'all interests [to] be heard" and "the interests of all claimants [to] be harmonized.'" *Dow Corning*, 96 F.3d at 496-97 (quoting *Robins*, 788 F.2d at 1014). Moreover, "[c]entralization of claims increases the debtor's odds of developing a reasonable plan of reorganization which will 'work a rehabilitation of the debtor and at the same time assure fair and non-preferential resolution of the [asserted] claims.'" *Id.* at 496 (quoting *Robins*, 788 F.2d at 1011).

In this manner, Section 157(b)(5) provides the tools necessary to accomplish a "prompt, fair and complete resolution of all claims 'related to' bankruptcy proceedings." *Id.* at 497 (citing *Robins*, 788 F.2d at 1011).

D.   **That broad authority has been exercised effectively in mass tort bankruptcies such as this to centralize adjudication of related tort claims.**

This broad grant of jurisdictional authority has been used in prior mass tort bankruptcies to centralize adjudication of related tort claims. Mass tort cases present unique problems associated with voluminous dispersed litigation. Such cases involve thousands of claimants bringing cases in multiple state and federal jurisdictions against the debtor and related parties, all of which may impact the bankruptcy estate. In prior mass tort

44

bankruptcies such as *Dow Corning* and *A.H. Robins*, courts have utilized their broad powers under 28 U.S.C. § 1334(b) and § 157(b)(5) to resolve the unique problems associated with mass tort litigation. Similar procedures should be employed here.

> **1.    The need for centralized resolution of common, threshold issues concerning the validity of asserted claims warrants exercise of this Court's jurisdiction.**

The idea of using a consolidated bankruptcy proceeding to address a central issue in mass tort litigation is not new. Courts in prior mass tort bankruptcies have exercised jurisdiction under 28 U.S.C. § 1334(b) and § 157(b)(5) to avoid piecemeal adjudication of central, threshold issues that may seriously impact the bankruptcy estate. *See, e.g., Dow Corning*, 86 F.3d at 489 (breast implant tort claims); *Robins*, 788 F.2d at 1013-14 (Dalkon Shield IUD tort claims).

In *Dow Corning*, for example, the court transferred thousands of claims against non-debtor breast implant manufacturers to resolve the threshold scientific issue of whether silicone breast implants cause disease. The court concluded that it was essential to Dow Corning's Chapter 11 that related cases against other breast implant manufacturers be consolidated within the Chapter 11 proceedings to resolve this threshold issue and thereby "increase[] the debtor's odds of developing a reasonable plan of reorganization" and "'assure fair and non-preferential resolution of . . . claims.'" *Id.* at 496 (quoting *A.H. Robins*, 788 F.2d at 1011).

Utilizing Section 157(b)(5), the court sought to "establish a mechanism for resolving the claims at issue in the most fair and equitable manner possible." *Id.* at 487. In directing that all related claims should be litigated in a single forum, the court took into

45

consideration "the judicial system's interest in allocating its limited resources effectively and efficiently." *Id.* *See also Robins*, 788 F.2d at 1013-14 (observing that the "tremendous expense of trying these cases separately" was avoided where "all Dalkon shield claims and suits [were] centralized before a single forum where all interests [could] be harmonized").

Accordingly, the court transferred claims against non-debtor breast implant manufacturers to preside over a "threshold jury trial on the issue of whether silicone gel breast implants cause the diseases claimed." *Dow Corning*, 86 F.3d at 486. Through this mechanism, the court avoided piecemeal litigation in "separate forums nationwide" which could "seriously impact[]" the bankruptcy estate. *Id.* at 490.[72]

The automobile manufacturers request that the same procedures be implemented here. Federal-Mogul's liability for asbestos-related claims is an important part of these Chapter 11 proceedings.[73] Thus, as in *Dow Corning*, exercise of this Court's jurisdiction is necessary to centralize adjudication for a threshold determination concerning whether brakes and other automotive parts cause the diseases claimed.

---

[72] After the Sixth Circuit directed the district court to transfer the pending cases pursuant to Section 157(b)(5), the district court in subsequent proceedings indicated that it would abstain. The non-debtors filed a petition for mandamus, which the Sixth Circuit granted in part and denied in part, indicating that abstention was so "wholly inappropriate" with respect to certain non-debtors that mandamus was warranted. *In re Dow Corning Corp.*, 113 F.3d 565, 570 (6th Cir. 1997).

[73] Federal-Mogul Asbestos Primer, at www.federal-mogul.com. *See also* Debtor's Informational Brief 6 (Oct. 1, 2001) (D.I. 2) (observing that asbestos contained in "automotive friction products was resin-bonded and encapsulated chrysotile"); Jamie Butters, *Asbestos Endangers Supplier's Health Lawsuits Could Drive Federal-Mogul to Seek Bankruptcy Protection*, Detroit Free Press, July 20, 2001, at 1C ("As many as 90 percent of suits are from people with no evidence of asbestos-related illness . . . and if responsible companies are all forced into bankruptcy, they can't pay the rightful claims of those who are sick.") (quoting Federal-Mogul's CEO, Frank Macher).

46

2.   **Exercise of this Court's jurisdiction is necessary to preclude collateral litigation of liability that is "directly attributable to the Debtor."**

Consolidated proceedings before this Court are particularly critical given the derivative nature of the automobile manufacturers' liability. In prior mass tort bankruptcies, courts have exercised jurisdiction over related tort claims against non-debtors even where the non-debtors were mere co-defendants or joint tortfeasors. For example, in order to resolve the common, threshold scientific issues concerning whether breast implants cause disease, the court in *Dow Corning* transferred claims against non-debtor breast implant manufacturers that were merely co-defendants of the debtor.

Here, however, the relationship between the automobile manufacturers and the Debtor is much closer given that their liability is derivative in nature. The claims against the automobile manufacturers are based in part on the *same products* as claims asserted against the Debtor. Accordingly, the liability of the automobile manufacturers turns on the same threshold question governing the claims against the Debtor — whether the friction products manufactured by the Debtor are capable of causing disease — making the case for centralized adjudication before this Court even more compelling.

Numerous courts have concluded that the exercise of jurisdiction is warranted under such circumstances where the liability of the third party is "directly attributable to the debtor." *Robins*, 788 F.2d at 999, 1004. *See also McCartney v. Integra Nat'l Bank North*, 106 F.3d 506, 510 (3d Cir. 1997) (ordering stay whether there was "such identity between the debtor and the third-party defendant" and citing *Robins*); *In re Johns-Manville Corp.*, 26 B.R. 420, 426 (Bankr. S.D.N.Y. 1983) (suits against officers and employees were "in reality

47

derivative of identical claims brought against Manville"), *aff'd*, 40 B.R. 219 (S.D.N.Y. 1984); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 862 (6ᵗʰ Cir. 1992) (enjoining litigation against company officers that was "inextricably intertwined" with claims against the debtor).

For example, in *A.H. Robins*, the district court stayed litigation against certain non-debtors and entered an order transferring Dalkon Shield cases for centralized resolution within the bankruptcy proceedings. In upholding the district court's decision, the Fourth Circuit indicated that an important factor was the "identity between the debtor and the third-party defendant," which existed where the non-debtor's liability was "directly attributable to the debtor." *Robins*, 788 F.2d at 999, 1004.

Similarly, in *McCartney* the Third Circuit following *Robins* applied the automatic stay to actions against a non-debtor codefendant where there was "such identity between the debtor and the third-party defendant . . . that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.'" 106 F.3d at 510 (citing *Robins*, 788 F.2d at 999). As the court observed, failing to stay related actions against non-debtor co-defendants where the liability of the non-debtors was derivative of the debtor's liability would "defeat the purpose" of the bankruptcy system to "centralize all prebankruptcy civil claims against a debtor in the bankruptcy court." *Id.* at 511.

Here, as in *Robins* and *McCartney*, the liability of the automobile manufacturers for claims involving brakes and other automobile parts is "directly attributable to the Debtor." *See Robins*, 788 F.2d at 1004. The claims against the automobile manufacturers and thus claims for contribution and indemnification against the Debtor are dependent upon a determination that the products of the Debtor cause disease, making

48

consolidated adjudication before this Court to resolve this central question even more critical.

> **3.** **The very scope of the existing litigation – and the resulting prospect of numerous and significant claims for contribution and indemnification – threatens the successful reorganization of the Debtor and warrants exercise of this Court's jurisdiction.**

Finally, courts in prior mass tort bankruptcies have concluded that centralization of litigation under 28 U.S.C. § 157(b)(5) is necessary given the thousands of potential claims for contribution and indemnification that threaten the successful reorganization of the debtor. *See, e.g., Dow Corning*, 86 F.3d at 494. *Cf. Celotex*, 504 U.S. at 310 (exercise of jurisdiction warranted where there may be "a direct and substantial adverse effect on [the debtor's] ability to undergo a successful reorganization"); *McCartney*, 106 F.3d at 510 ("Courts have also extended the stay to nondebtor third parties where stay protection is essential to the debtor's efforts of reorganization.").

In *Dow Corning*, for example, the court concluded that, given the sheer magnitude and dispersed nature of the claims involved, transfer of related claims to the bankruptcy court under Section 157(b)(5) was essential. As the court observed, "[a] single possible claim for indemnification or contribution does not represent the same kind of threat to a debtor's reorganization plan as that posed by the thousands of potential indemnification claims at issue here." 86 F.3d at 494. In ruling that the related claims should be transferred, the court reasoned that the thousands of "[c]laims for indemnification and contribution, whether asserted against or by Dow Corning, obviously would affect the size of the estate and the length of time the bankruptcy proceedings will be pending, as well as Dow Corning's

49

ability to resolve its liabilities and proceed with reorganization." *Id.*

The situation is no different here. Federal-Mogul faces an ever-expanding exposure to claims for contribution and indemnification stemming from thousands of claims involving its products. As in *Dow Corning*, this liability threatens the Debtor's successful reorganization, and therefore should be addressed within these Chapter 11 proceedings.

## V. THIS COURT IS UNIQUELY SITUATED TO RESOLVE THIS CENTRAL ISSUE PROMPTLY.

Not only is this the only forum in which a complete and centralized resolution of the threshold scientific issue concerning liability for brakes and other automotive parts can occur, the Federal Rules provide a framework for accomplishing this task promptly.

### A. Threshold issues relating to the validity of asserted claims may be resolved through summary judgment proceedings.

At the outset of these proceedings, the Court may employ summary judgment proceedings to resolve threshold scientific issues concerning the validity of the asserted claims. *See, e.g., In re The Babcock & Wilcox Co.*, No. Civ. A 00-0558, 2000 WL 422372, at *4 (E.D. La. Apr. 17, 2000) (withdrawing the reference to determine validity of asserted asbestos claims); *In re A.H. Robins Co.*, 59 B.R. 99, 102 (Bankr. E.D. Va. 1986); *In re Dow Corning Corp.*, 215 B.R. 346, 360 (Bankr. E.D. Mich. 1997) ("Summary judgment will serve to weed out those claims which do not present a genuine issue of material fact, and for which the debtor is entitled to judgment as a matter of law.").

As part of the summary judgment proceedings, the Court may reject claims based on unreliable scientific evidence of disease and/or causation. *See Daubert*, 509 U.S. at 592-93; *Kumho Tire*, 526 U.S. at 147 ("gatekeeping" requirement applies "to all expert

50

testimony"); *In re Babcock & Wilcox*, 2000 WL 422372, at *4 (withdrawing the reference to determine "the validity of claims based on unreliable scientific evidence of disease and/or causation"); *In re Dow Corning Corp.*, 211 B.R. 545, 590 (Bankr. E.D. Mich. 1997) (application of *Daubert* in complex personal injury bankruptcy case).

The admissibility of such evidence is governed by applicable federal law. *See, e.g.*, Bankruptcy Rule 9017 (Federal Rules of Evidence (which have been amended to conform with *Daubert*) apply *in toto* to bankruptcy proceedings); *In re Canvas Specialty, Inc.*, 261 B.R. 12, 16 (Bankr. C.D. Cal. 2001) ("This new language [of Federal Rule of Evidence 702, amended December 1, 2000] governs the admissibility of the evidence here at issue.").

Plaintiffs must first come forward and demonstrate to the Court that their evidence is admissible given the stringent gatekeeping requirements outlined by the Supreme Court in *Daubert*. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068, 1071 (6th Cir. 1993) (affirming grant of summary judgment on *Daubert* grounds), *cert. denied*, 510 U.S. 1193 (1994); *Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999) (The "proponent of the expert testimony" must "prove by a preponderance of the evidence that the testimony is reliable.").

If the plaintiffs cannot meet their burden, or if the *Daubert*-tested evidence they produce is otherwise insufficient to allow a reasonable jury to find in their favor, the summary judgment motion must be granted, and the plaintiffs' disease claims must be disallowed as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

51

(1986) (standard under Rule 56); *see also In re Barto Tech. Servs., Inc.*, 181 B.R. 255, 256

(Bankr. W.D. Pa. 1995) ("The summary judgment standard of Fed. R. Civ. P. Rule 56(c)

applies in bankruptcy cases.").

Where, as here, the *Daubert* inquiry involves complicated scientific issues,

courts can appoint scientific experts pursuant to Federal Rule of Evidence 706, if necessary,

to aid the court in its "gatekeeping" role and ensure that only reliable evidence is admitted.

Indeed, the Supreme Court has encouraged the use of scientific experts in complex cases.

In *General Electric*, for example, the Court upheld the trial court's grant of summary

judgment based in part on the failure of plaintiffs' experts to provide sufficient evidence of

disease causation. In a concurring opinion, Justice Breyer recognized the difficulties that

complex cases impose on judges, and cited with favor the *New England Journal of

Medicine's* proposal for experts to assist courts in the gatekeeping process: "'a judge could

better fill this gatekeeper function if he or she had help from scientists. Judges should be

strongly be encouraged to make greater use of their inherent authority . . . to appoint

experts.'" 522 U.S. at 149-50. Such independent experts can – by virtue of their scientific

knowledge – play a critical role in advising the court and informing the decision-making

process.[74]

**B.**     **Any remaining issues relating to the validity of asserted claims may be
resolved through Rule 42 common issue trials.**

Should the Court deny any of the motions for summary judgment, the

---

[74] A panel of medical and scientific experts has been proposed in other Chapter 11 proceedings, including the *Babcock & Wilcox* and *W.R. Grace* bankruptcies, which involve thousands of claims for asbestos-related diseases.

remaining issues may be adjudicated using Rule 42 common issue trials.   Through

Bankruptcy Rule 7042, Federal Rule of Civil Procedure 42 specifically applies in adversary

proceedings under Chapter 11.   Rule 42(a) "confers upon a district court broad power,

whether at the request of a party or upon its own initiative, to consolidate cases for trial as

may facilitate the administration of justice."   *Ellerman Lines, Ltd. v. Atlantic & Gulf*

*Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir. 1964).

The "broad grant of authority" found in Rule 42 "has been applied liberally"

to avoid unnecessary costs or delay by resolving common issues in unified proceedings.   *See*

Fed. R. Civ. P. 42(a); *In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*, 549

F.2d 1006, 1013 (5th Cir. 1977).

Thus, courts in a variety of circumstances have consolidated claims under

Rule 42 to resolve common, threshold issues such as those at issue here.   *See, e.g., In re Dow*

*Corning*, 211 B.R. 545, 583 (Bankr. E.D. Mich. 1997) (consolidation of breast implant tort

claims for generic causation trial appropriate to resolve "a threshold issue which, depending

on its resolution, could obviate the need for further proceedings"); *In re Paoli R.R. Yard PCB*

*Litig.*, 113 F.3d 444, 452 & n.5 (3d Cir. 1997) (observing that "exercising its discretion under

Federal Rule of Civil Procedure 42(b)," district court ordered consolidated trial on "issues

of exposure, causation, medical monitoring, and property damages" which served "the

interests of judicial economy"); *In re Bendectin Litig.*, 857 F.2d 290, 317 (6th Cir.1988)

(affirming consolidated trial on causation and observing: "Many courts have ... permitted

separate issue trials when the issue first tried would be dispositive of the litigation. . . . [A]ll

claims depended upon the answer to a single question:  Does Bendectin, taken in therapeutic

53

doses cause birth defects?"), *cert. denied*, 488 U.S. 1006 (1989); *In re Beverly Hills Supper Club Fire Litig.*, 695 F.2d 207, 217 (6th Cir.) (affirming consolidation under Rule 42 for trial on causation), *cert. denied*, 461 U.S. 929 (1982).

**C.     These procedures can be implemented promptly once the Court has asserted jurisdiction.**

In order to avoid unnecessary delay and burden, after transferring the related claims the Court may immediately implement these procedures to resolve the threshold scientific issue that is central to these proceedings. Should the Court deem it necessary, it may provide for a brief period of discovery, followed by summary judgment proceedings in which the automobile manufacturers will ask the Court to apply the established law to test the scientific evidence concerning brake exposure claims. In order to aid it in resolving the scientific issue at the heart of this case, the Court may appoint a panel of experts pursuant to Fed. R. Evid. 706. The Court may then conduct hearings and related *Daubert* proceedings before ruling on the automobile manufacturers' summary judgment motions. If necessary, any remaining claims may be consolidated for trial after summary judgment proceedings are completed.

## CONCLUSION

As the foregoing overview has shown, centralized resolution of the threshold scientific issue concerning claims related to brakes and other automotive parts at the outset of these Chapter 11 proceedings is essential to the successful reorganization of the Debtor. Only by applying the established science to the claims brought against the Debtor along with related claims against the automobile manufacturers, can a prompt, fair and complete

resolution of all claims related to these proceedings be ensured.  The automobile manufacturers respectfully request that the Court initiate such procedures by exercising jurisdiction under 28 U.S.C. § 1334(b) and permitting transfer of claims related to these proceedings pursuant to 28 U.S.C. § 157(b) for the purpose of adjudicating the threshold scientific issue concerning the validity of claims relating to brakes and other automotive parts in a single forum.

Dated: November 20, 2001                      Respectfully submitted,

_____

KLETT, ROONEY, LIEBER & SCHORLING
Teresa K.D. Currier (Del. Id. No. 3080)
Daniel Rath (Del. Id. No. 3022)
1000 West Street
Suite 1410
P.O. Box 1397
Wilmington, Delaware
(302) 552-4200
(302) 552-4295 (fax)

- and -

KIRKLAND & ELLIS
David M. Bernick
John Donley
Douglas G. Smith
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000
(312) 861-2200 (fax)

Attorneys for DaimlerChrysler Corp., Ford
Motor Company, and General Motors Corp.

55

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ARMSTRONG WORLD | : | Chapter 11 |
| INDUSTRIES, INC., et al., | : | Case Nos. 00-4471, 00-4469, |
| | : | 00-4470 |
| Debtors. | : | |
| IN RE: W.R. GRACE & CO., | : | Chapter 11 |
| et al., | : | Case Nos. 01-1139 through |
| | : | 0-1200 |
| Debtors. | : | |
| IN RE: FEDERAL-MOGUL | : | Chapter 11 |
| GLOBAL, INC., T&N | : | Case Nos. 01-10578, et al.[1] |
| LIMITED, et al., | : | |
| | : | |
| Debtors. | : | |
| IN RE: USG CORPORATION, | : | Chapter 11 |
| a Delaware Corporation, | : | Case Nos. 01-2094 through |
| et al., | : | 01-2104 |
| | : | |
| Debtors. | : | |
| IN RE: OWENS CORNING, | : | Chapter 11 |
| et al., | : | Case Nos. 00-3837 through |
| | : | 00-3854 |
| Debtors. | : | |

## FIRST CASE MANAGEMENT ORDER

The Court having held a case management conference in each
of the above-captioned Chapter 11 cases; and counsel having
requested certain case management relief including clarification
and relaxation of deadlines in certain scheduling provisions made
in those conferences and in the prior Orders of the Court; and
good cause appearing

---

[1] See attached list.

782

It is on this 21st day of December, 2001

ORDERED that this Order governs each of the above-captioned administratively consolidated Chapter 11 proceedings and that, except as provided to the contrary in this Order, reference to "debtors" in this Order is deemed to refer to every debtor in each of the proceedings, and it is further

ORDERED that the terms Transfer Motion, Friction Products, Friction Products Claims, and Transferred Plaintiffs shall have the same meaning as defined in previous Orders of this Court, and it is further

ORDERED that the debtors shall preserve all documents and other records containing information potentially relevant to asbestos-related claims against them, provided however that it shall not be a violation of this Order if a debtor shall erase computerized data pursuant to an established electronic data erasure policy and the debtor reasonably lacks knowledge that such electronic data is relevant to asbestos-related claims against it and provided the debtor preserves any printouts of erased electronic data, and it is further

ORDERED the debtors shall establish a written policy for its employees to implement the debtors' documents preservation obligations pursuant to this Order and deliver a hard copy of that policy to each of their employees within twenty-one (21) days of the date of this Order, and it is further

2

ORDERED that the written document retention policy shall be preserved and made available for inspection or filing with the Court as may in future be required, and it is further

ORDERED that within twenty-one (21) days of the date of this Order, counsel for each of the lead debtors in the above-captioned Chapter 11 proceedings and each of the official committees shall send to this Court a letter, ex parte, of five single-spaced pages, setting forth their opinion of what substantive, merits-based issues must be resolved with respect to asbestos-related claims against the debtors and whether they anticipate resolution of those issues shall be by consent of the interested parties or by the Court, and it is further

ORDERED that the deadlines for Transferred Plaintiffs to file briefs in opposition to the several Transfer Motions as set forth in the Orders of this Court dated December 18, 2001 and December 19, 2001, is hereby extended to January 7, 2002, and it is further

ORDERED that the time for each Transferred Plaintiff to file a motion for remand is hereby tolled until this Court's resolution of the several Transfer Motions, and it is further

ORDERED that all parties are on notice that the Transferred Plaintiffs may, in the course of briefing their opposition to the Transfer Motions, raise arguments directed to the subject matter jurisdiction of this Court and/or the propriety of remand to the

3

Case 1:01-cv-00197   Document 10   Filed in TXSD on 01/14/2002   Page 132 of 142

several state courts in which the Friction Product Claims were
originally pending and/or whether this Court should abstain from
hearing these claims and this Court may, on consideration of
those arguments, make such disposition of the Friction Product
claims as shall seem appropriate in law or equity, including
without limitation, vacation of the Provisional Transfer Order,
abstention or remand to the state courts, and it is further

ORDERED that the Court's case management plan and the
commentary as set forth before counsel at the case management
conference on December 20, 2001, is hereby incorporated by
reference.


/s/_____
ALFRED M. WOLIN, U.S.D.J.


4

FROM KLETT ROONEY LIEBER & SCHC...NG      (SAT) 12. 22' 01 16:.   .T. 16:54/NO. 4860060742 P  6

## IN RE: FEDERAL-MOGUL GLOBAL, INC.
### Case Numbers

| | | | |
|---|---|---|---|
| 01-10578 | 01-10643 | 01-10700 | 01-10750 |
| 01-10580 | 01-10644 | 01-10701 | 01-10751 |
| 01-10582 | 01-10646 | 01-10702 | 01-10752 |
| 01-10585 | 01-10647 | 01-10703 | 01-10753 |
| 01-10586 | 01-10649 | 01-10704 | 01-10754 |
| 01-10587 | 01-10650 | 01-20705 | 01-10755 |
| 01-10589 | 01-10651 | 01-10706 | 01-10756 |
| 01-10591 | 01-10652 | 01-10707 | 01-10757 |
| 01-10593 | 01-10653 | 01-10708 | 01-10758 |
| 01-10594 | 01-10654 | 01-10710 | 01-10759 |
| 01-10596 | 01-10655 | 01-10711 | 01-10760 |
| 01-10598 | 01-10656 | 01-10712 | 01-10761 |
| 01-10599 | 01-10657 | 01-10713 | 01-10762 |
| 01-10600 | 01-10658 | 01-10714 | 01-10763 |
| 01-10601 | 01-10659 | 01-10715 | 01-10764 |
| 01-10603 | 01-10660 | 01-10716 | 01-10765 |
| 01-10604 | 01-10661 | 01-10717 | 01-10766 |
| 01-10605 | 01-10662 | 01-10718 | 01-10767 |
| 01-10606 | 01-10664 | 01-10719 | 01-10768 |
| 01-10608 | 01-10665 | 01-10721 | 01-10769 |
| 01-10610 | 01-10666 | 01-10722 | 01-10770 |
| 01-10611 | 01-10668 | 01-10723 | 01-10771 |
| 01-10613 | 01-10669 | 01-01724 | 01-10772 |
| 01-10614 | 01-10672 | 01-10726 | 01-10773 |
| 01-10615 | 01-10673 | 01-10727 | 01-10774 |
| 01-10617 | 01-10675 | 01-10728 | |
| 01-10618 | 01-10682 | 01-10729 | |
| 01-10619 | 01-10683 | 01-10730 | |
| 01-10620 | 01-10684 | 01-10731 | |
| 01-10621 | 01-10685 | 01-10732 | |
| 01-10622 | 01-10686 | 01-10733 | |
| 01-10623 | 01-10687 | 01-10734 | |
| 01-10625 | 01-10688 | 01-10736 | |
| 01-10626 | 01-10689 | 01-10737 | |
| 01-10627 | 01-10690 | 01-10739 | |
| 01-10629 | 01-10691 | 01-10741 | |
| 01-10630 | 01-10692 | 01-10742 | |
| 01-10632 | 01-10693 | 01-10743 | |
| 01-10633 | 01-10694 | 01-10744 | |
| 01-10634 | 01-10695 | 01-10745 | |

Case 1:01-cv-00197   Document 10   Filed in TXSD on 01/14/2002   Page 134 of 142

| | | |
|---|---|---|
| 01-10637 | 01-10696 | 01-10746 |
| 01-10638 | 01-10697 | 01-10747 |
| 01-10640 | 01-10698 | 01-10748 |
| 01-10641 | 01-10699 | 01-10749 |

01/08/2002 12:34 FAX 713 525 6.  BROWN McCARROLL  ☑002

01/07/02 MON 12:19 FAX 312 86:  00  KIRKLAND & ELLIS  ☑002

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

CHAMBERS OF
**ALFRED M. WOLIN**
JUDGE

MARTIN LUTHER KING JR. FEDERAL BUILDING
50 WALNUT ST., ROOM 4069
P.O. BOX 999
NEWARK, NJ 07101-0999
(973)645-2580

January 3, 2002

**LETTER OPINION - NOT FOR PUBLICATION**
**ORIGINAL FILED WITH THE CLERK OF THE COURT**

IN RE: FEDERAL-MOGUL GLOBAL, INC., T&N LIMITED, et al.
Case Nos. 01-10578, et al.[1]

TO ALL COUNSEL:

This matter is opened before the Court upon its own motion.
Familiarity with the motions to transfer and to provisionally
transfer so-called "Friction Products Claims" to this Court is
assumed.  It has come to the attention of the Court through
examination of certain papers submitted in support of motions to
transfer and provisionally transfer by additional Friction
Products Defendants and through informal communications of
counsel that the Court's prior Orders have been interpreted
inconsistently with either their terms, the Court's intent and/or
the law.

First, only claims against the moving Friction Products
Defendants were transferred to this Court by the Provisional

---

[1]See attached list.

Transfer Orders.  The bankruptcy removal statute only permits the removal to a district court of a "claim or cause of action" within the federal bankruptcy jurisdiction.  28 U.S.C. § 1452(a). This does not authorize the wholesale removal of an entire case regardless of the existence of non-bankruptcy "claims or causes of action" or parties with no connection to a debtor.  In taking this position, the Court speaks only for itself, of course, and does not purport to bind any transferor district court in which the balance of a case may still be pending following an improvident, overbroad removal.  Nor should the Court be understood to endorse the proposition that federal bankruptcy jurisdiction is indeed correctly asserted with respect to the claims actually subject to the Provisional Transfer Orders.

Second, the only claims transferred to this Court are those that had already been removed to federal court on the date the relevant Provisional Transfer Order was entered.  The Provisional Transfer Orders were entered by the Court in reliance on the representation that the movant Friction Products Defendants had already removed or were in the process of removing the claims against them.  Regardless of whether section 157 of Title 28 empowers this Court to transfer claims to itself directly out of the state courts, and regardless of the retrospectively perceived desirability of interpreting the Provisional Transfer Order to transfer claims from state court, that was not the factual

2

context within which the Court understood its ruling would operate. Therefore, the Court's Orders do not effect the transfer of Friction Products Claims not already pending within the federal court system on the date the applicable Provisional Transfer Order was entered. Any claim removed subsequent to the date of the relevant Provisional Transfer Order is still pending in the district to which it was originally removed.

On the other hand, it makes no sense to leave these subsequently removed claims in procedural limbo due to an accident of timing. The Court will order that any Friction Product Claim now removed to federal court that would have been subject to one of the extant Provisional Transfer Orders had that removal been timely will also be provisionally transferred to this Court. The newly transferred plaintiffs may feel aggrieved due to lack of time to oppose the plenary hearing on the transfer motions, particularly in light of the peremptory briefing schedule now in effect. To obviate this problem, the Court will adjourn _sine die_ any briefing of plenary transfer of these late-removed claims.

For the foregoing reasons, the Court is satisfied that an Order clarifying its previous Provisional Transfer Orders and governing any future Provisional Transfer Orders will advance the orderly conduct of these proceedings.

3

An appropriate Order is attached.

_/s/_____
ALFRED M. WOLIN, U.S.D.J.

4

BROWN McCARROLL
KIRKLAND & ELLIS

@006
@006

## IN RE: FEDERAL-MOGUL GLOBAL, INC.
### Case Numbers

| | | | |
|---|---|---|---|
| 01-10578 | 01-10643 | 01-10700 | 01-10750 |
| 01-10580 | 01-10644 | 01-10701 | 01-10751 |
| 01-10582 | 01-10646 | 01-10702 | 01-10752 |
| 01-10585 | 01-10647 | 01-10703 | 01-10753 |
| 01-10586 | 01-10649 | 01-10704 | 01-10754 |
| 01-10587 | 01-10650 | 01-10705 | 01-10755 |
| 01-10589 | 01-10651 | 01-10706 | 01-10756 |
| 01-10591 | 01-10652 | 01-10707 | 01-10757 |
| 01-10593 | 01-10653 | 01-10708 | 01-10758 |
| 01-10594 | 01-10654 | 01-10710 | 01-10759 |
| 01-10596 | 01-10655 | 01-10711 | 01-10760 |
| 01-10598 | 01-20656 | 01-10712 | 01-10761 |
| 01-10599 | 01-10657 | 01-10713 | 01-10762 |
| 01-10600 | 01-10658 | 01-10714 | 01-10763 |
| 01-10601 | 01-10659 | 01-10715 | 01-10764 |
| 01-10603 | 01-10660 | 01-10716 | 01-10765 |
| 01-10604 | 01-10661 | 01-10717 | 01-10766 |
| 01-10605 | 01-10662 | 01-10718 | 01-10767 |
| 01-10606 | 01-10664 | 01-10719 | 01-10768 |
| 01-10608 | 01-10665 | 01-10721 | 01-10769 |
| 01-10610 | 01-10666 | 01-10722 | 01-10770 |
| 01-10611 | 01-10668 | 01-10723 | 01-10771 |
| 01-10613 | 01-10669 | 01-01724 | 01-10772 |
| 01-10614 | 01-10672 | 01-10726 | 01-10773 |
| 01-10615 | 01-10673 | 01-10727 | 01-10774 |
| 01-10617 | 01-10675 | 01-10728 | |
| 01-10618 | 01-10682 | 01-10729 | |
| 01-10619 | 01-10683 | 01-10730 | |
| 01-10620 | 01-10684 | 01-10731 | |
| 01-10621 | 01-10685 | 01-10732 | |
| 01-10622 | 01-10686 | 01-10733 | |
| 01-10623 | 01-10687 | 01-10734 | |
| 01-10625 | 01-10688 | 01-10736 | |
| 01-10626 | 01-10689 | 01-10737 | |
| 01-10627 | 01-10690 | 01-10739 | |
| 01-10629 | 01-10691 | 01-10741 | |
| 01-10630 | 01-10692 | 01-10742 | |
| 01-10632 | 01-10693 | 01-10743 | |
| 01-10633 | 01-10694 | 01-10744 | |
| 01-10634 | 01-10695 | 01-10745 | |
| 01-10637 | 01-10696 | 01-10746 | |
| 01-10638 | 01-10697 | 01-10747 | |
| 01-10640 | 01-10698 | 01-10748 | |
| 01-10641 | 01-10699 | 01-10749 | |

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE: FEDERAL-MOGUL       :      Chapter 11
GLOBAL, INC., T&N          :      Case Nos. 01-10578, et al.[1]
LIMITED, et al.,           :
                           :
          Debtors.         :
------------------------   :

**ORDER OF CLARIFICATION RE:**
**PROVISIONAL TRANSFER OF FRICTION PRODUCTS CLAIMS**

This matter having been opened upon the Court's own motion;
and the Court having withdrawn the reference with respect to
several motions to transfer and to provisionally transfer (the
"Transfer Motions") claims pending in the several United States
District Courts against defendant manufacturers of so-called
"friction products" (respectively the "Friction Products Claims"
and the "Friction Products Defendants") previously removed by the
Friction Products Defendants from the several state courts; and
for the reasons set forth in the letter opinion of the Court
filed herewith; and for good cause shown

It is this    day of January, 2002

ORDERED that this Order governs all Provisional Transfer
Orders whether already issued by the Court or that may be issued
in the future and those Orders shall not be construed in a manner
inconsistent with the terms of this Order, and it is further

ORDERED that the Provisional Transfer Orders are limited in

---

[1]See attached list.

effect to only those claims against the Friction Products
Defendant(s) identified in the respective moving papers and
Provisional Transfer Orders and that no other claims and no other
parties are affected by the Provisional Transfer Orders, and it
is further

ORDERED that any Friction Product Claim that would have been
subject to a Provisional Transfer Order previously issued by this
Court but for the fact that such Friction Product Claim had not
yet been removed on the date the Provisional Transfer Order was
issued is hereby provisionally transferred to this Court subject
to further Order of this Court, and it is further

ORDERED that counsel identified in the Court's previous
Provisional Transfer Orders shall provide to claimants
provisionally transferred by this Order such notice and waivers
of further service as was specified in the relevant previous
Orders, and it is further

ORDERED that claimants provisionally transferred by this
Order shall not be subject to the briefing schedule with respect
to the Transfer Motion, and shall file no papers in opposition to
the Transfer Motion except as provided by further Order of this
Court.

                          /s/_____
                          ALFRED M. WOLIN, U.S.D.J.

                                  2

01-10637      01-10696      01-10746
01-10638      01-10697      01-10747
01-10640      01-10698      01-10748
01-10641      01-10699      01-10749